```
 1              IN THE UNITED STATES DISTRICT COURT FOR THE

 2                            DISTRICT OF HAWAII

 3    UNITED STATES OF AMERICA,      )    CRIMINAL NO. 02-00411ACK
                                     )
 4              Plaintiff,           )    Honolulu, Hawaii
                                     )    May 15, 2003
 5         vs.                       )    9:09 a.m.
                                     )
 6    (01) RICK K. VO,               )    FURTHER JURY TRIAL
                                     )    VOLUME 2
 7              Defendant.           )
      _____)

 8
                          TRANSCRIPT OF JURY TRIAL
 9               BEFORE THE HONORABLE ALAN C. KAY,
                   SENIOR UNITED STATES DISTRICT JUDGE
10
      APPEARANCES:
11
      For the Government:       THOMAS C. MUEHLECK, Esq.
12                              Assistant U.S. Attorney
                                District of Hawaii
13                              Room 6100 - PJKK Federal Bldg.
                                300 Ala Moana Blvd.
14                              Honolulu, Hawaii 96813

15

16    For the Defendant:        MICHAEL A. WEIGHT, Esq.
                                Assistant Federal Public Defender
17                              Room 7104 - PJKK Federal Bldg.
                                300 Ala Moana Blvd.
18                              Honolulu, Hawaii 96813

19

20    Official Court Reporter:  Cynthia Tando Fazio, RMR, CRR
                                United States District Court
21                              P.O. Box 50131
                                Honolulu, Hawaii  96850
22

23

24
      Proceedings recorded by machine shorthand, transcript produced
25    with computer-aided transcription (CAT).
```

Exhibit A.1

1                    I N D E X

2    GOVERNMENT'S WITNESSES:                         Page No.

3    DANIEL KENT BRADY
         DIRECT EXAMINATION BY MR. MUEHLECK.........  29
4
     ARI KARABINAS
5        DIRECT EXAMINATION BY MR. MUEHLECK.........  45
         VOIR DIRE EXAMINATION BY MR. WEIGHT.........  53
6        RESUMED DIRECT EXAMINATION BY MR. MUEHLECK..  54
         VOIR DIRE EXAMINATION BY MR. WEIGHT.........  59
7        RESUMED DIRECT EXAMINATION BY MR. MUEHLECK..  61
         VOIR DIRE EXAMINATION BY MR. WEIGHT.........  61
8        RESUMED DIRECT EXAMINATION BY MR. MUEHLECK..  62
         CROSS-EXAMINATION BY MR. WEIGHT.............  73
9        REDIRECT EXAMINATION BY MR. MUEHLECK........  92

10   TOM HUGHES
         DIRECT EXAMINATION BY MR. MUEHLECK.........  96
11
     STEVE VO
12       DIRECT EXAMINATION BY MR. MUEHLECK......... 102

13   GARY GOLDBERG
         DIRECT EXAMINATION BY MR. MUEHLECK......... 109
14       VOIR DIRE EXAMINATION BY MR. WEIGHT......... 111
         RESUMED DIRECT EXAMINATION BY MR. MUEHLECK.. 118
15       VOIR DIRE EXAMINATION BY MR. WEIGHT......... 132
         RESUMED DIRECT EXAMINATION BY MR. MUEHLECK.. 133
16       CROSS-EXAMINATION BY MR. WEIGHT............. 135
         REDIRECT EXAMINATION BY MR. MUEHLECK........ 142
17
     NICOLE PAYNE
18       DIRECT EXAMINATION BY MR. MUEHLECK......... 142
         VOIR DIRE EXAMINATION BY MR. WEIGHT......... 155
19       CROSS-EXAMINATION BY MR. WEIGHT............. 160

20   VICTOR ALFEROS
         DIRECT EXAMINATION BY MR. MUEHLECK......... 161
21
     DAVID DOOROS
22       DIRECT EXAMINATION BY MR. MUEHLECK......... 173
         CROSS-EXAMINATION BY MR. WEIGHT............. 182
23
     MICHAEL GILLESPIE
24       DIRECT EXAMINATION BY MR. MUEHLECK......... 188

25   BRENDA MARIA VO
         DIRECT EXAMINATION BY MR. MUEHLECK......... 204

```
 1                          EXHIBITS

 2

 3    GOVERNMENT'S:

 4

 5    1 was  received in evidence...................  34

 6    2 was  received in evidence...................  35

 7    3 was  received in evidence...................  54

 8    4 was  received in evidence................... 107

 9    5 was  received in evidence...................  67

10    6 was  received in evidence................... 127

11    9 was  received in evidence...................  60

12    10 was received in evidence...................  62

13    16 was received in evidence................... 133

14    17 was received in evidence................... 159

15    20 was received in evidence................... 134

16    19 & 21 were received in evidence............. 172

17

18

19

20

21

22

23

24

25
```

1    THURSDAY, MAY 15, 2003                    9:09 A.M.

2          THE CLERK:  Criminal Number 02-00411ACK, United

3    States of America versus Defendant One, Rick Vo.

4          MR. MUEHLECK:  Good morning, Your Honor.  Tom

5    Muehleck for the United States.  With me is DEA Agent Richard

6    Jones.

7          THE COURT:  Okay.

8          MR. WEIGHT:  Morning, Your Honor.  Michael Weight for

9    the defense.  Mr. Vo is here and we're ready to go.

10          THE COURT:  Good morning.

11          Good morning, ladies and gentlemen of the jury.

12          Government will now make its opening statement.

13          Mr. Muehleck.

14          MR. MUEHLECK:  Your Honor, may I move the podium?

15          THE COURT:  You may.

16          MR. MUEHLECK:  Thank you.

17          Ladies and gentlemen of the jury, good morning.

18          My name is Tom Muehleck.  I introduced myself just

19    briefly yesterday.  I'm with the United States Attorney's

20    Office.  I represent the United States.

21          With me at counsel's table is Drug Enforcement

22    Administration Agent Richard Jones, and under the rules of

23    court, he's allowed to sit at counsel table with me.  He's a

24    case agent.  You'll see Agent Jones leave the courtroom at

25    times.  He'll help me present the case, he'll help me with the

1    exhibits, you'll see him go out to get the next witness,

2    perhaps make a phone call out there.  It was the Drug

3    Enforcement Administration that did the investigation in this

4    case and that's why he's here.

5           This is one of the few times that I get to speak with

6    you directly.  Most of the times in court an attorney will be

7    questioning a witness or addressing the court, His Honor,

8    arguing over things, but not speaking directly to the jury.

9    This is one of a couple of times I get to do that and it's our

10   chance to pretty much tell you a little bit about the case.

11          Now, you already heard Judge Kay instruct you a

12   little bit about the case, that it's a drug case, and that's

13   correct.  The judge has also told you that the charges in this

14   case were brought by an indictment by the United States

15   through a grand jury, and that's merely an accusation of a

16   crime that must be proven beyond a reasonable doubt.  And

17   that's certainly correct, that's the constitutional law of the

18   land.

19          We submit to you -- and I like to tell you a little

20   bit about where we're going or what this -- this case is.  The

21   indictment charges -- the accusation is that the defendant

22   Rick Vo here committed two crimes.  And there are two types of

23   crimes charged.  And the judge will provide you the

24   instructions on the law.  Not myself or Mr. Weight.  You look

25   to the court for the rule of law, what the law is.  And I

1    don't pretend to tell you that.  He's going to tell you, the

2    judge will tell you detailed instructions on what the law is

3    and he'll tell you that the defendant is charged with two

4    crimes, conspiracy, and aiding and abetting, and he'll provide

5    detailed instructions.  But basically it's, conspiracy is an

6    agreement between people to break the law, to violate the law.

7            And in this case the agreement that they agreed to

8    break -- the law they agreed to break was the law that

9    prohibits the possession with intent to distribute of

10   methamphetamine and the law that prohibits the distribution of

11   methamphetamine.  So, it's a conspiracy to possess with intent

12   to distribute and to distribute crystal meth.  That's the one

13   type of crime.  That's Count 1.  And we charged the crimes

14   that -- the crimes are charged as counts.  Count 1 is

15   conspiracy to possess with intent to distribute and to

16   distribute crystal meth.

17           The second type of crime charged in the indictment is

18   aiding and abetting.  That is, the defendant is charged in

19   Count 2, second crime, with aiding and abetting another person

20   in the possession with intent to distribute methamphetamine.

21   And the court will explain that in detail to what -- what

22   aiding and abetting is, and he'll tell you that it's aiding --

23   it's someone who aids or counsels, commands, induces or

24   procures another person to commit a crime.  Aiding and

25   abetting.  It's -- we call it conspiracy.  We call it aiding

1    and abetting.

2          And the counts charged the defendant Rick Vo with

3    conspiring with his wife, Brenda Marie Cooper Vo, and others

4    to possess with intent to distribute and to distribute

5    methamphetamine.  That's Count 1.  And Count 2, the defendant

6    Rick Vo is charged with aiding and abetting Brenda Marie

7    Cooper Vo, his wife, in the possession with intent to

8    distribute methamphetamine.

9          The United States believes that the evidence during

10   the trial will show that last fall, on the 3rd of October,

11   that at Mail Boxes Etc., MBE, one of these mail services

12   stores over on Kapahulu Avenue, a young lady came in and she

13   was waited on by a clerk, young fellow by the name of Michael

14   Gillespie, works there in the afternoon shift, he's a UH

15   student and he works there.  And Michael Gillespie --

16   Mr. Gillespie waited on this young lady who came in and asked

17   to mail a package.  This -- this lady came in with a sealed

18   cardboard package and asked to have it shipped overnight

19   express, express delivery the next day in Playa del Rey,

20   California, at an address 8009 Hulbert Avenue in Playa del

21   Rey, California.

22          And Mr. Gillespie will tell you that Mail Boxes Etc.

23   employs Fed Ex, Federal Express -- that's the company that

24   services Honolulu -- to get it to California the next day.  If

25   you want it overnight express, you have to go through -- Mail

1    Boxes Etc. has to use Federal Express, and they pick up at

2    2:00 p.m. every afternoon.  And that this lady came in just

3    before the 2:00 p.m. pickup by Federal Express, had the sealed

4    cardboard box, identified herself as Linda Chang, the box was

5    already sealed and she had an address, a delivery address of

6    8009 Hulbert Avenue in Playa del Rey, and it was addressed to

7    a Gabriella Vo.

8         And the charge for that delivery service and going

9    through Mail Boxes Etc. was about 65 -- $65.  And she told --

10   Mr. Gillespie will tell you that when you go to ship something

11   through Mail Boxes Etc. with one of these courier services,

12   either UPS or Fed Ex, that you have to declare what the

13   contents of the box are.  And that she told -- this lady told

14   Mr. Gillespie that it was hair products.  And she paid cash,

15   and she was alone, and she left the store.  And the package

16   was taken, and for process they put a tracking code number on

17   it and a label on it.

