1    Q    Okay.  So you were anticipating, based on that initial

2    phone call, that there would probably be an attempt to make a

3    controlled delivery of a package that contained suspected

4    narcotics or drugs?

5    A    No, we received a phone call, then we went out to make

6    sure the address actually existed.

7    Q    Okay.  You did that first?

8    A    We did that.  We ran a database check on the residence of

9    the location and we came up with the names of Brenda and Rick

10   Vo, and it matched the last name of the intended recipient of

11   the package.

12   Q    And this was all done on the 4th of October?

13   A    Yes.

14   Q    Okay.  At that point you did not have the drugs to

15   deliver yet; is that right?

16   A    That's correct.

17   Q    Once the house was found and determined to exist, that

18   the address was a real address, in other words, was it staked

19   out at any time?

20   A    When we took the pictures, we were there for a little

21   bit, but we did not stake it out.  We did not sit there for

22   hours looking at it.

23   Q    You kind of drove by, took some --

24   A    We drove by, we made sure it existed, we took pictures

25   and then we went back to the office.

Exhibit A.2

1    Q    Okay.  Was any attempt made to ascertain who lived there?

2    A    Other than database search, we looked -- we went through

3    a database, I don't remember which one it was, and we got the

4    names of Brenda and Rick Vo at the location.

5    Q    All right.  And then you went through the process you

6    described, you got a search warrant, you got basically an

7    anticipatory search warrant, right?

8    A    That's correct.

9    Q    And that warrant allowed you to put the transmitting

10   device in the package?

11   A    Yes.

12   Q    And allowed you then, once the package had been delivered

13   to the address where it's supposed to go, you could then

14   execute the warrant?

15   A    That's correct.

16   Q    Did the warrant require you to wait until the beeper went

17   off or the transmitter went off before you executed the

18   warrant?

19   A    Yes.

20   Q    Okay.  So basically, this was truly anticipatory in the

21   sense that you get the warrant ahead of time, you deliver the

22   package, you wait outside; if the beeper goes off, you go in?

23   A    That's correct.

24   Q    About right?

25   A    Yes.

1    Q    Okay.  And the delivery was scheduled for the 5th, that

2    would be the day after you initially got the call; is that

3    right?

4    A    That's when we scheduled it, yes.

5    Q    Okay.  And it was one of your agents that was going to

6    dress up like a Fed Ex man and make the delivery?

7    A    That's correct.

8    Q    Now, I gather from your earlier testimony that you had a

9    team of about eight people involved in the execution of this

10   search warrant?

11   A    That's correct.

12   Q    Or more correctly to say, you had eight people lined up

13   ready to execute it if the conditions the warrant required

14   were met?

15   A    There were eight people on scene.  They weren't lined up,

16   but --

17   Q    Well, on scene.

18   A    On scene.

19   Q    And they all had specific tasks and jobs to do if the

20   warrant was going to be executed?

21   A    Correct.

22   Q    You've described one guy had a battering ram to knock the

23   door down?

24   A    That's correct.

25   Q    And that was his specific task?

1    A    That's correct.

2    Q    Okay.  You had a dog man there with a dog?

3    A    He was on scene also, yes.

4    Q    And he was the -- he was the guy to go in and they were

5    going to sniff the place out and see if there were any drugs?

6    A    That's correct.

7    Q    And you had numerous other agents?

8    A    That's correct.

9    Q    Were all of the agents, dog handler included, armed?

10   A    Yes.

11   Q    And how were the DEA agents dressed?  Describe your

12   attire when you went to the house that day to pay a call and

13   deliver the -- and execute the warrant.

14   A    I can't describe everyone's attire, everyone had

15   something different, but we all had entry vests which says

16   "DEA Police" on it.

17   Q    Entry vests are like bullet-proof jackets?

18   A    Bullet-resistant jackets, yes.

19   Q    And they are what color?

20   A    Black in color.

21   Q    They say "DEA" across the front and the back?

22   A    Yes, they do.

23   Q    Okay.  You guys wearing helmets?

24   A    Whoever had a helmet probably was wearing it.

25   Q    So some guys were wearing helmets?

1    A    Yeah.  I think -- I'm not sure who wore a helmet.  I did

2    not wear a helmet, though.

3    Q    Okay.  See, this is beginning to sound a lot like what we

4    see on TV, helmets, goggles, night vision equipment on

5    submachine guns, all that kind of stuff.  What -- what were

6    you guys carrying by way of weapons?

7    A    Our handguns.

8    Q    Submachine guns?

9    A    I don't think anyone had one on scene, no.

10   Q    Shotguns?

11   A    There might have been a shotgun on scene, but that did

12   not go inside the house until after people were taken out of

13   the house.

14   Q    Okay.  So now the Fed Ex guy arrives and you guys are at

15   the scene waiting, and the Fed Ex man arrives with the

16   package, right?

17   A    Special Agent Tom Hughes, yes.

18   Q    Okay.  And he knocks on the door, someone comes to the

19   door and he delivers the package?

20   A    That's what came over the radio, yes.

21   Q    You did not personally observe that because you were a

22   block away?

23   A    Right.  That's correct.

24   Q    But he told you what he observed when he delivered the

25   package, didn't he?  Didn't he broadcast that?

1    A    Yes.

2    Q    He said this kid came to the door, a 12-year-old girl --

3    or not 12-year-old, but some young girl comes to the door and

4    I gave the package to her; is that right?

5    A    That's correct.

6    Q    Did he say that he had asked her:  Are you Gabriella Vo?

7    That's who this package is supposed to go to?

8    A    Did he tell me afterwards?  Yes.

9    Q    So he inquired when he delivered the package:  Are you

10   Gabriella?  And she said:  Yes?

11   A    That's correct.

12   Q    And he delivers the package?

13   A    Right.

14   Q    Was a photograph taken of the delivery?

15   A    No.

16   Q    So we don't have a picture of the Fed Ex guy standing

17   there handing her a package?

18   A    No.

19   Q    Okay.  Did -- to your knowledge, did Agent Hughes tell

20   you later that he inquired of Gabriella who else was home?

21   A    I don't remember.

22   Q    Okay.  At any rate, how long was it from the time Agent

23   Hughes delivers the package to the time the -- the transmitter

24   transmits?

25   A    A couple minutes probably.  It wasn't that long.

1    Q    And what happened at that time?

2    A    After we were advised the transmitter went off, then we

3    drove up to the house, lined up, and then we knocked and

4    announced.

5    Q    When you say "lined up," you didn't have eight guys

6    standing in line out there in front of the front door, did

7    you?

8    A    Not eight guys.  There were, I think, five -- five or six

9    of us at that point.

10   Q    And a couple people around back --

11   A    Yes.

12   Q    -- checking to make sure nobody jumped out a back window

13   and made a run for it?

14   A    That's correct.

15   Q    And they were all armed?

16   A    Everyone was armed, yes.

17   Q    And they all had their guns drawn?

18   A    The people that were outside with me?  Yes.

19   Q    Okay.  And there's a knock on the door by whom?

20   A    Special Agent Vo knocked and announced.

21   Q    Steve Vo?

22   A    Yes.

23   Q    He knocks on the door, and he says what?

24   A    He announces:  Police depart -- Police.  We have a search

25   warrant.

1    Q    And does he say that in a conversational tone like I'm
2    speaking right now, or does he say it loud?
3    A    No, he said it loud.
4    Q    Real loud?
5    A    Loud enough for the occupants to hear.
6    Q    And does he, like, ring the door bell or does he pound on
7    the door?
8    A    No, he knocked on the door.
9    Q    Knock?
10   A    He knocked maybe a little louder than that.
11   Q    (Demonstrating.)
12   A    Probably that about.
13   Q    Okay.  And now you knew going in there was a 12-year-old
14   kid in the house or young girl in the house?
15   A    We knew there was a child, yes.
16   Q    Okay.  And you waited, you say, 30 seconds?
17   A    Approximately about 30 seconds.  We knocked and we
18   waited; no answer.
19   Q    Did you knock more than once?
20   A    He knocked more than once.
21   Q    Did he announce more than once?
22   A    Yes.
23   Q    Okay.  So there's no response.  And so the battering ram
24   guy comes up?
25   A    Same person.

1    Q    Steve Vo?

2    A    Yes.

3    Q    So he was ready with the battering ram, he knocks and he

4    stands by.  And the battering ram, describe it.  What are we

5    talking about here?

6    A    Piece of metal about three-feet long with handles on

7    them.

8    Q    And it's real heavy?

9    A    It -- it has some weight to it.  It's not real heavy.

10   Q    How heavy?

11   A    20 pounds, 15 pounds maybe.

12   Q    Does it have like a blunt front end so that it -- for

13   knocking on the -- knocking the door down?

14   A    Yes.

15   Q    And the whole object is to knock the door clean off its

16   hinges, if you can, to gain entry immediately?

17   A    To open the door, yes.

18   Q    Well, open it not by turning the knob?

19   A    Right.

20   Q    You have to break the lock off or break whatever is

21   holding it in place to get it open?

22   A    That's correct.

23   Q    And how big a fellow is Mr. Vo?

24   A    He's about 5'5", weighs about 150, 160 pounds.  I'm not

25   sure.

1    Q    And he applies the battering ram to the door?

2    A    He hit it a few times, yes.

3    Q    And the door goes down?

4    A    The door eventually went down.

5    Q    Clean off its hinges?

6    A    Yes.

7    Q    Flat on the ground?

8    A    Yes.

9    Q    And you -- and who is the first guy in the place?

10    A    I was.

11    Q    Okay.  And when you entered, did you enter at a normal

12    pace or did you go rushing in?

13    A    Well, as soon as I entered, the staircase was up there,

14    and I saw the child upstairs.  So I stopped her right there.

15    Q    Okay.  And when people entered, were they yelling loudly

16    as they entered?

17    A    They were saying that they were police department.

18    Q    And they rushed through the house to secure the premise?

19    A    No, first, we -- we had the child upstairs, and then the

20    other person, Khanh Vo, right around the corner.  They were

21    taken out of the residence, and then the rest of the house was

22    secured.

23    Q    Okay.  And the child, who took custody of the child?

24    A    I asked her to come down the stairs; she came down the

25    stairs, and Special Agent Cubillos, Alice Cubillos stayed with

1    the child.

2    Q    Where was the package, by the way?

3    A    It was upstairs in the kitchen.

4    Q    So the kitchen to this house is on the upstairs level?

5    A    Yes.

6    Q    And Mr. Khanh Vo, where was he found?

7    A    He was right around the corner behind the staircase.

8    Q    On the first floor?

9    A    On the first floor.

10   Q    So the house is then entered.  The people are removed.

11   There were only two people in the house, right?

12   A    After we secured the residence, those are the only two we

13   found, yes.

