1    Q    Which -- which was what, what instrument?

2    A    I used a gas chromatograph once again, but rather than a

3    flame ionization detector, it was equipped with an infrared

4    detector which can tell me, based on the pattern of the

5    molecule that it sees, exactly what it is.  So different

6    compounds, whether that would be cocaine, heroin,

7    acetaminophen, anything, it would give a different picture,

8    fingerprint, if you will, for whatever --

9    Q    Is that -- is that a specific test then for a -- for a

10   compound?

11   A    Yes, it is a specific test.

12   Q    And what did you find then using the infrared with the

13   gas liquid chromatograph?

14   A    The infrared detector, with -- with that I found that the

15   sample was in fact methamphetamine.

16   Q    Did you test two heat sealers that day?

17   A    Yes, I did.

18   Q    And your results on the heat sealer that's before you in

19   Exhibit 9 was what?

20   A    Well, they're both --

21   Q    I'm sorry, go ahead.

22   A    Both sealers are inside this bag.

23   Q    Take them one at a time then, please.

24   A    Okay.  There is a cylindrically shaped sealer and inside

25   the cap, I tested the cap because there was some residue that

Exhibit A.3

1    was visible.  On that one, I suspected that there might be

2    methamphetamine.  However, when I took it to the next

3    instrument, I was not able to obtain a positive

4    identification.  On the longer sealer, I -- I tested that

5    also.  I did that one twice, and I determined that there was

6    methamphetamine by testing two different areas.  Both tests

7    concluded that there was methamphetamine residue on the

8    sealer.

9    Q    On the long sealer?

10   A    Yes.

11   Q    Okay.  Is that marked with your seal on there or your

12   markings?

13   A    The sealer itself?

14   Q    Yes.

15   A    I did not mark either of the sealers.  That was because

16   it was a residue and if I had marked them, it is possible that

17   the solvent that I used could have dissolved the ink.  So that

18   is why I didn't mark them specifically.

19   Q    Were you able to test for a purity of the

20   methamphetamine?

21   A    No.  Typically with the residue, there's not sufficient

22   sample to test the purity.

23   Q    And did you report your findings in writing?

24   A    Yes, I did.

25   Q    And is that on Exhibit 17?

1    A    Yes.

2              MR. MUEHLECK:  Offer Exhibit 17 into evidence.

3              MR. WEIGHT:  Voir dire, if I may?

4              THE COURT:  You may.

5                    VOIR DIRE EXAMINATION

6    BY MR. WEIGHT:

7    Q    Ms. Payne, if I understand correctly what you did, you

8    did a wash of each of those two separate mechanical devices

9    that are in the same bag; is that right?

10   A    That's correct.

11   Q    On one of them you found evidence of residue of

12   methamphetamine, the other you found nothing; is that right?

13   A    No.  That's not correct.

14   Q    Would you correct me then?

15   A    On one of the sealers, I did find methamphetamine.  On

16   the other one, I found what I suspected to be methamphetamine

17   but could not identify.  So it's not as though I did not find

18   anything at all, I just cannot tell you exactly what it is

19   that was there.

20   Q    Well, did you run a test to see what it was, whether it

21   was green peas or beef, or some other drug?

22   A    Yes, the tests that I ran, the screening test told me

23   that there was a good indication that it could be

24   methamphetamine; however, the confirmatory tests do not show

25   that methamphetamine was there.  I suspect that was because

1    the concentration was too low to pick that up.

2    Q    When you say "too low," how many parts per what quantity,

3    million or billion, does your test work at?

4    A    Typically with the gas chromatograph with the infrared

5    detector, we will usually see a result, a reading when the

6    sample is at least 1 milligram per milliliter.  Some

7    substances may take 2 milligrams per milliliter.  So if you

8    have a substance that is concentrated below that level, you

9    will not see something, although it could reasonably be there.

10   You just -- I can't say for sure that it is.

11   Q    What is 1 milligram per milliliter if we put it in

12   decimal points; one dot, dot, to how big a number, how many

13   zeros?

14   A    1 milligram per milliliter?

15   Q    Yeah.

16   A    Well, what do you mean if we -- if you put that into a

17   decimal, that's just one over one.  So it's just one, but I'm

18   not sure I understand.  Is that what you mean?

19   Q    Well, what I'm trying to get at is that -- that the

20   sensitivity of the tests that you're running is a rather

21   sensitive test, isn't it?

22   A    Yes, it is.

23   Q    And it will test extremely minute amounts of -- it will

24   detect extremely minute amounts of whatever it is you're

25   testing for, in this case methamphetamine; is that right?

1    A    Well, not to say extremely minute -- I don't know what

2    you mean extremely minute.  However, 1 milligram, just to give

3    you an idea of how much that is, would be if you took a packet

4    of Sweet'n Low and divided it into a thousand parts, you put

5    that into 1 milliliter, which is also known as a cubic

6    centimeter, that would be the amount that the instrument could

7    detect.

8    Q    Okay.  Let me see if I got this right.  If you took a

9    packet of Sweet'n Low that you would use to put in your

10   coffee?

11   A    Right.

12   Q    And divided that into 1,000 parts?

13   A    Right.

14   Q    And you took one of those little parts?

15   A    Yes.

16   Q    And you put that in a cubic centimeter of liquid?

17   A    Yes.

18   Q    1 cc?

19   A    Yes.

20   Q    That's what we're talking about in this case?

21   A    That --

22   Q    Your equipment would test for that?

23   A    The instrument that does the identification would be able

24   to detect something that had 1 to 2 milligrams, depending on

25   the substance.  However, the screening instrument, that one

1    can detect one or just a few in nanograms, which would be a

2    billionth of a gram.  So that one is more sensitive.  The one

3    to screen is more sensitive, which is why when I took it to

4    the next instrument to try to obtain an identification, it did

5    not register on that instrument because it requires more

6    sensitivity -- or more -- more substance.

7    Q    Okay.  Well, I'm a layman and I think I flunked

8    chemistry, so you're going to have to help me out here.  A

9    nanogram, that's like, what, a millionth of a gram?

10   A    More like a billionth.

11   Q    A billionth of a gram?

12   A    Yes.

13   Q    How much of that packet of Sweet'n Low would that be?

14   How many places would you have to divide that out to, a

15   billion places?

16   A    Not a billion places.

17   Q    A million?

18   A    If we said -- okay, if you wanted 1 milligram and you

19   took the packet of Sweet'n Low, you divide that into 1,000.

20   In order to get a billionth, you'd have to divide that

21   thousand -- a hundred -- no, a million? -- let me think about

22   this.

23        Okay, you go 1,000th, so that's -- I believe it's a

24   million more times, but you're putting me on the spot, so

25   doing my best here.

1    Q    But what we're talking about really, Ms. Payne, is a

2    tiny, tiny amount could be detected by the tests that you were

3    running, correct?

4    A    You could call that tiny.  Some people might call that a

5    lot.

6    Q    Well, when you get down to millionths of things, I would

7    call that tiny, wouldn't you?

8    A    Um --

9    Q    Well, I'll withdraw that question.  You're a chemist.

10        What you were able to detect, if I gather -- and what

11   you wrote on this report is that you found evidence that at

12   some point in time methamphetamine had come in contact with

13   the surface that you did the methanol wash on; is that right?

14   A    That's correct.

15   Q    You have no idea as to what point in time, when or where

16   that that occurred?

17   A    All I could tell you in that regard is that it occurred

18   before it was received into the laboratory.

19   Q    Okay.  Okay.

20        MR. WEIGHT:  I have no further questions, and I have

21   no objection to Government's Exhibit 17.

22        THE COURT:  17 is admitted.

23   (Government's Exhibit 17 was received in evidence.)

24        MR. MUEHLECK:  I have no further questions of the

25   witness, Your Honor.

1           THE COURT:  Any further cross-examination?

2           MR. WEIGHT:  Very briefly, Your Honor.  I think I

3    covered most of it.

4                       CROSS-EXAMINATION

5    BY MR. WEIGHT:

6    Q    When you received the seal-a-meals that are in front of

7    you, that's what, Government's Exhibit what, 9?

8    A    Yes.

9    Q    10.  There was no request made to do any fingerprint

10   examination or analysis of the -- those items; is that right?

11   A    Right.  At the time I received it, there were no

12   fingerprint requests on order.

13   Q    Could you tell whether it had any -- well, strike that.

14        When you received it, you received it on behalf of

15   the lab or had someone else received it on behalf of the lab?

16   A    Someone else had received that on behalf of the lab.

17   Q    Had any other tests been done on it before you got -- it

18   got to you that you are aware of?

19   A    Not that I'm aware of.

20   Q    And your examination of this can only tell us -- or tell

21   the jury that at some point in time some -- something that

22   had -- that that seal-a-meal came in contact with some

23   methamphetamine; is that about right?

24   A    My analysis can definitely tell you that, that I did find

25   that, and I have also testified that prior to it being in the

1   lab, I could not tell you what point in time that that was.

2   Q    And that could have been a contamination done by someone

3   who had retrieved the item initially at some location and

4   packaged it and sent it to you, but you can't tell?

5          MR. MUEHLECK:  I'm going to object because that calls

6   for speculation.

7          THE COURT:  I'll allow the question.

8          THE WITNESS:  I can't tell.  I can't tell you that.

9          MR. WEIGHT:  Okay.  No further questions.

10         MR. MUEHLECK:  No further questions, Your Honor.

11         THE COURT:  Thank you.  You may step down.

12         THE WITNESS:  Thank you.

13                                      (Witness excused)

14         MR. MUEHLECK:  Call Victor Alferos, Your Honor.

15                     VICTOR ALFEROS,

16   called as a witness by the Government, having been first duly

17   sworn, was examined and testified as follows:

18         THE CLERK:  Please be seated.

19         Please state your name and spell your last name.

20         THE WITNESS:  Victor Alferos, A-L-F-E-R-O-S.

21                    DIRECT EXAMINATION

22   BY MR. MUEHLECK:

23   Q    How are you employed, sir?

24   A    Fingerprint specialist with Drug Enforcement

25   Administration in Vista, California.

ALFEROS - DIRECT                                    2-162

1    Q     How long have you been a fingerprint specialist with the
2    DEA in Vista, California, Mr. Alferos?
3    A     Six years.
4    Q     And what's -- what are your job -- what's your job there,
5    what's your duty description there?  What do you do?
6    A     To process items for fingerprints.
7    Q     Do you have any background prior to coming to the DEA in
8    the area of fingerprint processing?
9    A     I spent 29 years with the Santa Monica Police Department.
10   Q     Santa Monica?
11   A     Yes, sir.
12   Q     In what capacity in Santa Monica?
13   A     Same job, sir, fingerprints.
14   Q     And can you give us a little bit about your training in
15   fingerprint comparison?
16   A     Initially I was employed by Glendale Police Department.
17   This was June 1st, 1966.  That was just for 14 months, that
18   was my initial training.  There have been several, many, many
19   formal classes related to fingerprints, comparison part, the
20   actual processing part, most recently in Milwaukee there was
21   a -- I'm sorry, in San Diego, a comparison course, a two-week
22   course in comparison.  Processing courses, most of it in Los
23   Angeles County, Milwaukee, Miami.
24   Q     What -- tell me a little bit about your expertise.
25   What -- what do you do day to day with the DEA?