18        And Mr. Gillespie will also tell you that Mail Boxes

19   Etc. has a policy that -- and they also declare that policy in

20   signs in the store, notice in the store, that they will not

21   accept -- parcels are subject to inspection and they will not

22   accept hazardous, flammable or contraband to send it through

23   the -- through their company and through a common carrier like

24   Fed Ex, because they're concerned with the liability, of

25   course.

1          And that after the package had been accepted, it was

2    opened.  And they were concerned -- Mr. Gillespie and the

3    manager at the store, gentleman by the name of Roger Chun,

4    they were concerned that it might have aerosol cans in the

5    box, which, of course, if you fly it overnight in an airplane

6    it could explode.  We all know traveling, what concerns there

7    are when you do that sort of thing.  They open the box and the

8    box had -- the contents were newspaper, packaging material

9    around it, and they examined it and felt down in the box, and

10   it was cylindrical objects, crystalline -- crystals and a

11   powder, and in their opinion it was not hair products.

12          They notified the FBI.  They called the FBI, and the

13   person they spoke to was a Dan Brady, Special Agent Dan Brady,

14   and they told him of their concerns.  Agent Brady will tell

15   you -- he'll testify and he'll tell you that he was notified

16   of this on the 3rd of October.  And that in order to get a

17   search warrant, they tried to get a narcotics dog from the

18   Honolulu Police Department to sniff the box, to see if the dog

19   will alert that there may be drugs or explosives or something

20   in the box.  And Agent Brady will tell you he couldn't get a

21   dog that afternoon.  There weren't any dogs available that

22   afternoon.  And that the decision was made to let the box go

23   to Fed Ex.

24          Agent Brady contacted Fed Ex and a decision was made

25   at Fed Ex, because the FBI had a concern or suspicious

1    package, that they would not send it out.  Fed Ex would not
2    mail that package out that day but keep it for the next day
3    and for the 4th, a delivery or putting it in transit on the
4    4th, rather than sending it out on the 3rd.  Agent Brady will
5    tell you the next day, October 4th, I believe it was a Friday,
6    that he did get a dog, canine from HPD, and the dog did not
7    alert on the box, but they did get a search warrant from a
8    U.S. magistrate judge in this court to open the box.
9         And he opened the box and what he found packed in
10   amongst the newspaper and some gallon bags was about 15 bags
11   of crystal methamphetamine, which is a drug.  He tested it
12   with a field kit.  They have a chemical kit that they --
13   commercially prepared that they break open and put the dye in
14   a small portion, a sample of the drug, and if it turns a
15   certain color, it tells them generally what the type of drug
16   it is.  And he'll tell you that test kit was positive for
17   amphetamine or methamphetamine.
18        And at that point they decided that they would bring
19   the Drug Enforcement Administration in.  They did some
20   checking with the address on the -- on the package for a
21   Gabriella Vo at 8009 Hulbert, and it came back to the
22   defendant and Brenda Cooper Vo as being residents at that
23   particular address in Playa del Rey.  And that then they
24   decided they would bring in the Drug Enforcement
25   Administration.  They called Agent Jones' office and requested

1   assistance for the possibility of making what they call a

2   controlled delivery in California.  That is, to have the

3   agents or police officers pose as a Federal Express delivery

4   man in the uniform, with a truck, driving up and delivering a

5   portion of the drugs and seeing what happens to the bag or the

6   package up there.

7           And they did that.  The package was taken up to

8   California.  It was met up there by a team of agents.  There

9   was a DEA agent up there by the name of Ari Karabinas.  He is

10  with the Los Angeles International Airport DEA office.  And

11  Agent Karabinas and a couple of other agents and task force

12  officers -- that is, local officers assigned with DEA to a

13  task force working in a DEA office carrying federal

14  credentials and federal authority assisting the Drug

15  Enforcement Administration, that office -- those task force

16  officers, Agent Karabinas and DEA officers, and I believe one

17  or two L.A.P.D. officers, the evidence will show, did a search

18  warrant.

19          What happened was they had a DEA agent by the name of

20  Tom Hughes put on a Fed Ex employee's uniform and borrow a Fed

21  Ex company truck and take the Fed Ex company clipboard and go

22  to 8009 Hulbert Avenue in Playa del Rey and knock on the door.

23  And a young lady came to the door.  It turned out to be the

24  defendant's 13-year-old, I believe, daughter by the name of

25  Gabriella Vo, and she signed for the package, accepted the

1     package.

2             Inside the package was roughly 500 grams of crystal

3     methamphetamine.  And DEA had placed in the package a

4     transmitter.  Agent Karabinas will tell you that the purpose

5     of that transmitter is to alert them to when the package is

6     opened.  When the package is open, the transmitter goes off,

7     sends an electronic message to DEA, and then they will execute

8     the search warrant.

9             They got a search warrant in California, Agent

10    Karabinas.  They waited outside.  The package -- the

11    transmitter went off after Agent Hughes, posing as the DEA

12    agent, left.  The package -- the transmitter went off, they

13    entered the door, knocked down the door, a number of agents.

14    Inside was Gabriella Vo and the defendant's brother, a

15    gentleman by the name of Khanh Vo.  No one else was in the

16    house.  The people in the house were cooperative.

17            They executed the search warrant looking in the house

18    as they were authorized to do, and they found two seal-a-meal

19    devices for sealing meals in plastic packaging.  They found

20    $37,700 in a safe in the master bedroom.  They found five

21    Rolex watches.  There were a number of vehicles at the

22    residence, including two Mercedes Benz automobiles, a '94 and

23    a '95, a four-wheel drive truck.  They seized a number of

24    articles, including the seal-a-meal -- oh, they also found

25    packaging material with the seal-a-meal and they sent the

1    seal-a-meal and -- to the lab for examination.

2           And they found on one of the seal-a-meals -- there

3    were two of them.  They found on one of the seal-a-meals, the

4    laboratory found that there was methamphetamine residue on the

5    one seal-a-meal.  That was found in a downstairs office,

6    slash, bedroom.  It didn't -- they will tell you it didn't

7    appear someone was living there, sort after guest bedroom,

8    slash, office, computers in the -- in the -- this area.

9    Clothing that was packaged up in a -- boxes in the area.

10           Agent Karabinas will also tell you that he examined

11    the seal-a-meal plastic that was found with the seal-a-meals,

12    the plastic packaging with the seal-a-meals, and that matches

13    two of the packages that contained the drugs, the

14    methamphetamine, that was in -- that was found in the box, the

15    Mail Boxes Etc. box that was being shipped; that is, the

16    plastic packaging matched.

17           At that point Agent Brady back in Hawaii was notified

18    that the warrant had been executed and these things had been

19    found.  And they had -- were looking at the airport.  They had

20    determined that Mr. Vo, the defendant, had a flight from

21    Hawaii -- from Honolulu back to California.  And the evidence

22    will be that both the defendant and his wife have lived in

23    Hawaii at various times.  That on the 5th of October, which

24    was a Saturday, that was the day the search warrant was

25    executed, agent Brady and a number of agents were watching the

1    Honolulu airport for the defendant's return.  They found out
2    that his flight had been -- or he had canceled his reservation
3    and rescheduled for the 6th of October, a Sunday.

4         They watched the planes that day.  It was Hawaiian
5    Airlines flight.  And the defendant was arrested along with
6    his wife.  His wife apparently was driving him to the airport.
7    Agent Brady will tell you that they arrested him as he got out
8    of the car with his wife.  There was one bag in the car, his
9    tag was on it.  He had the reservation to leave that day.  His
10   wife Brenda Vo did not.

11        Brenda Vo will testify.  She's a convicted drug
12   dealer.  She has an agreement to testify for the United
13   States.  She was convicted back in 1991 of distribution in the
14   state system, in Circuit Court, actually right across the
15   street here on Punchbowl, First Circuit Court, of promotion of
16   a dangerous drug in the first degree.  She sold cocaine on two
17   occasions to an undercover DEA agent in 1991.  Sold an ounce
18   of crack cocaine, and then several months later sold an ounce
19   of regular cocaine.  Was prosecuted there, pled no contest in
20   the state system, got ten years probation, and she's not been
21   sentenced yet in court.

22        And she will tell you that she was living in
23   California.  She actually met the defendant in 1997.  They
24   started dating.  They were seeing other people initially, but
25   they started dating.  In 1998, they bought the Playa del Rey

1    house at 9008 Hulbert.  They bought that house.  Then they got

2    married.  Then they had a child in 1999.  That child is a

3    three-year-old now, and that the defendant has -- Gabriella is

4    his daughter from a previous marriage.

5         And she will tell you that in 2001, in late 2001, the

6    defendant asked her to mail a package to Hawaii.  And she at

7    that point understood what was in the package, there were

8    drugs in the package, and she -- there was some discussion she

9    didn't want to do this.  She was concerned about getting

10   caught.  She was still on the ten years probation from her

11   drug conviction in this state.  And he told her carry the

12   package and showed her how to carry the package

13   (demonstrating) without getting your fingertips on it.  And

14   told her to use the name Chang, phony name Linda Chang, send

15   it to Hawaii.  And he took her to a -- one of these express

16   mail stores, and she went in and mailed the package using the

17   phony name to Hawaii.

18        And a little while after that, he asked her to do

19   another package, again under the phony name Linda Chang.  And

20   she did that package again to Hawaii.

21        The evidence will show that she was -- phony name,

22   phony return address, and that after this, there was --

23   decided to separate.  She came back here to Hawaii, separated

24   from the defendant November, late 2001.  Moved back in with

25   her parents, live out -- they live out in Foster Village.

1    Their name is Cooper.

2            And then in somewhere around May, she moved back to

3    California, rejoined her husband.  Her husband had come out

4    here, the defendant had come out here in the spring of 2002,

5    and she rejoined him in California, moved back into the house.

6    And that she'll tell you that on October 1st, last fall,

7    October 1st, 2002, she and the defendant came to Hawaii to

8    visit her family, and that on the 3rd of October, he asked her

9    to mail another package.  This one from Hawaii to California.

10            And she again was concerned, discussions about her

11   being on probation and still having a tremendous problem with

12   if she got caught.  And he said:  Don't worry about it.  We're

13   not going to get caught.  Use the name Linda Chang and send it

14   overnight next day service UPS.

15            She'll tell you that she went along with that, agreed

16   with that, went into the store with the box holding it as he

17   had held it when he passed it to her without using the

18   fingertips, just in the palms of the hands, and that she took

19   it in the store using the name Linda Chang.  He told her make

20   up a phony return address, and she made up some address, Hart

21   Street or something she used, and paid it for it.  And the

22   clerk, talking to a young man, she said, who was -- waited on

23   her.  And there was another older gentleman there.  I believe

24   the evidence will show that that's Roger Chun, the manager of

25   the Mail Boxes Etc. in Kapahulu.