14   Q    Okay.  So those two people were taken outside, and then

15   the dog handler goes through and basically the search takes

16   place to find the package?

17   A    Yes.

18   Q    And the package was found intact?

19   A    It was opened, it was on the kitchen counter, yes.

20   Q    Were the contents removed?

21   A    No, it was just opened.  You could see the contents --

22   Q    The box was sitting there with the flaps open?

23   A    Right.

24   Q    And that's it?

25   A    Yeah.  That's correct.

1    Q    Okay.  And then you proceeded to execute a search of the

2    rest of the house.  For what?

3    A    Looking for any other drugs, any weapons in the house,

4    any other people.  That's what we initially started, go

5    looking for people.

6    Q    Did you find any people?

7    A    No.

8    Q    Find any guns?

9    A    We didn't find any guns, no.

10    Q    Find any drugs?

11    A    No, but the -- the canine indicated that there were

12    narcotics or it indicated positive alert for narcotics in the

13    residence.

14    Q    The canine acted like he would act if drugs were present,

15    but no drugs were found?

16    A    Correct.

17    Q    You are not the dog handler?

18    A    No.

19    Q    Okay.  Let's talk about the interior of the house for a

20    moment.  The downstairs level has two -- a two-car garage?

21    A    Yes.

22    Q    A living room?

23    A    Yes.

24    Q    A staircase going upstairs?

25    A    That's correct.

1    Q    And a back bedroom?

2    A    Has a back bedroom, a laundry area.  There's a bathroom

3    back there also.

4    Q    The back bedroom is what you have been describing as a

5    bedroom/office arrangement?

6    A    That's correct.

7    Q    There was a computer in there?

8    A    There was a work station, there were files in there, file

9    cabinet that was all against the wall in that room.

10   Q    And the computer was seized too, wasn't it?

11   A    Two computer towers were seized.

12   Q    So you took them basically thinking there might be drug

13   evidence on the computers?

14   A    That's correct.

15   Q    But you found out there wasn't any, didn't you?

16   A    I don't remember.  I -- I didn't look at the analysis.

17   The analysis was sent here to this office.

18   Q    I see.  But to your knowledge -- nobody told you that

19   they found any drug evidence on either of the computers?

20          MR. MUEHLECK:  Objection.  Asks for hearsay.

21          MR. WEIGHT:  Well, Your Honor, it's part of his

22   investigation.

23          THE COURT:  I'll allow it.

24   BY MR. WEIGHT:

25   Q    Did they?

1    A    No.  I was told there were some records, that's all.

2    Q    Okay.  And the seal-a-meals, there were two of them found

3    in a cardboard box in a closet in the bedroom/office area on

4    the first floor; is that right?

5    A    That's correct.

6    Q    Okay.  And that's what you have up there at the witness

7    box right now as Government's Exhibit 9 and 10?

8    A    That's correct.

9    Q    In Government's Exhibit 10, you have described a roll of

10   seal-a-meal bags or -- is that right, is that what it is?

11   A    Yeah, that's correct.

12   Q    And you have described that as being similar to the

13   bags -- to two of the bags that were found in the drug

14   evidence that was brought up from Honolulu; is that right?

15   A    That's right.

16   Q    These seal-a-meals, are they commercially available?

17   A    Yes, they are.

18   Q    They can be purchased in department stores and sundry

19   stores all over the country; isn't that true?

20   A    That's correct.

21   Q    And likewise, the bags or the things that you use to put

22   the stuff in that you are going to seal, like food?

23   A    That's correct.

24   Q    In the course of your investigation in this case, did you

25   go into the kitchen?

 1   A     We did go to the kitchen, yes.

 2   Q     Did you inspect the refrigerator and freezer?

 3   A     I didn't myself.   I'm sure someone else --

 4   Q     Did another agent inspect the freezer and ice box?

 5   A     I'm sure they did.

 6   Q     And the reason they do that is oftentimes in your

 7   experience drugs are found kept in freezers and ice boxes;

 8   isn't that so?

 9   A     That's correct.

10   Q     But no drugs were found in this case?

11   A     No.

12   Q     Did you find packages of food in seal-a-meal bags in

13   either the freezer or the refrigerator?

14   A     I did not myself.

15   Q     Did any other agents find anything like that, to your

16   knowledge?

17   A     I wasn't told of any.   I don't know.

18   Q     So nobody mentioned it to you?

19   A     No.

20   Q     The fact of the matter is nobody was looking to see what

21   kind of frozen food they had, you were looking for drugs?

22   A     That's correct.

23   Q     When the -- strike that.

24         To your knowledge, the only evidence that the dog

25   actually hit on where there was some evidence that drugs might

```
 1   be involved was the seal-a-meal; is that right?
 2   A    No.
 3   Q    No?
 4   A    No.
 5   Q    There was something else?
 6   A    The dog indicated a positive alert to other parts of the
 7   house on the upper level.
 8   Q    And what specifically?
 9   A    In the hallway and in one of the bedrooms, and the dog
10   was indicating something up in the air.
11   Q    He was sniffing around and acting like there might be
12   something in the air?
13   A    Something up high.
14   Q    Okay.  Did you have the dog sniff the money?
15   A    Yes.
16   Q    Did he alert on the money?
17   A    No.
18   Q    Did you have him sniff the safe?
19   A    I don't know if we had him alert -- sniff on the safe, I
20   don't know.
21   Q    And now let's talk about that safe.  That safe is a
22   typical little safe that you can buy at Kmart or Wal-Mart or
23   Costco to put in your house, right?
24   A    That's correct.  Yes.
25   Q    We're not talking about some huge bank safe?
```

 1   A    No.

 2   Q    How big is it?  Describe it to the jury.

 3   A    I'd say 18-by-18 inches.  I think Century model,

 4   something to that effect.

 5   Q    And how would you gain access to the safe, how do you get

 6   into it?

 7   A    They broke into it.  The Los Angeles -- L.A.P.D.

 8   detectives broke it, broke the lock and got into it.

 9   Q    Okay.  And in the safe they found money and watches?

10   A    Money and watches and the keys to the cars.

11   Q    And the keys to the cars.  And these are in the master

12   bedroom?

13   A    In the master bedroom, in the closet on the ground, on

14   the floor.

15   Q    Okay.  So the safe was in the closet in the master

16   bedroom?

17   A    Yes.

18   Q    On the floor.  And was there evidence that this master

19   bedroom was occupied by a man and a woman?

20   A    Yes.

21   Q    When you submitted items to the lab, you use a form you

22   call a DEA-7; is that right?

23   A    That's correct.

24   Q    And you used one with reference to the items in

25   Government's Exhibit Number 9, which are the seal-a-meals?

1    A    Yes.

2    Q    And in that exhibit you asked the lab to look for things?

3    A    Yes.

4    Q    You asked them to see is there any evidence of drugs on

5    either of these devices?

6    A    That's correct.

7    Q    And you asked them to see if there were any fingerprints?

8    A    No, I did not ask for that on this form.

9    Q    You did not.  Did you ask them for them in some other

10   form?

11   A    Later on we contacted the lab and asked for fingerprint

12   analysis.

13   Q    And what did that analysis come back?

14   A    I don't think there was anything found.

15   Q    No fingerprints?

16   A    That's correct.

17   Q    To your knowledge, did they fingerprint the seal-a-meal

18   roll of bags --

19   A    No.

20   Q    -- in Government's Exhibit 10?

21   A    They did not.

22   Q    They did not?

23   A    No.

24   Q    They did fingerprint -- or you did request them to

25   fingerprint the bags that had originally contained the drugs

KARABINAS - REDIRECT

1    that had come up from Honolulu?

2    A    That's correct, yes.

3             MR. WEIGHT:  I have no further questions of this

4    witness at this time, Your Honor.

5             THE COURT:  Mr. Muehleck?

6             MR. MUEHLECK:  A moment please, Your Honor.

7                       (Pause in the proceedings.)

8             MR. MUEHLECK:  May I approach and get the proffered

9    exhibits, Your Honor?

10            THE COURT:  You may.

11            MR. MUEHLECK:  Thank you.

12            Approach the witness with 23 marked for

13    identification?

14            THE COURT:  You may.

15            MR. MUEHLECK:  And 16 marked for identification.

16                     REDIRECT EXAMINATION

17   BY MR. MUEHLECK:

18   Q    Mr. Weight asked you about requesting fingerprint

19   analysis on the packaging material, which is, I believe,

20   Exhibit 19 marked for identification, the box?

21   A    Yes.

22   Q    All right.  And you said you requested it in a document?

23   A    Yes.

24   Q    Okay.  Is that document in front of you?

25   A    Yes, it is.

1    Q    What -- what is the exhibit number of that document?

2    A    Well, it's in both, it's Exhibit 16 and 23.

3    Q    Okay.  Does one document go to the lab and the other

4    document come back with the response from the lab?

5    A    That's correct.

6    Q    Okay.  The document that went down to the lab requesting

7    analysis is what number?

8    A    Number 16.

9    Q    All right.  And the -- the response back from the lab?

10   A    I'm sorry.  The one going down to the lab, it's

11   probably -- we send one copy down and they return it back to

12   us.

13   Q    Okay.  Is a copy, that's what's sent down to the lab kept

14   in the file at the DEA office --

15   A    Yes.

16   Q    -- in Los Angeles?

17   A    Yes.

18   Q    Okay.  Looking at 16 marked for identification, can you

19   tell us if that indicates or requests a fingerprint analysis?

20   A    Yes, it does.

21   Q    And who prepared that part of the document, 16 marked for

22   identification?

23   A    I did.

24   Q    And that was a request for fingerprint analysis of what,

25   Agent Karabinas?

1    A    Of the whole item, plastic bags, the drugs, whatever is
2    in there.
3    Q    Alice -- you used the name Alice -- Special Agent
4    Sabillos (phonetic)?
5    A    Cubillos.
6    Q    I'm sorry.  Spell, please.
7    A    C-U-B-I-L-L-O-S.
8    Q    And who does she work for?
9    A    For DEA also.
10   Q    What was -- what were her -- she was at the site on
11   October 15th?
12   A    Yes, she was.
13   Q    Excuse me, October 5?
14   A    Five, yes.
15   Q    And what were her duties?
16   A    Well, she's -- she was with us, she was on the line, part
17   of the search team.
18   Q    Once you entered into the home, do you know what she did?
19   A    She stayed with the child.
20   Q    How long after the transmitter went off did you execute
21   or start to go for the door?
22   A    Short -- after we were told on the radio that the
23   transmitter went off, we started moving toward the door.
24   Q    How much time had expired from when the transmitter went
25   off to when you got moving towards the door?

1    A    Probably --

2    Q    You got into the residence?

3    A    Probably about a minute.

4    Q    And how long was it after the package was delivered that

5    the transmitter went off?