ALFEROS - DIRECT                              2-163

```
 1   A      I will be contacted by the agents, by a chemist that a

 2   request has been made to process certain evidence that's in

 3   custody in our lab.  I will then check out the items from the

 4   vault and -- which is headed by the evidence technicians.  And

 5   depending on the type of items or evidence, that would

 6   determine how it would be processed.

 7   Q      Did you -- I'm sorry, I didn't mean to cut you off.

 8   A      Not all services would be processed the same, sir.

 9   Q      Okay.  Did you do that type of work at Santa Monica?

10   A      Yes.

11   Q      And -- and did you ever have to testify in court?

12   A      Perhaps three to 400 times.

13   Q      And did you -- were you qualified as an expert in any of

14   those courts?

15   A      Yes.

16   Q      What were you qualified as an expert in, Mr. Alferos?

17   A      Processing, comparison, photography, footprints, tire --

18   tire impressions.

19   Q      Have you also been qualified in the federal courts, sir?

20   A      Yes.

21   Q      Okay.  Approximately how many times?

22   A      About 30.

23   Q      And that's since you've joined the Drug Enforcement

24   Administration, those 30 times?

25   A      I did a few robberies with the Santa Monica department
```

1    that was in a federal court.

2    Q    All right.

3    A    Bank robberies.

4    Q    I see.  Let me ask you, can you tell us a little bit

5    about the principles you -- you follow, or maybe I should ask

6    you the first thing is how you collect prints and what -- what

7    procedure you follow after you collect prints from an object

8    to make a determination or an identification, I guess I should

9    say?  How do you collect prints off a -- for instance, my pen

10   here or water jug?

11   A    They would be exposed to a -- those items, the pen, the

12   water jug would be exposed to super glue fumes, and then

13   dusted with a fingerprint powder.  Some items, the super glue

14   procedure isn't done, for example, at a scene, so to speak.

15   Q    How about paper?

16   A    Paper would be dumped or sprayed with a liquid chemical

17   called ninhydrin, N-I-N-H-Y-D-R-I-N, that would -- first of

18   all, fingerprints, it's just -- it's perspiration, the pores

19   and the ridges the fingers, the bottom of the feet --

20   Q    Yes.

21   A    -- the palms are constantly exuding perspiration.  That

22   perspiration not what -- that causes a fingerprint.  However,

23   it's not -- perspiration is 98 percent water, which is as far

24   as fingerprints of no value.  It's the rest of what's left

25   over, mainly salt and some fatty tissue -- fatty particles.

1    Q    So it's a solution and these fatty particles and the salt

2    that causes a print that we see on TV to be a fingerprint?

3    A    Yes.

4    Q    All right.  And what about plastic, if somebody had a

5    plastic, what would you do to check for to collect a print off

6    a piece of plastic?

7    A    Right, that would -- that process would involve exposing

8    the plastic items in a airtight chamber.  Super glue fumes are

9    then -- common super glue is poured in a container.

10   Q    Super glue?

11   A    Super glue, yes.

12   Q    All right.  Please continue.

13   A    It wasn't discovered, I think, until the '80s.

14        Oh, okay.  Then those fumes will attach to any

15   fingerprints.

16   Q    The stuff we buy in the stores, the Super Glue or that

17   type of compound, that's what you're talking about?

18   A    Yes.

19   Q    Okay.  And then it's used in what, a fumes -- fumes are

20   generated or what?

21   A    It's heated, sir.

22   Q    Okay.

23   A    And it's heated, and then the fumes would circulate

24   throughout the airtight chamber.

25   Q    And what does that do then?

1    A    They would -- if there are any prints on the -- the

2    plastic -- the jug you just picked up, they would attach to

3    it, sir.

4    Q    Okay.

5    A    Then they're made visible.

6    Q    All right.  And then how do you preserve them or what do

7    you do to make a comparison?

8    A    They would be photographed.

9    Q    And comparison -- go ahead.

10   A    Photographed on film which would produce a product, a

11   photograph --

12   Q    And --

13   A    -- to either compare with, if we have a known print card

14   to compare with.

15   Q    A known print of a person who has been identified,

16   attached to an individual?

17   A    Yes.

18   Q    What's that print called?

19   A    It's called a fingerprint card or known print or

20   fingerprint card, an ink print.

21   Q    And the unknown print, what is that called?

22   A    A latent print.

23   Q    All right.

24        MR. MUEHLECK:  Approach, Your Honor, with 16 and 19

25   not admitted?

1          THE COURT:  You may.

2          MR. MUEHLECK:  May I, Judge?

3          THE COURT:  You may.

4          MR. MUEHLECK:  Thank you.

5     BY MR. MUEHLECK:

6     Q    16 marked for identification and 19 identified -- 16

7     admitted exhibit and 19 marked for identification.

8     Mr. Alferos, have you seen 16 marked for identification --

9     16 -- Exhibit 16, admitted exhibit, before, sir?

10    A    Yes.  This is a copy of a DEA document.

11    Q    Which does what, sir?

12    A    It indicates a case number, their DEA exhibit, and then

13    it lists what the item consists of.

14    Q    And the exhibit number on that admitted exhibit, sir,

15    that R number is what?

16    A    R4-3-0006.

17    Q    Is that the same number you see on Exhibit 6?

18    A    Yes.

19    Q    Did you do an examination based on this exhibit, sir, of

20    some certain articles for the presence of fingerprints?

21    A    Yes.  There were, consisted of 16 sheets of newspaper, 15

22    Ziploc type bags, sealable plastic bags, I believe they were

23    about the gallon size, they were empty.  And then a few

24    plastic food saver pouches, clear plastic pouches.  They were

25    cut -- one end was -- they were empty also.

1    Q    Mr. Alferos, would you look in Exhibit 19 marked for

2    identification inside that box, and look at the box and tell

3    me if you've seen the contents before?

4    A    May I stand up?

5    Q    Yes, sir, please.  Just keep your voice up.  In fact, you

6    can take a look at it, and then sit down and we'll -- we'll

7    talk.  Whatever -- if you need more time to look at it, just

8    let me know.

9    A    (Complying).

10   Q    Have you seen those items before?

11   A    Yes.

12   Q    When -- when did you see those items or in what capacity

13   did you see those items, as an examiner?

14   A    Yes.

15   Q    Okay.  Please go ahead.

16   A    About five -- about weeks ago, I turned it in as a

17   completed work project.

18   Q    Could you tell us what you did to examine those items,

19   sir?

20   A    The newspaper, there's about 16 pieces of newspaper, some

21   double, some single pages.  They were affected with the

22   ninhydrin, a liquid, which would attach to any -- the salt

23   part of the fingerprints.  If there were -- if there were

24   finger or palm prints, if there were any present, they -- they

25   would be visible after 24 hours.

1    Q    And did you find anything on these newspaper -- on the

2    newspaper?

3    A    No.  No.

4    Q    And please continue, did you do any further examination

5    of the articles in Exhibit 19?

6    A    The -- the Ziploc bags, the food saver pouches, they were

7    exposed to the super glue fumes, and there were negative

8    results on that also.

9    Q    So all the contents of Exhibit 19 you checked for

10   fingerprints, Mr. Alferos?

11   A    Yes, I did.

12   Q    And you were unsuccessful in finding any prints?

13   A    An identifiable finger/palm print, which could be --

14   well, let's say have comparison quality.

15   Q    Okay.  What did you -- what did you find, did you find

16   stuff of bad quality or smudges, or what -- what were you able

17   to find?

18   A    Could I take a closer look?

19   Q    Absolutely.

20   A    I'm looking for --

21   Q    Okay.  You are going to have to go back to the mike,

22   please, if you could, please, sir.

23   A    I was looking for partial prints or smudges, which I

24   didn't see.

25   Q    All right.  And this examination was performed how long

1    ago, sir?

2    A    I checked it back in on April the 11th.

3    Q    And did you --

4    A    Of this year.

5    Q    Did you prepare a report recently?

6    A    Yes.

7    Q    Of your findings, that is?

8    A    Yes.

9         MR. MUEHLECK:  21 for identification, Mr. Weight.

10   BY MR. MUEHLECK:

11   Q    There are factors that would affect whether a fingerprint

12   would be deposited on those items, the fingerprint -- the --

13   that is the fingerprint on the newspaper and on the plastic

14   and on the bags, sir?

15   A    Yes, many, many.

16   Q    Like what?

17   A    The object itself, the handling of -- human contact,

18   hands touching the items, things like that.  The handling

19   part, say a fingerprint was left on an item, now, what has

20   happened to that particular surface between the time it was

21   left and it's processed, this -- this box, it had already

22   been, say, handled by the -- the chemist -- apparently wasn't

23   asked to process it before the chemist took possession of it.

24   That could be a detrimental factor.

25   Q    How about the pressure that someone would put on a

1    particular object.  Would that have an effect?

2    A    Yes, if they're talking about pressure or contact, if

3    there was a -- if there is movement before, during or after

4    the contact was made, then that would destroy any print as far

5    as comparison quality.  Also, if the person -- once again,

6    it's perspiration -- wasn't exuding enough perspiration at the

7    time to leave a print, that's another.  The object itself, if

8    it's exposed to a lot of heat, whatever exposure, that could

9    be detrimental also.

10   Q    What about the type of paper or the grain of the paper?

11   A    Yes.  The tighter, the finer the pattern, say a magazine,

12   say a page out of a Playboy magazine, which is glossy and

13   smooth, that the smoother the surface, the tighter the pattern

14   of the paper or cardboard, so to speak, that would have a

15   higher yield percentage versus newspaper, cardboard.

16   Q    Or something like a cheap stationery tablet where --

17   A    Yes.

18   Q    -- wide open grain?

19   A    Yes.

20   Q    Be tougher to leave a print on that?

21   A    Yes.

22   Q    And temperature, would that have an effect?

23   A    Yes.

24   Q    And -- all right.

25             MR. MUEHLECK:  Mr. Weight?

ALFEROS - DIRECT                                    2-172

1          MR. WEIGHT:  No questions, Your Honor.

2          THE COURT:  Thank you.  You may step down.

3          MR. MUEHLECK:  I've offered 21 into evidence, Your

4     Honor.

5          No, I haven't.  I haven't showed it to the witness.

6          Mr. Weight, I wanted to show it to Mr. Alferos, see

7     if he can identify it.  He didn't have any questions.

8          THE WITNESS:  Yes, this is --

9     BY MR. MUEHLECK:

10    Q    Mr. Alferos, what is that, please?

11    A    Government Exhibit 21 is a copy of a fingerprint report

12    that I generated concerning the -- the items in the cardboard

13    box.  I forget what exhibit you call it.

14    Q    The exhibit is marked on the top, it should be marked

15    Exhibit 19 with a yellow sticker.

16    A    That's correct.  People's -- or Exhibit 19.

17         MR. MUEHLECK:  Offer exhibit -- Exhibit 19 into

18    evidence, Your Honor, and Exhibit 21.

19         MR. WEIGHT:  No objection.

20         THE COURT:  19 and 21 are admitted.

21     (Government's Exhibits 19 & 21 were received in evidence.)