1          And she said:  I want to send it out.  I want it

2     delivered the next day.  And they said:  Okay.  We'll send it

3     out Fed Ex.  And they proceeded to take her money, and she

4     filled out the paperwork and they put a labeling on it --

5     label on it and a tracking number on it.  She went out back in

6     the car.  The defendant waited in the car.  The evidence will

7     show he never went into the store.  The evidence will also be

8     that no one from the store could see the defendant where he

9     was parked.  The car was not out front.

10          The evidence will also be that she had a discussion,

11     Ms. Vo, Brenda Vo had a discussion with the defendant after

12     they left, and she said:  Well, I -- he said:  Let me see the

13     receipt.  And she showed him the receipt.  And he said:  I

14     told you to send it UPS, not Fed Ex.  Fed Ex will require a

15     signature there when it's delivered.  I don't want it sent

16     with a signature.  I just want it left there.  Because there

17     was also a concern when she -- when they initially discussed

18     this, Ms. Vo was concerned that it be there, the package be

19     delivered when Gabriella, the 13-year-old daughter, was there.

20     And Mr. Vo, the defendant, said:  Don't worry.  She won't be

21     there when it's delivered.  She's not going to be there.  She

22     won't be in the house.

23          At that point when she showed the receipt of the Fed

24     Ex delivery, the Fed Ex receipt from Mail Boxes Etc., the

25     defendant said:  Call the store.  Make sure they deliver it --

1    we get it delivered without a signature and get it changed to
2    UPS.
3            They used the phone.  Mrs. Vo called the store.  And
4    Mr. Gillespie will tell you that the lady that sent it out
5    using the name Linda Chang called back about ten minutes after
6    she was first in the store and wanted it delivered no
7    signature, that he had to change a tracking number on it, and
8    told her:  Okay.  It'll be delivered.  We'll change it so that
9    it's delivery without a signature.  Nobody has to sign for it.
10   And that was that.
11           She'll also tell you that the next day she called
12   a -- they called, she and her husband called a 1-800 number
13   for Fed Ex to track the package.  She'll tell you she
14   understood that the package could be tracked.  She also -- her
15   husband told her call back to the Mail Boxes Etc., when they
16   learned the package wasn't going to be delivered on the 4th of
17   October.  They went in on the 3rd, it was supposed to be
18   delivered on the 4th.  She went in on the 3rd, I should say.
19   Ms. Vo went in on the 3rd.  It was supposed to be delivered on
20   the 4th.  They learned on the 4th by calling the 1-800 number
21   that the package was not going to be delivered on the 4th.
22   They called the store to find out, and Ms. Vo called the
23   store, and the -- Mr. Gillespie, Michael Gillespie had been
24   instructed by the FBI:  If this woman calls back, get a phone
25   number on her, get some more information on her.

1          She called the store -- Vo called Mail Boxes Etc.
2     back on the 4th, on Friday, and said:  What's the story on the
3     package?  And he said -- Mr. Gillespie says:  I'll check.  He
4     called, he checked on the computer, said:  Well, because I had
5     to change the tracking label on it, because you changed the
6     delivery terms from signature to no signature, I had to change
7     the tracking number on it and that screwed up the delivery.
8     Therefore, it's not going to be delivered on the 4th.  And if
9     there's any problem with this, Ms. Chang, why don't you give
10    me a call-back number?

11         Ms. Vo will tell you that she, not thinking, gave her
12    mother's work number, which is Pearl Kai Hairdressing.  And
13    that that information was taken by Mr. Gillespie and passed on
14    to the FBI.

15         This case is not like anything you've seen on TV.
16    It's not going to be presented that way.  There's no narrator
17    here.  I won't be able to get up and tell you again what this
18    case is all about.  It's going to come in in bits and pieces.
19    One witness will testify one day and give you a little bit of
20    what the entire picture is.  A document might come in and
21    explain some more information for you.  You might get another
22    witness -- there will be other witnesses, will explain what
23    they saw and what they heard and give you testimony as another
24    aspect of either the package, or the delivery, or what was
25    said, or what they observed.  It's going to come in piecemeal.

1    Bits and pieces.

2            The court has told you you can take notes.  Please

3    listen to the court's instructions.  Take notes.  Be patient.

4    We'll put it all together for you at the end.  And at the end

5    I'll come back and ask you for a verdict against the defendant

6    of guilty to both counts.

7            Thank you.

8            THE COURT:  Thank you.

9            Mr. Weight?

10           MR. WEIGHT:  Thank you, Your Honor.

11           Morning, folks.  My name is Michael Weight.  I'm an

12   attorney and I represent Rick.

13           The government has given you a thumbnail sketch of

14   what it expects the evidence to show in this case.  However,

15   they haven't painted the whole picture of what is going to

16   come out in this trial.  I have no quarrel with the

17   government's description to you in the last few minutes

18   regarding Brenda Vo's taking a package to Mail Boxes Etc.

19   under the name Linda Chang, delivering it to them for trans --

20   shipment and delivery to her home in California.  I have no

21   quarrel with that.  And I have no quarrel with what the DEA

22   did and the FBI did and their part of their investigation

23   leading up to the arrest of Brenda and Rick Vo.

24           As we all know, life does not occur in a vacuum.

25   There are surrounding set of facts and circumstances, there

1    are background facts and circumstances that go into the big

2    picture.  And if you would, I would like to just freeze-frame

3    this for a moment where the cuffs are being clapped on Brenda

4    Vo and Ricky Vo, and step back in time.

5        Mr. Muehleck hinted at Brenda's prior drug

6    involvement, but let's go into that in a little more detail

7    because I believe that the evidence in this case is going to

8    show that Brenda Vo was heavily and deeply involved in drugs

9    for many years.  She was a poly-drug abuser.  She abused all

10   sorts of drugs.  She smoked it, she snorted it, the works.

11       She was a clever girl.  The evidence will show that

12   in 1991, she was indeed arrested because she was trafficking

13   in drugs, and the DEA got wind of her and set her up to sell

14   them crack cocaine and powder cocaine on two separate

15   occasions.

16       The evidence is going to show that crack cocaine is a

17   form of the drug which is highly, highly addictive.  It's a

18   refined form of the drug.  And to refine it, it has to be

19   cooked.  And not everybody knows how to do that.  It requires

20   chemicals, it requires a processing, and it requires an

21   intelligent person to know how to operate this.  The evidence

22   is going to show Brenda knows how to cook crack.  She knows

23   how to cook dope.  And the evidence is going to show that she

24   was involved with numerous people that cooked crack, sold

25   crack, and that she was not some minor dealer.

1          The evidence is going to show that her involvement in

2     1991, 11 years before this occasion, she was working with the

3     DEA to set up to sell them a kilogram of cocaine.  A kilogram

4     is over two pounds.  It's 2.2 pounds of cocaine.  So she was

5     working her way up the ladder.  And we're talking about

6     thousands of dollars here.  We're not talking chump change.

7          The evidence is going to show that Brenda was caught.

8     She was arrested by the Feds.  That for reasons that are not

9     clear, in 1991, the United States Attorney's Office declined

10    to prosecute the case.  But the evidence is also going to show

11    that clever Brenda made herself a deal, because the case was

12    handed off to the Prosecuting Attorney for the City and County

13    of Honolulu, and they agreed to prosecute her for Promoting a

14    Detrimental Drug in the First Degree.  Now, the degree

15    business is just like burns, first degree is the worst.  And

16    they charged her with two counts of Promoting a Detrimental

17    Drug in the First Degree in 1991, when it happened.

18          But the prosecution gets strung out and it gets

19    strung out for a period of five years, because it isn't until

20    1996 that Brenda goes to court.  And with a very clever

21    lawyer, who is now one of the top guys at the prosecuting

22    attorney's office, she's able to cut a deal with the court and

23    get ten years of probation.

24          The evidence is going to show that she was facing --

25    at the time that she was prosecuted in 1991 through 1996, she

1    was facing 20 years in prison, in state prison, for her little

2    escapade involving the DEA in '91.  But clever girl that she

3    is, with the help of her good lawyer, she gets ten years of

4    probation.

5        Now we jump ahead.  In the interim she meets and

6    marries Rick Vo.  The evidence is going to show that Rick had

7    lived in Hawaii, was now living in California.  He was an

8    aspiring actor.  He is a martial arts student and teacher.

9    They started a business called Shaolin, based on the ancient

10   Oriental martial arts religious organization, a clothing

11   business.  And that clothing business bumped along.  It didn't

12   blossom, it didn't turn into a Quick Silver or a Banana

13   Republic, but they were doing their best.  And as part of

14   their business, they rented a warehouse and were dealing in

15   their clothes.  But business wasn't that good.

16       When a promoter came along and said:  Hey, how would

17   you like to rent your warehouse to us for the weekend?  We

18   want to have a party here.  We'll pay you a lot of money.  And

19   they said:  Okay.  And it -- the deal went down.  The promoter

20   rented the warehouse, they had the party, promoter paid them a

21   lot of money, like thousands of dollars, and said:  Would you

22   guys like to do that again?  And they said:  Sure.

23       And so on a regular basis for many weeks and months,

24   they rented out their warehouse to promoters to throw parties,

25   these big parties.  And they received thousands and thousands

1     and thousands of dollars in cash.

2          They bought their house in California before that

3     began.  I believe the evidence is going to show that Brenda,

4     through her family, put about $20,000 down to buy this house

5     in Playa del Rey.  The defendant's family kicked in some money

6     so they could buy their house in Playa del Rey.  And they went

7     on about their business.

8          Rick, as I say, the evidence will show was an

9     aspiring actor, he was a martial arts instructor, he was

10    basically struggling along.  They made their money largely

11    from the rental of the warehouse.  They made some money from

12    Shaolin but not much.  And a lot of their money was in cash.

13         Rick's brother, the evidence will show -- in fact,

14    couple of members of Rick's family came to live with them from

15    time to time at their house at Playa del Rey, his brother

16    Khanh, his brother Mon Lee, his mom on occasion.  The evidence

17    is going to show that Brenda didn't get along with them.  She

18    didn't like his family.  She didn't like his brothers.  She

19    certainly didn't like her mother-in-law.

20         And the evidence is going to show that the

21    relationship between Rick and Brenda became strained, and then

22    strained almost to the point of breaking.  She would leave and

23    come back to Hawaii for months at a time.  She'll tell you

24    what she was doing back here, who she was hanging out with.  I

25    believe the evidence is going to show that, you know, old

1    habits die hard; that she got money from ex-boyfriends back

2    here, she was hanging out with ex-boyfriends.

3         Rick came out here a couple of times to try to woo

4    her back, and one time was successful, got her back -- to come

5    back to California after she had been here for several months.

6    He tried to patch things up.  He desperately wanted to have

7    another child.  He wanted a son.  He had two daughters at this

8    point.  He had Gabby, Gabriella, and Kianna with Brenda, who

9    was at that time an infant.  And he wanted a boy.