6    A    Shortly afterward.

7    Q    You know what Agent Hughes was doing in the residence

8    after he entered?

9    A    He was part of the search team and providing security

10   also.

11             MR. MUEHLECK:  One moment please, Your Honor.

12                      (Pause in the proceedings.)

13             MR. MUEHLECK:  May I retrieve 23 and 16, Your Honor?

14             THE COURT:  You may.

15             MR. MUEHLECK:  I don't have any other questions for

16   this witness.

17             MR. WEIGHT:  I don't have any further questions, Your

18   Honor.

19             THE COURT:  Thank you.  You may step down.

20                                      (Witness excused)

21             MR. MUEHLECK:  May I call the next witness, Your

22   Honor?

23             THE COURT:  Yes, please.

24             MR. MUEHLECK:  Call Tom Hughes.

25                      TOM HUGHES,

 1    called as a witness by the Government, having been first duly

 2    sworn, was examined and testified as follows:

 3                THE CLERK:  Please be seated.

 4                Please state your name and spell your last name.

 5                THE WITNESS:  First name Tom, last name Hughes.  Last

 6    name spelled H-U-G-H-E-S.

 7                              DIRECT EXAMINATION

 8    BY MR. MUEHLECK:

 9    Q    Mr. Hughes, how are you employed?

10    A    I am currently a special agent with the Drug Enforcement

11    Administration in Los Angeles.

12    Q    How long have you been with DEA?

13    A    Approximately three years.

14    Q    How long have you been working in Los Angeles?

15    A    Approximately two-and-a-half.

16    Q    Were you employed with the -- and your position in Los

17    Angeles, the last couple of years has been what?

18    A    Special agent at LAX narcotics task force.

19    Q    Do you know an Ari -- Special Agent Ari Karabinas?

20    A    Yes, I do.

21    Q    How do you know him?

22    A    He's a co-worker of mine.

23    Q    On October 5th of last year, what were your duties?

24    A    I was to work in undercover capacity to deliver the Fed

25    Ex box to the Vo residence located at 8009 Hulbert Avenue in

1    Playa del Rey, California.

2    Q    And as an under -- in an undercover role, how are you

3    attired?

4    A    I was dressed in a Federal Express uniform, polo shirt

5    with blue pants.

6    Q    Okay.  And what did you do that day as the Fed Ex

7    undercover?

8    A    I went to the above residence and rang the doorbell.  A

9    young female, Asian, approximately teenager, I think 12 years

10   old, came to the door.  I said:  I have a package for

11   Gabriella Vo.  The young lady said:  I'm Gabriella Vo.  I

12   asked her to sign for it, at which time she did and --

13   Q    Let me ask you -- I'm sorry.

14   A    Yes, sir.

15   Q    You said you had a package?

16   A    Yes, sir.

17   Q    Would you recognize the package if you saw it again?

18   A    Yes, I would.

19        MR. MUEHLECK:  One marked for identification, Your

20   Honor, to the witness?

21        THE COURT:  You may.

22        MR. MUEHLECK:  One admitted, correct?  Admitted

23   exhibit, excuse me, to the witness.

24   BY MR. MUEHLECK:

25   Q    Agent Hughes, you recognize that?

1    A    Yes, I do.

2    Q    What is that?

3    A    This is the package that I delivered to Gabriella Vo.

4         MR. MUEHLECK:  Approach the witness with Exhibit 3.

5    BY MR. MUEHLECK:

6    Q    You can put that aside, please.

7         MR. MUEHLECK:  Admitted exhibit, Your Honor,

8    photograph?

9         THE COURT:  You may.

10   BY MR. MUEHLECK:

11   Q    Agent Hughes, would you explain to -- you recognize this

12   exhibit?

13   A    This is the Vo residence in Playa del Rey, California.

14   Q    Is that the residence you went to on October 5th?

15   A    That's correct.

16   Q    Could you point or orient us -- orient the jury as to

17   where you went on October 5th to deliver Exhibit 1, the box?

18   A    Sure.  I parked the car on the sidewalk and walked on

19   foot to this area right here, the area right here on the front

20   door.

21   Q    And that's where Gabriella Vo came?

22   A    That's correct.

23   Q    Did you ask Gabriella Vo any questions or have any

24   conversation with her?

25   A    No, I did not.

1    Q    How long were you at the front door?

2    A    Approximately a minute to a minute-and-a-half.

3    Q    Then where did you go?

4    A    I as an -- as an undercover, you have to leave the scene

5    immediately.  I got in my truck, which was a Fed Ex van, and

6    drove away.

7    Q    Did you have occasion to go back into the residence

8    depicted in Exhibit 3 on October 5th, Agent Hughes?

9    A    Yes, I did, when the -- the house was secured.

10    Q    And what did you do?

11    A    I at that time -- the individual there by the name of

12    Khanh Vo was there, and I sat with him until the agents were

13    done searching the residence.

14    Q    Did you see a safe at that residence that day?

15    A    Yes, I did.

16    Q    Okay.  And was the safe locked or unlocked when you saw

17    it?

18    A    It was locked.

19    Q    Okay.  And how were you able to get into it?  Was it open

20    that day, the safe?

21    A    It was opened later in the day with a pry bar.

22    Q    Did you ask Mr. Khanh Vo if he knew the combination to

23    the safe?

24    A    Yes, I did.

25    Q    What was his response?

1    A    He did not know the combination.

2              MR. MUEHLECK:  Moment please, Your Honor.

3                    (Pause in the proceedings.)

4              MR. MUEHLECK:  16 marked for identification,

5    Mr. Weight.

6              Again, to the witness, if I might, Your Honor?

7              THE COURT:  You may.

8    BY MR. MUEHLECK:

9    Q    Have you seen 16 marked for identification before, Agent

10   Hughes?  Can you identify that document?

11   A    Yes -- yes, I can.

12   Q    How can you identify that document?

13   A    I was the one who wrote the document indicating that the

14   methamphetamine had been processed by our agency.

15   Q    And what was done with the methamphetamine after it was

16   processed by your agency?

17   A    We sent it via Federal Express to the drug lab in

18   San Diego.

19   Q    How was it taken to the Fed Ex -- lab in San Diego?

20   A    It was sent.

21   Q    Wasn't it hand-carried by you, the methamphetamine?  Take

22   your time and read the exhibit, if it will refresh your

23   memory.

24   A    I will.

25   Q    Directing your attention to block 21.

 1    A    That is correct.

 2    Q    Can you tell us when you took the methamphetamine to the

 3    laboratory in San Diego?

 4    A    On October 8th, 2002.

 5    Q    And where did you get it from?

 6    A    I got it from our safe at the LAX office.

 7    Q    We're talking about the methamphetamine that was

 8    originally seized in Honolulu?

 9    A    That's correct.

10    Q    Do you recall what you did with it when you took it to

11    the lab in San Diego?

12    A    I handed it over to Kristin -- if I can spell her last

13    name, F-R-O-E-T-S-C-H-E-R, and she received it and gave me

14    this receipt.

15    Q    Who is she employed by?

16    A    The Drug Enforcement Administration.

17              MR. MUEHLECK:  One moment please, Your Honor?

18                   (Pause in the proceedings.)

19              MR. MUEHLECK:  No further questions of the witness,

20    Your Honor.

21              MR. WEIGHT:  No questions, Your Honor.

22              THE COURT:  Thank you.  You may step down.

23                                        (Witness excused)

24              MR. MUEHLECK:  Call our next witness, Your Honor?

25              THE COURT:  Yes.

```
 1              MR. MUEHLECK:  Call Agent Steve Vo.

 2         Thank you, Agent Hughes.

 3                   (Pause in the proceedings.)

 4              MR. MUEHLECK:  Court intends to quit at 12:00, Judge?

 5         THE COURT:  Correct.

 6              MR. MUEHLECK:  Thank you.

 7              THE COURT:  Would save a little time if you had your

 8   witnesses.

 9              MR. MUEHLECK:  They're supposed to be out there,

10   Judge.  Let me step outside.  I have other witnesses we can

11   take out of order, if the court wishes.

12         I also had them here yesterday, Your Honor.

13         Please step forward, sir, to the lady in the blue

14   jacket.

15                        STEVE VO,

16   called as a witness by the Government, having been first duly

17   sworn, was examined and testified as follows:

18              THE CLERK:  Please be seated.

19         Please state your name and spell your last name.

20              THE WITNESS:  First name is Steve, last name is Vo,

21   spelled V-O.

22                   DIRECT EXAMINATION

23   BY MR. MUEHLECK:

24   Q    How are you employed, Mr. Vo?

25   A    Sir?
```

1    Q    How are you employed?

2    A    I am employed with the Drug Enforcement Administration.

3    Q    In what capacity?

4    A    I'm a special agent investigator for the Drug Enforcement

5    Administration.

6    Q    How long have you been a special agent with DEA?

7    A    Approximately five years.

8    Q    And where are you assigned?

9    A    Los Angeles field division.

10   Q    Were you working with the Los Angeles field division

11   office or with the field division of the Los Angeles DEA on

12   October 5th of last year, 2002?

13   A    Yes, sir.

14   Q    What were your duties that day, Agent Vo?

15   A    Assisting fellow agents.

16   Q    Doing what?

17   A    Doing a search warrant on a residence.

18   Q    Do you recall where that residence was?

19   A    Yes, sir.

20   Q    Where was it?

21   A    It's 8009 Hulbert Street in Playa del Rey.

22   Q    In California?

23   A    Yes, sir.

24   Q    Is that Playa del Rey, is that a suburb of Los Angeles?

25   A    I --

1    Q    Okay.

2    A    I don't know.

3    Q    All right.  What were you -- what particularly did you do

4    to assist the other agents that day, October 5th?

5    A    I was in seizing the property at the residence.

6    Q    Seizing property?

7    A    Yes, sir.

8    Q    Did you help execute the actual warrant and enter the

9    property?

10   A    Yes, sir.

11   Q    What did you do to enter the property?

12   A    I was the -- I was the knock and announce.

13   Q    Explain what you mean to the jury, you were the knock and

14   announce?

15   A    Well, basically we had a team lined up at the front door.

16   I was the man to approach the front door and announce the

17   police present.

18   Q    How do you announce that?

19   A    "Police, police, federal search warrant."

20   Q    Do you announce it in the same voice that you and I are

21   talking this morning?

22   A    No.  A higher voice.

23   Q    Louder voice?

24   A    Yes, sir.

25   Q    Okay.  And did you do -- do so that morning with a loud

1    voice?

2    A    Yes, sir.

3    Q    Then what did you do?

4    A    Then approximately 30 seconds there's -- there's no

5    answer.