22         MR. MUEHLECK:  Moment please, Your Honor?

23              (Pause in the proceedings.)

24         MR. MUEHLECK:  No further questions, Your Honor.

25    Thank you.

1          THE COURT:  Mr. Weight?

2          MR. WEIGHT:  No questions.

3          MR. MUEHLECK:  Thank you, Mr. Alferos.

4                                        (Witness excused)

5          MR. MUEHLECK:  Let me retrieve the exhibits, Your

6     Honor.

7          Officer Dooros.

8                    DAVID DOOROS,

9     called as a witness by the Government, having been first duly

10    sworn, was examined and testified as follows:

11         THE CLERK:  Please be seated.

12         Please state your name and spell your last name.

13         THE WITNESS:  David Dooros, the last name is spelled

14    D, as in David, O-O-R-O-S.

15                    DIRECT EXAMINATION

16    BY MR. MUEHLECK:

17    Q    Mr. Dooros, how are you employed?

18    A    I'm a Los Angeles police officer.

19    Q    How long have you been with the L.A.P.D.?

20    A    13 years.

21    Q    And what are your duties there with the L.A.P.D.?

22    A    I work Narcotics Division.  I'm a canine handler.

23    Q    How long have you been a canine handler with L.A.P.D.?

24    A    Four-and-a-half years.

25    Q    And prior to that what were your duties?

1    A    I have been a motor officer.  I've -- I've been -- worked

2    on a bicycle, I've been a patrolman, been a training officer

3    of new probationers.  I've worked undercover vice, I've worked

4    uniform, prostitution enforcement detail.

5    Q    You've worked a number of different duties in the 13

6    years?

7    A    Yes.

8    Q    Let me direct your attention to October 5th of last year,

9    2002.  Do you know what your duties were on that day?

10    A    Yes.

11    Q    What were your duties, Officer?

12    A    I was the on -- the on-call canine handler for the

13    Narcotics Division.

14    Q    Did you get called that day to go out?

15    A    Yes.

16    Q    Where did you go?

17    A    Down west side.

18    Q    You remember the address?

19    A    No, I do not.

20    Q    Okay.  Would you recognize the address you went to if you

21    saw it again?

22    A    I'd recognize the house.

23         MR. MUEHLECK:  Approach the witness with Exhibit 3,

24    Your Honor?

25         THE COURT:  You may.

1                THE WITNESS:  Yes, that's the house.

2    BY MR. MUEHLECK:

3    Q    Can you tell us a little bit about your training as a

4    canine officer?

5    A    We do most of our training in-house, meaning we have

6    other officers that -- that train the new officers that come

7    in.  Prior to being a canine handler, I've had about -- about

8    15 years of training canines, training dogs for -- for

9    hunting.  That's been informal training.  The formal training

10   at the Narcotics, I've been through seminars with the

11   California Narcotic Canine Association.  They hold a three-day

12   seminar every January that -- that we attend.

13   Q    Is there a certification of the dog that's done?

14   A    Certification is done once a year.

15   Q    And is the dog you use certified?

16   A    Yes.

17   Q    What's the dog's name?

18   A    Annie.

19   Q    Annie?

20   A    Annie.

21   Q    Okay.  And how long have you had Annie?

22   A    I've had Annie since June of 2000.

23   Q    And does the handler get trained with the dog or to work

24   with the dog, or how does that works?

25   A    It -- it all depends.  It depends if the dog comes with

DOOROS - DIRECT                                    2-176

1    some training, it depends if the dog comes raw, meaning it

2    simply -- it doesn't know anything, even about narcotics.

3    Q    Okay.  And this dog, what's -- what's Annie's background?

4    A    This dog came through us to a -- through a dog vendor.

5    The dog world, they use vendors sort of like -- like used

6    cars, if you will.  We get dogs that are anywhere from a year

7    to three years of age that have certain aptitudes, certain

8    attitudes.  And we take those dogs.  This dog came from a

9    vendor, one such vendor with some training already in it.

10   Q    Okay.  And then the training it's received since it came

11   to L.A.P.D.?

12   A    Has all been through me.

13   Q    All right.  What have you done to train Annie?  And what

14   type of dog is Annie?

15   A    Annie is a Belgian Malinois.

16   Q    Okay.  I'm not familiar with that.  Can you explain to

17   the jury --

18   A    A Belgian Malinois is sort of like -- it's a Dutch

19   shepherd, an offshoot of a Dutch shepherd.  If you took a

20   German shepherd and put it with the body of a coyote, long and

21   lanky, gave it a black face and four black paws, you would

22   have a Belgian Malinois.

23   Q    Okay.  Now, how can you tell if the dog -- when I say

24   "certification," what does a certification mean for the -- for

25   your dog?

1    A    Certification means that the team, her and I, can

2    identify when the scent of narcotics is present.

3    Q    And how -- how is it certified, how does that occur?

4    A    What occurs is that the -- the CNCA official, the

5    certifying official, will put out five -- five different

6    narcotics.  They put out cocaine, both rock and powder; they

7    put out heroin; they put out opium; they put out marijuana;

8    they put out methamphetamine.  They're put out -- in each room

9    there is two finds.

10   Q    I'm sorry, two what?

11   A    I'm sorry, two finds.  Two different locations where

12   there are narcotics.  And the dog has -- the dog and the team

13   has to find one of them within a five-minute time period.

14   They also have to find narcotics on a vehicle.  There's one

15   find in the vehicle and one find on the outside of the

16   vehicle, and the team must find at least one of the finds.

17   Q    How many times have you done this with Annie?

18   A    Four.

19   Q    And how has she done?

20   A    She's done fine.  She certified every time.

21   Q    Has she ever found -- using Annie, have you ever had to

22   find a substance that she determined or told you or reacted so

23   that you believed it was narcotics, and then that narcotics

24   was taken to a lab and determined to be narcotics?

25   A    Yes.

1    Q    How often has that happened?

2    A    Oh, several hundred.

3    Q    Okay.  Can you tell me about, Officer, using Annie that

4    day at this address and what's depicted as Exhibit 3, please?

5    A    I ran that -- when I say "run," I searched that -- that

6    residence with Annie.

7    Q    Okay.  Who were you working with, do you remember the

8    name of the agent?

9    A    There was the DEA -- the DEA crew from the task force

10   that was there.  I can name off some of them that were there.

11   Q    You remember any of them?

12   A    Yes.  The DEA -- G-15 is Randy, Randy Davis.  There's Ari

13   Karabinas.

14   Q    Ari Karabinas?

15   A    Yeah, Ari Karabinas.

16   Q    That's fine.

17        THE COURT:  Excuse me, let's break now.  Please be

18   back at quarter to 3:00.

19        MR. MUEHLECK:  Thank you.

20        (A recess was taken from 2:35 p.m. to 2:50 p.m.)

21        THE COURT:  Please proceed, Mr. Muehleck.

22   BY MR. MUEHLECK:

23   Q    I think we were talking about your dog?

24   A    Yes.

25   Q    Okay.  Did you take the dog into the residence?

1    A    Yes.

2    Q    Okay.  Tell us what procedure you followed.

3    A    When we -- when we entered that location, I -- I took her

4    off lead, I took her off leash, and I let her, as we commonly

5    do, have her nose, just to run -- run the area, and a dog will

6    typically follow the scent cone to the largest scent

7    available.

8    Q    Follow the what?

9    A    They call it the scent cone.  The scent cone is the --

10   the expansion of scent from the origin.  Like if you were to

11   open the microwave after you pop popcorn, all of a sudden you

12   can smell it in the kitchen, and then a couple of minutes you

13   can spell it in the living room and then down the hall.

14   That's the scent cone, so that's the scent that's moving

15   through the air.

16          And so we let the dog have her nose.  She immediately

17   ran in the house, and she went up the stairs and she went back

18   towards -- she started searching the kitchen area, and then

19   she went -- then I went down to the back bedrooms.  After I

20   did the back bedrooms and the hallway, I came back down and

21   did the downstairs room.

22   Q    Did she react to anything?

23   A    Yes.

24   Q    Where did she react?

25   A    I got a -- an alert and an indication in my opinion that

1    it was in the attic.

2    Q     In the where, attic?

3    A     In the attic.  There was a -- a bed in the room as you go

4    down the hallway like back towards the street, back into the

5    right.  I believe it was --

6    Q     This is on the second floor?

7    A     Yes, I believe it was a young girl's room.  She ran the

8    room, went up on the bed, and then she ran the four corners of

9    the bed with her nose up towards the ceiling.  And then she

10   actually leaned over and started to -- to scratch with her

11   nose up in the air.  And so that it was an indication that

12   there was something high.  There was nowhere, it's just a

13   ceiling, so I -- I advised the agents of -- of that.

14   Q     Any other areas?

15   A     I had run -- I searched the -- it was a hallway closet.

16   Q     Hallway closet?

17   A     There was a hallway closet, and I had run that, and she

18   hadn't indicated anything there until the -- the agents that

19   went up there removed the hatch cover to the attic.  And once

20   you do that, you break the seal, and whatever scent would be

21   up there would come down through.  Well, she jumped into

22   the -- into the closet, which actually has a short rise to it.

23   It's not a closet.

24   Q     Not level with the floor?

25   A     Not level with the floor.  She jumped in and started

DOOROS - DIRECT                                    2-181

1    going up towards the, you know, scratching on the -- on the

2    walls, and I brought her back down.  That was further

3    indication that there was something -- that there was scent

4    coming from the attic.

5    Q    And on the first floor, anything?

6    A    The first floor, when I ran -- there was a room as you

7    enter the house and you go down, it's all the way to the -- I

8    believe it's all the way at the end on the right, had like

9    some computer and paperwork, computer desk in there.  There

10   was a closet there over to the left, there were some boxes,

11   and she didn't scratch there, but she showed a significant

12   interest in that area, alerting to that area.  So I told them

13   to check that area, too.

14   Q    Do you know if they found anything or seized anything?

15   A    No, I -- typically in a search, we run the search with

16   the dog, and then we tell them where different areas are, and

17   typically we won't do any of the searching ourselves until

18   after -- after they've already searched and not found

19   anything.

20        MR. MUEHLECK:  One moment, please, Your  --

21   BY MR. MUEHLECK:

22   Q    Any other places in the house if you recall?

23   A    No.

24        MR. MUEHLECK:  Moment please, Your Honor?

25             (Pause in the proceedings.)

1          MR. MUEHLECK:  I don't have any other questions of

2    Officer Dooros.

3          THE COURT:  Mr. Weight?

4          MR. WEIGHT:  Briefly, Your Honor.

5                    CROSS-EXAMINATION

6    BY MR. WEIGHT:

7    Q    Officer Dooros, if I understand correctly, you ran the

8    dog through the house basically letting her go and following

9    her?

10   A    Yes.

11   Q    She acted like there was something up in the attic?

12   A    Yes.

13   Q    Did the other officers go up in the attic?

14   A    Yes, they did, as did I.

15   Q    I'm sorry?

16   A    As did I.

17   Q    You went up in the attic, too?

18   A    Yes, I did.

19   Q    Didn't find anything?

20   A    No.

21   Q    And she acted as though she had interest in this closet

22   on the ground floor in the bedroom office in the back; is that

23   right?