10        The evidence is going to show Brenda did get

11   pregnant.  She didn't tell Rick about it.  She went and got an

12   abortion.  That things became so strained between them that

13   there was talk of divorce.  And then this incident happened.

14        Now, Mr. Muehleck mentioned that at the time that

15   Brenda called Mail Boxes Etc. to find out where the heck her

16   package was that she had delivered and why wasn't it in

17   California yet, and the guy says:  Well, leave me a phone

18   number.  And she leaves her mom's workplace phone number.

19   Good investigators that they were, the DEA pounced on that and

20   the FBI pounced on that, and found out, okay, this place is

21   owned by Brenda's mom.  Where does Brenda -- Brenda's parents

22   live?  And they found that out and they get a search warrant,

23   and they go to Brenda's folks' house.

24        And what do they find when they go to Brenda's folks'

25   house?  Tens of thousands of dollars in cash that Brenda has

1    stashed there.  Brenda has stashed there.  What else do they

2    find?  They find a bank account which had a couple of hundred

3    thousand dollars in it at one point in time, $59,000 of which

4    had been siphoned out just a day or two prior to the cops

5    coming down on them, and there was still about $60,000 left in

6    dad's bank account that had apparently been deposited in cash.

7    There is evidence, and we believe that it will show, that

8    Brenda was sending money out here and bringing money to Hawaii

9    surreptitiously in the tens of thousands of dollars, stashing

10   it, hiding it from her husband.

11          Now, we get back up to the point where Brenda's been

12   arrested.  Brenda and Rick are arrested.  They are processed

13   into the court system.  They are arraigned before a magistrate

14   judge down on the second floor in this building.  They are

15   appointed lawyers.  I step in as Rick's attorney, another

16   attorney is appointed to represent Brenda.  And Brenda is now

17   told the facts of life.  And the evidence is going to show

18   that the facts of life for Brenda at this point in time are as

19   follows:

20          Brenda, you are on probation in the state court for a

21   crime you committed in 1991.  The State of Hawaii is going to

22   revoke your probation, and under state law you will be

23   sentenced to 20 years in prison for a crime committed in 1991.

24   That's in state court.

25          And by the way, Brenda, you are now in federal court

1    on these new charges, and let me tell you what you're looking

2    at.  Because of the quantity of drugs involved and under the

3    federal sentencing guidelines, Brenda, and because you used

4    your daughter, who was a minor at the time that the drugs were

5    to be delivered, you are looking at a sentence of 30 years to

6    life on the federal side.  And by the way, Brenda, that will

7    be consecutive to your state sentence, which means you will

8    serve your federal time after the state's done with you or

9    vice versa, whichever comes first.

10          So Brenda, let's take a hard look at this.  You are

11   looking at 30 years in prison, federal, and when you're done

12   with that, you can go back to the state and do another 20 for

13   them.  That's 50 years.  Now, Brenda, remember you're the gal

14   that brought the stuff in that talked to the guy in Mail Boxes

15   Etc., who talked to him on the phone, who tipped him off about

16   your parents and so forth.  What are you going to do to help

17   yourself, Brenda?

18          And the evidence is going to show that Brenda

19   negotiated with her smart lawyer a deal with Uncle Sam.  And

20   that Brenda's belief that this deal is that by agreeing to

21   help the government, by burning somebody else to get herself

22   out from under her awful, awful situation, these are the

23   benefits that she will accrue:  One, she will get a lesser

24   sentence.  She will not face the mandatory minimum 20-year

25   sentence in federal court she faces.  Mandatory minimum, not

1    talking about the maximum, which is 30 to life.  Mandatory

2    minimum because of her state prior.

3         She believes -- I submit the evidence will show that

4    she believes that the government is going to come before the

5    sentencing judge and say:  Judge, she helped us out.  Cut her

6    some slack.  Sentence her to something less than the 20-year

7    mandatory minimum and something less than the 30 years that

8    she's looking at based on the quantity of drugs and the use of

9    her minor daughter in the commission of the offense.  That's

10    for openers.

11         Furthermore, her lawyer will go across the street,

12    Brenda believes, and cut a deal with the state court to say:

13    Okay, you got to sentence me to 50 years under state law, but

14    please, make that time concurrent so that my state sentence

15    and federal sentences will run together so I am not looking at

16    50 years anymore, I'm looking at something I can live with.

17         And what is the quid pro quo?  What does Brenda have

18    to pay for that to get her sentence reduced to something she

19    can live with?  She has to take Rick down.

20         Listen very closely to the evidence, folks.  Look at

21    it very carefully.  Because when all is said and done, we're

22    going to ask you the question that you have to decide:  Has

23    the government proved its case beyond a reasonable doubt?  And

24    we'll get into that later.

25         I have one more chance to talk to you before this

1    trial is over.  And that will be after all of the evidence has

2    been presented, Mr. Muehleck has spoken to you, and then I get

3    a chance one last time to try to wrap this up.

4            Hold me to what I've said today.  Hold me to what

5    I've said, because I believe this is what the evidence is

6    going to show.  And when all is said and done, we will ask you

7    to acquit Rick Vo, and let the blame fall where it truly

8    belongs, on the lady who pled guilty.  Thank you.

9            THE COURT:  Thank you.  Government will now present

10   its first witness.

11           MR. MUEHLECK:  Call Agent Dan Brady, Your Honor.

12                   DANIEL KENT BRADY,

13   called as a witness by the Government, having been first duly

14   sworn, was examined and testified as follows:

15           THE CLERK:  Please be seated.

16           Please state your name and spell your last name.

17           THE WITNESS:  Daniel Kent Brady, B-R-A-D-Y.

18                   DIRECT EXAMINATION

19   BY MR. MUEHLECK:

20   Q    Mr. Brady, how are you employed?

21   A    I'm a Special Agent with the Federal Bureau of

22   Investigation.

23   Q    And where are you stationed?

24   A    Here in Honolulu.

25   Q    How long have you been with the FBI?

1    A     Approximately four years.

2    Q     And how long in Honolulu?

3    A     Four years.

4    Q     Prior to that, what was your employment?

5    A     Prior to that, I was a practicing attorney for several

6    years.

7    Q     What state?

8    A     Virginia and Colorado.

9    Q     Let me direct your attention to October 3rd, 2002, last

10   fall.  Do you know if you were working that day?

11   A     Yes, I was.

12   Q     What were your duties that day?

13   A     At approximately 2 o'clock p.m., I initiated an

14   investigation into a suspicious package that had been

15   delivered to the Mail Boxes Etc. at 758 Kapahulu Avenue.  And

16   based on what I learned, I wanted to obtain a search warrant

17   for that package.

18   Q     Okay.  I'm sorry.  Didn't mean to cut you off.

19         What was the basis or what initiated that

20   investigation by yourself?

21   A     I received a complaint call or citizen call from Michael

22   Gillespie, who was a clerk at Mail Boxes Etc., who informed me

23   of his suspicions concerning this package that had been

24   delivered for shipment.

25   Q     What actions did you take on October 3rd of last fall

1    after getting that information?

2    A    Well, I conducted an investigation on everything that he

3    had received, but what I wanted to do to obtain a search

4    warrant was have a narcotics trained canine sniff the parcel.

5    Q    Why -- why?

6    A    I suspected it was going to be narcotics related.  And

7    Fed Ex picks up from that location at 2:30.  So it was a very

8    short window of time and I was not able to arrange for a

9    narcotics canine to sniff the package at that time.  So I was

10   not able to seize or detain the package at that time.

11   Q    What happened to the package?

12   A    It was picked up at 2:30 by Fed Ex.

13   Q    Did you talk to Fed Ex about that -- after that?

14   A    I did.  I contacted the security manager of the Pacific

15   region of Fed Ex so I could determine where I could next

16   further investigate this package so that we could arrange a

17   narcotics canine.

18   Q    And what action was taken?

19   A    Well, I learned that the package would be detained in the

20   operations manager's office overnight.  Fed Ex was

21   uncomfortable further shipping this suspicious parcel until

22   the suspicions were alleviated.  So then the following

23   morning, I did have a narcotics canine sniff the parcel.  It

24   was about 8:00 a.m.

25   Q    That was the 4th of October?

1    A    That was the 4th of October, Friday.

2    Q    You got a -- you were able to get a dog?

3    A    I was able to arrange for a dog.

4    Q    Where did the dog come from?

5    A    From the airport task force, the DEA airport task force.

6    It was an HPD officer who's detailed to them is my

7    understanding.

8    Q    Is that where you go -- does the FBI have canines they

9    use themselves?

10    A    We do -- we do not, so I would always contact them to

11    arrange for narcotics canines when I would need them.

12    Q    And the result of having that canine to sniff the

13    package?

14    A    The result was negative.  The canine did not alert upon

15    that package, but my further investigation had provided me

16    with probable cause to go ahead and get a search warrant,

17    which I did at approximately 9:05.  Magistrate Judge Kevin

18    Chang signed that search warrant.

19    Q    Is that a federal or state judge?

20    A    That's a federal magistrate judge --

21    Q    In this courtroom?

22    A    -- in this building.  In this courtroom -- or his

23    courtroom is on the second floor.

24             So I immediately took that search warrant and went to

25    Fed Ex where the other officers who were working with me on

1    this project were -- remained with the parcel.  And it was

2    approximately at 9:50 a.m.  So not too long after I obtained

3    the search warrant that we executed that warrant, we opened up

4    the parcel.

5             MR. MUEHLECK:  Exhibit 1, please.

6             Approach, Your Honor, with Exhibit 1 for

7    identification?

8             THE COURT:  You may.

9    BY MR. MUEHLECK:

10   Q    Agent Brady, have you seen Exhibit 1 marked for

11   identification before?

12   A    Yes, I have.

13   Q    Where have you seen it before?

14   A    That was the parcel that we executed the search warrant

15   upon.

16   Q    It's empty now?

17   A    Yes, I believe it is.  No, there are some items inside of

18   it.

19   Q    Oh.

20   A    Newspaper and packaging material.

21   Q    Okay.  All right.

22            MR. MUEHLECK:  Offer Exhibit 1 into evidence, Your

23   Honor.

24            MR. WEIGHT:  No objection, Your Honor.

25            THE COURT:  Government's 1 is admitted.

1            (Government's Exhibit 1 was received in evidence.)

2    BY MR. MUEHLECK:

3    Q    You were there when it was opened?

4    A    Yes, I was.  I was the one who opened it.

5    Q    What -- I'm sorry?

6    A    I was the one who opened it.

7    Q    What did -- and how did you open it?  Please tell the

8    jury.

9    A    Well, prior to opening something like this, we would

10   always photograph it prior to when we did that, and then open

11   it with a -- a knife or maybe a key off my key ring to cut the

12   tape.  We were wearing latex gloves.  We always want to do

13   that to preserve any potential fingerprint evidence.  And open

14   it up, and I saw newspapers and underneath the newspapers were

15   vacuum-packed bags, large bags with newspaper visible on the

16   inside of those bags.