6    Q    Was there an answer?

7    A    No, sir.

8    Q    Then what happened?

9    A    Then I have to knock the door down.

10   Q    How did you knock the door down?

11   A    With the breacher.

12   Q    I'm sorry?

13   A    With the --

14   Q    Did you say breacher?

15   A    Yeah.

16   Q    To breach you mean?

17   A    To breach the door down.

18   Q    And you call it a breacher?

19   A    Yes.

20   Q    Have you ever heard it called a ram?

21   A    A ram, yes.

22   Q    How did you proceed to breach the door?

23   A    Uh.

24   Q    Stand up and show us, please.

25   A    I use -- I use force, pulled it back and just hit the

 1    door (demonstrating).

 2    Q    How many times did you have to hit the door?

 3    A    A lot of times because it's a -- it's a big door.

 4    Q    Did you knock -- were you able to breach that door?

 5    A    Yes.

 6    Q    And did the door come off the hinges?

 7    A    Yes.

 8    Q    Then what happened?

 9    A    Then the whole team entered the residence.

10    Q    Sit down, please, sir.  Thank you.

11         Whole team entered the residence?

12    A    Correct.

13    Q    And you said you seized property that day?

14    A    Yes, sir.

15    Q    What did you seize, Mr. Vo -- Agent Vo?

16    A    My duty was to seize and process the -- the Rolexes,

17    watch.

18    Q    How many Rolex watches did you seize?

19    A    There were -- there are four -- five.  I'm sorry, five.

20    Four of them, 18 karat gold, diamonds.

21    Q    And the fifth?

22    A    And one female.

23    Q    And a female watch?

24    A    Four men and one female.

25         MR. MUEHLECK:  Mr. Weight.

1              Approach, Your Honor, with 4 marked for

2    identification?

3              THE COURT:  You may.

4    BY MR. MUEHLECK:

5    Q    Mr. Vo, can you see 4 marked for identification?

6    A    Yes, sir.

7    Q    Can you identify this photograph?

8    A    Yes, sir.

9    Q    What is this photograph of?

10   A    There are five Rolex watch.

11   Q    And where were they from?

12   A    From the residence, inside the safe in the master

13   bedroom.

14   Q    October 5th of last year?

15   A    Yes, sir.

16   Q    At the residence you just spoke about?

17   A    Yes, sir.

18   Q    Does this photograph accurately depict and portray the

19   watches on that day, October 5th of last year?

20   A    Yes, sir.

21             MR. MUEHLECK:  Offer the exhibit, Your Honor.

22             MR. WEIGHT:  No objection.

23             THE COURT:  Government's 4 is admitted.

24        (Government's Exhibit 4 was received in evidence.)

25   BY MR. MUEHLECK:

1    Q      Were they all --

2                MR. MUEHLECK:  May I publish, Your Honor?

3                THE COURT:  You may.

4                MR. MUEHLECK:  If I could stand over here once more,

5    Judge?

6                THE COURT:  You may.

7                MR. MUEHLECK:  Thank you.

8                The pointer, may I, Ms. Miwa?

9                THE CLERK:  Yes.

10               MR. MUEHLECK:  Thanks a lot.

11   BY MR. MUEHLECK:

12   Q      Agent Vo, do you see the ladies' watch that you're

13   talking about?  Would you point it out for us?

14   A      This is the ladies'.

15   Q      On the far left-hand side?

16   A      Yes, sir.

17   Q      Okay.  Were they -- all the watches when seized, were

18   they in this -- this box marked Rolex?

19   A      Yes, sir.

20               MR. MUEHLECK:  Moment please, Your Honor.

21                    (Pause in the proceedings.)

22               MR. MUEHLECK:  I don't have any other questions for

23   the witness, Your Honor.

24               MR. WEIGHT:  No questions.

25               THE COURT:  Thank you.  You may step down.

1                             (Witness excused)

2              THE COURT:  Next witness?

3              MR. MUEHLECK:  Next witness was a Mr. Goldberg, Gary

4     Goldberg, Your Honor.

5                         GARY GOLDBERG,

6     called as a witness by the Government, having been first duly

7     sworn, was examined and testified as follows:

8              THE CLERK:  Please be seated.

9              Please state your name and spell your last name.

10             THE WITNESS:  My name is Gary Goldberg,

11    G-O-L-D-B-E-R-G.

12                       DIRECT EXAMINATION

13    BY MR. MUEHLECK:

14    Q    Mr. Goldberg, how are you employed?

15    A    I'm a senior forensic chemist for the U.S. Drug

16    Enforcement Administration.

17    Q    How long have you been a chemist with the DEA?

18    A    Almost 21 years.

19    Q    And where are you assigned, sir?

20    A    Our laboratory is in Vista, California, which is in

21    San Diego.

22    Q    And let me ask you a little bit about your training, if

23    you would, please, in the field of chemistry, I guess.

24             Tell us about that.

25    A    I have a Bachelor's of Science degree in chemistry from

1    Northern Arizona University, and I completed a ten-month

2    training program at the laboratory before becoming a forensic

3    chemist.

4    Q    And your duties as a forensic chemist with DEA at the

5    Vista laboratory?

6    A    My primary duty is to analyze exhibits that are submitted

7    to the lab to determine if they contain controlled substances

8    or not.  I also testify in court, I assist agents in the

9    seizure of clandestine laboratories, and I conduct training

10   for various police law enforcement personnel as well as other

11   chemists in various aspects of my job.

12   Q    How many times have you had the opportunity or the duty,

13   I guess I should say, to analyze compounds for the presence of

14   controlled substances?  That is, to act as a forensic chemist,

15   how many times have you had that opportunity?

16   A    Approximately a little over 9,000 times.

17   Q    Have you ever been accepted as an expert in the field of

18   forensic chemistry for the determination of the presence of

19   controlled substances?

20   A    Yes, I have.

21   Q    On what -- in court, in a courtroom before?

22   A    Yes.

23   Q    How many courts roughly?  How many times has that

24   happened?

25   A    Approximately 150 times.

1          MR. MUEHLECK:  Your Honor, I'm going to offer the

2     witness as an expert in the field of forensic chemistry for

3     the determination of the presence of controlled substances.

4          THE COURT:  Mr. Weight?

5          MR. WEIGHT:  Voir dire?

6          THE COURT:  You may.

7                       VOIR DIRE EXAMINATION

8     BY MR. WEIGHT:

9     Q     Is it Dr. Goldberg or Mr. Goldberg?

10    A     No, sir, just mister.

11    Q     You hold a Bachelor's Degree from Northern Arizona

12    University?

13    A     Yes, sir.

14    Q     In chemistry?

15    A     Yes.

16    Q     What subsequent training have you had in chemistry?

17    A     Pardon me?

18    Q     What subsequent training have you had in chemistry since

19    you left the university, Northern Arizona University?

20    A     The training program at the DEA laboratory, which was

21    specifically designed for identifying controlled substances as

22    well as testifying, seizing clandestine laboratories, so it

23    was specific to the job.  I have since also taken many

24    training classes which have been provided by instrument --

25    instrument manufacturers in the operation of the various

1    instruments that we use, as well as several universities

2    pertaining to the theory of the various instrumental

3    techniques that we use.

4    Q    Well, what training, then, did you receive from the DEA

5    in how to analyze for drugs?

6    A    That was a forensic chemist training program that was

7    in-house at our laboratory.  There was -- there at the time

8    was a chemist assigned as the training officer in the

9    laboratory, and one of his responsibilities was to train new

10   forensic chemists in how to do the job.

11   Q    And how long does that training take or how long does it

12   run?

13   A    It took me, because there were several breaks involved

14   because part of my time in training was spent as a co-op

15   student, so I actually had not graduated from college yet.  So

16   between -- for the actual amount of time that I was in the DEA

17   lab training, it was approximately ten months.

18   Q    So the actual training time, if you put it all together,

19   would be about ten months?

20   A    Yes, sir.

21   Q    Okay.  And that was under the supervision of whom?

22   A    The chemist, who was the training officer at our lab at

23   the time, was Robert Arnold.

24   Q    And what is his background?

25   A    He had been a DEA chemist for at that point probably at

1    least 15, 18 years, but I don't know his educational

2    background.

3    Q    All right.  So you received your chemistry degree, a

4    Bachelor's of Chemistry -- a Bachelor of Science?

5    A    Yes.

6    Q    In chemistry from Northern Arizona University and

7    immediately went to work for the DEA; is that right?

8    A    That's correct.

9    Q    And you had some in-house training?

10   A    Yes, sir.

11   Q    And then the instrument manufacturers who want you to

12   buy their instruments come by and teach you how to use them;

13   is that right?

14   A    The instrument manufacturers offer a whole variety of

15   training classes in various aspects of, yes, in fact quite

16   often the instruments that they sell.  But we already have --

17   would have purchased the instruments before I would have gone

18   and taken the classes.

19   Q    And how long do these classes last?  Let's talk about one

20   specific instrument.  Let's take a mass spectrometer, for

21   example.

22        MR. MUEHLECK:  Well, I'm going to object because now

23   we're getting beyond the voir dire and we're getting into

24   cross-examination.

25        MR. WEIGHT:  Your Honor, we're getting into voir

1    dire --

2              THE COURT:  I'll allow it.

3              MR. WEIGHT:  Okay.

4              THE WITNESS:  I took, I can recall at least two

5    classes, more than that, probably at least three classes that

6    were specific for mass spectrometers; two of which were in

7    Cincinnati, Ohio.  One was a basic theory class, I believe.

8    Another one was an operation class as far as how to operate a

9    particular instrument that we had at the laboratory.  There

10   was another one that I took in Orlando, Florida, which was

11   advanced interpretation of drugs of abuse.  So it was

12   interpreting the spectra that you -- we obtain from the

13   instrument.

14   BY MR. WEIGHT:

15   Q    Well, how long do these classes last, are we talking a

16   couple of hours or a couple of days, this training?

17             MR. MUEHLECK:  Well, I'm going to object unless we're

18   more specific.  So I'm going to object to the form of the

19   question here.

20             THE COURT:  I'll allow the question.

21             THE WITNESS:  The two that I took in -- in

22   Cincinnati, Ohio, were both week-long classes.  The one in

23   Orlando, the interpretation class, was a two-day class.  There

24   was another class, as I'm recalling that I took, actually one

25   of my more recent ones was held in Boston about three years

1    ago.  And that was the -- the operation of the newer variety

2    of mass spectrometer that we have in the laboratory and the

3    one that I currently use in the laboratory.  So that's at

4    least four that particularly pertain to mass spectrometer that

5    I can remember.

6    BY MR. WEIGHT:

7    Q    And gas chromatographs, would it be about the same, same

8    training?