24   A    Yes.

25   Q    She didn't alert on it?

DOOROS - CROSS

1    A    Well, when I said -- it wasn't the scratch alert.  The --

2    when a dog alerts, it's basically an emotional response.  The

3    alert is an emotional response.  The dog gets excited, the dog

4    begins sniffing more often, like almost hyperventilating

5    because it's getting excited because it's about to find its

6    toy, which we train it to smell -- their toy smells like

7    narcotics.  So it gets excited.  That in itself is the

8    emotional response.

9         What we then train the dog to do is a trained

10   response is to, once it finds it, to begin scratching.  And

11   there's a process that we go through to train the dog to

12   scratch.  So a scratch, when I said a scratch alert, okay,

13   versus -- versus a non-scratch alert, that's the difference

14   there.

15   Q    So scratch alert is kind of like a higher level of -- of

16   alert; is that right?

17   A    A scratch alert would be more as if the dog has

18   pinpointed where it is.  A dog will be in the scent cone and

19   not be able to pinpoint where it's at, but it will be alerting

20   along a wall, let's say, and there's no seam on the wall.  The

21   whole wall smells like narcotics because they've hidden it

22   behind the, you know, behind the drywall and -- and painted

23   over it.  So the dog might not -- you might not get a scratch

24   out of that, but you'll still get an alert.

25   Q    Okay.  And you didn't get a scratch alert in this case?

1   A     No, I did not get a scratch alert in this case, no.  She
2   upped all -- she did a lot of work on her own.  She was very
3   excited.  She went -- they get very possessive of the area,
4   meaning after I begin to leave the room, she says:  Uh-uh, no,
5   no, no, come on back.  And she goes back to the area herself.
6   Q     The reason is because she wants to find her toy, she
7   wants -- she wants to produce, right?
8   A     What -- I'm sorry?
9   Q     Well, the dog is trained to find the toy, so to speak?
10  A     Yes.
11  Q     And that's what the dog wants to do, that's her mission?
12  A     That's play to her, yes.
13  Q     So when you say:  Come on let's go, it's like abandoning
14  the mission?
15  A     Well, I'm -- I'm moving her to a different area.
16  Q     Okay.
17  A     That's --
18  Q     Now, in all of your training in working with dogs, have
19  you run across any studies that talk about the sensitivity of
20  a dog's nose; in particular, the breed you're working with,
21  your Belgian -- what was it again?
22  A     Belgian Malinois.
23  Q     Malinois.  Okay.  How sensitive a nose do they have?
24  A     The studies range and what we've -- what we've been told
25  in our training is it's anywhere from 50 to 125 times that of

1    a human.  And that's by measuring simply the cell -- the

2    cells, the nasal -- the actual nasal receptor cells.  They'll

3    take how many we have versus how many they have and -- and try

4    to extrapolate it that way.

5    Q    Okay.  Now, when was Annie certified?  You said you've

6    had her since 2000.  Was she certified in 2000?

7    A    She was certified in -- in July of 2000.

8    Q    Okay.  And in the time that you worked with her, how many

9    times has she been wrong or she alerted on something that

10   turned up to be a blank?

11   A    You're saying that that's wrong, though.  I don't know of

12   any -- I don't know of any times when she has been wrong.

13   Q    Well, wrong in the sense that she alerted on something

14   that would lead one to believe there were drugs there and it

15   turned out there were not?

16   A    Hundreds of times.

17   Q    So she would alert -- sometimes she would alert on

18   something and there were no drugs found?

19   A    Because that's not -- she's not trained to find drugs.

20   Q    Right, I understand that.

21   A    She's trained to find the scent, and just like that

22   popcorn analogy, if that popcorn came out and somebody ate

23   that popcorn in -- in the kitchen, and you came through the

24   door and you said:  Oh, someone just popped popcorn.  I want

25   some.  There's no more left, though, but the scent is still

1    left in the house.

2    Q    Okay.

3    A    So the dog will alert to the scent of narcotics, not the

4    substance.

5    Q    And as far as the scent goes, it can be a trace as well

6    as a quantity, can it not?

7    A    When you say --

8    Q    Well, let me give you an example.  Has she ever alerted

9    on United States currency, money?

10   A    Yes, she has.

11   Q    And is it not also a known fact that most of the currency

12   in circulation in the United States is contaminated in one way

13   or another with some drug residue?

14   A    No, that's completely wrong.

15   Q    Okay.  Well, what percentage of it would you say?

16   A    The study that you are talking about has never -- has

17   never been duplicated because the sample of the study was --

18   was poorly put together.  The study has been examined numerous

19   times by Professor Ferton (ph. sp.) from the -- from a college

20   in Florida, he's a chemist down there, and the sodium -- I

21   believe it's sodium benzonite spike in the spectrograph that

22   the dog alerts to is.  In that study, they extrapolated out

23   that the trace amount of cocaine even on those bills, it would

24   have taken 175,000 individual bills to make one gram of

25   cocaine, and we don't train under a gram of cocaine.  So as

1    far as money goes, that's -- that study really doesn't hold

2    any water in the dog world, and that's never been duplicated

3    and the reason why is because it was -- it was a poor study to

4    begin with.

5    Q    Well, let me give you another question then.  Has the dog

6    ever alerted like on a single $20 bill or something like that?

7    A    No.

8    Q    It's always been a substantial amount of -- of money that

9    the dog alerted on when it came to money?

10   A    She has alerted to -- smallest number of bills, I would

11   probably say it was right around 50.

12   Q    Okay.

13   A    That would be the smallest amount.

14   Q    If there were -- strike that.

15         40 or 50 bills is about the smallest amount she's

16   alerted on?

17   A    Yes.

18   Q    Okay.

19         MR. WEIGHT:  I have no further questions of this

20   witness.

21         MR. MUEHLECK:  No questions, Your Honor.

22         THE COURT:  Thank you.  You may step down.

23                              (Witness excused)

24         MR. MUEHLECK:  Call Michael Gillespie, Your Honor.

25              MICHAEL GILLESPIE,

GILLESPIE - DIRECT                    2-188

1    called as a witness by the Government, having been first duly

2    sworn, was examined and testified as follows:

3              THE CLERK:  Please be seated.

4              Please state your name and spell your last name.

5              THE WITNESS:  Michael Gillespie.

6              THE CLERK:  Spell your last name.

7              THE WITNESS:  G-I-L-L-E-S-P-I-E.

8                     DIRECT EXAMINATION

9    BY MR. MUEHLECK:

10   Q    Are you a student, sir?

11   A    Yes.

12   Q    Where are you a student?

13   A    West Oahu.

14   Q    What year?

15   A    Third year.

16   Q    Do you work?

17   A    Yes, I do.

18   Q    Where do you work?

19   A    Mail Boxes Etc.

20   Q    And where is that store?

21   A    On Kapahulu Avenue.

22   Q    How long -- what do you do there?

23   A    Package, ship items.

24   Q    How long have you worked at the Mail Boxes Etc. at

25   Kapahulu?

1    A    Four-and-a-half years.

2    Q    Let me direct your attention to October 3rd, 2002, and

3    ask you if you were working that day?

4    A    Yes.

5    Q    What were -- when did you start work that day?

6    A    1 o'clock.

7    Q    Do you have a normal shift?

8    A    Yeah, 1 to 6 o'clock.

9    Q    Did you take any items in that day?

10   A    Oh, yeah, every day.

11        MR. MUEHLECK:  Approach, Your Honor, with an admitted

12   exhibit?

13        THE COURT:  You may.

14   BY MR. MUEHLECK:

15   Q    That yellow sticker, see that, Mr. Gillespie?

16   A    Yes.

17   Q    Have you seen that exhibit before?

18   A    Yes.

19   Q    Where have you seen that exhibit before?

20   A    Came into my store, a lady brought it in to ship it out

21   Fed Ex.

22   Q    Would you turn it so the jury can see the front part of

23   it.  The white thing on the top -- on the right-hand cover and

24   the white thing on the left-hand cover, were they on it when

25   it came into your store?

1    A    No.

2    Q    How did they get on the box, the white -- the white

3    labels?

4    A    The big white label, we put on at the store, and Fed Ex,

5    when the driver comes to pick up the package, puts on the

6    smaller white label.

7    Q    Now, you said a lady brought this in to your store on

8    October 3rd?

9    A    Yes.

10   Q    In the afternoon?

11   A    Yes.

12   Q    About what time, do you recall?

13   A    Between 1:00 and 2:00.

14   Q    How do you know it was between 1:00 and 2:00?

15   A    Fed Ex comes to pick up by 2:15, and she came in when I

16   was there.

17   Q    Fed Ex comes to your store to pick up parcels?

18   A    Yes.

19   Q    And they ship them from -- that's how you ship parcels

20   from -- from Kapahulu to the Mainland?

21   A    Yes.

22   Q    Could you describe this person for us?

23   A    She was about 5'8" to 5'9", long brown hair, tan skin,

24   little acne on the face, and that's about it.  Her hair had

25   blonde streaks, age about mid-30s.

1    Q    Would you call her attractive?

2    A    Yeah.

3    Q    And she brought Exhibit 1 to you?

4    A    Yes.

5    Q    What condition was it in when she brought it to you?

6    A    It was sealed.

7    Q    And did you have a conversation with her?

8    A    Not too much.  We just asked her what was inside the

9    package, and she said that she only had hair products in

10   there.

11   Q    Why do you ask?

12   A    Because we have to make sure what's inside to see if it's

13   not illegal or make sure that the carrier will take it.

14   Q    What won't the carrier take?

15   A    Anything that is flammable or anything with pressure,

16   like aerosol.

17   Q    Aerosol cans?

18   A    Yes.

19   Q    Can't ship, the carrier won't take them?

20   A    No.

21   Q    All right.  So why don't you want -- I mean don't you get

22   paid to send that stuff out, to send packages out?  Why would

23   you care if an aerosol can --

24   A    Because we can get in trouble with Fed Ex.

25   Q    So she said what was in the box?

GILLESPIE - DIRECT

2-192

1    A    Hair products.

2    Q    All right.  And what did she want you to do with the box?

3    A    Send it Fed Ex, standard, which is -- or get there next

4    day in the afternoon.

5    Q    Where was it going to go?

6    A    California.

7    Q    Do you know where in California?

8    A    I believe Playa del Rey.

9    Q    Okay.  So what do you do when this person wanted this

10   package sent to Playa del Rey, California?

11   A    I make her fill out a form called a parcel shipping

12   order --

13   Q    All right.

14   A    -- that has her address and where it's going to, and then

15   I -- after she fills it out, I type up that big label and --

16   Q    On the right-hand side?

17   A    Yes.

18   Q    Okay.

19   A    And print that out, which has her name -- where it's

20   going to and her name and our address on it.

21   Q    Did she give you a name?

22   A    Yes.

23   Q    What name did she give you?

24   A    Linda Chang.

25   Q    Is it on the label?

GILLESPIE - DIRECT

2-193

1   A   Yes.

2   Q   How do you print up the label or type up the label; how

3   do you do that, sir?

4   A   On the computer we have a program that does it for us.

5   Q   All right.  And is the address on the label?

6   A   Yes.

7   Q   Did she give an address?

8   A   Yes.

9   Q   Or any other identifying information or phone number, or

10  anything?