17   Q    Do you recall how many bags you saw?

18   A    Four.  After -- you know, you could only see one at the

19   top, but when you removed them, there were four.

20   Q    You say you took photos when you went in?

21   A    Yes, throughout the process of the execution we took

22   photos.

23   Q    I'm sorry.

24            MR. MUEHLECK:  Exhibit 2 for identification.

25            Approach the witness?

1                THE COURT:  You may.

2                MR. MUEHLECK:  May I stand over here, Your Honor?

3                THE COURT:  You may.

4    BY MR. MUEHLECK:

5    Q     Can you see Exhibit 2 marked for identification?

6    A     Yes, I do.

7    Q     Can you tell me what that is?

8    A     Yes.  That's a photo that I took when we were in the

9    process of opening this.  This is what was inside of this bag.

10   Q     "This," you mean Exhibit 1?

11   A     Yes.  That's a photo of this bag as we opened it.  It's

12   sitting on the floor of the office where the package had been

13   secured overnight.

14   Q     Does it accurately, truthfully depict the contents of

15   Exhibit 1 on October 4th of 2002 when you opened it?

16   A     Yes, it does.

17               MR. MUEHLECK:  Offer Exhibit 2 into evidence, Your

18   Honor.

19               MR. WEIGHT:  No objection, Your Honor.

20               THE COURT:  Government's 2 is admitted.

21         (Government's Exhibit 2 was received in evidence.)

22               MR. MUEHLECK:  Permission to publish, Your Honor?

23               THE COURT:  You may.

24   BY MR. MUEHLECK:

25   Q     You said there were how many bags you saw?

1    A    Four of those Ziplocs, large.

2    Q    And anything inside those?

3    A    Yes.  I opened one of the four to see what was beneath

4    the newspaper.  You could feel that, but you couldn't really

5    see what was in the newspaper.  So I opened it to determine

6    what was in that and --

7    Q    What did you observe?

8    A    Inside the one that I opened there were four gallon-size

9    bags containing off-white crystalline substance.

10    Q    Did you examine the substance?

11    A    I did.  I conducted a field test on it.  We have these

12    field test kits that are presumptive tests of -- I -- I

13    suspected it to be methamphetamine, so that's -- the

14    methamphetamine is the test kit that I used, and it tested

15    positive.

16    Q    How many times have you seen methamphetamine in the four

17    years you've been in Honolulu?

18    A    Oh, many, many, many.  I've worked primarily crystal

19    methamphetamine and methamphetamine cases.

20    Q    Explain the presumptive test to the jury, if you would,

21    please.

22    A    It's a little plastic tube that has certain chemicals in

23    it and you -- what you do is, you know, you have to be very

24    careful with gloves to get a small sample and you put it into

25    the plastic tube.  You seal the tube, and then you break these

1    glass vials, and if the chemicals react in the correct way,

2    you'll get a -- the test kit I was using, you would get a

3    color blue then.  If it's not the substance that I suspected

4    it to be, you would not get the color blue.  So you break

5    these vials, shake it, and it turned blue.

6                    MR. MUEHLECK:  Mr. Weight, Exhibit 6.

7                    Approach with Exhibit 6 for identification, Your

8    Honor?

9                    THE COURT:  You may.

10                   MR. MUEHLECK:  Again, stand over here if I might,

11   Your Honor?

12                   THE COURT:  You may.

13   BY MR. MUEHLECK:

14   Q    Mr. Brady, Exhibit 6 marked for identification, have you

15   seen that before?

16   A    Yes, I have.

17   Q    Okay.  And where have you seen that?

18   A    In your office, but I did not take this photo.  But four

19   of these bags would have been exactly what I observed.  And

20   the one vacuum pack bag that I did open.

21   Q    Okay.  And the -- do they accurately depict the bags that

22   you observed?

23   A    Yes, they do.

24   Q    Do you know where the photo was taken?

25   A    It was taken at the DEA laboratory, I believe.

1    Q    Okay.  Does it accurately depict the exhibits or the

2    substances that you seized on the 4th of October?

3    A    Yes, it does.

4              MR. MUEHLECK:  Offer the exhibit into evidence.

5              MR. WEIGHT:  Objection, Your Honor.  No proper

6    foundation.

7              THE WITNESS:  I --

8              THE COURT:  Sustained.

9              MR. MUEHLECK:  All right.

10   BY MR. MUEHLECK:

11   Q    What was done with the suspected methamphetamine?

12   A    What -- what I did at that point, after opening just one

13   of the four, is I knew immediately that to further this

14   investigation appropriately, we would want to do a controlled

15   delivery to the address that this was shipped to.  And the

16   address was Gabriella Vo at 8009 Hulbert Avenue, Playa del

17   Rey, California.  The drug enforcement agency is really the

18   expert agency at conducting those sorts of operations.

19   Q    What do you mean "a controlled delivery"?

20   A    A controlled delivery is where you would, you know,

21   retape up the parcel, and they would put a device in there

22   that would alert when the parcel was opened.  And then they

23   would, you know, pretend to be Fed Ex and they would deliver

24   the parcel.  And then with a search warrant, they would go in

25   and determine who opened the parcel.  And that's the big

BRADY - DIRECT                                                    2-39

1   question is we want to know who shipped drugs to Gabriella Vo

2   and we want to know who Gabriella Vo is, and items such as

3   that.

4   Q    Did you know who lived at the address at --

5   A    At that point I did through public records.  The two

6   suspects who we believed lived at that address were Brenda

7   Marie Cooper Vo and Rick Vo.

8   Q    And had you talked to Mr. Michael Gillespie that day, the

9   4th of October, the day after he had spoken with you?

10  A    I did.  I spoke with him and I told him that if we had

11  any further contact with the individual who shipped it, to let

12  me know right away and to try to get additional contact

13  information from that individual.  Because that individual who

14  shipped it, my investigation led me to believe, was using

15  fictitious information.

16  Q    Okay.  Did you get information from Mr. Gillespie that

17  day?

18  A    Yes, I did.  He advised me that at about 1:30 that day he

19  received a phone call.

20       MR. WEIGHT:  I object to the hearsay nature of this

21  evidence, Your Honor.

22       MR. MUEHLECK:  This is not offered for the truth of

23  the matter asserted.  This is offered for communication of

24  information provided to him, and that witness is our next

25  witness, Your Honor.

1          MR. WEIGHT:  Well, Your Honor, it's still hearsay.

2          THE COURT:  I'll allow it not for the truth but for

3   the reason as to why this agent acted in the manner he acted.

4   BY MR. MUEHLECK:

5   Q    Please continue.

6   A    So I -- I was advised that the shipper had contacted

7   Michael Gillespie.  I received the call from Michael Gillespie

8   shortly after 1:30 and he had just spoken with the -- the

9   shipper.  I advised Mr. Gillespie to try -- well,

10  Mr. Gillespie was -- had advised the individual that he was

11  going to try to determine why the package had not been shipped

12  or received because it was due to be received in California by

13  that point, because this was in 1:30 in the afternoon and it

14  was due to be received in California by 3:00.  So, at that

15  time it would have been after that point in time in

16  California.  And the individual -- the shipper was going to

17  recontact Mr. Gillespie with the answer as to why the package

18  was not received.

19         So I wanted Mr. Gillespie to try in that second

20  conversation to get some further information so that I could

21  further conduct my investigation as to who the shipper was.

22  And he called me later, gave me a telephone number, and I took

23  that telephone number and ran it through public records cross

24  indexes.

25  Q    What was that telephone number you got from

1    Mr. Gillespie?

2    A    It was eight -- no, 487-4004.

3    Q    Was that supposed to be a local number?

4    A    Yes, that is a local number.

5    Q    And what did that come back to?

6    A    It came back to Pearl Kai Hairstyling, which is a hair

7    salon near 24-Hour Fitness in the Pearl -- Pearl City Shopping

8    Center.  I believe it's across from the mall, Pearlridge Mall.

9    I --

10   Q    What -- go ahead, sir.

11   A    I then conducted an investigation as to Pearl Kai

12   Hairstyling, and I determined that it was a hair salon that's

13   owned and operated by the parents of Brenda Marie Cooper Vo.

14   Q    What was done with the contents, the suspected

15   methamphetamine that was found in Exhibit 1?

16   A    Well, I took those contents then immediately to the task

17   force offices at the airport because we wanted to do this

18   controlled delivery.  At that point, with those DEA special

19   agents and officers and task force officers present, we opened

20   the remaining pack -- no, we -- they did not open the

21   remaining packages until later after I was left -- after I had

22   left the area, but we -- we discussed what we were going to

23   do, we discussed doing a controlled delivery, and we discussed

24   that -- that my agents on my squad would further investigate

25   the shippers of the parcel, and then they would try to

1    investigate the California end because they have --

2    Q    "They" meaning?

3    A    The DEA.  -- because they have the systems in place to

4    more rapidly respond to that sort of operation.

5    Q    Were the suspected drugs sent to California?

6    A    They were.  I turned the suspected drugs over to those

7    agents and officers, and they immediately that afternoon left

8    to go conduct that controlled delivery operation.

9    Q    When was the controlled delivery supposed to occur?

10   A    Saturday.

11   Q    What day would that have been?

12   A    That would have been October, let's see, the 4th was

13   Friday, so it would have been the 5th, October 5th.

14   Q    Were you in contact with agents in California on the 5th

15   of October, the Saturday?

16   A    Special Agent Rich Jones remained in contact with me

17   frequently throughout the -- that 24-hour period.  We were

18   letting --

19   Q    That's the case agent?

20   A    That's the case agent.  We were letting each other know

21   as to what we learned with our respective investigations.

22   Q    Did you happen to go to the airport that day on the 5th

23   of October?

24   A    I did.  I was advised that Rick Vo or my investigation

25   determined that Rick Vo was scheduled to depart that day.  He

1    was originally scheduled to depart on the Thursday at about

2    the time that this package was supposed to be received, but we

3    learned from Hawaiian that he delayed that departure.  So we

4    then suspected he was going to be departing Saturday night,

5    and we --

6    Q    Did you go to the airport?

7    A    I did not but agents on my team did go to the airport,

8    and we did stay in contact with Hawaiian and he did not depart

9    that evening.

10   Q    Did you go to the airport again --

11   A    Yeah, we --

12   Q    -- subsequent to the 5th of October, Saturday?

13   A    Yes, we did.  Subsequent to that we learned that he had

14   made reservations to depart Sunday evening.  So that would

15   have been the -- October 6th.  And he was scheduled to depart

16   on the 10:05 flight at Hawaiian.

17   Q    10:05 p.m.?

18   A    10:05 p.m., the red eye.

19   Q    And was there an arrest that night?

20   A    There was.  We were watching for him on the curb, and we

21   saw him pull up with Brenda Marie Cooper Vo in the car, and

22   they sat in the car saying good-byes for a few minutes while

23   we approached them and then we arrested them.