9    A    Similar.  There's -- there's less theory involved in gas

10   chromatography simply because the spectra are not quite as

11   complex and the information that you get from a gas

12   chromatograph is not as specific as a mass spectrometer.

13          The first training class I ever took was in

14   Santa Clara, California, and that was a gas chromatography

15   class.  So considering that was so early in my career, it was

16   probably a basic operation and theory of the gas

17   chromatograph.  And I don't recall any other specific gas

18   chromatography classes.

19   Q    You say you have done teaching as part of your current

20   employment?

21   A    Yes, sir.

22   Q    Who do you teach?

23   A    I am currently -- as I described before, when I was in

24   training, there was a laboratory training officer.  Well, I am

25   currently the laboratory training officer, and right at this

1    particular time I have seven forensic chemist trainees under

2    my guide in the laboratory going through the forensic chemist

3    training program.

4            I have conducted classes for all of the division

5    field offices that we service pertaining to clandestine lab

6    safety, drug identification, field testing.  I've conducted

7    classes for so far two U.S. Attorneys' offices in the details

8    of my job that pertain to their work and currently trying to

9    schedule a few more of those classes.

10           I have participated as a moot court instructor for

11   three of the DEA basic forensic chemist classes which are held

12   in Quantico, Virginia.  I have taught drug synthesis at least

13   three or four times at the basic clandestine laboratory

14   certification schools, for those schools are for other

15   chemists, DEA agents, as well as state and local police

16   officers who are going through the DEA clandestine lab

17   certification program.  I've conducted various seminars as

18   well.  One last summer was for the National College of

19   District Attorneys.  I've conducted seminars for the

20   California Narcotics Officers Association.  I'm sure there's

21   more.

22   Q    All right.  You indicated that you have testified as an

23   expert witness in court; is that right?

24   A    Yes, sir.

25   Q    How many times in United States District Court cases?

1    A    Of the approximately 150 times that I've testified,

2    probably two-thirds of those have been in U.S. District Court.

3    Q    Okay.  And have you published -- as part of your being a

4    chemist, have you written articles for publication in

5    professional magazines or written books?

6    A    No, I have not.

7         MR. WEIGHT:  I have no further questions, Your Honor.

8         And -- are you proffering him as an expert witness?

9         MR. MUEHLECK:  (Nods head up and down).

10         MR. WEIGHT:  In what field?

11         MR. MUEHLECK:  What I offered Mr. Goldberg was as a

12    forensic chemist in the field to determine the presence of

13    controlled substances.  That's the field of forensic

14    chemistry.

15         MR. WEIGHT:  In that case, I have a few more

16    questions.

17    BY MR. WEIGHT:

18    Q    In the course of your employment, have you had occasion

19    to analyze substances for presence of methamphetamine?

20    A    Yes, I have.

21    Q    On how many occasions, roughly?

22    A    Roughly, about 2,000 occasions.

23    Q    Okay.  And have you had occasion to testify in court with

24    reference to your findings?

25    A    Yes, I have.

1    Q    How many times, on meth cases?

2    A    I would guess maybe about 25 or 30 times.

3    Q    When was the most recent?

4    A    I don't recall exactly what some of the last times that

5    I've testified on, but I know I distinctly remember a time in

6    Saipan last June.  So about ten months ago, 11 months ago, and

7    I know that was for methamphetamine.  And I've probably

8    testified six or seven times since then, but I can't remember

9    exactly what the drugs were in those.

10   Q    Okay.

11        MR. WEIGHT:  No further questions.  And he is

12   acceptable to the defense.

13        THE COURT:  Very well.  The court finds that

14   Mr. Goldberg is qualified to testify as an expert in the area

15   of forensic chemistry for the determination of the presence of

16   controlled substances.

17        And with that, we'll break for lunch.  Please be back

18   at 1 o'clock.

19   (A recess was taken from 12 o'clock p.m. to 1:10 p.m.)

20        THE COURT:  Please proceed, Mr. Muehleck.

21        MR. MUEHLECK:  Yes, Your Honor.  Thank you.

22                   RESUMED DIRECT EXAMINATION

23   BY MR. MUEHLECK:

24   Q    Mr. Goldberg, where is the lab located that you work at?

25   A    Lab is currently located in Vista, California.

1    Q    And in October of last year, where was it located?

2    A    In National City, California.

3    Q    And is that near a major metropolitan area, you have one

4    of those -- that you mentioned?

5    A    They're both in the San Diego metropolitan area.

6    Q    What's the equipment that you have in the lab that you

7    use to do the analysis of -- for controlled substances?

8    A    Primarily the equipment that I utilize, one is an

9    infrared spectrophotometer, another one is a gas

10   chromatograph.  I utilize a microscope for certain analysis.

11   A mass spectrometer I also utilize for certain analysis, and

12   those would be the four largest instrumental type pieces of

13   equipment that I use.

14   Q    Are those pieces of equipment you mentioned state of the

15   art, so to speak?

16   A    Yes, they are.

17   Q    Let me ask you --

18            MR. MUEHLECK:  If I might approach with Exhibit 6

19   marked for identification?

20            THE COURT:  You may.

21   BY MR. MUEHLECK:

22   Q    Exhibit 6 marked for identification, have you seen this

23   before?

24   A    Yes, I have.

25   Q    Okay.  Where have you seen this before?

1   A    I took that picture on my work area in the laboratory,

2   and the original of it I provided to you Tuesday morning when

3   I was in your office.

4   Q    Was this -- what was it taken of, sir?

5   A    That is Exhibit Number 1 in R4-03-0006, and that was the

6   exhibit that I performed an analysis on.

7   Q    Did you write a report concerning that analysis -- that

8   analysis, sir?

9   A    Yes, I did.

10                MR. MUEHLECK:  16 marked for identification.

11                Approach the witness with 16 for identification?

12                THE COURT:  You may.

13  BY MR. MUEHLECK:

14  Q    Have you seen 16 marked for identification before?

15  A    Yes, I have.

16  Q    How can you tell, sir?

17  A    This is a copy of the DEA form number 7 for the case

18  number that I just read off of the photograph and --

19  Q    That you just read off of Exhibit 6 for identification?

20  A    Yes, Exhibit 6, the photograph that's Exhibit 6.

21  Q    Okay.

22  A    And I recognize this because it has my signature at the

23  bottom next to my typed name.

24  Q    And when did you receive that form, sir?

25  A    I first would have received this form approximately

1    October 15th, 2002.

2    Q    And what -- as a result of receiving that form, what did

3    you do with Exhibit 16 marked for identification, what did you

4    do with the laboratory, sir?

5    A    Once I received this form, that meant that this

6    particular case was assigned to me to analyze, and then I

7    would have proceeded to the vault in our laboratory to sign

8    out the actual evidence, go back to my work area and proceed

9    with my analysis.

10    Q    Can you tell looking at Exhibit 16 marked for

11    identification how the materials got into your laboratory?

12    A    Yes, I can.

13    Q    How -- how did the materials get to your laboratory, sir?

14    The materials for analysis I'm talking about.

15    A    The materials for analysis were hand-delivered by Special

16    Agent Hughes.

17             MR. MUEHLECK:  Approach, Your Honor?

18             THE COURT:  You may.

19    BY MR. MUEHLECK:

20    Q    20 marked for identification, Mr. Goldberg.  Will you

21    examine that, please?  Can you recognize 20 marked for

22    identification?

23    A    Yes, I can.

24    Q    How do you recognize it?

25    A    I recognize the box, my initials, the date that I first

1   received the box and the person's initials from whom I

2   received it are written on the corner of the label which is on

3   the top of the box.  I also recognize it as, this is my

4   writing along the top and along this side with the words

5   "retain for court."

6   Q     What was the condition of the box when you received it?

7   A     When I first received the box, it was in a sealed

8   condition with an evidence sticker on it indicating that it

9   was still sealed.

10  Q     And when was it you first saw it?

11  A     On October 15th, 2002.

12  Q     Okay.  And the contents of the box, would you take a look

13  at that, please?

14  A     (Complying).

15  Q     Do you recognize the contents of the box?

16  A     Yes, I do.

17  Q     How do you recognize that?

18  A     The -- the plastic bags, which are still inside the box,

19  each have the -- these are the four original plastic evidence

20  envelopes that the material was contained in inside the box.

21  And I recognize each of them because the strip that I cut off

22  of each bag to open it at the bottom is still inside each bag

23  with my initials, the date, the case number and lab number on

24  them.

25          And then the other bags here are the bags in which I

1    supplied and put all of the remaining material after I

2    completed my analysis in.  Again, my signature is on each bag

3    and the date which I sealed it up.  The lab number of this

4    particular exhibit and the weight of each bag after I sealed

5    it up is on there.  And I could also recognize my writing, my

6    initials, the date and the identification of the exhibit on

7    the contents of -- of each of the three bags.

8    Q    Why did you put them in different bags, sir?

9    A    When -- our procedure is when we analyze seizures which

10   are more than 2 kilograms of a Schedule II controlled

11   substance, we're instructed to repackage them.  So 2 kilos are

12   set aside as a sample to be retained for court and any excess

13   of 2 kilos -- this is not -- does not apply to cocaine, but of

14   all of the rest of the Schedule II drugs, the excess of 2

15   kilos is separated in order to more quickly be able to destroy

16   it to avoid having to store excess amount in our evidence

17   vault for storage, size reasons and for safety reasons.

18   Q    You mentioned a Schedule II.  What is that, please, sir?

19   A    Schedule II is the way the Code of Federal Regulations

20   defines controlled substances.  There are five schedules and

21   each are categorized based on their potential for abuse.

22   Q    And methamphetamine is what?

23   A    Methamphetamine is a Schedule II.

24   Q    When you received the materials in Exhibit 20 -- do you

25   have a background to do fingerprint analysis, sir?

1    A    No, sir.

2    Q    Do you know if there was a request to do a fingerprint

3    analysis on this exhibit, the materials in Exhibit 20?

4    A    Yes, there was a request.

5    Q    Okay.  And did you take any procedure based upon that

6    request?

7    A    Yes, I did.

8    Q    And is that request on -- noted on the documents in front

9    of you?

10   A    Yes, it is.  It's noted on Government's Exhibit Number

11   16.

12   Q    All right.  What procedure did you follow seeing that

13   there was a fingerprint request made?

14   A    Once I noticed that there's a fingerprint request made, I

15   very carefully with gloves unwrap and separate the wrapping

16   material from the actual suspected drug material and reseal

17   the wrapping material in a separate box or evidence envelope,

18   depending on how much is there.  And that gets immediately

19   separated, returned to the vault, and subsequently the

20   fingerprint examiner in the laboratory will go and sign that

21   piece of evidence out and conduct his part of the analysis,

22   which would be the fingerprint work.  I will then keep the

23   drug material with me, complete my part, which is the analysis

24   of the drug material, reseal it up in a container and then

25   return it to the vault.