11  A   Phone number and address.

12  Q   Is that on the label?

13  A   No.

14  Q   Okay.  Where did that come from?

15  A   Off the parcel shipping order.

16  Q   And who fills out the parcel shipping order?

17  A   She does.

18  Q   Do you recall what the charge was?

19  A   About -- I believe $60, around there.  I'm not sure.

20  Q   And was supposed to be delivered when?

21  A   The next day in the afternoon.

22  Q   Okay.  What service does this woman get for the money she

23  gave you?

24  A   It's called Fed Ex standard.

25  Q   Standard?

1    A    Yes.

2    Q    Please explain.

3    A    When she comes in, if she comes in before Fed Ex picks up

4    the parcel, then when Fed Ex picks it up, it will get

5    delivered the next day in the afternoon around 3:00, 3:30.

6    Q    Whose time 3:30?

7    A    Their time.

8    Q    So if it's California, it's going to be delivered around

9    3:30 California time?

10   A    Yes.

11   Q    Was anyone with her?

12   A    No.

13   Q    You see if she arrived on foot or in a car, or could you

14   tell?

15   A    I couldn't tell.  She just walked in.

16   Q    How long was she in the store?

17   A    About 15 minutes.

18   Q    And what happened to the package, Exhibit 1?

19   A    After she had left, we had to make sure that there is no

20   aerosol in, and that's when my manager opened it up.

21   Q    Who's the manager?

22   A    Roger Chun.

23   Q    And where did he -- did you see him open it up?

24   A    Yes.  We took it into the back of the store and opened it

25   up.

1   Q    And what did you observe?

2   A    There was some bubble wrap on the top and newspaper,

3   and --

4   Q    I'm sorry, some what?

5   A    Bubble wrap and some newspaper.  And then when we cleared

6   that, we found a vacuum-sealed package with two large

7   pillow-looking shapes in it, cylinder shapes.

8   Q    Did you examine them?

9   A    Yes.

10  Q    What did you think?

11  A    Well, they weren't hair products.  We felt it and it was

12  grainy on the inside.

13  Q    I'm sorry, it was what?

14  A    Grainy.  Felt kind of like sand, real fine sand.  And

15  inside they were wrapped with newspaper so we couldn't see

16  exactly what it was.

17  Q    So what did you do?

18  A    We -- I then called agent -- the FBI and told them what

19  we found.

20  Q    Who did you speak with?

21  A    Agent Brady.

22            MR. MUEHLECK:  Exhibit 2, if I might approach, Your

23  Honor?

24            THE COURT:  You may.

25  BY MR. MUEHLECK:

1    Q    Can you see that from here?

2    A    Yes.

3    Q    Can you identify that?

4    A    Yes.

5    Q    What is that?

6    A    That's what's in the box.

7    Q    That's what it looked like?

8    A    Yes.

9    Q    In Exhibit 1?

10   A    Yes.

11   Q    How far down the box did you go?

12   A    About halfway.

13   Q    You called Agent Brady?

14   A    Yes.

15   Q    What did you tell him?

16   A    Told him we found a package that was sealed in

17   vacuum-sealed packages and they felt grainy, and it looked

18   like a cylinder -- cylinder shapes, two in each vacuum-sealed

19   package.

20   Q    And what happened then?

21   A    He then instructed us to send it through and that he

22   would deal with it when -- when it got to Fed Ex.

23   Q    Okay.  Did you see that or talk to that woman again?

24   A    I -- she called back about 15 to 20 minutes after she

25   left to make sure that the package had the option to just

GILLESPIE - DIRECT

1    leave it at the door, to waive the signature.

2    Q    To waive the signature?

3    A    Yes.

4    Q    What does that mean?

5    A    So the receiver doesn't have to sign for it, the driver

6    can just leave it at the door.

7    Q    Is that -- had she -- had you provided that service when

8    she originally came in or did she request that?

9    A    She asked for it, but I just forgot to put that option

10   in.

11   Q    All right.  So what did you do when she made that

12   request?

13   A    I then put the option in and printed out a new label

14   where a new tracking number came out.

15   Q    Okay.  Did you take the old label off or just put a

16   new --

17   A    No, I just put a new one on it.

18   Q    And that was a message she left by phone?

19   A    Yes.

20   Q    And what did you do with the box?  Did it go through the

21   Fed Ex?

22   A    Yes, Fed Ex picked it up.

23   Q    Did you ever talk to that woman again?

24   A    Yes, the next day.

25   Q    How did that occur?

1    A    She called saying that her package wasn't delivered.

2              MR. WEIGHT:  I'm going to object to hearsay, Your

3    Honor.

4              MR. MUEHLECK:  Submit it's not hearsay.  The witness

5    is here.  And it's not offered for the truth of the matter

6    asserted, it's offered for a communication to him and what he

7    did with the communication.  I think we've already gone into

8    this with Agent Brady.

9              THE COURT:  I'll allow it, not for the truth of the

10   matter but to show why this witness did whatever he did

11   following that.

12   BY MR. MUEHLECK:

13   Q    Did you talk to her the next day?

14   A    Yes.  She called --

15   Q    Okay.  What -- go ahead.

16   A    She called wondering where her package was because it

17   wasn't delivered.

18   Q    Go ahead.  Did you have further conversation with her?

19   A    Yes.  I then took the tracking number down and ran it

20   through the Internet at FedEx.com, where I can see the

21   progress of the package.

22   Q    Okay.  Explain that to people like me who haven't done

23   this before and to the jury.  What are you talking about?

24   A    Okay.  Fed Ex has a Web site for their company where you

25   can track your package as long as you have the tracking number

1    each package has.

2    Q    Show us.  Is there a tracking number on this?

3    A    Sure.  Tracking number is this big number right there

4    (indicating).

5    Q    How many digits?

6    A    Nine.

7    Q    Read it to us into the record, please.

8    A    It's 7906 0714 6974.

9    Q    Okay.  And the tracking number, you take that and what do

10   you do?

11   A    Put it into a field where it says you can track your

12   packages, and then there should be a button that says track

13   it, and it'll show you the details of where it's been and

14   where it's going.

15   Q    Do you know if Fed Ex also has an 800 number to contact?

16   A    Yes.

17   Q    And if you have the -- have you ever had occasion to tell

18   a customer he can call an 800 number if he doesn't have a

19   computer?

20   A    Yes.

21   Q    And using that tracking number, can they also determine

22   the -- the status of the package?

23   A    Yes.

24   Q    All right.  And did you talk to this lady about the

25   package?

GILLESPIE - DIRECT

1    A    Yes.

2    Q    And what was the conversation then?

3    A    She wanted to know where -- where it was, and because it

4    didn't get at the -- to the destination at its proper time.  I

5    then told her I would call Fed Ex and see what had happened.

6    Q    Okay.  And did you continue -- did you call Fed Ex?

7    A    Yes.  I hung up with her and I called -- actually, no, I

8    didn't call Fed Ex.  I called Agent Brady --

9    Q    Yes.

10    A    -- right after she got -- I got off the phone with her.

11    And Agent Brady instructed me to tell her that the package was

12    missorted because of the option change of the signature waiver

13    that she wanted.

14    Q    The change in the delivery information you mean?

15    A    Yes.

16    Q    The delivery service?

17    A    Yes.

18    Q    All right.

19    A    And because of that, that screwed up some of their

20    systems and that they would deliver it on Saturday, the next

21    day, no extra charge.

22    Q    Did you talk to her again after you had this conversation

23    with Agent Dan Brady of the FBI?

24    A    Yes.  She called back about ten minutes later.

25    Q    All right.  And what was that conversation?

1    A    And I told her what Agent Brady told me to say, and I
2    also got a phone number from her.
3    Q    Why did you do that?
4    A    To -- just in case anything does happen, we can contact
5    her and also to give to Agent Brady.
6    Q    Did Agent Brady ask you to see if you could get a
7    call-back number from her?
8    A    Yes.
9    Q    And do you recall -- did you get a number from her?
10   A    Yes, I did.
11   Q    And what did you do with that number?
12   A    I gave it to Agent Brady.
13   Q    All right.  After that, did you have any other
14   conversation with this woman who brought the parcel in?
15   A    No.
16   Q    So what -- did you tell her the package would be
17   delivered?  Did you tell her anything about when the package
18   would be delivered?
19   A    Yes, the next day about 3:00 to 3:30.  That was the --
20   from the first time she came in.
21   Q    Okay.
22   A    And then on Saturday, I told her it would get delivered
23   around noon.
24   Q    Okay.  So she came in on the 3rd?
25   A    Yes.

GILLESPIE - DIRECT                                2-202

1    Q    And you talked to her then on the 4th?

2    A    Yes.

3    Q    And again on Saturday, the 5th?

4    A    No.

5    Q    The last time you talked to her was on the 4th?

6    A    Yes.

7    Q    And that was when you got the call-back number?

8    A    Yes.

9             MR. MUEHLECK:  One moment please, Your Honor?

10                      (Pause in the proceedings.)

11            MR. MUEHLECK:  I don't have any further questions,

12    subject to recall of the witness for the matter we discussed

13    before, Your Honor.

14            THE COURT:  Mr. Weight?

15            MR. WEIGHT:  No questions.

16            THE COURT:  Thank you.  You may step down.

17                                      (Witness excused)

18            MR. MUEHLECK:  Call our next witness, Your Honor?

19            THE COURT:  Yes.

20            MR. MUEHLECK:  Call Brenda Cooper Vo.

21                      (Pause in the proceedings.)

22            THE COURT:  I'll meet with counsel at sidebar while

23    we're waiting.

24                      (Bench conference on the record:)

25            THE COURT:  I just want to caution you not getting

1   into what Mr. Weight has raised.

2        MR. MUEHLECK:  Understand, Judge.  I've been very

3   careful about that.  I've got my questions addressed

4   carefully.  I may cut her off, but she understands generally,

5   you know, that we have this motion to rule on.  I may cut her

6   off, you know, if I think there's something going on.

7        THE COURT:  When are you going to be filing your

8   opposition?

9        MR. MUEHLECK:  I am going to do it tonight, Judge.  I

10  would have done it last night but --

11       THE COURT:  When do you want to hear it?

12       MR. MUEHLECK:  That's up to you, Your Honor.  I would

13  have suggested we do it tomorrow, but we just kept plugging

14  along.  We had her brought in today, that's why.

15       THE COURT:  We're waiting on that.

16       MR. MUEHLECK:  I understand.  I understand.

17            (End of bench conference.)

18                 BRENDA MARIA VO,

19  called as a witness by the Government, having been first duly

20  sworn, was examined and testified as follows:

21       THE CLERK:  Please be seated.

22       Please state your name and spell your last name

23  witness.  And speak into the mike.