24   Q    Was there any luggage in the car?

25   A    There was, there was one piece of luggage.

1   Q    Do you know if there was any identity on the luggage?

2   A    Yes, it had Rick Vo's name on the luggage.

3   Q    Did you seize any items that night?

4   A    Yes, some cellular telephones were also seized.

5   Q    From who, do you recall?

6   A    Both Rick Vo and Brenda Vo.

7   Q    Is Rick Vo in the courtroom?

8   A    Yes, he is.

9   Q    Point to him and tell me what he's wearing for the

10  record.

11  A    He's wearing a gray suit.  He's a Asian male with a -- a

12  ponytail.

13       MR. MUEHLECK:  May the record reflect the witness has

14  indicated the --

15  BY MR. MUEHLECK:

16  Q    Would you point to him, please?

17  A    (Indicating).

18       MR. MUEHLECK:  May the record reflect the witness has

19  identified the defendant.

20       THE COURT:  The record will so reflect the

21  identification of this defendant.

22       MR. MUEHLECK:  One moment please, Your Honor.

23            (Pause in the proceedings.)

24       MR. MUEHLECK:  Pass the witness.  Your Honor, I would

25  ask to recall him on another -- on an issue we raised

1    yesterday with the court, but I would pass the witness with

2    respect to that.

3              THE COURT:  Very well.

4              MR. WEIGHT:  No questions, Your Honor.

5              THE COURT:  Pardon me?

6              MR. WEIGHT:  No cross-examination, Your Honor.

7              THE COURT:  Very well.  You may step down.

8                                   (Witness excused)

9              THE COURT:  Next witness?

10             MR. MUEHLECK:  We would call Mr. Ari Karabinas

11   please, Your Honor.

12                        ARI KARABINAS,

13   called as a witness by the Government, having been first duly

14   sworn, was examined and testified as follows:

15             THE CLERK:  Please be seated.

16             Please state your name and spell your last name.

17             THE WITNESS:  Ari Karabinas, K-A-R-A-B-I-N-A-S.

18                      DIRECT EXAMINATION

19   BY MR. MUEHLECK:

20   Q    Mr. Karabinas, how are you employed?

21   A    I'm a special agent with the Drug Enforcement

22   Administration.

23   Q    How long have you been with DEA, sir?

24   A    Approximately six years now.

25   Q    Prior to that, do you have law enforcement experience?

KARABINAS - DIRECT                    2-46

1    A    Yes, I do.  I was a United States Marshal for

2    approximately a year-and-a-half in New York.

3    Q    Let me ask you, in 2002, where were you working?

4    A    I was assigned to the Los Angeles International Airport

5    for the DEA task force there.

6    Q    And how long had you been with the DEA task force at the

7    Los Angeles International Airport?

8    A    Approximately a year -- approximately two years at that

9    time.

10   Q    What were your duties at the Los Angeles International

11   Airport with the DEA task force?

12   A    We were assigned to interdict, which is to stop the

13   transport -- transportation of narcotics and monetary proceeds

14   from the sale of narcotics through the airplanes and through

15   packages, and that sort of thing.

16   Q    On October 4th of last fall, were you involved in an

17   investigation that was initiated out of Honolulu?

18   A    Yes, I was.

19   Q    What was your involvement, sir?

20   A    I was notified by Special Agent Rich Jones that they had

21   a package they wanted to proceed with a controlled delivery to

22   Los Angeles, to the Los Angeles area.

23   Q    And what -- what was done after talking to Agent Jones

24   requesting a controlled delivery of a package?

25   A    I started to write a search warrant, an anticipatory

1   search warrant for the residence the package was destined to

2   go to.

3   Q     Explain what an anticipatory search warrant is for the

4   jury, please.

5   A     An anticipatory search warrant is a search warrant we

6   apply for before we do a delivery, so if a delivery of a

7   package actually goes through and the package goes inside, we

8   have to go back and get the package.  So the search warrant

9   allows us to go in.  It's -- we get the search warrant before

10  we actually do a delivery so that we can go in as soon as the

11  package goes in.

12  Q     If the package doesn't go into the residence, are you

13  able to execute the search warrant?

14  A     No.

15  Q     So it's contingent upon the package being delivered to

16  the residence?

17  A     That's correct.

18  Q     Did you get an anticipatory search warrant for a

19  particular location on or about the 4th -- or the 5th of

20  October of last year?

21  A     Yes, I did.

22  Q     And what -- where did you get that search warrant from?

23  A     From --

24  Q     From the court?

25  A     From U.S. federal court, magistrate judge signed off on

1   it.

2   Q    What was the address that you were seeking to search?

3   A    It was 8009 -- 8009 Hulbert Avenue in Playa del Rey,

4   California.

5   Q    And what was the plan for the use of that search warrant,

6   please, Agent Karabinas?

7   A    The plan was if the package was to be delivered and

8   accepted, the package itself had a transmitting device inside

9   it which would indicate that the package was opened.  When the

10  package was opened, the we would execute the search -- execute

11  the search warrant at that point.

12  Q    And you used a what, a transmitting device?

13  A    Yes.

14  Q    That was placed inside the package?

15  A    Yes.

16  Q    Was there any drugs to be used?

17  A    Yes.

18  Q    How much?

19  A    About 500 grams.

20  Q    And was that the same -- did you have the drugs from

21  Honolulu in your possession?

22  A    Yes, we had them at the office.  We had them in

23  possession in the office.

24  Q    And how were you going to make the delivery, sir?

25  A    One of our agents was going to dress up with a Federal

1    Express uniform and with a truck, and he was going to deliver

2    the package to the residence.

3    Q    Who was that agent?

4    A    Special Agent Tom Hughes.

5    Q    Could you tell us what happened on the 5th of October?

6    A    We -- we had the search warrant signed off by the

7    magistrate judge and we -- Special Agent Jones -- Special

8    Agent Hughes dressed up in Fed Ex uniform and delivered the

9    package to the address.

10   Q    Were you there?

11   A    I was on scene, yes.

12   Q    How many agents were with you?

13   A    About eight agents and two Los Angeles Police Department

14   detectives with us.

15   Q    Do you know Mr. Dave Dooros?

16   A    Yes, I do.

17   Q    Who is Mr. Dooros?

18   A    Dave Dooros is a -- a Los Angeles Police Department

19   canine handler.

20   Q    Do you know if he was present that day?

21   A    Yes, he was.

22   Q    Did he have a canine with him, a dog?

23   A    Yes, he did.

24   Q    And what was the purpose of having Mr. Dooros -- Officer

25   Dooros and his dog there?

1    A    If we executed the search warrant, then Officer Dooros
2    would take his dog through the residence and see if the dog
3    can detect any narcotics within the residence.
4    Q    Were you physically present when the delivery occurred or
5    were you away from the particular location?
6    A    I was about a block-and-a-half away from the location.
7    Q    What happened?
8    A    From what I heard over the radio, Special Agent Hughes
9    delivered the package to the door.  It was received by a
10   12-year-old daughter -- the 12-year-old daughter of the
11   residence.  And then he drove away.  About a minute or so
12   later, another one of the other agents, Agent Williams,
13   reported that the transmitting device had gone off, indicating
14   the package was opened.
15   Q    Then what happened?
16   A    Then we executed the search warrant.
17   Q    Explain to the court, the jury, please, what you mean
18   when you say "we executed the search warrant"?
19   A    At that point -- after we were advised that the
20   transmitting device had gone off, we all drove near to the
21   location and we set up to go inside the house.  We had a
22   battering ram, and at that point Special Agent Vo knocked on
23   the door, announced that we were the police department, we had
24   a search warrant.  We waited and there was no answer, then we
25   began to take down the door.

1   Q    Now, let me ask you, you've used Special Agent Vo.  Okay.

2   Is that what you said, V-O?

3   A    V-O.

4   Q    Do you know who the occupants or did you have a suspicion

5   who the occupants of the -- this address would be, what their

6   name was?

7   A    Yes.

8   Q    What's the -- what was their name?

9   A    The owners of the residence were Brenda and Rick Vo.

10  Q    Okay.  Is Agent Vo any relationship to those individuals?

11  A    No.

12  Q    All right.  And the address that you were executing this

13  warrant on was?

14  A    The address?

15  Q    Yes.

16  A    8009 Hulbert Avenue in Playa del Rey.

17  Q    All right.  And the warrant was then?

18  A    Well, then the warrant was executed.  We knocked on the

19  door.  And then we went inside with our agents and the Los

20  Angeles Police Department.

21  Q    Did you go in?

22  A    Yes, I did.

23  Q    Okay.  And --

24       MR. MUEHLECK:  Moment please, Your Honor.

25                 (Pause in the proceedings.)

1             MR. MUEHLECK:  Three, please.

2    BY MR. MUEHLECK:

3    Q    Do you know if there were any photographs taken prior to

4    the execution of the warrants?

5    A    Yes, there were.

6             MR. MUEHLECK:  Three for identification, Mr. Weight.

7             Approach, Your Honor?

8             THE COURT:  You may.

9             MR. MUEHLECK:  Three marked for identification.

10            Again, if I could stand here, Judge?

11            THE COURT:  You may.

12   BY MR. MUEHLECK:

13   Q    Exhibit 3 for identification, marked for identification,

14   Agent Karabinas.

15   A    Yes.

16   Q    Can you identify that?

17   A    That's the residence that the search warrant was

18   executed, 8009 Hulbert Avenue, Playa del Rey.

19   Q    Is this a photograph of it?

20   A    Yes, it is.

21   Q    Do you know when this photograph was taken?

22   A    It was taken day before.  Myself and Special Agent Hughes

23   were in the car when we took the picture.

24   Q    Why did you go out there the day before the search

25   warrant was executed?

1    A    To look at the location, to see what it looked like, just

2    to see if it actually existed.

3    Q    Okay.  That's standard operating procedure?

4    A    Standard operating procedures.

5    Q    Does it accurately, truthfully depict 8009 Hulbert

6    Avenue, Playa del Rey, on October 4th and October, 5th 2002?

7    A    Yes.

8              MR. MUEHLECK:  Offer the exhibit.

9              MR. WEIGHT:  Voir dire, if it please the court?

10             THE COURT:  You may.

11                     VOIR DIRE EXAMINATION

12   BY MR. WEIGHT:

13   Q    Agent Karabinas, this is what the place looked like the

14   day you saw it and took the picture?

15   A    Yes.

16   Q    It didn't look like that after you battered down the

17   front door with the battering ram, did it?

18   A    After we executed the search warrant, the door was down.

19   That's about it.

20   Q    Down meaning?

21   A    It fell off, yes, off its hinges.

22   Q    Knocked right off its hinges?

23   A    Yes.

24             MR. WEIGHT:  Then I have no objection.

25             THE COURT:  Government's 3 is admitted.

1              (Government's Exhibit 3 was received in evidence.)