1              MR. MUEHLECK:   19 marked for identification.

2              Approach the witness, Your Honor?

3              THE COURT:  You may.

4    BY MR. MUEHLECK:

5    Q    19 marked for identification.  If you could take a look

6    at that, Mr. Goldberg, and tell me if you can identify that

7    box and the contents?

8    A    Yes, I can.  When I receive the request in writing on the

9    DEA Form 7 --

10   Q    You're talking about Exhibit 16?

11   A    Exhibit 16, yes, I'm sorry.

12   Q    Okay.  Thank you.

13   A    For there to be a fingerprint request or a fingerprint

14   exam conducted on the material, this is the box that I went

15   and found, and this is the box that I packaged all of the

16   material to be fingerprinted in.

17   Q    You are referring to Exhibit 19?

18   A    Exhibit Number 19.

19   Q    Cardboard box?

20   A    Yes.  So I recognize it because on the label there, it's

21   my writing and signature, and I noted on the corner there that

22   this is the material to be fingerprinted.

23   Q    And you pass it on then?  Or what do you do with it to

24   get the analysis, the fingerprints done?

25   A    I return it to the vault.

1   Q    All right.

2   A    And then the fingerprint examiner will independently

3   check out the -- the evidence from the vault and conduct his

4   analysis.

5   Q    Do you know any of the fingerprint examiners in the

6   laboratory at your DEA laboratory?

7   A    Yes, I do.

8   Q    Who are they?

9   A    We currently have one, and his name is Victor Alferos.

10  Q    Do you know if he conducted a fingerprint analysis or a

11  test in this case?

12  A    I can look in the file to see if there's a record --

13  Q    If you don't know independently, that's fine.

14  A    I don't know.

15  Q    All right.  Look in the file if you would then, please.

16  A    I really can't tell from the -- the signature on the

17  label and there's no documentation in the particular file.

18  Q    That's fine.

19        MR. MUEHLECK:  Let me retrieve 19, please, if I

20  could, Your Honor.

21        THE COURT:  You may.

22  BY MR. MUEHLECK:

23  Q    Let's go back to Exhibit 20.  And can you tell me briefly

24  what you did to analyze the contents of Exhibit 20?

25  A    Yes, the contents of Exhibit 20 were originally in 15

1    clear plastic Ziploc bags.  So once I unwrapped each of the

2    bags and put them in substitute clear plastic bags, those bags

3    that I put them into were tared, which means I had weighed

4    them before I filled them up.  So once I had filled them up, I

5    proceeded to obtain a net weight, and that's the weight of the

6    actual powder material without any of the wrappers.

7    Q    And, Mr. Goldberg, let me interrupt you here.  Exhibit 6,

8    you mentioned the bags and you mentioned taking the

9    photograph, Exhibit 6 in my hand?

10   A    Yes.

11   Q    Is what's in Exhibit 6 in front of you?

12   A    Yes.

13            MR. MUEHLECK:  Offer Exhibit 6 into evidence, Your

14   Honor.

15            MR. WEIGHT:  No objection, Your Honor.

16            THE COURT:  Exhibit 6 is admitted.

17       (Government's Exhibit 6 was received in evidence.)

18            MR. MUEHLECK:  May I publish then, Your Honor?

19            THE COURT:  You may.

20            MR. MUEHLECK:  Maybe I can publish from up here and

21   Mr. Goldberg can tell us where this shot was taken.

22            THE COURT:  You may.

23            THE WITNESS:  What's depicted in the photograph of

24   Exhibit Number 6 is the 15 original Ziploc bags which

25   contained the crystalline material that I was to analyze.  And

1    this is in our old laboratory.  This was my bench top area

2    where I conducted all of my work.  So this sign in the picture

3    was prepared by me with the case number, exhibit number,

4    that's the lab number, where it was seized, the date it was

5    seized, those are my initials and the date that I was taking

6    the photograph.

7    Q    This is in your physical lab then?

8    A    Yes.

9    Q    And this case number, that's the control number within

10   Drug Enforcement Administration?

11   A    Yes, the case number is a number that is generated by the

12   submitting office.  R4 is the designation for the Honolulu

13   office.  The "3" is the fiscal year it was received.  And then

14   every time they just take out a new case, the number

15   progresses from one to as high as it gets throughout that

16   fiscal year.

17   Q    Do you see that number on Exhibit 16 marked for

18   identification in front of you?

19   A    Yes, I do.  That's listed as the file number in Section

20   2A.

21   Q    Thank you.  If I could please ask you to continue in the

22   examination you did.  You were talking, I think, the tare

23   weight you were talking?

24   A    Yes.  So once I used -- used the substitute bags to

25   obtain the net weight, which is, like I said, the actual

1    weight of the powder material in question, I conducted a

2    series of screening tests before combining the material in

3    each of the 15 different bags.  And the purpose for conducting

4    a screening test is to give me an idea of whether or not the

5    contents of each of the 15 bags are the same before I go ahead

6    and form a composite.  So in this particular case I conducted

7    two screening tests; one is called a marquis test and one is

8    called the nitroprusside test.

9    Q    Please explain those briefly.

10   A    Each of the test involves dropping just a drop of -- out

11   of like a medicine dropper onto a small amount, just a couple

12   milligrams, of the powder.  And a specific color change will

13   occur if in fact the material is what it's suspected to be.

14          So for methamphetamine with the marquis test, it's

15   going to turn orange and then it's going to slowly get dark to

16   a brown color.  And with the nitroprusside test, once I drop

17   the solutions on, it will turn bright blue.  And each of the

18   instances of all 15 bags that happened in this case.

19   Q    So, what did that mean to you then, the screening test

20   and the marquis reaction and the other reaction?

21   A    Well, it indicated to me two things:  That it was in

22   fact -- they did at least screen positive for methamphetamine,

23   although that's not a specific test.  But, more importantly,

24   it indicated to me that the contents of each of those 15 bags

25   were more than likely the same.  And then I can go ahead and

1    form a composite, which would allow me a more manageable

2    sample size to analyze -- conduct the rest of my test on, but

3    that sample -- that smaller composite would still be

4    representative of the entire contents of the 15 bags.

5    Q    So did you proceed --

6    A    Yes.

7    Q    -- with further examination?

8    A    And that's what I did, I formed a composite with portions

9    of each of the 15 bags.  The final composite that I narrowed

10   it down to, I ground and mixed thoroughly in order to make

11   sure I was analyzing a homogeneous sampling of the entire

12   sample, and then I proceeded to conduct my instrumental

13   analysis on that material.

14   Q    What is the instrumental analysis that you did on the

15   items, the compounds in Exhibit 6, please?

16   A    The instrumental analysis included an infrared

17   spectrophotometer test and two different tests utilizing the

18   gas chromatograph.

19   Q    Okay.  Can you keep it simple for me here or maybe

20   explain it briefly, and what we're looking for, how it works?

21   A    Sure.  The infrared spectrophotometer is a specific form

22   of identification.  It uses infrared radiation that is shined

23   into the molecule, and each different molecule absorbs

24   infrared radiation at a particular wavelength at a different

25   percentage.  And so based on how much at the various

1    wavelengths the sample absorbs, a spectra is generated and

2    that spectra from the sample is compared to a known standard.

3    And if they match, that's the basis for the identification.

4           So in this particular case, the infrared

5    spectrophotometer indicated that the material was in fact

6    methamphetamine hydrochloride.

7           The second test I performed utilizes the gas

8    chromatograph, and that test is done to determine the isomer

9    of the methamphetamine.  And in this case the methamphetamine

10   was the D-isomer.

11          And in the third test, which also utilizes the gas

12   chromatograph, is how I determine the percentage or the

13   quantitative part of the analysis.  And I go ahead and utilize

14   that test, and it determined that the strength of the

15   methamphetamine was 51 percent.

16   Q    Can you give us a net weight of the methamphetamine, sir?

17   A    Yes, the net weight of this particular exhibit was 6,669

18   grams.

19   Q    Did you report that in Exhibit 16, sir?

20   A    Yes, I did.

21   Q    And did you sign that and submit it back to the DEA

22   regional office?

23   A    Yes, I did.

24          MR. MUEHLECK:  Offer 16 into evidence, Your Honor.

25          MR. WEIGHT:  Voir dire?

1           THE COURT:  You may.

2                  VOIR DIRE EXAMINATION

3    BY MR. WEIGHT:

4    Q    Mr. Goldberg, there is a reference in block number 25 on

5    Government's Exhibit 16 which says "EX1 was found to contain,"

6    and it talks about methamphetamine HCL.  I presume that's

7    hydrochloride?

8    A    Yes.

9    Q    What is the next term following that?

10   A    And dimethylsulfone, that's another compound that was

11   identified in Exhibit Number 20.

12   Q    What is dimethylsulfone?

13   A    Dimethylsulfone is actually is a vitamin supplement

14   that's utilized primarily in cows and horses.  That's its

15   legitimate use.

16   Q    Okay.  So this stuff that you have here, this mixture, is

17   a mixture of methamphetamine and some diet supplement for

18   cattle?

19   A    Yes, sir.

20   Q    And according to your -- your report, the strength of the

21   methamphetamine is 51 percent, and so the rest of it was what,

22   the rest of it was the feed supplement?

23   A    Most of the rest of it would be the feed supplement, yes.

24   Q    Okay.

25             MR. WEIGHT:  No objection, Your Honor.

1          THE COURT:  16 is admitted.

2      (Government's Exhibit 16 was received in evidence.)

3          MR. MUEHLECK:  Just a little follow-up if I could,

4    Your Honor, please.

5                    RESUMED DIRECT EXAMINATION

6    BY MR. MUEHLECK:

7    Q    Methamphetamine hydrochloride, you said drugs are

8    scheduled accordance -- in accordance with what, their

9    tolerance or their propensity for abuse, did you say?

10   A    Propensity for abuse and their -- how potent they are,

11   their potency.

12   Q    Methamphetamine hydrochloride, could you tell me what

13   that is?  What do you mean by hydrochloride?

14   A    Hydrochloride is a term used to describe what's in

15   chemistry called a salt.  And it's the result of what is an

16   organic base in which what methamphetamine would classify as

17   in combination with an acid.  And hydrochloric acid would be

18   the acid utilized in this particular case.  And when you

19   combine organic base with an acid, one of the results is a

20   salt.  And methamphetamine hydrochloride would be referred to

21   as a salt form, one of the salt forms of methamphetamine.

22   Q    And that's a Schedule II controlled substance,

23   methamphetamine hydrochloride?

24   A    Yes, it is.  Actually, the controlled substance is

25   methamphetamine and it's defined as any salt, any isomer or

GOLDBERG - RESUMED DIRECT                    2-134

1    any salt of any isomer of methamphetamine, of which

2    methamphetamine hydrochloride is qualified as that.