24       THE WITNESS:  Brenda Maria Vo, last name Vo, V-O.

25                 DIRECT EXAMINATION

```
 1    BY MR. MUEHLECK:

 2    Q     Are you in custody?

 3    A     Yes.

 4    Q     Where are you being held?

 5    A     FDC Honolulu.

 6    Q     The Federal Detention Center here in Honolulu?

 7    A     Yes.

 8    Q     How long have you been held at the Federal Detention

 9    Center?

10    A     About seven months.

11    Q     You were arrested, do you recall the day, the date?

12    A     I believe it was October 6th.

13    Q     Sunday night of last year?

14    A     Yes.

15    Q     Have you had your trial yet?

16    A     No.

17    Q     Are you testifying in accordance with a plea agreement

18    with the United States?

19    A     Yes.

20          MR. MUEHLECK:  18 marked for identification to

21    Mr. Weight.

22          Approach the witness, Your Honor?

23          THE COURT:  You may.

24    BY MR. MUEHLECK:

25    Q     Mrs. Vo, I've handed you what's been marked as Government
```

```
 1   Exhibit 18 for identification.  Can you take a look at that,
 2   tell me if you can identify it?
 3   A    Yes.
 4   Q    What is that, please?
 5   A    It's the plea agreement.
 6   Q    You recognize your signature on it?
 7   A    Yes.
 8   Q    Are you testifying today in accordance with that plea
 9   agreement?
10   A    Yes.
11   Q    Do you have any other agreements, Mrs. Vo, with the
12   United States concerning your testimony today?
13   A    No.
14   Q    Have you pled guilty or are you pending trial, Mrs. Vo?
15   A    I pled guilty.
16   Q    What did you plead guilty to?
17   A    To conspiracy with intent to distribute 50 grams or more
18   of methamphetamine.
19   Q    Have you been sentenced yet?
20   A    No.
21   Q    Who will sentence you, do you know?
22   A    Judge Gillmor.
23   Q    What is the maximum sentence that you understand you're
24   facing?
25   A    Life.
```

BRENDA VO - DIRECT                    2-206

1    Q    And is there a fine that can be imposed as a result of

2    your plea of guilty?

3    A    Yes.

4    Q    What's the maximum fine that can be imposed?

5    A    $8 million.

6    Q    Is there a mandatory minimum sentence?

7    A    Yes.

8    Q    What is the mandatory minimum sentence you're facing?

9    A    20 years.

10   Q    Do you have any agreement with the United States about

11   what your sentence will be?

12   A    No.

13   Q    Were you convicted in First Circuit Court, the State of

14   Hawaii, in May of 1996 --

15   A    Yes.

16   Q    -- for a felony?  For a felony?

17   A    Yes.

18   Q    All right.  And was that for Promoting Dangerous Drugs in

19   the First Degree?

20   A    Yes.

21   Q    Two counts?

22   A    Yes.

23   Q    And was that for the sale of crack cocaine and cocaine to

24   an undercover agent -- or undercover agents of the DEA?

25   A    Yes.

1    Q    Do you remember when those sales occurred?

2    A    In 1991, the summer, and also a few months later.

3    Q    Where were you when -- where were you living when those

4    sales occurred?

5    A    I was living in San Diego, and I came home for the

6    summer.

7    Q    What were you doing in San Diego?

8    A    Going to school at a junior college.

9    Q    Okay.  And when you came back to Hawaii, were you -- had

10   you lived in Hawaii before?

11   A    Yes.

12   Q    When did you live in Hawaii?

13   A    I lived in Hawaii ending of elementary through high

14   school and community college.

15   Q    And how is it you happened to sell cocaine to an

16   undercover agent of the DEA?

17   A    A person named Ron that lived across the street from my

18   parents' house asked me if I could get some cocaine for a

19   friend of his on another island.

20   Q    Where did you go to get the cocaine for him?

21   A    From an ex-boyfriend of mine here on the island.

22   Q    What was his name?

23   A    Francis Beauchamp.

24   Q    Do you know how to spell that last name for our record

25   that's being kept?

BRENDA VO - DIRECT                2-208

1    A    B-E-A-U-C-H-A-M-P.

2    Q    All right.  After you were arrested by the State of

3    Hawaii, did you go to court?

4    A    Yes.

5    Q    Did you have a trial or did you plead guilty or did you

6    plead no contest or what, do you recall?

7    A    I pled no contest.

8    Q    And what sentence did you receive?

9    A    Ten years probation.

10   Q    Did you have a plea bargain with the State of Hawaii --

11   like you had a plea bargain with the United States today, did

12   you have a plea bargain with the State of Hawaii?

13   A    No.

14   Q    Did you agree to testify against anybody in the State of

15   Hawaii?

16   A    No.

17   Q    Did you provide information to police in the State of

18   Hawaii concerning your knowledge of what was going on in order

19   to get your sentence of ten years probation?

20   A    No.

21   Q    Do you remember who represented you?

22   A    Wayne Tashima.

23   Q    Now, the cocaine you sold first, do you know what type of

24   cocaine that was?

25   A    Crack cocaine.

1    Q    Had you used crack cocaine before?

2    A    Yes.

3    Q    Where had you used it?

4    A    With my ex-boyfriend in Honolulu.

5    Q    What was his name?

6    A    Michael Freitas.

7    Q    How come you didn't get -- did you get the crack cocaine

8    from him or someone else, you said?

9    A    From someone else.

10            MR. WEIGHT:  Objection.  Leading.

11            THE COURT:  Sustained.

12   BY MR. MUEHLECK:

13   Q    Where did you get the crack cocaine from?

14   A    Francis Beauchamp.

15   Q    Why did you go to Mr. Beauchamp?

16   A    Because he had crack cocaine.

17   Q    And did you have discussions with the DEA about the sale

18   of crack cocaine to them?

19   A    Can you repeat the question?

20   Q    Well, the person that bought the crack cocaine from you,

21   did you have discussions -- he was an undercover agent of the

22   DEA?

23   A    Yes.

24   Q    It was not Ron, it was someone else?

25   A    Yes.

1   Q    How did you meet this undercover agent from the DEA?

2   A    From Ron.

3   Q    Ron introduced you to him?

4   A    Yes.

5   Q    And did you have discussions with this person from the

6   DEA about the purchase of crack cocaine?

7   A    I don't remember.

8   Q    It was -- what price did you get for the crack cocaine?

9   A    I don't really remember that either.

10   Q    You don't remember who paid you or how much you were

11   paid, I should say?

12   A    I -- I remember it was about 1200 or 1400.

13   Q    Did you make any money on this?

14   A    Yes.

15   Q    How much money did you make?

16   A    $200.

17   Q    And the rest of the money went where?

18   A    To Francis Beauchamp.

19   Q    You said there was another sale of cocaine?

20   A    Yes.

21   Q    When would that occur?

22   A    About four months later.

23   Q    You know if that was -- who that person was you sold it

24   to?

25   A    Another undercover agent.

```
 1    Q    Was that a different person than the first DEA agent?

 2    A    Yes.

 3    Q    How did you meet him?

 4    A    Through Ron on the telephone.

 5    Q    And what did that undercover officer ask you for?

 6    A    He wanted crack cocaine.

 7    Q    What did you tell him?

 8    A    I couldn't find any crack cocaine.

 9    Q    Why is that?

10    A    I didn't know anybody who had it.

11    Q    Why couldn't you get it from Mr. Beauchamp?

12    A    Because he had -- he was shot.

13    Q    Where was he shot?

14    A    In San Francisco.

15    Q    Did he survive?

16    A    No.

17    Q    What is your understanding of what that was about?

18    A    I was told he was at the wrong place at the wrong time.

19    Q    Okay.  How much cocaine did you get for the second

20    person, the second DEA agent?

21    A    One ounce.

22    Q    Did you have discussions with him about other drug

23    related -- other drug-related conversations with him?

24    A    I don't recall.

25    Q    Do you know if you were tape-recorded by him?
```

```
 1   A    On the telephone?

 2   Q    Yes.

 3   A    Yes.

 4   Q    Do you know how many times?

 5   A    No.

 6   Q    Where did the second amount of cocaine come from?

 7   A    My -- Michael Freitas got it.

 8   Q    Okay.  And did you make money on that?

 9   A    Yes.

10   Q    How much money did you make on that?

11   A    $200.

12   Q    Prior to the first deal, the sale of crack cocaine, had

13   you sold crack cocaine before?

14   A    No.

15   Q    Do you know if Mr. -- your friend had, Mr. Beauchamp?

16   A    Do I know if he did?

17   Q    Well, other than to you, was he a dealer in cocaine?

18   A    Yes.

19   Q    Okay.  And Mr. Freitas, was he a dealer in cocaine?

20   A    No.

21   Q    Did you know how to make crack cocaine when you sold it

22   to the first DEA agent introduced to you by Ron?

23   A    Yes.

24   Q    Where did you learn to do that?

25   A    From my ex-boyfriend Michael Freitas.
```

BRENDA VO - DIRECT                    2-213

```
 1   Q   Had you done that before with Mr. Freitas?

 2   A   Yes.

 3   Q   How much have you done that?

 4   A   How often?

 5   Q   Yes.

 6   A   I did it for about a year.

 7   Q   Okay.  Where did you do that?

 8   A   At his house, his parents' house.

 9   Q   In what state or what area?

10   A   Honolulu, Hawaii.

11   Q   Were you using crack cocaine then?

12   A   No.

13   Q   Was he selling it?

14   A   No.

15   Q   Okay.  What was being done with the crack cocaine that

16   you saw was being made by Mr. Freitas for that year period?

17   A   What was being done?  We were smoking it.

18   Q   Who was smoking it?

19   A   Him and I.

20   Q   Do you know a Rick Vo?

21   A   Yes.

22   Q   How do you know Rick Vo?  How do you know Rick Vo?

23   A   I met him a long time ago here on the island.

24   Q   Can you tell us when that was?

25   A   I was about 12 years old.
```

```
 1   Q    Okay.  And after the age of 12, did you see him again?

 2   A    Yes.

 3   Q    Where?

 4   A    In Waikiki.

 5   Q    And after that, did you become close at sometime?

 6   A    In California.

 7   Q    Where were you living in California?

 8   A    Studio City.

 9   Q    Where was he living?

10   A    On the west side.

11   Q    For people that haven't lived in Los Angeles, explain

12   what you mean "the west side," the west side --

13   A    Inglewood was the city.

14   Q    Okay.  How often -- and when was this?

15   A    December of 2000 -- of '97.

16   Q    After that summer did you see him more often?

17   A    Yes.

18   Q    Have a relationship?

19   A    Yes.

20   Q    What's the next thing that occurred between the two of

21   you in that relationship in the next year, '98?

22   A    We bought a house together.

23   Q    Where did you buy a house?

24   A    Playa del Rey.

25   Q    Do you remember the address?
```

1    A    8009 Hulbert Avenue.

2            MR. MUEHLECK:  If I might, Your Honor, with Exhibit

3    3?

4            THE COURT:  Pardon me?

5            MR. MUEHLECK:  If I might use Exhibit 3, Your Honor?

6            THE COURT:  You may.

7            MR. MUEHLECK:  Thank you.

8    BY MR. MUEHLECK:

9    Q    Ms. Vo, do you see this --

10   A    Yes.

11   Q    -- Exhibit 3?  Could you identify this?

12   A    Yes.

13   Q    What is this?

14   A    That's our house.

15   Q    Did it look like this when you bought it in '98?

16   A    Yes.

17   Q    Were you still single at that time?

18   A    Yes.

19   Q    Did that relationship change?

20   A    Yes.

21   Q    When did -- when did the relationship change?  Did you

22   get married?