2                      RESUMED DIRECT EXAMINATION

3      BY MR. MUEHLECK:

4      Q     You knocked down the door?

5      A     The door was knocked down, yes.

6      Q     Why do you do that?

7      A     No one answered the knock when we announced.  No one came

8      to the door and opened the door for us.

9      Q     Why don't you wait for someone to come to the door?

10     A     We did wait.

11     Q     How long do you wait?

12     A     Maybe about 30 seconds, 40 seconds, I don't know.  It was

13     a while, but we knew there were people inside because somebody

14     accepted the package.

15     Q     Well, why didn't you wait for someone to come to the door

16     longer?

17     A     Oh, because there's narcotics involved and we also worry

18     about narcotics being flushed down the toilet, any other

19     evidence being thrown out.  And we also worry -- whenever

20     there's narcotics, we worry about weapons being in the home

21     also.

22     Q     Is it standard procedure that you followed that day?

23     A     Yes.

24                  MR. MUEHLECK:  One moment please, Your Honor.

25                      (Pause in the proceedings.)

1           MR. MUEHLECK:  May I publish now, Judge?

2           THE COURT:  You may.

3           MR. MUEHLECK:  Thank you.

4           And maybe you can, if I could stand over here or

5    maybe the witness can hold it.  If I can stand here, Judge,

6    the witness can point out a little bit about the house.

7           THE COURT:  You may.

8           MR. MUEHLECK:  I'll try to keep my voice up for

9    Ms. Fazio.

10   BY MR. MUEHLECK:

11   Q    Can you describe the house for us, please, roughly?

12   A    There's a two-car garage here.  That's the main entrance

13   for the house.  It goes around -- the corner is right around

14   there.  The other corner is right back here.

15   Q    How many stories?

16   A    Two stories.

17   Q    And --

18   A    The upper level, this is the first level here.

19   Q    And going in, generally give us a little bit of the

20   description what the layout was.

21   A    Going in through the door, you have -- we went in through

22   the door here, you have a little hallway that leads to the

23   garage area here.  There's a staircase that goes upstairs

24   here, living room, and then hallway to the back of the house

25   is on the other side over there.

1   Q    And then upstairs?

2   A    Upstairs is a main kitchen.  If you go up the stairs,

3   straight ahead there's a kitchen.  Actually you pass a little

4   living room first.  There's a master bedroom behind it, so the

5   master bedroom would be somewhere in this area, up here in the

6   front of the house.  Another couple of bedrooms in this area,

7   one here and one farther back also.

8   Q    Okay.  Were there items that were found in the house that

9   were seized?

10  A    Yes, there were.

11  Q    Do you know if there was any money that was found?

12  A    Yes, there was.

13  Q    How much money was found?

14  A    $37,700.

15  Q    Where was that found?

16  A    That was found in the safe in the master bedroom.

17  Q    Were there -- was there any jewelry found?

18  A    Yes, there was.

19  Q    What was found?

20  A    There was quite a bit of jewelry found.  There was also

21  five Rolexes found in that safe also.

22  Q    Was there another agent involved in that seizure of

23  the -- of the Rolex watches?

24  A    Yes, there was.

25  Q    What was his name?

1   A     Special Agent Vo.

2   Q     Are there any other items, mechanical items that were

3   seized of interest?

4   A     We conducted our search warrant and our search after we

5   actually went inside.  In the office bedroom on the first

6   floor, there was -- there's a bed in there, there's a closet,

7   and there's also a work station.

8   Q     Describe the -- describe that room on the first floor.

9   A     Okay.  It's in the back part of the house.  There was a

10  bed in there, so it acted as a spare bedroom.  There's a

11  closet, and on the other side of the room, there's a work

12  station, computer work station, file cabinet, so it's an

13  office bedroom type.

14          In the office bedroom, we seized a couple items.  We

15  seized computer towers that were in there, we seized some

16  paperwork, we seized tax returns, and we seized a heat

17  sealer -- a box, a white box containing a heat sealer, and a

18  roll of food saver or the stuff that food is saved in when

19  they heat-seal it, when people heat-seal it and put it in

20  there, that sort of thing.

21          MR. MUEHLECK:  Nine for identification.

22          Approach the witness, Your Honor?

23          THE COURT:  You may.

24  BY MR. MUEHLECK:

25  Q     Would you look at 9 for identification.  Please tell me

1    if you can identify that.

2    A    Yeah, this was the item that was found in that white box

3    in the upper left-hand corner of the closet in that room.

4    Q    And it was taken?

5    A    Yes, it was seized, yes.

6    Q    Who seized it?

7    A    I did.

8    Q    And what did you do with it, sir?

9    A    We placed it into evidence.  We processed it, put it into

10   these heat-sealed bags, we took it to the office, and then we

11   place it into evidence.

12   Q    Why did you seize it?

13   A    It's a heat sealer.  We knew the packages were

14   heat-sealed.  It was found in the bedroom of the house, the

15   office bedroom of the house, and there was roll -- the roll

16   was similar to what was found on the narcotics in the box.

17   Q    You said there was a roll of -- what else was found?

18   A    The heat -- the plastic envelope, whatever they use to

19   save the food in.

20   Q    Does 9 marked for identification appear to be in the same

21   condition it was when you seized it on October 5th?

22   A    Well, this is part of the exhibit.  There's another part

23   of the exhibit also, but this is the part, yes.  This is the

24   heat sealer that was in the box.

25             MR. MUEHLECK:  Offer 9 marked for identification into

1    evidence.

2                 MR. WEIGHT:  Voir dire, if it please the court?

3                 THE COURT:  You may.

4                        VOIR DIRE EXAMINATION

5    BY MR. WEIGHT:

6    Q    Agent Karabinas, when this was seized by you, did you --

7    were you wearing gloves at the time?

8    A    Yes, I was.

9    Q    Okay.  And did you dust it for fingerprints?

10   A    I did not, no.

11   Q    Was it going to be submitted to be dusted for

12   fingerprints?

13   A    Yes.

14   Q    And to your knowledge, was it dusted for fingerprints?

15   A    It looks like it has been, yes.

16   Q    And that would explain the gray powder that appears on

17   the contents of that bag?

18   A    That's correct.

19   Q    That bag being the one that holds the seal-a-meal?

20   A    Yeah, the -- the dark powder that's all over the heat

21   sealer and all that, yeah.

22   Q    Okay.  Do you know who the occupant of that room was?

23   A    The occupant of the room?

24   Q    Yes.

25   A    Looking at the paperwork -- well, let's say the tax

1    returns found in there was tax returns for Brenda and Rick Vo

2    and for Shaolin Corporation.

3    Q    Okay.  And this was like a bedroom office, you say?

4    A    A bedroom office.  There was clothing in the closet also,

5    all types of different clothing, men's clothing, women's

6    clothing, boxes of clothing in there also.

7    Q    Did it appear to have been occupied as a bedroom?

8    A    I don't know as a bedroom.  The bed was made,

9    everything -- didn't look like anybody had been sleeping

10   there.  I would say it was occupied as maybe storage and an

11   office.

12   Q    Unless somebody slept there, got up, made the bed and

13   left before you got there?

14   A    That could be.  I don't know.

15            MR. WEIGHT:  No other questions on voir dire on this

16   issue.  No objection.

17            THE COURT:  Government's 9 is admitted.

18        (Government's Exhibit 9 was received in evidence.)

19            THE COURT:  Let's take a 15-minute break now.  Please

20   be back at quarter to.

21            MR. MUEHLECK:  15 minutes, Your Honor?

22            THE COURT:  Yes.  Be back at quarter to 11:00.

23        (A recess was taken from 10:31 a.m. to 10:52 a.m.)

24            THE COURT:  Please proceed, Mr. Muehleck.

25            MR. MUEHLECK:  Thank you, Your Honor.  Ten marked for

1    identification.

2              Approach, Your Honor?

3              THE COURT:  You may.

4                    RESUMED DIRECT EXAMINATION

5    BY MR. MUEHLECK:

6    Q    Ten marked for identification, can you identify that,

7    sir?  Have you seen that before?

8    A    Yes, I have.  This was the rest of the contents that were

9    found in the white box in the office bedroom.

10   Q    What else was in the white box?  What else was in the

11   white box?

12   A    This was and the two heat sealers that are in here.

13   Q    You've indicated 10 marked for identification in front of

14   you --

15   A    Yes.

16   Q    -- and 9, an admitted exhibit on your left?

17   A    Yes.

18   Q    Appear to be in the same condition today as it was when

19   it was seized?

20   A    Yes.

21             MR. MUEHLECK:  Offer the exhibit.

22             MR. WEIGHT:  Voir dire, if it please the court?

23             THE COURT:  Very well.

24                    VOIR DIRE EXAMINATION

25   BY MR. WEIGHT:

1    Q    Agent Karabinas, the Exhibit 10, what does it purport to

2    be?

3    A    It contains the roll of heat-sealing paper, some plastic

4    containers maybe, and there's a scissor in there also.

5    Q    It's in the -- a part of the seal-a-meal device itself,

6    is it?

7    A    I -- I don't know.  It was all in the same box.

8    Q    It was all in the same box?

9    A    It was in the same box, yes.

10    Q    And was it dusted for fingerprints as well?

11    A    This was not.  This was not sent in.

12    Q    Okay.

13         MR. WEIGHT:  No further questions.  And no objection.

14         THE COURT:  Government's 10 is admitted.

15    (Government's Exhibit 10 was received in evidence.)

16                    RESUMED DIRECT EXAMINATION

17    BY MR. MUEHLECK:

18    Q    What was done with exhibit -- Exhibit 9, sir -- or what

19    was done with Exhibit 9, the seal-a-meal on your left?

20    A    At the time of seizure?

21    Q    Yeah, what was done after you seized it?

22    A    We put it in the bag, we sealed it and we kept it in the

23    office until it was sent down to the lab for analysis.

24    Q    Who sent it down to the lab for analysis?

25    A    I did.

1          MR. MUEHLECK:   17 marked for identification to

2     Mr. Weight.

3          MR. MUEHLECK:   Approach, Your Honor?

4          THE COURT:   You may.

5     BY MR. MUEHLECK:

6     Q     Agent Karabinas, 17 marked for identification, can you

7     identify that, sir?

8     A     Yes, it's a DEA-7.

9     Q     What is a DEA-7?

10    A     It's a -- it's a report that we fill out for drug

11    property or items that are seized that we believe might have

12    drugs on 'em.

13    Q     What's it used for?

14    A     To send the item to the lab.

15    Q     Okay.  And how do you recognize D -- this exhibit,

16    Exhibit 17 marked for identification?

17    A     It has my signature on it.

18    Q     And what was this exhibit used for?

19    A     What was this --

20    Q     How did you use this particular piece of paper, 17?

21    A     Oh.  This went along with the heat sealers to the lab.

22    Q     Exhibit 17 marked for identification accompanied Exhibit

23    9, an already admitted exhibit, the heat sealers to the

24    laboratory?