3              MR. MUEHLECK:  Your Honor, I am going to offer

4    Exhibit 20 into evidence.

5              MR. WEIGHT:  No objection, Your Honor.

6              THE COURT:  20 is admitted.

7         (Government's Exhibit 20 was received in evidence.)

8              MR. MUEHLECK:  One moment, please, Your Honor.

9                   (Pause in the proceedings.)

10   BY MR. MUEHLECK:

11   Q    You know a Nicole Payne, sir?

12   A    Yes, I do.

13   Q    How do you know a Nicole Payne?

14   A    Nicole Payne is another one of the chemists that works in

15   the DEA Southwest Laboratory with me.

16   Q    A colleague?

17   A    Yes.

18   Q    How long has she been there, do you know?

19   A    Approximately five years.

20   Q    Do you know what her training has been?

21             MR. WEIGHT:  Your Honor, I'm going to object to this

22   as being beyond the scope of anything.  There was no --

23   withdraw the objection.  Withdraw.

24             MR. MUEHLECK:  I'm not done yet.

25             MR. WEIGHT:  I withdraw the objection.

1    BY MR. MUEHLECK:

2    Q    Nicole Payne, she's a colleague?

3    A    Yes.

4    Q    Do you know her -- what her training is, sir, within DEA?

5    A    Yes, she would have completed a very similar training

6    program to what I completed, and I believe while she was

7    completing the program, I was actually the deputy training

8    officer at the laboratory.

9            MR. MUEHLECK:  I don't have anything else, Your

10   Honor.  Thank you.

11           THE COURT:  Mr. Weight?

12                        CROSS-EXAMINATION

13   BY MR. WEIGHT:

14   Q    Mr. Goldberg, if I understand correctly what you did when

15   you received the -- what is now Government's Exhibit 16,

16   that's the DEA-7, that was your first indication to you that

17   you were going to be working on this case; is that right?

18   A    Yes, sir.

19   Q    And as soon as you got that, then you went and withdrew

20   the drug evidence from the vault?

21   A    It may not have been that exact day, but once I had the

22   DEA Form 7 or the -- what was the original of Government's

23   Exhibit 16 in my possession, it was on my docket, so to speak,

24   to -- when I finished whatever I may have been doing at that

25   particular time to obtain that evidence and proceed with that

1    analysis.

2    Q    And the -- the DEA 16 -- or the DEA-7, which is

3    Government's Exhibit 16, indicated to you that the analysis

4    that was being requested was for both drug analysis and

5    fingerprint, right?

6    A    Yes, sir.

7    Q    And so this -- that's why you handled the drugs the way

8    you did, as you testified, with gloves on and you took the

9    original bags and separated the contents, and put the original

10   bags back in the vault; is that right?

11   A    Yes, sir.

12   Q    That was so that whoever is going to do the fingerprint

13   analysis would have uncontaminated bags to work with?

14   A    That's correct.

15   Q    At least not contaminated by you?

16   A    Correct.

17   Q    And you had nothing further to do with those bags once

18   you had taken the content of each of these 15 Ziploc bags, put

19   that into your own bags and put the 15 bags back in the vault;

20   that was the end of your working with them?

21   A    Right, once I repackaged all of the material to be

22   fingerprinted in the box that was just up here on the desk a

23   couple minutes ago, I had no further contact with the

24   fingerprinting material.

25   Q    And so the only thing you were left to deal with was the

1    drug -- was the material itself, the stuff that had been in

2    the bags?

3    A    That's correct.

4    Q    Now, do I understand you correctly that you took 15

5    samples, one from each of the bags, and then you did a -- did

6    a screening test, actually two screening tests on each sample?

7    A    Yes, sir.

8    Q    And that was to determine whether each of the 15 bags

9    contained the same type of material?

10   A    Yes.

11   Q    And you concluded that it did?

12   A    Yes.

13   Q    Now, tell me about the -- tell the jury about this

14   composite.  How do you create this composite that you later

15   test?  What -- what do you do?

16   A    Okay.  What I did in this particular case was I have a

17   large spoon and it's about 18 inches long, it's a silver metal

18   spoon -- not silver metal but silver in color metal spoon.

19   And what I would have done is put the spoon into each of the

20   Ziploc bags, mixed the contents, and then taken a spoonful out

21   of each bag, put a spoonful of -- so 15 spoonfuls on a large

22   brown piece of paper, taken the contents, then mixed them up

23   completely with a spatula and a spoon until I got them in kind

24   of a cone, like a pile.  Take the spatula and proceed to take

25   that pile and quarter it, and continue to quarter it down

1    until I get what I feel is a reasonable amount, usable amount

2    as a final composite.  And I can tell you approximately how

3    many grams that turned out to be if you would like.

4    Q    Okay.  Well, I -- I'm trying to follow you.  Basically

5    you're taking a sample from each one of 15 bags and putting it

6    into one pile?

7    A    Right.

8    Q    Stirring it up and then subdividing that pile?

9    A    Yes, sir.

10   Q    Into how many parts?

11   A    Four.  And then I continue to quarter it until I get one

12   part down to a size that I want to use as my final composite.

13   Q    So you don't use all 15 spoonfuls, you just use a small

14   portion of that?

15   A    Right, the actual material that goes into the instruments

16   to be tested is a portion of what originally was included in

17   the 15 spoonfuls.

18   Q    Okay.  And so how long do you mix this together to make

19   sure that you have a good aggregate; that is, that it's all

20   well mixed and not, you know, one side of it happens to be

21   just the one spoonful from one bag and the rest is partially

22   mixed?

23   A    About a minute or two.

24   Q    Of stirring, just --

25   A    Yes, sir.

1    Q    Okay.  And it's after you do that that you do the

2    instrumental examination of it?

3    A    Yes, sir.

4    Q    And in this case you use the infrared spectrometer?

5    A    Yes, it's infrared spectrophotometer.

6    Q    And a gas chromatograph?

7    A    Yes, sir.

8    Q    Anything else?

9    A    No.  That would have been the two instruments that I

10   utilized in this particular analysis.

11   Q    And one of them tells you that it's meth, the other tells

12   you that it's the D-isomer of meth, and it also tells you what

13   percentage of strength it is?

14   A    That's correct, that's what they were used for in this

15   particular analysis.

16   Q    What did you use to tell you that the other 49 percent of

17   what you were working with was dimethylsulfone?

18   A    The infrared spectrophotometer also was utilized to

19   identify the dimethylsulfone.

20   Q    And did you -- and did you get more than just a

21   qualitative analysis on the dimethylsulfone; did you get a

22   qualitative analysis as well?

23   A    No.

24   Q    So you didn't care how much of dimethylsulfone there was

25   in there?

1    A    Right, my responsibility is to quantitate or conduct a

2    quantitative analysis on the controlled substances, and

3    dimethylsulfone is not a controlled substance.

4    Q    Now, you've indicated to this jury that you have worked

5    on an awful lot of meth cases over the years.  How many did

6    you say?

7    A    Approximately 2,000.

8    Q    And in all of those cases did you do a qualitative and

9    quantitative analysis the way you've just described to the

10    jury you did in this case?

11    A    In all of the methamphetamine exhibits that were greater

12    than 100 milligrams, because that's the requirement for

13    conducting a quantitative analysis, and all of the

14    methamphetamine exhibits that were liquids that contained more

15    than trace amounts of methamphetamine in them, yes, I would

16    have conducted a qualitative and quantitative analysis on

17    those exhibits.

18    Q    In how many of those other cases, to the best of your

19    ability to estimate now, did you find dimethylsulfone along

20    with methamphetamine?

21    A    Of the 2,000, it would be a very small percentage.  I

22    would say with -- from about four years ago and previous to

23    that, I would never have encountered dimethylsulfone.  And

24    more recently, within the past four years, it's actually rare

25    that I do not encounter dimethylsulfone in methamphetamine

1    exhibits.

2    Q    Is dimethylsulfone used in some way to manufacture

3    methamphetamine?

4    A    No, it's not.

5    Q    Would you describe it as a foreign contaminant?

6    A    I would describe it as a diluent.

7    Q    As a?

8    A    A diluent.

9    Q    Diluent meaning used to dilute it?

10   A    Yes, sir.

11   Q    To cut it?

12   A    Yes, sir.

13   Q    To reduce the -- reduce the purity level, is that right,

14   of the meth?

15   A    Reducing the purity level would be a result, but actually

16   its purpose would be to enhance the size of the sample in

17   order to be able to sell more of it.

18   Q    So it bulks it up, but it dilutes the purity?

19   A    That's correct.

20   Q    I see.  And is this particular substance,

21   dimethylsulfone, itself an illegal -- an illegal thing to have

22   or can you buy it at a pet store or something?

23   A    You can buy it at a pet store.

24        MR. WEIGHT:  I have no further questions, Your Honor.

25        MR. MUEHLECK:  May I proceed, Your Honor?

1            THE COURT:  Yes, redirect?

2            MR. MUEHLECK:  Yes, very briefly

3                    REDIRECT EXAMINATION

4    BY MR. MUEHLECK:

5    Q    You said it's rare if you don't see it; you're saying

6    it's common to see it today, this dimethylsulfone?

7    A    Yes.  Yes, within the last several years it's very common

8    to find dimethylsulfone present in methamphetamine samples.

9            MR. MUEHLECK:  Thank you.

10           THE COURT:  Anything more, Mr. Weight?

11           MR. WEIGHT:  No recross, Your Honor.

12           THE COURT:  Thank you.  You may step down.

13                                (Witness excused)

14           MR. MUEHLECK:  We would call our next witness, Nicole

15    Payne, Your Honor.  And I'll retrieve these exhibits, if I

16    might.

17                    NICOLE PAYNE,

18    called as a witness by the Government, having been first duly

19    sworn, was examined and testified as follows:

20           THE CLERK:  Please be seated.

21           Please state your name and spell your last name.

22           THE WITNESS:  Nicole Payne, P-A-Y-N-E.

23                    DIRECT EXAMINATION

24    BY MR. MUEHLECK:

25    Q    Are -- are you employed, ma'am?

1    A    Yes, I am.

2    Q    How are you employed?

3    A    I'm employed as a forensic chemist.

4    Q    Where?

5    A    I'm employed by the Drug Enforcement Administration in

6    Vista, California.

7    Q    How long have you been a forensic chemist with the DEA?

8    A    Five years.

9    Q    Can you tell us a little bit about your educational

10   background in chemistry?

11   A    Yes.  I obtained a Bachelor of Science degree in

12   biochemistry and chemistry from the University of California,

13   San Diego.

14   Q    And when was that?

15   A    In 1996.

16   Q    And following graduation from San Diego, UC-San Diego,

17   where did you -- did you go into employment?