23   A    Yes.

24   Q    To Mr. Vo?

25   A    Yes.

1    Q    Is he in the courtroom?

2    A    Yes.

3    Q    Point to him and tell me what he's wearing for the

4    record.

5    A    He's wearing a dark suit with a tie and yellow in it.

6         MR. MUEHLECK:  May the record reflect the witness has

7    indicated the defendant.

8         THE COURT:  The record will so reflect the

9    identification of the defendant.

10   BY MR. MUEHLECK:

11   Q    When did you get married?

12   A    May of 1999.

13   Q    Did you have a child?

14   A    Yes.

15   Q    When was the child born?

16   A    July 1999.

17   Q    What was the child's name?

18   A    Kianna.

19   Q    That's a little girl?

20   A    Yes.

21   Q    Did Mr. Vo already have a child?

22   A    Yes.

23   Q    What was that child's name?  When you married him I'm

24   talking about.

25   A    (No response.)

BRENDA VO - DIRECT                        2-217

1   Q   Take your time.

2   A   Gabriella.

3   Q   Mr. Vo had previously been married?

4   A   Yes.

5   Q   And that child was born in that marriage, Gabriella?

6   A   Yes.

7   Q   Let me direct your attention to 2001.  Were you still

8   living in Playa del Rey, Hulbert Avenue, 2001, late 2001?

9   A   Yes.

10  Q   Do you know a Linda Chang, Mrs. Vo?

11  A   No.

12  Q   You ever heard that name?

13  A   Yes.

14  Q   When did you first hear the name Linda Chang?

15  A   Around September of 2001.

16  Q   From where did you hear that name from?

17  A   It was on a box.

18  Q   When did you first see that box?

19  A   Around September of 2001.

20  Q   And how did you happen to see the name Linda Chang in

21  relationship to this box?

22  A   My husband gave me the box.

23  Q   Was there a discussion about this box?

24  A   Yes.

25  Q   Where were you when you discussed this box?

1    A    At our house.

2    Q    What did you say, what was the discussion about?

3    A    He asked me if I could mail out a box.

4    Q    What did you say?

5    A    And I asked him what was in the box.

6    Q    What did he reply?

7    A    He told me not to worry about it.

8    Q    Did you see him handle the box at this point?

9    A    No.

10   Q    When he told you not to worry about it, what did -- did

11   the discussion continue?

12   A    Yes.

13   Q    Okay.  What did you discuss then?

14   A    I asked if he could -- if he could mail it out, and he

15   continued to ask me if I could do it.

16   Q    And did you agree to do it?

17   A    And I said no.

18   Q    Why not?

19   A    Because he didn't want to tell me what was in the box.

20   Q    Did you have a feeling about what was in the box?

21   A    Yes.

22   Q    What happened to that box?

23   A    A couple of days later, he brought it from the back of

24   the van.  We were pulling into a shopping center and he asked

25   if I could send out the box again.  And at that time I agreed

1    to do it because I felt guilty.

2    Q    Okay.  Did you do something with the box?

3    A    Yes.

4    Q    You said he brought the box out?

5    A    Yes.

6    Q    Where was the box?

7    A    In the back of the van.

8    Q    How did he handle the box?

9    A    He carried it without his fingers touching --

10   Q    Show us, please.

11   A    (Demonstrating.)

12   Q    Did the box touch -- did the fingers touch the box?

13   A    No.

14   Q    How did you carry it?

15   A    Like this (demonstrating).

16   Q    Did your fingers touch the box?

17   A    No.

18   Q    Why not?

19   A    Because I didn't want to get my fingerprints on it.

20   Q    What did you do with the box?

21   A    I brought it into a place that sent out overnight mail.

22   Q    And what did you do with it?

23   A    Sent it to Honolulu.

24   Q    Where in Honolulu?

25   A    I don't know.

BRENDA VO - DIRECT

2-220

```
 1   Q   How much did it cost?

 2   A   I don't recall.

 3   Q   What name did you use to send out the box?

 4   A   I remember Chang was on the box.

 5   Q   How did it get on the box?

 6   A   It was written on the box.

 7   Q   Did you write it on the box?

 8   A   No.

 9   Q   Was the box open or closed?

10   A   Closed.

11   Q   What did the box weigh?

12   A   I don't know.  I don't remember.

13   Q   All right.  Did you ever hear the name Linda Chang after

14   that?

15   A   Yes.

16   Q   When did you hear it after that, Mrs. Vo?

17   A   About a month later.

18   Q   When was that?  Under what circumstances a month later?

19   A   About October of 2001.

20   Q   How did you happen to hear it in October of 2001?

21   A   It was on another box.

22   Q   Where did you see that box?

23   A   In the van again.

24   Q   And who was in the van?

25   A   Rick Vo.
```

BRENDA VO - DIRECT                          2-221

1    Q    Was there a discussion about that box?

2    A    Yes.

3    Q    What was the discussion?

4    A    He asked me if I can mail out another box.

5    Q    To where?

6    A    Honolulu.

7    Q    What did you tell him?

8    A    I don't remember too much about the discussion, but I

9    ended up mailing that one.

10   Q    Do you remember where it was addressed?

11   A    No.

12   Q    You remember if there was a return address on the box?

13   A    I don't remember what the address was, but yes.

14   Q    What name was used?

15   A    Chang.

16   Q    How much did that cost to send the box?

17   A    I don't remember.

18   Q    You ever see any boxes mailed from the house during this

19   period of time, late 2001?

20   A    No.

21   Q    How about the next year, 2002?

22   A    Yes.

23   Q    What box did you see mailed from the house?  And talking

24   about, again, Playa del Rey in 2002, Mrs. Vo.  What box did

25   you see?

1    A    I came downstairs and UPS was there to pick up a box at

2    the front door.

3    Q    All right.

4    A    And I asked who was sending out a box, and my

5    brother-in-law pointed at the box in the garage.

6    Q    Who is your brother-in-law?

7    A    Khanh Vo.

8    Q    That's Mr. Vo, the defendant's husband -- or excuse me,

9    the defendant's brother?

10   A    Yes.

11   Q    All right.  And what happened then when you --

12   A    And I said that that wasn't my box.

13   Q    Who did you say that to?

14   A    Khanh Vo.

15   Q    What happened then?

16   A    He carried it.

17   Q    Who carried?

18   A    Khanh Vo.

19   Q    Where did he carry it to?

20   A    Towards the front door.

21   Q    How did he carry -- how did Khanh Vo carry the box to the

22   front door?

23   A    He carried it without using his fingers.

24   Q    Show us?

25   A    Like this (demonstrating).

```
 1    Q    And what happened to that box?

 2    A    I went into the back room, I don't know.

 3    Q    Did you see -- did you see the box again?

 4    A    No.

 5    Q    Did you see the UPS man after that?

 6    A    No.

 7    Q    In late 2001, you were still living at Playa del Rey?

 8    A    Late 2001?

 9    Q    Yes.

10    A    Yes.

11    Q    And did you continue to live there throughout the end of

12    the year, 2001?

13    A    I left in November of 2001, came to Hawaii.

14    Q    Why did you come to Hawaii?

15    A    Because my husband and I weren't getting along.

16    Q    Where did you go to in Hawaii?

17    A    My parents' house.

18    Q    Where did they live?

19    A    I'm sorry?

20    Q    Where did they live?

21    A    In Foster Village.

22    Q    And your child, where was your child?

23    A    I brought my daughter with me.

24    Q    Did you live with your parents in Foster Village?

25    A    Yes.
```

BRENDA VO - DIRECT

2-224

1    Q    How long did you live there?

2    A    About six months.

3    Q    How long did you -- when did you happen to leave Foster

4    Village, your parents' home?

5    A    About June of 2002.

6    Q    And where did you go?

7    A    I came back to Playa del Rey, our house.

8    Q    Why did you come back?

9    A    Because I had an appointment with my probation officer

10    and I also had to do our business taxes.

11    Q    What was the business you had?

12    A    A clothing company, Shaolin Corporation.

13    Q    Whose business was that?

14    A    I was the president.

15    Q    When did you become involved in Shaolin, the clothing

16    company?

17    A    2000 -- well, late 1999, but I started the corporation

18    2000.

19    Q    Was there a business in existence prior to you starting

20    Shaolin or -- the corporation, I should say, was there a

21    business prior to Shaolin being incorporated by you?

22    A    Yes.

23    Q    What was the name of that business?

24    A    Shaolin Worldwide.

25    Q    Whose business was that?

```
 1    A    My husband's and two other partners.

 2    Q    And when you first met your husband in California, when

 3    you saw your husband, then I guess your boyfriend, did he have

 4    a business or did he have a clothing business at that time?

 5    A    Yes.

 6    Q    Do you recall the name of it?

 7    A    Shaolin Worldwide.

 8    Q    Okay.  Have any partners in that?

 9    A    Yes.

10    Q    Who were the partners?

11    A    Jeff Hartsel and Rick Wargatsh.

12    Q    Now, I guess we're going to ask you to spell the last

13    names here of those two individuals, if you could, please.

14    A    I'm not sure how to spell Wargatsh, but Hartsel is

15    H-A-R-T-S-E-L.

16    Q    Okay.  Did you have a business other than the clothing

17    business in 1998, 1999, 2000, something other than this

18    clothing business?

19    A    Yes.

20    Q    What business did you have?

21    A    We had a warehouse that we rented out.

22    Q    Now, you say "we," who do you mean "we"?

23    A    My husband and I.

24    Q    And where was this warehouse?

25    A    Downtown Los Angeles in the artist district.
```

BRENDA VO - DIRECT                    2-226

1   Q    Was this part of the Shaolin --

2   A    Yes.

3   Q    -- business?

4   A    Yes.

5   Q    And how big a warehouse, can you tell us?

6   A    Five to 7,000 square feet.

7   Q    Okay.  And what was it used for?

8   A    We rented it out to people that put on events.

9   Q    What type of events?

10  A    Computer shows, they did some filming for videos,

11  parties, mini-concerts.

12  Q    And do you know how often you did that in 1998?

13  A    In '98, I'm not sure how often.

14  Q    How about 1999?

15  A    About two to three a month.

16  Q    Two to three times a month?

17  A    Yes.

18  Q    And was that profitable renting it out?

19  A    Yes.

20  Q    How much money could you make on that?  When I say

21  "make," how much money could you take in on that?

22  A    Take in or profit?

23  Q    Well, profit then.  How much money could you profit?

24  A    We averaged about $8,000 a month.

25  Q    And this was in addition to the clothing business?

BRENDA VO - DIRECT

2-227

1    A    Yes.

2    Q    Okay.  The clothing business at that time in 2000, how

3    was that doing?

4    A    In 2000, it was -- it was just average, it wasn't

5    losing -- a lot of money went into inventory.

6    Q    And continued running the warehouse through 2001?

7    A    Yes.

8    Q    And was it as profitable in 2001 as it had been in 2000,

9    if you know?

10    A    Yes.

11    Q    And what happened to that money from the -- from the

12    renting the warehouse or the promotions and that sort of

13    thing?

14    A    In 2000?

15    Q    Yes.

16    A    2001?  I -- are you talking about what happened to it as

17    who held it?

18    Q    Where it went.

19    A    I would collect the money at the end of the night and

20    hold the money.