25    A     Well, we -- this was still at our office when we had it.

1    Q    I understand.

2    A    And then when we sent this, the original seven, with the

3    item to the lab, and that's how it -- they process the

4    evidence from that.

5    Q    Exhibit 17 marked for identification, the piece of paper,

6    accompanies the heat sealer when it goes to the laboratory?

7    A    Yes.

8    Q    Do you recognize any signatures on it?

9    A    On Exhibit 17?

10   Q    Yes.

11   A    My signature, yes.

12   Q    Whose signature do you recognize?

13   A    My signature and my supervisor's.  Well, whoever signed

14   for my supervisor.

15   Q    All right.  And did that indicate how the heat sealer

16   went to the laboratory, how it was transported to the

17   laboratory?

18   A    Yes, it does.

19   Q    How was it transported to the laboratory?

20   A    It was sent down by Federal Express.

21   Q    And the drugs that you got that -- the day that were --

22   that were seized in Honolulu, do you know what happened to

23   those drugs?

24   A    Those were delivered to the lab.

25   Q    Okay.  And how did they happen to be delivered to the

1    lab?  What is the process for delivering drugs to the

2    laboratory for analysis?

3    A    Well, it'll have a seven with that exhibit also.

4    Q    Okay.  You are saying "a seven," you're meaning a DEA-7

5    document?

6    A    That's correct, the DEA-7.

7    Q    All right.  Because we're talking exhibits here and

8    documents here, and I want to make sure Ms. Fazio is still my

9    friend when this trial is over.

10         So now exhibit -- this DEA-7, is it a separate

11   exhibit for the drugs that is sent separate from 17 marked for

12   identification?

13   A    Yes.

14         MR. MUEHLECK:  16 marked for identification,

15   Government Exhibit 16 marked for identification to Mr. Weight.

16         16 for identification to the witness, Your Honor?

17         THE COURT:  You may.

18   BY MR. MUEHLECK:

19   Q    Exhibit 16 marked for identification, can you identify

20   that document, sir?

21   A    Yes.  This is a DEA-7 for the drugs that were seized from

22   the package.

23   Q    How do you recognize it?

24   A    It says so, that it was from the package there, and also

25   my signature is on it.

1    Q    And how did the drugs that were seized in Honolulu get to

2    the laboratory?

3    A    Those were delivered by -- by Special Agent Tom Hughes.

4    Q    All right.  Let me ask you, sir, you indicated Exhibit 9

5    and Exhibit 10 were found in a box in the office, slash,

6    bedroom on the first level at 8009 Hulbert?

7    A    That's correct.

8    Q    How did you happen to -- where were they found in that

9    room?

10   A    They were found in the closet in the upper shelf, upper

11   left-hand shelf.

12   Q    How did they happen -- how did they happen to be found?

13   A    Well, when we had Officer Dooros come in with his canine,

14   his narcotics canine, and he indicated that the dog was

15   showing something of interest in that area of the closet, and

16   then we searched that area and we found this.

17   Q    You indicated that there was a quantity of money found in

18   the safe?

19   A    That's correct.

20   Q    And was that safe unlocked or locked, if you know?

21   A    No, it was locked.

22   Q    Was the money seized?

23   A    Yes, it was.

24   Q    Do you know if a photograph was taken?

25   A    Yes, there was.

1              MR. MUEHLECK:  Five for identification to Mr. Weight.

2         Approach, Your Honor, with 5 for identification?

3              THE COURT:  You may.

4              MR. MUEHLECK:  Stand again over here, Judge, if I

5    may?

6              THE COURT:  Yes.

7    BY MR. MUEHLECK:

8    Q    Five for identification, Agent Karabinas?

9    A    Yes.

10   Q    Can you identify that?

11   A    Yes, that's the money that was found in the safe.

12   Q    When was that photograph taken, can you tell me?

13   A    On October 5th, 2002.

14   Q    Does it accurately depict the money that was found in the

15   safe, $37,700, on that date?

16   A    Yes.

17             MR. MUEHLECK:  Offer the exhibit.

18             MR. WEIGHT:  No objection, Your Honor.

19             THE COURT:  Five is admitted.

20        (Government's Exhibit 5 was received in evidence.)

21   BY MR. MUEHLECK:

22   Q    This appears to be banded in a rubber band?

23   A    That's correct.

24   Q    Was it in that condition, same condition when it was

25   found?

1   A    Yes.

2              MR. MUEHLECK:  Publish, Your Honor?

3              THE COURT:  You may.  Are you submitting 16 and 17

4   also?

5              MR. MUEHLECK:  Through the next couple witnesses,

6   Judge, with the laboratory personnel.

7              THE COURT:  Very well.

8              MR. MUEHLECK:  I can submit them now if there's any

9   issue.

10             MR. WEIGHT:  There is.

11             MR. MUEHLECK:  I'm sorry?

12             MR. WEIGHT:  There's an issue.

13             MR. MUEHLECK:  All right.  Fine.

14  BY MR. MUEHLECK:

15  Q    You said there was another officer that was -- seized a

16  number of watches?

17  A    Yes, Special Agent Vo.

18  Q    All right.  Were there any vehicles at the residence when

19  you were there?

20  A    Yes, there were.

21  Q    What vehicles did you see?

22  A    There was, I believe, there was a truck outside, there

23  was two Mercedes Benz vehicles inside the garage, and then

24  there was another, I think, a Caravan maybe at the -- right

25  outside the house.

1    Q    Can you tell us the years of the truck or the models of

2    the Mercedes Benz or any more information?

3    A    Yeah, I can look that up on my report here.

4              MR. MUEHLECK:  May the agent refer to his report,

5    Your Honor?

6              THE COURT:  He may.

7    BY MR. MUEHLECK:

8    Q    If that will refresh your memory, Agent Karabinas?

9    A    Yes, it will.  Okay.  The one Mercedes.

10   Q    Okay.  Please turn -- have you had an opportunity to read

11   it and refresh your memory?

12   A    Yes.  I'm looking at them right now.

13   Q    Turn them over then.

14   A    Okay.

15   Q    Give us the information you know about the truck and --

16   now that your memory has been refreshed, any information about

17   the Mercedes, now your memory has been refreshed.

18   A    The truck was a Chevy -- Chevy Silverado.  It was a 1995,

19   white in color, and it was -- had the big wheels on them.  The

20   Mercedes -- one of the Mercedes was a 1995 S500, I believe,

21   and then a 1995 or '94 E500.

22   Q    Where were the Mercedes vehicles?

23   A    The Mercedes vehicles were in the garage of the house.

24   Q    And the truck?

25   A    The truck was parked on the street.

1           MR. MUEHLECK:  If I might stand over with an admitted

2    exhibit, Your Honor, Exhibit 3?

3           THE COURT:  You may.

4    BY MR. MUEHLECK:

5    Q    On the right-hand border of Exhibit 3, Agent Karabinas,

6    can you see what I'm pointing at?

7    A    Yeah, I could see part of the front of the Chevy

8    Silverado.

9    Q    That was the one you are talking about on Exhibit 3?

10   A    Yes.

11   Q    It was parked there on October 5th?

12   A    Yes.

13   Q    Were the Mercedes Benz and the automobiles seized?

14   A    Yes, they were.

15   Q    And how were they -- how did you get them away from

16   the -- the residence, how were they transported?

17   A    We were -- we were going to tow them, but inside the safe

18   we found the keys for the three vehicles, so then we drove

19   them away.

20          MR. MUEHLECK:  One moment, please, Your Honor.

21                  (Pause in the proceedings.)

22   BY MR. MUEHLECK:

23   Q    And were the watches seized?

24   A    Yes, they were.

25   Q    And was the money seized?

KARABINAS - RESUMED DIRECT                    2-71

1    A    Yes, it was.

2                MR. MUEHLECK:  One moment, please, Your Honor.

3                     (Pause in the proceedings.)

4                MR. MUEHLECK:  19 marked for identification,

5    Mr. Weight.

6                Approach with Exhibit 19 marked for identification?

7                THE COURT:  You may.

8    BY MR. MUEHLECK:

9    Q    Exhibit 19 marked for identification -- do you have

10   gloves, Agent Karabinas?

11   A    Yes, I do.

12               MR. MUEHLECK:  May I ask the agent to put on his

13   gloves, Your Honor, and examine contents of Exhibit 19 marked

14   for identification?

15               THE COURT:  Very well.

16   BY MR. MUEHLECK:

17   Q    And if you would, please, if you'd compare that, when you

18   get a chance and get your gloves on, to the contents of

19   Exhibit 10, the admitted exhibit.

20               And this particular exhibit, 19, what is that, do you

21   know?

22   A    It's an evidence -- evidence box containing the packaging

23   that contained the drugs.

24   Q    Packaging that contained the drugs that were seized in

25   Honolulu?

1    A    That was seized in the box in Honolulu, yes.

2    Q    Okay.  Please go ahead.  Did you find plastic in there,

3    items in there of interest?

4    A    Yes, I did.  These are the heat-sealed bags that contain

5    the narcotics.  There are -- there's five of these bags in

6    here right now.

7    Q    All right.  And in comparison to Exhibit 10?

8    A    Two of the bags match the heat-sealing material found in

9    Exhibit 10.

10   Q    Did you examine that prior to coming to court today?

11   A    Yes.

12   Q    And when you say "match," explain.

13   A    They're the same brand, the writing is similar on them,

14   and the material is similar also.

15   Q    Was there a fingerprint analysis -- you can sit down,

16   sir, and I'll take it away from you.

17        Was there a fingerprint analysis requested by your

18   office of any of the materials that day that was seized?

19   A    Yes.

20   Q    What was requested?

21   A    A print analysis of the bags that were -- that contained

22   the narcotics.

23   Q    Who would have done that, who did you request that from?

24   A    From the lab.

25   Q    Your laboratory?

1    A    Our laboratory, yes.

2              MR. MUEHLECK:  One moment, please, Your Honor.

3                        (Pause in the proceedings.)

4    BY MR. MUEHLECK:

5    Q    Are those bags in the same condition today as they were

6    when you sent them to the laboratory?

7    A    Yes.

8              MR. MUEHLECK:  I don't have any other questions of

9    the witness, Your Honor.

10             THE COURT:  Mr. Weight?

11             MR. WEIGHT:  Thank you, Your Honor.

12                        CROSS-EXAMINATION

13   BY MR. WEIGHT:

14   Q    Mr. Karabinas, let's take it back to the beginning.

15   You're working at the Los Angeles airport DEA office in

16   October -- on October 4th, when you get a call from the

17   Honolulu DEA office; is that correct so far?

18   A    That's correct.

19   Q    Okay.  And you're talking to Rick Jones?

20   A    Yes, Rich Jones.

21   Q    Rich Jones.  He wants you to set up a controlled delivery

22   of a package that's coming up your way?

23   A    We're working on setting up -- getting a search warrant

24   for the location, finding out -- finding if the location

25   actually exists.  We're working all that out, yes.