18   A    Yes, I did.  I did work as a research assistant in

19   Pomona, California, for a company called Scientific

20   Pharmaceuticals.  I also did some temp work, and in 1998, I

21   was hired by the Drug Enforcement Administration.

22   Q    The pharmaceutical company you were with, what was --

23   what were your duties there?

24   A    I was a research assistant.  So, I altered formulations

25   for dental materials.

1   Q    All right.  Can you tell us a little bit about your

2   training with the Drug Enforcement Administration as a

3   forensic chemist?

4   A    Yes.  Once I came onboard with the DEA, I went through an

5   in-house training program in which I learned how to analyze a

6   piece of evidence such as powder tablets, et cetera, that --

7   any type of evidence that would be received from the --

8   Q    From the field?

9   A    Right.  That would be received as evidence to detect the

10  presence of controlled or noncontrolled substances.  I also

11  learned the instrumentation that I would use in my duties as a

12  chemist there.

13  Q    How many times have you had the occasion to test

14  compounds for the presence of controlled substances since you

15  joined the lab, the DEA, five years ago?

16  A    About 1800 times.

17  Q    Have you ever testified in court as an expert in forensic

18  chemistry?

19  A    Yes, I've testified in federal court approximately five

20  times.

21  Q    You ever testify in U.S. District Court in the District

22  of Hawaii --

23  A    Yes.

24  Q    -- as a forensic chemist expert?

25  A    Yes, I have.

1            MR. MUEHLECK:  Your Honor, I'm going to offer

2    Ms. Payne as an expert in the field of forensic chemistry for

3    the determination of the presence of controlled substances.

4            THE COURT:  Mr. Weight?

5            MR. WEIGHT:  Well, Your Honor, I don't think

6    sufficient foundation has been laid at this point in time.

7            MR. MUEHLECK:  Well, she's been -- I submit that it

8    has based upon her background, her training, her experience,

9    what she's done, and the fact that she's been qualified as an

10   expert before.

11           THE COURT:  Well, I'm going to find her qualified as

12   an expert in the area of forensic chemistry to determine

13   whether illegal drugs are included.

14           MR. MUEHLECK:  May I proceed then, Your Honor?

15           THE COURT:  You may.

16   BY MR. MUEHLECK:

17   Q    Ms. Payne, can you tell us a little bit about the

18   training that you have on the instruments that you use day to

19   day in the laboratory?

20   A    The training, you mean the training --

21   Q    The training that you've had.

22   A    Okay.  The training that I received on the

23   instrumentation is hands-on training.  Throughout the 12

24   months that I did participate in the training program with the

25   DEA, I used the instruments on a daily basis.  There will be

1    some days when I do just straight chemistry techniques, other

2    days where the instrumentation would be used throughout the

3    eight hours a day for the 52 weeks that I was there in

4    training.  It was just, you know, lecture by the instrument

5    monitors as well as reading and mostly hands-on type of --

6    Q    What instruments do you use at the DEA laboratory where

7    you work?

8    A    I use gas chromatographs, mass spectrometers, liquid

9    chromatographs, capillary electrophoresis, infrared

10   spectrometers.

11   Q    Let me ask you, Ms. Payne, did you ever see that

12   equipment prior to joining the DEA laboratory?

13   A    Yes, I did.

14   Q    Where did you see it?

15   A    At the University of California-San Diego, I did

16   participate in laboratory courses in which I had an

17   opportunity to use some of those instruments.

18   Q    And the laboratory courses you took at the University of

19   California at San Diego were what, can you tell us?

20   A    I had a physical chemistry lab, a biochemistry lab, and

21   in each of those labs -- of the biochemistry lab, I used

22   electrophoresis, and in the physical chemistry lab, I was able

23   to use gas chromatograph and maybe the mass spectrometer, but

24   I don't recall.

25   Q    Did you take organic chemistry when you were in college?

1   A    Yes, I did.

2   Q    And did you use any of the equipment in organic

3   chemistry?

4   A    In organic chemistry, you use mostly wet chemistry

5   techniques.  We also did thin layer chromatography in that

6   course, and that is another technique that I use very

7   frequently in my job.

8           MR. MUEHLECK:  Exhibit 17 marked for identification

9   to Mr. Weight.

10          Approach the witness, Your Honor?

11          THE COURT:  You may.

12  BY MR. MUEHLECK:

13  Q    Ms. Payne, would you look at that document Exhibit 17

14  marked for identification and tell me if you have seen that

15  document before?

16  A    Yes, I have seen this document before.

17  Q    How do you know you've seen it before?

18  A    My signature appears on the report, which is typical of

19  when we receive drug evidence into the laboratory.  A piece of

20  paperwork such as this, it's called the DEA-7, accompanies the

21  piece of evidence, and once it's been analyzed, I would have

22  to sign the report.

23  Q    And report your findings?

24  A    Yes.

25  Q    Can you tell us what piece of evidence you're looking at

1    in relationship to this exhibit, Government Exhibit 17 marked

2    for identification?

3    A    This evidence was comprised of two sealers, a heat sealer

4    and then another type of sealer.  I'm not sure if that one

5    used heat or not, but that's what I was told.

6    Q    Did you do an analysis on this piece of evidence that's

7    reflected in Exhibit 17 marked for identification, Ms. Payne?

8    A    Yes.

9    Q    Can you tell us what examination you -- let me ask you

10   this:  You did an examination on these -- of these items?

11   A    Yes.

12   Q    Had there been a request made of the DEA laboratory to do

13   a fingerprint analysis on these items?

14   A    No.

15   Q    How can you tell that?

16   A    When a fingerprint request is made, it usually will

17   appear on the DEA-7, and it may be highlighted or just written

18   in the remarks section or in one of the other sections saying

19   "fingerprints requested."

20   Q    The remark section is what section for the record?

21   A    Section 16.

22   Q    Okay.  And does such request appear in 16, block 16?

23   A    No.

24   Q    So you did an analysis, you said?

25   A    Yes, I did.

1    Q    Would you recognize the heat sealers or sealer if you saw

2    them again?

3    A    Yes, I would.

4              MR. MUEHLECK:  Exhibit 9 to the witness, Your Honor?

5              THE COURT:  You may.

6    BY MR. MUEHLECK:

7    Q    Would you look at Exhibit 9 received in evidence and tell

8    us if you've seen that before?

9    A    Yes, I have.

10   Q    How can you tell you've seen it before, Ms. Payne?

11   A    My initials appear on the outside of the label, as well

12   as on the inside there is a plastic strip that once was the

13   bottom of the bag.  Once I open that, I did initial and date

14   that as well as place the lab number on there.  There are also

15   some sample vials that I placed inside the heat-sealed

16   evidence envelope after I was finished with the analysis.

17   Q    Can you tell us what type of analysis -- what type of

18   testing you did on that piece of equipment, the heat sealer in

19   Exhibit 9, please?

20   A    When I received this evidence, it was submitted for

21   residue analysis.  So that is the analysis I performed.  I did

22   a gas chromatograph screening test on this and also a gas

23   chromatograph test that is equipped with a mass spectrometer.

24   Oh, pardon me.  Wait.  Not with a mass spectrometer, it was an

25   infrared detector.

1    Q    Okay.  And is that -- tell us a little bit more about

2    that if you could, please.  You -- you use a piece of

3    equipment to do the test, or how -- how do you do it with this

4    item, this heat sealer that is in Exhibit 9?

5    A    What I -- the type of analysis I did is sometimes

6    referred to as a wash.

7    Q    A wash?

8    A    A wash.

9    Q    Please explain.

10   A    Okay.  I took a beaker, which is just like a glass cup,

11   and I place methanol in that beaker.  I also took some

12   methanol and I rinsed some glassware that I was going to use

13   called a Pasteur pipette.  It's about this long (indicating).

14   Q    You're indicating about what, six inches?

15   A    Six or seven inches long.

16   Q    All right.

17   A    It looks like a little turkey baster --

18   Q    Okay.

19   A    -- that's made totally, completely out of glass, and I

20   rinse that out.  With the residue, you want to make sure that

21   there's no contamination.  So I placed the bulb on the end of

22   that and sucked up some of the methanol, and I just washed on

23   a portion of the sealer with the methanol.  I sucked that back

24   up and placed it into a sample vial.

25              Before I did that, I want to say that I used the same

1    pipette originally to take some of the methanol that I was

2    going to use for the analysis and I placed that in a sample

3    vial as a blank.

4    Q    What do you mean as a blank, what are you doing?  What is

5    that for?

6    A    A blank is to ensure that the methanol I am using is not

7    contaminated with anything, and I also use that blank to

8    determine that the system is not contaminated also.

9    Q    Okay.  So you've got a blank and you've got your pipette

10   and you say you're washing.  You mean like you turn on the

11   faucet or turn the hose on this -- this heat sealer or what?

12   How much liquid do you use?

13   A    It would -- it's just like when you have a turkey baster,

14   you suck up some gravy or some fat.  I just took about two, 1

15   to 2 milliliters, and I dropped that on to the sealer, sucked

16   it back up, so that way if there was any drugs or controlled

17   substances, they would dissolve into that methanol.  Since I

18   was looking for methamphetamine, I used a solvent methanol

19   that I knew that methamphetamine would dissolve in.  So I

20   sucked that back up and placed it into the vial.

21   Q    Okay.  So you've got this wash material, you put it in a

22   vial; then what do you do with it, Ms. Payne?

23   A    I took the sample vial as well as the blank, I ran the

24   blank on the instrument.  I basically just placed that on the

25   instrument.  There's a syringe on the instrument that will

1    pull up 1 microliter, inject that into the instrument, and as

2    a gas -- it will heat up the liquid into a gas, and that will

3    go through a coiled column and be detected by a flame

4    ionization detector.  That's the gas chromatograph screening

5    test.

6    Q    How specific is that particular piece of equipment for

7    testing items?

8    A    That equipment is not specific.  That will simply tell me

9    there was something there.  And it will give me a readout that

10   will appear like a peak, just a peak.  There's a baseline and

11   then a peak, it will show that there was something there.

12   Q    A readout on a piece of paper where there's a chart

13   that's -- with a peak like in a polygraph reading or something

14   like that, a lie detector test?

15   A    Yeah, something like that.

16   Q    So you got a piece of equipment that you said that's not

17   specific.  Did your testing continue?

18   A    Yes.  I -- the first test, which was not specific, I

19   simply use as a screening test to decide whether or not I

20   would go further with the analysis.  Of course, if I didn't

21   see anything, then I could reasonably conclude that there was

22   nothing there.

23          However, in this situation I did see a peak.  So I

24   moved on to another piece of instrumentation that would tell

25   me exactly what the peak was composed of.