21    Q    And what did you do with it?

22    A    I sent money home to my father.

23    Q    Why is that?

24    A    Because I had planned on taking my daughter and leaving

25    my husband.

BRENDA VO - DIRECT                    2-228

1    Q    Do you know how much money you gave to your father over

2    2000, 2001?

3    A    From the parties?

4    Q    From the parties, from the warehouse promotion.

5    A    About 15,000.

6    Q    Do you know if your father had other monies from you?

7    A    Yes.

8    Q    What other monies had your father gotten from you?

9              MR. WEIGHT:  Objection.  Leading, Your Honor.

10             MR. MUEHLECK:  I asked --

11             MR. WEIGHT:  Calls for hearsay.

12             MR. MUEHLECK:  Not hearsay.  It's what this person

13   has done.

14             MR. WEIGHT:  No, it's what other monies the father

15   had that --

16             MR. MUEHLECK:  No, no, I said what other monies had

17   she given the father.  That was the question maybe,

18   Mr. Weight --

19             THE COURT:  Well, reask the question.

20   BY MR. MUEHLECK:

21   Q    Other than the parties from the promotions from the

22   warehouse in 2000 and 2001, had you given your father other

23   monies?

24   A    Yes.

25   Q    What other monies had you given your father in 2000 and

1    2001?

2    A    I gave him a check for a mutual fund.

3    Q    Where did that money come from, the mutual fund?

4    A    It came from a mutual fund that I cashed in.

5    Q    How long had you had that?

6    A    About five years.

7    Q    Was there other money besides the mutual fund and the

8    promotions at the warehouse that generated income that you

9    gave to your father?

10    A    Yes.

11    Q    What other monies would that be?

12    A    There was a -- I gave him $10,000 back of money that he

13    had -- a check that he had given us.

14    Q    Okay.  Explain that if you could, please.

15    A    He gave us a check for $20,000 to help us with the house.

16    Q    All right.  And you say -- you mean you and the defendant

17    to purchase the house?

18    A    Yes.

19    Q    And you gave --

20    A    I gave him $10,000 back.

21    Q    And what did he do with that money that you gave back to

22    him, your father?

23    A    He added it to the money that he was holding for me.

24    Q    Do you know if there was other monies that your father

25    had in an account or, I should say, that were credited from

1    you?

2    A    Yes.

3    Q    How much total?

4    A    Altogether --

5    Q    Yes.

6    A    -- including the warehouse or separate?

7    Q    No, altogether.

8    A    About 50,000.

9    Q    And what was the purpose of you having him hold that

10   money?

11   A    So that I would have money when I left my husband with my

12   daughter.

13   Q    In 2002, did you ever have any visitors to the house?

14   A    Yes.

15   Q    All right.  And how would you describe those visitors to

16   the house in 2002?

17        MR. WEIGHT:  Your Honor, I'm going to object.  Vague

18   and ambiguous, unless it can be narrowed down as to date and

19   time.

20        MR. MUEHLECK:  I can -- I can ask a date.

21   BY MR. MUEHLECK:

22   Q    In early 2002 or mid-2002, I should say, June, July 2002,

23   do you know if you ever saw visitors at the house?

24   A    Yes.

25   Q    During that time frame, who did you see at the house,

1   Mrs. Vo?

2   A    I saw two Mexican guys at the front door.

3   Q    What were they doing there?

4   A    Talking to my husband.

5   Q    Do you know what they were talking about?

6   A    No.

7   Q    Did you have a conversation with your husband about that?

8   A    Yes.

9   Q    What was that conversation?

10  A    I had asked him who they were.

11  Q    What did he say?

12  A    He told me not to worry about it.

13  Q    Did you see them again after that?

14  A    I saw one of them.

15  Q    When was that?

16  A    Maybe a few months or a month after that at the house in

17  the front yard.

18  Q    What was he doing there?

19  A    Talking to my husband.

20  Q    Did you ask your husband about that?

21  A    No.

22  Q    Last October 2002, the first of October, do you know

23  where you were?

24  A    2002?

25  Q    Yeah, October 1st, last fall.

1    A    2002?

2    Q    Yes.

3    A    I was here in Honolulu, I believe.

4    Q    All right.  Why did you come to Honolulu?

5    A    Because I had promised my niece that I would attend a

6    field trip with her.

7    Q    Where were you going?

8    A    Waimea Falls.

9    Q    Did you come alone to Honolulu?

10    A    No.

11    Q    Who came with you?

12    A    My husband and my daughter Kianna.

13    Q    Do you remember what airlines you took?

14    A    No.

15    Q    All right.  Where did you stay?

16    A    My parents' house.

17    Q    And did you ever hear of the name Linda Chang?

18    A    Yes.

19    Q    Last October, 2002?

20    A    Yes.

21    Q    How did you happen to hear the name Linda Chang last

22    October, 2002?

23    A    My husband had asked me to mail out another box.

24    Q    Where were you when your husband asked you to mail out

25    another box?

BRENDA VO - DIRECT                              2-233

1    A    In a parking lot getting ready to eat down -- I'm not

2    sure what the city was, Kapahulu or something.

3    Q    All right.  And was there a discussion about this?

4    A    Yes.

5    Q    What did you say?

6    A    I -- I told him that -- I asked him why wouldn't he mail

7    it out.

8    Q    What did he say?

9    A    And he said that it wouldn't look good if he mailed it

10   out.

11   Q    Did the discussion continue?

12   A    Yes.

13   Q    What did you talk about?

14   A    So I -- so he asked me if I would mail it out and I

15   didn't want to mail it out.  I told him that I was on

16   probation, that I didn't want to take a chance of getting in

17   trouble while I was on probation.  I could do 20 years if I

18   ever got in trouble.

19   Q    What did he say?

20   A    He told me that I wouldn't get in trouble, stop worrying

21   about my probation.

22   Q    What happened then?

23   A    He asked me to send the box to our house in Playa del

24   Rey.

25   Q    And what did you do?

1    A    And he asked me to address it to Gabriella Vo.

2    Q    Did you talk about that?

3    A    Yes.

4    Q    What was your discussion about that?

5    A    I said -- I said:  Why would we want to send it to

6    Gabriella?  She -- I mean what if she was to receive the box?

7    And he said that she wouldn't receive the box, that she wasn't

8    going to be home.

9    Q    Why were you concerned about her receiving the box?

10   A    Because I thought that there -- there was drugs in the

11   box.

12   Q    What happened to the box?

13   A    I took it in to Mail Boxes Etc.

14   Q    What did the box look like when you took it into Mail

15   Boxes Etc.?  Was it an open box or closed box or partially

16   opened, or what was the condition?

17   A    It was a closed box.

18   Q    And you went into Mail Boxes Etc.?

19   A    Yes.

20   Q    What did you do in there?

21   A    I asked if I could mail it overnight.

22   Q    Who did you speak with?

23   A    A local man about 40-something years old.

24   Q    Speak to anyone else?

25   A    And a younger local guy.

BRENDA VO - DIRECT                           2-235

1    Q    Okay.  And what did you tell him?

2    A    I asked if I could send the package overnight to Playa

3    del Rey.

4    Q    And did you use a -- an address?

5    A    Yes.

6    Q    What address did you use?

7    A    The return or the --

8    Q    The address that you were sending it to.

9    A    8009 Hulbert Avenue, Playa del Rey.

10   Q    That's your residence?

11   A    Yes.

12   Q    Who was it addressed to?

13   A    Gabriella Vo.

14   Q    What name did you use to send the box?

15   A    Linda Chang.

16   Q    What did you -- did you use a return address?

17   A    Yes.

18   Q    What return address did you use?

19   A    I just made one up, Hart Street.

20   Q    Why did you use the name Linda Chang on the box?

21   A    So that it wouldn't be traced to me.

22   Q    And where did the idea come from to use Linda Chang?

23   A    Rick Vo.

24   Q    How long were you in that office with the box?

25   A    About five minutes.

1          MR. MUEHLECK:  May I approach, Your Honor, with one?

2          THE COURT:  I want to meet with counsel a minute at

3    the sidebar.

4          MR. MUEHLECK:  Yes.

5               (Bench conference on the record:)

6          THE COURT:  Mr. Weight, if you want a 404(b)

7    instruction at any time, I want you to let me know.

8          MR. WEIGHT:  If you -- if I what?

9          THE COURT:  If you want a 404(b) instruction at any

10   time, let me know.

11         MR. WEIGHT:  Very well, Your Honor.

12         THE COURT:  Otherwise, I'm not going to --

13         MR. WEIGHT:  I understand.

14         THE COURT:  -- because I understand you might not

15   want one for tactical reasons.

16         MR. MUEHLECK:  Well, I have stayed away from the area

17   that we've talked about, Judge.  The only thing -- yes, I

18   understand.

19         THE COURT:  She thought there were drugs in the box

20   that he wanted her to send.

21         MR. MUEHLECK:  Well, yes, but I didn't go into --

22         THE COURT:  No, I understand that.

23         MR. MUEHLECK:  But that's within the period of the

24   indictment, and one of the overt acts is that in September,

25   she did it, you know, per his instructions.  So our position

1    is this is overt acts, two overt acts and they're not all --

2    and with Khanh Vo, again, not necessarily all named in the

3    indictment, but our position is they are overt acts in the

4    indictment as opposed to 404(b).  Now, I've stayed away from

5    the other stuff until we had an opportunity to litigate this

6    tomorrow or whatever the court thinks.  But that's -- that's

7    where we are.

8         If I might suggest, Your Honor, I've got quite a bit

9    more to go, and before I do anything more, I'd suggest we take

10   a break for the day because I am beat.  I was up late last

11   night at the prison with her, and after that -- I think this

12   is a good spot to stop, anyways, unless the court --

13        THE COURT:  Well, it's almost 4:00, anyway.  Also, I

14   don't know whether it's appropriate at some point to give an

15   instruction about the fact that she's been convicted and how

16   that impacts --

17        MR. MUEHLECK:  Regular instruction?  That's up to

18   you, but I -- I suggest -- my suggestion, it isn't necessary

19   at this point.  It's at the end --

20        MR. WEIGHT:  Are you talking about the credibility

21   instruction, Your Honor?

22        MR. MUEHLECK:  That shouldn't be given in the middle

23   of someone's testimony.  That's not necessary.

24        THE COURT:  I just raise the issue, if there's some

25   instruction you feel should be given.

1          MR. WEIGHT:  My sense is wait until the end of the

2    case.

3          THE COURT:  Okay.

4          MR. WEIGHT:  Thank you.

5               (End of bench conference.)

6          THE COURT:  It's just about 4:00, so we'll break for

7    the day now.  Please be back at 9 o'clock tomorrow morning.

8          (The proceedings concluded at 3:58 p.m., May 15,

9    2003.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      COURT REPORTER'S CERTIFICATE

2              I, CYNTHIA TANDO FAZIO, Official Court Reporter,

3      United States District Court, District of Hawaii, Honolulu,

4      Hawaii, do hereby certify that the foregoing pages numbered 1

5      through 238 is a correct transcript of the proceedings had in

6      connection with the above-entitled matter.

7

8              DATED at Honolulu, Hawaii, February 2, 2004.

9

10

11                          CYNTHIA TANDO FAZIO, RMR, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25