1    IN THE UNITED STATES DISTRICT COURT FOR THE

2                    DISTRICT OF HAWAII

3    UNITED STATES OF AMERICA,         )    CRIMINAL NO. 02-00411ACK
                                       )
4              Plaintiff,              )    Honolulu, Hawaii
                                       )    May 16, 2003
5         vs.                          )    9:01 a.m.
                                       )
6    (01) RICK K. VO,                  )    FURTHER JURY TRIAL
                                       )    VOLUME 3
7              Defendant.              )
     _____)

8                   TRANSCRIPT OF JURY TRIAL
                 BEFORE THE HONORABLE ALAN C. KAY,
9             SENIOR UNITED STATES DISTRICT JUDGE

10   APPEARANCES:

11   For the Government:         THOMAS C. MUEHLECK, Esq.
                                 Assistant U.S. Attorney
12                               District of Hawaii
                                 Room 6100 - PJKK Federal Bldg.
13                               300 Ala Moana Blvd.
                                 Honolulu, Hawaii 96813

14

15

16   For the Defendant:         MICHAEL A. WEIGHT, Esq.
                                 Assistant Federal Public Defender
17                               Room 7104 - PJKK Federal Bldg.
                                 300 Ala Moana Blvd.
18                               Honolulu, Hawaii 96813

19

20   Official Court Reporter:   Cynthia Tando Fazio, RMR, CRR
                                 United States District Court
21                               P.O. Box 50131
                                 Honolulu, Hawaii  96850

22

23

24   Proceedings recorded by machine shorthand, transcript produced
     with computer-aided transcription (CAT).

Exhibit B.1

<u>I N D E X</u>

<u>GOVERNMENT'S WITNESSES:</u>                                    <u>Page No.</u>

BRENDA MARIA VO
    RESUMED DIRECT EXAMINATION BY MR. MUEHLECK..    7
    CROSS-EXAMINATION BY MR. WEIGHT.............   36
    REDIRECT EXAMINATION BY MR. MUEHLECK........   88

WAYNE TASHIMA
    DIRECT EXAMINATION BY MR. MUEHLECK..........  110
    CROSS-EXAMINATION BY MR. WEIGHT.............  113
    REDIRECT EXAMINATION BY MR. MUEHLECK........  119
    RECROSS-EXAMINATION BY MR. WEIGHT...........  120
    REDIRECT EXAMINATION BY MR. MUEHLECK........  120

JANETTE FREEMAN
    DIRECT EXAMINATION BY MR. MUEHLECK..........  122

ELAINE BURTON
    DIRECT EXAMINATION BY MR. MUEHLECK..........  133

STEPHANIE KAMAKANE
    DIRECT EXAMINATION BY MR. MUEHLECK..........  137

JAMES YUEN
    DIRECT EXAMINATION BY MR. MUEHLECK..........  141

RUSSELL WOODWARD
    DIRECT EXAMINATION BY MR. MUEHLECK..........  147


<u>EXHIBITS</u>


<u>GOVERNMENT'S:</u>

18 was received in evidence..................  109

22 was received in evidence..................  140

23 was received in evidence..................  124

24 was received in evidence..................  125

1    FRIDAY, MAY 16, 2003                    9:01 A.M.

2         (The following proceedings were held in open court

3    out of the presence of the jury:)

4         THE CLERK:  Criminal Number 02-00411ACK, United

5    States of America versus defendant one, Rick K. Vo.

6         MR. MUEHLECK:  Good morning, Your Honor.  Tom

7    Muehleck for the United States.  With me is DEA Agent Richard

8    Jones.

9         THE COURT:  Good morning.

10        MR. WEIGHT:  Good morning, Your Honor.  Michael

11   Weight for the defense.  Rick is here and we're ready to

12   proceed.

13        MR. MUEHLECK:  Witness is on the stand, Your Honor.

14        THE COURT:  Well, we probably better wait for the

15   jury before the witness starts testifying.

16        MR. MUEHLECK:  I didn't know if the court wanted to

17   see us separately, that's why I --

18        THE COURT:  That's right, I did because we had a

19   report from one juror, number 3, Mr. Hanki, that someone who

20   he thought might have been a DEA witness, he overheard in the

21   cafeteria saying that one of the jurors was frowning.

22        Now, I had presumed that the DEA had notified their

23   people that the jurors would be eating there in the same

24   cafeteria and they'd show a little discretion.  Have they been

25   notified?

 1           MR. MUEHLECK:  I -- I don't know, Your Honor.

 2           THE COURT:  Well, maybe a little discretion, maybe a

 3     little common sense, too, that they're not the only people

 4     present.

 5           MR. MUEHLECK:  I agree.  Do we know that it was in

 6     fact a --

 7           THE COURT:  Pardon me?

 8           MR. MUEHLECK:  Do we know in fact that it was a DEA

 9     agent, that it was a former witness or something?  Do we have

10     any more information?

11           THE COURT:  It's not that clear, but I just wanted to

12     bring it to the attention of the parties that --

13           MR. MUEHLECK:  I mean a lot of people eat in that

14     federal cafeteria, including the --

15           THE COURT:  Precisely.  Precisely.

16           MR. MUEHLECK:  -- our office and the Public

17     Defender's Office, of course.

18           THE COURT:  All right.  There are not that many

19     people in this courtroom, though, who are looking at the

20     jurors in this courtroom.

21           So I want to be sure that you caution all your

22     witnesses that when they go over to the cafeteria, they're not

23     the only ones present, and to use a little discretion and

24     common sense and not go shooting off their mouths like that.

25           Counsel want to do anything more about this?

1          MR. WEIGHT:  I think all that would do would be to

2     emphasize the matter.  I think it's best left alone.

3          THE COURT:  I -- I don't think there's been any harm

4     at this point.  But from now on, I don't want to hear anything

5     more about witnesses being overheard in the cafeteria.

6          MR. MUEHLECK:  Well, Your Honor, we don't even know

7     that it's a witness.  I -- I'd object to that on the record

8     without more information.  It could be anybody.  I mean did

9     the -- Your Honor, respectfully, did the -- did this juror

10    number 3 say it was a witness or -- or --

11         THE COURT:  He thought it was one of the DEA

12    witnesses.

13         MR. MUEHLECK:  Well, okay.  Because the court didn't

14    say "witness" before.  The court said a "DEA person."

15         THE COURT:  I thought I had said "DEA witness."

16         MR. MUEHLECK:  No, not before.

17         THE COURT:  Again, he wasn't sure, but he thought it

18    was a DEA witness.

19         MR. MUEHLECK:  Okay.  I'll ask -- I'll instruct the

20    case agent to speak to all those DEA agents.  I think most of

21    them --

22         THE COURT:  Thank you.

23         MR. MUEHLECK:  -- are not here, Your Honor, but

24    that's why I questioned when the court said "witness."  You

25    didn't previously say "witness" and I didn't want the court to

1    add on to something that I wasn't aware of, that it could have

2    been --

3              THE COURT:  I -- I meant to say that the witness --

4    or the juror thought it was a DEA witness, but he wasn't sure.

5    He didn't have a precise recollection.

6              So we'll break for the jury.

7              (A recess was taken from 9:06 a.m. to 9:12 a.m.)

8              (The following proceedings were held in open court in

9    the presence of the jury:)

10              THE CLERK:  Criminal Number 02-00411ACK, United

11    States of America versus defendant one, Rick K. Vo.

12              MR. MUEHLECK:  Good morning, Your Honor.  Tom

13    Muehleck for the United States.  With me is DEA Agent Richard

14    Jones.

15              THE COURT:  Good morning.

16              MR. WEIGHT:  Morning, Your Honor.  Michael Weight for

17    the defense.  Mr. Vo is here.  We're ready to go.

18              THE COURT:  Good morning.

19              Good morning, ladies and gentlemen of the jury.

20              Please proceed, Mr. Muehleck.

21              MR. MUEHLECK:  Yes.  Your Honor, may I approach with

22    Exhibit 1?

23              THE COURT:  You may.

24              MR. MUEHLECK:  Government Exhibit 1?

25              THE COURT:  You may.

1          MR. MUEHLECK:  Thank you.

2                         BRENDA MARIA VO,

3    called as a witness by the Government, having been previously

4    sworn, was examined and testified as follows:

5                  RESUMED DIRECT EXAMINATION

6    BY MR. MUEHLECK:

7    Q    Ms. Vo, I believe I was asking you about the box that you

8    took into the Mail Boxes Etc. store on October 3rd of last

9    year; do you remember that line of questioning yesterday?

10   A    Yes.

11   Q    All right.  Can you identify Government Exhibit 1?  You

12   can turn it around.  You can take a look at it.

13   A    (Complying).

14   Q    Can you identify that exhibit?

15   A    Yes.  I thought it had something else written on it, but

16   it's been a while.

17   Q    Okay.  How can you identify it?  What is it that you

18   recognize?

19   A    That it has a hair product name on it.

20   Q    Okay.  Do you know where that box came from?

21   A    The back of the car.

22   Q    All right.  And prior to that, do you know?

23   A    No.

24   Q    All right.  When you carried Exhibit 1, will you show us

25   how you carried Exhibit 1 into the Mail Boxes Etc. store?

```
 1    With the box, please?

 2    A      (Demonstrating).

 3    Q      Thank you.  And where was the box in the car that day,

 4    October 3rd?

 5    A      In the trunk.

 6    Q      And how did it get out of the trunk?

 7    A      I carried it.

 8    Q      Okay.  Now, the name on the tag, do you see the name on

 9    the tag, the white part of it?

10    A      Yes.

11    Q      What name do you see?

12    A      Gabriella Vo.

13    Q      Okay.  And is there -- is there a return address or a

14    sender listed?

15    A      No.

16            MR. MUEHLECK:  May I approach, Your Honor?

17            THE COURT:  You may.

18            THE WITNESS:  Oh, yeah, at the top.  Yeah, I see it.

19    BY MR. MUEHLECK:

20    Q      Feel free to turn the box around, take a look at it,

21    Ms. Vo.  Do you see a sender listed?

22    A      Yes.

23    Q      What name do you see?

24    A      Linda Chang.

25    Q      All right.  And that name came from where?
```

1    A    My husband.

2    Q    And is there a return address or a sender's address?

3    A    Yes.

4    Q    What is that?

5    A    The Mail Box Etc.

6    Q    Okay.  You took it into the store.  Who did you deal with

7    inside the store?

8    A    Like a local, about 40 something years old.

9    Q    How many employees were in the store?

10   A    Three.

11   Q    Did you deal with anyone else or talk with anyone else?

12   A    Another -- another younger local guy.

13   Q    Okay.  And how much did it cost, do you recall, to send

14   the box?

15   A    I don't really remember.

16   Q    How were you supposed to send the box?

17   A    Overnight.

18   Q    And --

19   A    UPS.

20   Q    I'm sorry?

21   A    UPS overnight.

22   Q    And how was the box sent, how did Mail Boxes Etc. store

23   people send the box out, do you know?

24   A    Federal Express.

25   Q    And why -- do you know why they sent it out Federal

1    Express?

2    A    Because I just said "overnight."

3    Q    Okay.  And how long were you in the store?

4    A    Maybe five minutes.

5    Q    Where did you park your car, where was -- who was driving

6    the car that morning when you went to Mail Boxes Etc.?

7    A    My husband.

8    Q    And where was the car parked in relationship to the

9    store?

10   A    On the side street right around the corner.

11   Q    Could you see from the car into the front of the store?

12   A    No.

13   Q    After you left the store, where did you go?

14   A    Into the car.

15   Q    And what happened then?

16   A    And my husband asked me if I sent it out, and I said yes.

17   Q    Did you have a discussion?

18   A    He asked if I sent it by UPS.

19   Q    What did you tell him?

20   A    And I looked at the receipt and it said Federal Express.

21   Q    Did you show him the receipt?

22   A    Yes.

23   Q    What did he say?

24   A    He said to call and have them change it.

25   Q    Why?

1    A    Because no one was going to be home to receive the

2    package.

3    Q    Well, so what?

4    A    So it needed to be left without a signature.

5    Q    So what did you do?

6    A    Called from a pay phone.

7    Q    And what did you say on the phone?

8    A    And I told them that no one was going to be there to

9    receive the package, if I could send it by UPS.

10    Q    And who did you speak with?

11    A    Not sure which gentleman it was.

12    Q    It was a guy you spoke with?

13    A    Yes.

14    Q    And what did they say?

15    A    They said that Federal Express could leave it without a

16    signature.

17    Q    Okay.  So was that acceptable to you or what, what

18    happened then?

19    A    Yeah.

20    Q    So did you go back in the car or where did you go from

21    the public phone?

22    A    Back into the car.

23    Q    And was there a conversation then?

24    A    No, I just told him that I left it with Federal Express.

25    Q    What did he say?

1    A    And with no signature.  And he said okay.

2    Q    Then where did you go?

3    A    I think we went to the mall after that.

4    Q    The mall?

5    A    Yeah.

6    Q    Okay.  Do you know if you checked on the status of the

7    package after this, after you went to the mall?

8    A    Yes.

9    Q    How did you happen to do that?

10   A    We pulled into a shopping center area to a pay phone and

11   he wanted me to call and check on the tracking number.

12   Q    When you say "he," you mean your husband, the defendant?

13   A    Yes.

14   Q    All right.  And what -- what was -- did you speak about

15   that, did you talk about that?

16   A    Yes.  He asked me to call and I didn't want to call.  So

17   he called, he took the receipt and called --

18   Q    From where?

19   A    From the pay phone.

20   Q    Okay.

21   A    And then he called me to the phone and told me to ask

22   them about the tracking number.

23   Q    Why did he want you to ask about the tracking number?

24   A    Because he didn't want to ask.

25   Q    Did you ask about the tracking number?

1    A    Yes.

2    Q    What did you learn about the tracking number?

3    A    They said there was no existing number.

4    Q    So what did you do then?

5    A    I told him, and then we called again, I called again.

6    Q    And who are you calling when you're calling this -- to

7    find out about the package, who was called?  Were you calling

8    the store, Mail Boxes Etc.?

9    A    Federal Express, the first time.

10   Q    All right.  And the second time, there was another call,

11   is that what you're saying?

12   A    Mm-hmm.  Yes.

13   Q    Tell me about the second call.

14   A    The second call was made from a Korean restaurant across

15   the street and --

16   Q    Who called?

17   A    I did.  And I asked about the tracking number and said

18   that there was -- that I called and they said they didn't have

19   a -- such tracking number and the gentleman said he would

20   check into it and get back with me.

21   Q    And who are you talking to at this time, the second call

22   from the Korean restaurant?

23   A    I'm not sure which one it was.  It was one of the

24   gentlemen that helped me at Mail Box Etc.

25   Q    Okay.  You're calling the Mail Box Etc. store now?

1   A    Yes.

2   Q    From where you mailed the package?

3   A    Yes.

4   Q    And after that call, did you check on the package?

5   A    Yes, I called back and I asked him if he found out about

6   the package, and he said because I changed the instructions,

7   that they issued it a new tracking number.

8   Q    Okay.  And did you call any more about the package that

9   day?

10  A    No.

11  Q    The next day, do you know if you checked on the package?

12  A    Yes.

13  Q    How did that occur?

14  A    My husband called on a cell phone.

15  Q    And who did he call, do you know?

16  A    Federal Express.

17  Q    And what -- do you know what information he got or what

18  the conversation was?

19  A    He asked me to call, and then I didn't want to and he

20  gave me the phone and I -- I asked about the tracking number

21  and they gave me the information on when it was going to

22  arrive.

23  Q    What phone were you using?

24  A    His cell phone.

25  Q    You know where you were calling from?

1    A    My parents' house.

2    Q    And after that call on the 4th of October, was there any

3    conversation or checking on the package?

4    A    I just called to see if my daughter was at the house, my

5    stepdaughter.

6    Q    Did you ever give anybody your phone number at Mail Boxes

7    Etc.?

8    A    Oh, yes.

9    Q    When did that occur?

10   A    At the restaurant when I called back.

11   Q    Korean restaurant?

12   A    Yes.

13   Q    How did -- why was that, what happened then?

14   A    He asked -- the guy at Mail Box Etc. asked me if there

15   was a number I could leave in case he needed to contact me,

16   and I left my parents' beauty salon number.

17   Q    Why did you do that?

18   A    Because I was -- I was nervous.

19   Q    What's your parents' beauty salon number?

20   A    487-4004.

21   Q    Area code 808, local number?

22   A    Yes.

23   Q    And what's the name of that establishment?

24   A    Pearl Kai Hairstyling.

25   Q    After your call to your home on the 4th of October, did

1   you continue to stay in Honolulu?

2   A    Yes.

3   Q    And the next day, was there any concern about the

4   package, the 5th of October?

5   A    Uh --

6   Q    Or did you check on the package, if you know?

7   A    No.

8   Q    Did there come a point when you learned about a search

9   warrant being executed at the Playa del Rey residence?

10  A    Yes.

11  Q    How did you learn about the search warrant being executed

12  at your home?

13  A    My brother called me and --

14  Q    Who is your brother?

15  A    My brother David Cooper.

16  Q    And where were you when he called you?

17  A    In the car.

18  Q    Were you alone or were you going somewhere with someone

19  else or what, do you know?

20  A    We were going to -- my husband and my daughter and I were

21  going to go eat.

22  Q    What were you told?

23  A    My brother told me that my brother-in-law called him.

24  Q    Who is the brother-in-law?

25  A    Khanh Vo.

1          MR. WEIGHT:  Objection.  Hearsay, Your Honor.

2          MR. MUEHLECK:  Government's response is this is their

3     knowledge and what -- what information they received and how

4     they acted upon that knowledge.

5          MR. WEIGHT:  Your Honor, it's hearsay, pure and

6     simple.  It's offered for the truth of the matter asserted.

7          MR. MUEHLECK:  It's their state of mind and it

8     will -- I submit if the court wants a sidebar, also a response

9     by the defendant to this information.

10          THE COURT:  I will allow it not for the truth of the

11     matter but as to why the witness acted as she did.

12     BY MR. MUEHLECK:

13     Q    What did you learn from your brother David Cooper that he

14     had learned from Khanh Vo, please?

15     A    That some -- he told my brother that somebody sent a

16     package with drugs to the house and tried to set us up and

17     they came and did a raid and they destroyed the house and that

18     we should sue the government.

19     Q    You should sue the government because they had raided the

20     house?

21     A    Yeah, they destroyed the house, they tore the doors out

22     of the wall and everything.

23     Q    Did you have a discussion with anyone about this, this

24     information?

25     A    My brother told me about this and I told my husband after

1    I got off the phone.

2    Q    What did you tell your husband?

3    A    Exactly what he told me.

4    Q    What was the defendant's response?

5    A    He said:   What?  And then he put his head down and put

6    his hand up to his head.

7    Q    This was in the car?

8    A    Yes.

9    Q    And after that, was there conversation?  Did he say

10   anything?

11   A    No.

12   Q    Now, that day, which was two days later, was a Saturday,

13   do you know if -- what your husband's travel plans were that

14   day?

15   A    He had a return flight to go back to California.

16   Q    Did he go on that flight?

17   A    No.

18   Q    And the next day, were you supposed to go with him that

19   night, the 5th?

20   A    No.

21   Q    The next day, the 6th of October, do you recall where you

22   were that day?

23   A    That was the day that I was taking him to the airport.

24   Q    And what happened that day?

25   A    I drove up to the curb and we were arrested, asked to

1    step out of the car.

2    Q    Who arrested you, do you know?

3    A    DEA and FBI, I think.

4    Q    And that's the day you've been in jail since then, in

5    custody since then?

6    A    Yes.

7    Q    Were you going to go fly that night -- or what time of

8    the day was the flight you were taking your husband to meet?

9    A    The -- that night?  It was at night.

10   Q    Do you know what hour at night the flight was to leave?

11   A    Maybe around ten, I think 10 o'clock.

12   Q    And were you joining him on that flight?

13   A    No.

14   Q    Let me ask you, Mrs. Vo, you talked about income from the

15   promotions when they hired the warehouse that you had through

16   the corporation, you talked about renting the -- for

17   promotions and for parties, renting the warehouse out to a

18   different company and you had income from that of -- did you

19   say like $8,000 a month?

20   A    Yes.

21   Q    And that was in what year?

22   A    In 2000 and 2001.

23   Q    All right.  And that income, would that have been cash or

24   would you have been paid in check or how do you -- can you

25   recall what that was?

3-20

1    A    There were a few checks, but mostly all cash.

2    Q    And what generated the cash?

3    A    The cash that I had or the cash that was made from the

4    parties.

5    Q    Okay.  What generated that at the parties?  I mean is it

6    they pay at the gate to come in the door?

7    A    They pay to come in at the door and they also pay to buy

8    drinks.

9    Q    And who ran the bar?

10   A    And for us to make money we -- we charge for them to use

11   the facility and also we make money from the bar.  The

12   bartender and my husband ran the bar.

13   Q    Was the bar a cash bar or was it -- did they buy tickets

14   with, like, credit cards and checks, or how was the bar run?

15   A    It was a cash bar.

16   Q    Okay.  And do you know if that cash, that income from

17   the -- the promotions, running the warehouse and from the

18   gate, the gate selling entry tickets and the bar, do you know

19   if that income was reported on your -- did you file in 2000,

20   the year 2000?

21   A    Yes.

22   Q    Was that income reported?

23   A    Some of it.

24   Q    All right.  The same question as to 2001, you said there

25   was income from the rental of the warehouse in 2001?

BRENDA VO - RESUMED DIRECT                3-21

1    A    Yes.

2    Q    In late 2001, was there income from promotions at the

3    warehouse?

4    A    Yes.

5    Q    All right.  And in 2002, you said that you had left in

6    late 2001 and returned to Hawaii?

7    A    Yes.

8    Q    Was it still operating in late 2001 when you left for

9    Hawaii, that is the promotions and that sort of thing?

10   A    Yes.

11   Q    When you returned in 2002, when did you return in 2002

12   from Hawaii back to California?

13   A    June of 2002.

14   Q    What was -- what was the operation then, was it being

15   operated then?

16   A    No.

17   Q    In 2000 -- or excuse me, 2001, did you file tax returns

18   in 2001?

19   A    Yes.

20   Q    Do you know if the income was reported, the cash I'm

21   talking about, or the income from the promotions and the gate

22   and the bar, was that reported in 2001 on your income tax?

23   A    Yes, part of it.

24   Q    And some was not reported?

25   A    Yes.

1    Q    All right.

2         MR. MUEHLECK:  Moment please, Your Honor.

3                   (Pause in the proceedings.)

4    BY MR. MUEHLECK:

5    Q    Did you -- you said you had a cellular phone in October

6    of 2002?

7    A    Yes.

8    Q    Do you recall the cell phone number?

9    A    (310) 863-7698.

10   Q    And your husband had his own cell phone?

11   A    Yes.

12   Q    Do you recall that phone number?

13   A    (310) 863-7704.

14   Q    All right.  Now, some cell phones have different

15   services.  Do you know if you had a voice mail service on your

16   phone?

17   A    Yes.

18   Q    And you said David Cooper was your brother?

19   A    Yes.

20   Q    Did he have a phone that you would contact him?

21   A    Yes.

22   Q    What was that number, if you recall?

23   A    (619) 379-8774.

24   Q    All right.  And your father's name is Richard Cooper?

25   A    Yes.

1    Q    Did he have a phone?

2    A    Yes.

3    Q    How would you contact him?

4    A    His phone number?

5    Q    Please.

6    A    (808) 371-4087.

7    Q    And do you know if there was a cell phone that was used

8    by your father or your mother?

9    A    My father's cell phone.

10   Q    Okay.  And was there a home phone?

11   A    Yes.

12   Q    What was the home phone?

13   A    (808) 422-1223.

14   Q    That's in what area of Honolulu?

15   A    Foster Village.

16   Q    And you said -- I think you said your parents' business

17   was Pearl Kai Hairstyling or Hairdressing?

18   A    Hairstyling.

19   Q    That number was what?

20   A    487-4004.

21   Q    At the -- Exhibit 3, the residence -- if I could just set

22   that there, Your Honor -- do you know if you had a safe in the

23   residence?

24   A    Yes.

25   Q    Where was the safe?

1    A    In our bedroom closet.

2    Q    Who had access to the safe?

3    A    Both of us.

4    Q    And how would you get into the safe?

5    A    By pushing in the code.

6    Q    What was the code, do you know?

7    A    I don't remember it.

8    Q    How did you get into the safe if you didn't remember the

9    code?

10   A    Because I wrote it down when I needed to go into it one

11   time.

12   Q    And did you always have that written down, code available

13   to you?

14   A    No.

15   Q    Well, how would you get in then if you wanted to get in?

16   A    I would have to ask him.

17   Q    "Him" being?

18   A    Rick Vo, my husband.

19   Q    Who bought the safe?

20   A    I did.

21   Q    And let me ask you about --

22        MR. MUEHLECK:  May I approach, Your Honor, with

23   Exhibit 9?

24        THE COURT:  You may.

25   BY MR. MUEHLECK:

1    Q    If you'd take a look at Exhibit 9, have you ever seen

2    that before?

3    A    It looks a lot dirtier than the one I saw, but I guess it

4    is.

5    Q    Okay.  Go ahead.

6    A    I remember seeing a seal-a-meal, yes.

7    Q    Where did you see that before?

8    A    In our house.

9    Q    Did you ever use it?

10   A    I remember trying to use it one time.

11   Q    How did it work?

12   A    I think I remember pushing -- pushing something on the

13   end.  I don't know if this is the same one, but pushing

14   something on the end for the air to suction.

15   Q    Did you use it often?

16   A    No.

17   Q    Do you know how it got in the house?

18   A    No.

19   Q    Did you buy it?

20   A    No.

21   Q    Did you ever physically see, like you can see this water

22   jug, methamphetamine in the house?

23   A    I'm sorry, can you repeat the question?

24   Q    Did you ever see, you know, methamphetamine in the house?

25   A    No.

1    Q    And in late 2001 before you left, you talked about

2    taking -- at the request of your husband, taking two packages

3    under the name Linda Chang and mailing them to Hawaii;

4    remember that testimony?

5    A    Yes.

6    Q    At that period of time did your husband have a regular

7    job where he would, you know, leave during the day every day

8    for regular hours?

9              MR. WEIGHT:  Objection.  Leading.

10             MR. MUEHLECK:  Did your husband have regular

11   employment.

12             THE COURT:  I'll allow the question.

13             THE WITNESS:  Just -- I just knew that he trained

14   people part-time and handled the events.

15   BY MR. MUEHLECK:

16   Q    Now, let me ask you about the cars.  We see a couple cars

17   here in Exhibit 3.  Can you see --

18             MR. MUEHLECK:  May I approach, Your Honor?

19             THE COURT:  You may.

20   BY MR. MUEHLECK:

21   Q    Can you see that all right?

22   A    Yes.

23   Q    All right.  You recognize those cars?

24   A    Yes.

25   Q    Whose cars are those?

```
 1    A    The one in -- on the left side is my brother David's.

 2    Q    Now, when you say "on the left side"?

 3    A    My left.

 4    Q    Your left over here (indicating)?

 5    A    Yes.

 6    Q    All right.  And this one on the right, looks like 3EG or

 7  something, I don't know what it is?

 8    A    Escort.  It's my brother's girlfriend's car.

 9    Q    Was there a Mercedes, did you ever have a Mercedes in the

10  house -- or in the garage I should say?

11    A    Yes.

12    Q    Okay.  Who bought that Mercedes?

13    A    Which one?  There was two of them.

14    Q    There were two.  All right.  When you left in '91 and

15  came to Honolulu, how many Mercedes --

16             THE COURT:  '91?

17             MR. MUEHLECK:  Excuse me, Your Honor.  Thank you.

18  BY MR. MUEHLECK:

19    Q    In 2001, when you left and came to Honolulu, how many

20  Mercedes automobiles did you own in that period of time, 2001?

21    A    There was one Mercedes when I left.

22    Q    And who bought that car?

23    A    My husband.

24    Q    And when you returned in 2002, the next year, from Hawaii

25  back to California to Playa del Rey, how many Mercedes
```

1    automobiles were there at that residence?

2    A    Two.

3    Q    Did you buy that car, that second one?

4    A    No.

5    Q    Who drove that car?

6    A    Both of us.

7    Q    Who brought that car into the garage?  Who bought that

8    car?

9    A    Who bought it?

10   Q    Yeah.

11   A    I -- I think my husband did.

12            MR. MUEHLECK:  Exhibit 4 marked for identification.

13   May I approach, Your Honor?

14            THE COURT:  You may.

15            MR. MUEHLECK:  May I stand over here, Judge?

16            THE COURT:  You may.

17            MR. MUEHLECK:  Thank you.

18   BY MR. MUEHLECK:

19   Q    You have a Rolex watch, Ms. Vo?

20   A    Yes.

21   Q    You do.  And is it in Exhibit 4 that you see here?

22   A    Yes.

23   Q    Which one is it?

24   A    (Indicating).

25   Q    Okay.  You've indicated on the far left-hand side of

1    Exhibit 4?

2    A    Yes.

3    Q    Okay.  Who bought that watch?

4    A    I'm not sure who bought it, but my husband gave it to me.

5    Q    When was that?

6    A    A couple of months after we moved into the house.

7    Q    That would have been what year for the record?

8    A    1998.

9    Q    These other four instruments, time pieces on the right,

10   did you ever see -- whose are those?

11   A    I never saw those before.  I don't know.

12   Q    Now let me take you back to 1991 when you were involved

13   with, what was his name, Ron, the guy from across the street?

14   A    Yes.

15   Q    And you sold cocaine to -- on two occasions to different

16   DEA agents?

17   A    Yes.

18   Q    Did you discuss with -- you remember having a discussion

19   with any of them about marijuana?

20   A    I remember talking about marijuana, but I don't remember

21   with who.

22   Q    Why is that?  What did you talk about?

23   A    I just remember -- I remember knowing that I had

24   marijuana, but I don't remember what we talked about.

25   Q    You had marijuana?

1   A    Yes.

2   Q    What were you doing with it?

3   A    Smoking it.

4   Q    Did you ever sell it or give it to other people?

5   A    Yes.

6   Q    Now, let me ask you about the second guy, the second DEA

7   agent that you sold cocaine to.  You recall about when that

8   was in 1991?

9   A    About maybe November.

10  Q    And do you recall how many times you talked to him on the

11  phone?

12  A    No.

13  Q    Do you recall ever talking to him about Kauai or Maui,

14  doing something for him?

15  A    Yes.

16  Q    What was that conversation about?

17  A    He was trying to get me to fly to one of the neighbor

18  islands and carry the drugs over there.

19  Q    You mean cocaine, when you say "the drugs"?

20  A    Yes.

21  Q    Okay.

22          MR. MUEHLECK:  One moment please, Your Honor.

23               (Pause in the proceedings.)

24          MR. MUEHLECK:  One moment please, Your Honor.

25               (Pause in the proceedings.)

1    BY MR. MUEHLECK:

2    Q    You ever know of anybody by the name of Crash Om?

3    A    Yes.

4              MR. MUEHLECK:  May I, Your Honor, the chart, the

5    flip -- flip chart?

6              THE COURT:  You may.

7              MR. MUEHLECK:  Thank you.

8    BY MR. MUEHLECK:

9    Q    Ms. Vo, can you see this?

10   A    Yes.

11   Q    Can you see that, what I've written, can you see that?

12   A    Yes.

13             MR. MUEHLECK:  Can you see it, Mr. Weight?

14             MR. WEIGHT:  Yes.

15             MR. MUEHLECK:  All right.  Would the court inquire if

16   the jury can all see it, Judge?

17             THE COURT:  I think we can all see it.

18             MR. MUEHLECK:  Okay.  Thank you.

19   BY MR. MUEHLECK:

20   Q    How do you know Crash Om?

21             MR. WEIGHT:  Your Honor, I'm going to object.

22   Request a sidebar.

23                  (Bench conference on the record:)

24             MR. WEIGHT:  Your Honor, I think under the

25   circumstances an offer of proof needs to be required of the

1    government before they ask any further questions of this

2    witness relative to this line of questioning because this is

3    information that has never been proffered to the defense, it

4    has never been discussed and it's clear at this point that

5    it's not relevant.  But I don't know how Mr. Muehleck intends

6    to make it relevant and I think Your Honor should inquire

7    before this witness is allowed to testify about whoever this

8    guy is.

9              MR. MUEHLECK:  The United States' position is that it

10    doesn't have to explain exactly where it's going during the

11    trial.  And there's no precedent for what Mr. Weight or

12    support for what he's saying.  This is not 404(b).  It's

13    clearly within the period of the indictment, with the next

14    question I'll make that -- the indictment also charges that

15    Rick Vo conspired with her and others, and that's where we're

16    going with it, Your Honor, to distribute and possess with

17    intent to distribute methamphetamine.

18              THE COURT:  To '91?

19              MR. MUEHLECK:  No, Your Honor, this is going to be

20    2002, Your Honor.  Within the period of the indictment.

21              THE COURT:  I'll allow it.

22              MR. MUEHLECK:  Thank you.

23                   (End of bench conference.)

24              MR. MUEHLECK:  May I proceed, Your Honor?

25              THE COURT:  Please.

1    BY MR. MUEHLECK:

2    Q    How do you know Crash Om, Ms. Vo?

3    A    I met him a long time ago when I was younger, but I

4    didn't know him from then.

5    Q    Were you introduced to him again after that?

6    A    Yes.

7    Q    In what year?

8    A    2002.

9    Q    Who introduced you to Crash Om in 2002?

10   A    It wasn't in person, but I was -- my husband called me

11   and asked if I could call him.

12   Q    Where were you when your husband called you and asked you

13   if you could contact Crash Om?

14   A    Staying with my parents at my parents' house.

15   Q    Where was your husband?

16   A    In California.

17   Q    What was that conversation, what did he tell you, why did

18   he tell you to contact Crash Om?

19   A    He told me that -- he wanted to know if I could go and

20   pick up money that he owed him.

21   Q    Who owed who?

22   A    Crash Om owed him.

23   Q    And did you?

24   A    Yes.

25   Q    How much money did you pick up?

BRENDA VO - RESUMED DIRECT                    3-34

```
 1    A    I think it was $1200.

 2    Q    And what did you do with the money?

 3    A    Brought it back to my parents' house.

 4    Q    How did you contact Mr. Crash Om?

 5    A    I called him.

 6    Q    And how did you get the number for him?

 7    A    My husband gave it to me.

 8    Q    Do you know if you ever had that number on your cell

 9    phone directory?

10    A    On my other cell phone.

11    Q    Okay.  And let me ask you, how many times did you contact

12    Crash Om on behalf of your husband?

13    A    Two times.

14    Q    And what was the second time you contacted him?

15    A    You said --

16    Q    The purpose, what was his purpose of the second time?

17    A    To pick up money.

18    Q    And were you able to pick up money from Mr. Om at that

19    time?

20    A    No.

21    Q    Where did you meet -- did you meet Mr. Om to get the

22    money the first time?

23    A    Yes.

24    Q    Where did you meet him?

25    A    In a parking lot off of Kinau Exit.
```

1    Q    And could you describe him for us?

2    A    I don't remember what he looks like.  I only looked at

3    him for a few seconds.

4    Q    And where did he live, if you know?

5    A    I don't know.

6    Q    What was that money for, for your husband from Crash Om?

7             MR. WEIGHT:  Objection, Your Honor.  Unless this

8    witness can state that she knows.

9    BY MR. MUEHLECK:

10   Q    Do you know what that money was that was owed to your

11   husband by Crash Om?

12   A    I don't know, but --

13   Q    But what?

14   A    But I think --

15            MR. WEIGHT:  I'm going to object to any buts.  She

16   doesn't know.  That's the answer.

17            MR. MUEHLECK:  The witness --

18            THE COURT:  Sustained.

19            MR. MUEHLECK:  Moment please, Your Honor?

20                 (Pause in the proceedings.)

21            MR. MUEHLECK:  We'll pass the witness, Your Honor.

22            MR. WEIGHT:  Your Honor, at this time I move to

23   strike all the testimony of this witness relative to anybody

24   by the name of Crash Om.  I want the jury admonished that

25   clearly this has had nothing to do with any alleged

1    conspiracy.  There's nothing to tie anything that Brenda said

2    relative to Crash Om to anything alleged in the indictment.

3            THE COURT:  I'll take that under consideration.

4    Please proceed.

5                      CROSS-EXAMINATION

6    BY MR. WEIGHT:

7    Q    Brenda, when did you first meet Ricky Vo?

8    A    When I was about 12 years old.

9    Q    And did you know him steadily from the time you were 12

10   until now?

11   A    No.

12   Q    When did you meet him again after you were 12 years old?

13   A    I was about -- in the late '80s.

14   Q    And where did that meeting take place?

15   A    In Waikiki.

16   Q    When did you and Rick become a couple, so to speak?

17   A    In 1998.

18   Q    And wasn't that in California?

19   A    Yes.

20   Q    You and he met under social circumstances and then began

21   dating after that?

22   A    Yes.

23   Q    And then you and he decided to buy a house together in

24   1998 or '99, when was it?

25   A    '98.

1    Q    And you did buy a house together?

2    A    Yes.

3    Q    And you had some money from your parents, did you not, at

4    that time that you put into the purchase of the house?

5    A    Yes.

6    Q    And Rick had some money that he got from his family that

7    he put into the purchase of the house; isn't that true?

8    A    Yes.

9    Q    And in fact, at that time he was involved in a company by

10   the name of Shaolin, right?

11   A    Yes.

12   Q    Do you know where they got the name Shaolin for the

13   company?

14   A    Something to do with martial arts.

15   Q    It's a martial arts semi-religious organization, an

16   ancient one, in China; is that right?

17   A    Yes.

18   Q    And Rick Vo is a very avid martial arts expert, is he

19   not?

20   A    Yes.

21   Q    He practices every day; is that right?

22   A    Yes.

23   Q    He studies under a Shaolin master, does he not?

24   A    Yes.

25   Q    He teaches martial arts, does he not?

1    A    Yes, part-time, sometimes.

2    Q    And he is a personal trainer for physical fitness as

3    well; isn't that so?

4    A    Yes.

5    Q    And he spends a lot of time at the gym either working out

6    or training people; is that right?

7    A    Yes.

8    Q    Also, he is an aspiring actor, he wanted to be a movie

9    actor, didn't he?

10   A    Yes.

11   Q    And Rick fancied himself in the style of Bruce Lee, the

12   martial arts expert who was a famous movie actor; isn't that

13   true?

14   A    Yes.

15   Q    And in fact, Rick was studying acting and taking lessons,

16   wasn't he?

17   A    Yes.

18   Q    And this was -- he was paying money for these lessons, I

19   mean this was serious business to him, wasn't it?

20   A    Yes.

21   Q    And this was going on from the time you met him in '97

22   right up to the present, isn't it?

23   A    Yes.

24   Q    Does Rick take his Shaolin training and martial arts

25   expertise to a semi-religious level in your opinion?

 1  A    Yes.

 2  Q    He truly believes in this as a way of life, doesn't he?

 3  A    Yes.

 4  Q    His diet is somewhat controlled, and by that I mean he

 5  eats foods that are supposed to be good for you, he doesn't

 6  eat a lot of junk food, does he?

 7  A    No.

 8  Q    And he eats well?

 9  A    Yes.

10  Q    He watches his weight?

11  A    Yes.

12  Q    Takes good care of himself physically?

13  A    Yes.

14  Q    You've never seen him use drugs, have you?

15  A    No -- yes.

16  Q    "Yes" what?

17  A    I have.

18  Q    You have seen him use drugs.  When?

19  A    When we first started dating.

20  Q    When you first started dating in California?

21  A    Yes.

22  Q    And what was he using?

23  A    GHB or GH -- something that burns your fat, but it's --

24  it's supposed to be a drug.

25  Q    So it's some kind of a medicinal drug for dietary

1    reasons, you take it for diet purposes?

2    A    It's supposed to be illegal, but they sell it under

3    different names.

4    Q    But it's not a drug in the sense that crystal

5    methamphetamine is a drug, is it?

6    A    No.

7            MR. MUEHLECK:  I'm going to object.  Without

8    foundation at this point.  She's answered that question.

9    Unless she has -- can explain what controlled schedules are.

10   And the court's well aware what the schedule is on this, and

11   I'll provide that at a sidebar if the court wants.

12           MR. WEIGHT:  Your Honor, the witness can testify as

13   to what she knows and believes.

14           MR. MUEHLECK:  But she shouldn't be misled as to what

15   the law is not by counsel.  Court is well aware of what the

16   scheduled drugs are, I am, Mr. Weight is.

17           THE COURT:  Mr. Weight?

18           MR. WEIGHT:  Well, Your Honor, her testimony is that

19   the drugs that he was taking --

20           THE COURT:  She can testify as to her impression.

21           MR. WEIGHT:  Thank you.

22           THE COURT:  Not as to what the law is or --

23           MR. WEIGHT:  Thank you.  I'll go with that.

24   BY MR. WEIGHT:

25   Q    Is it your impression that the drug that he was taking to

```
 1   burn fat was in the same category as heroin?
 2               MR. MUEHLECK:  I'm -- I'm going to object.  Now --
 3               THE COURT:  I'll sustain the objection on that.
 4               MR. WEIGHT:  I'll move on, Your Honor.
 5   BY MR. WEIGHT:
 6   Q    When you met Rick Vo, he had a company or was part of a
 7   company called Shaolin, what was it, Shaolin Enterprises or
 8   something?
 9   A    I'm sorry, can you repeat the question?
10   Q    When you met Rick Vo in California in 1997, was he
11   already part of a company named Shaolin something?
12   A    Yes.
13   Q    What was the name of that company?
14   A    Shaolin Worldwide.
15   Q    Shaolin Worldwide.  And what was the nature of the
16   company, that is, what did it do?
17   A    It was a clothing company.
18   Q    So it manufactured, like, what, hats, t-shirts, things
19   like that, jackets?
20   A    Yes.
21   Q    And sold them worldwide?
22   A    Yes.
23   Q    And Rick had business partners that he worked with,
24   according to your testimony yesterday; is that true?
25   A    Yes.
```

1    Q    So he had a partnership going on with how many other

2    people that you were aware of?

3    A    Two.

4    Q    And this was an ongoing business, was it not?

5    A    Yes.

6    Q    And it generated product, like t-shirts and hats and

7    things like that?

8    A    Yes.

9    Q    And those were in fact sold around the world?

10   A    Yes.

11   Q    How did they sell them?  Like at trade shows and things

12   like that?

13   A    Yes.

14   Q    And they would take orders then and ship them out to

15   wherever people wanted them sent?

16   A    Yes.

17   Q    Were you a part of that company?

18   A    At that time?

19   Q    Yes.

20   A    In the beginning, no.

21   Q    Did you become a part of that company?

22   A    Yes.

23   Q    As a matter of fact, Rick used to bring you to company

24   meetings, did he not, with his partners?

25   A    Yes.

```
 1    Q    But the partners didn't like having you at the meetings,
 2    did they?
 3    A    No.
 4    Q    In fact, they told him to stop bringing you to meetings,
 5    didn't they?
 6    A    Yes.
 7    Q    And at some point did you stop going to these meetings of
 8    Shaolin Worldwide?
 9    A    Yes.
10    Q    And sometime after you and Rick got together in 1997, did
11    you and Rick form a company called Shaolin Clothing Company?
12    A    I'm sorry, can you repeat that?
13    Q    Did you and Rick form another company named Shaolin
14    Clothing Company, or something like that?
15    A    After when?
16    Q    After you and he had gotten together in '97.
17    A    Yes.
18    Q    When was that company formed?
19    A    The -- I think January of 2000.
20    Q    And what was the nature of Shaolin Clothing Company, what
21    did it do?
22    A    The same thing.
23    Q    Was it in competition with Shaolin Worldwide?
24    A    No, it was just another corporation name.
25    Q    So basically Rick had two companies going on at that
```

1    time, he had Shaolin Worldwide and his own Shaolin Clothing

2    Company; is that right?

3    A    It was pretty much the same.

4    Q    Did he have the same partners in Shaolin Clothing Company

5    or --

6    A    No.

7    Q    -- were you and he it?

8    A    In -- in which company?

9    Q    In Shaolin Clothing Company, the one that you and he

10   formed?

11   A    Shaolin Corporation was just me and him.

12   Q    Okay.  And what did the company do?

13   A    Manufacture clothing and ship it out.

14   Q    Show them at trade shows --

15   A    Trade shows.

16   Q    -- take orders, send it all over the world, wherever it

17   was wanted; is that right?

18   A    Yes.

19   Q    And you had people design clothing for you that you then

20   marketed; is that right?

21   A    Yes.

22   Q    And this generated income, didn't it?

23   A    Yes.

24   Q    So in addition to Rick's being a personal trainer on a

25   part-time basis and a martial arts instructor on a part-time

1    basis, you and he had income from Shaolin Corporation,

2    correct?

3    A    Yes, but it wasn't generating much income.

4    Q    Not as much as the warehouse rental business?

5    A    Not as much, no.

6    Q    And this warehouse rental business went on for years,

7    didn't it?

8    A    Yes.

9    Q    As far as you know, it began when, the rental business?

10   A    As far as I know, I wasn't involved, but they started

11   doing it when we got into the building in '98.

12   Q    So from 1998 to sometime in 2002, this was an ongoing

13   business, the rental business, right?

14   A    Yes.

15   Q    I believe your testimony was that when you left your

16   husband for six months in late 2001, you came to Hawaii for

17   six months, it was -- the rental business was going on, right?

18   A    Can you repeat the question?

19   Q    When you left California in late 2001 to come to Hawaii,

20   and you stayed here for six months until June of the following

21   year, 2002?

22   A    Yes.

23   Q    During that time period you were gone, the business was

24   ongoing, the rental of the warehouse?

25   A    During the time that I was gone?

 1   Q    Yes.

 2   A    I don't -- as far as I knew it wasn't going on.

 3   Q    Well, was it going on when you left?

 4   A    Yes.

 5   Q    But it wasn't going on when you got back?

 6   A    I didn't know of anything.  Nobody told me of any events.

 7   Q    All right.  As far as the use of drugs are concerned,

 8   you've testified that you were aware that Rick was taking a

 9   drug and you gave us initials for it, G something, something,

10   GHR or something?

11          MR. MUEHLECK:  GHB is what she said.

12   BY MR. WEIGHT:

13   Q    GHP; is that right?

14          MR. MUEHLECK:  B.

15          THE WITNESS:  I think it's B, like boy.

16   BY MR. WEIGHT:

17   Q    GHB?

18   A    There was a different name that was on the bottle, but it

19   was supposed to be that type of drug.

20   Q    The drugs came in a bottle?

21   A    Yeah.

22   Q    With a label on it?

23   A    Yes.

24   Q    Like the kind you get at the drug store?

25   A    Yeah.

1    Q    Okay.  During the time that you were with Rick Vo from

2    1997 to the day you got arrested, did you ever see him use

3    crystal methamphetamine?

4    A    No.

5    Q    Did you ever see him use any illegal or street drug?

6    A    No.

7    Q    After you bought the house in California, that's in the

8    picture that Mr. Muehleck likes to show us, did you ever have

9    occasion to rent out a room or rooms in that house to other

10   people?

11   A    Yes.

12   Q    Did you have tenants by the name of Eugene and Aiko that

13   lived in that house with you at some point in time?

14   A    Yes.

15   Q    How long did they live with you?

16   A    About a year.

17   Q    And where did they live in the house?

18   A    Downstairs.

19   Q    Where downstairs?

20   A    In the room downstairs.

21   Q    Well, there's been a room described in your house

22   downstairs that had a bed and a closet with clothes in it and

23   a computer.  Is that the room we're talking about?

24   A    Yes.

25   Q    And this was the room that Eugene and Aiko rented; is

1    that right?

2    A    Yes.

3    Q    Aiko was a model; is that right?

4    A    Yes.

5    Q    That's what she did for a living.  And Eugene worked as a

6    disc jockey or something like that?

7    A    Yes.

8    Q    And they did a lot of travelling; is that true?

9    A    Yes.

10   Q    They came back and forth from California to Hawaii?

11   A    Yes.

12   Q    Isn't it a fact that you found out, and Rick found out,

13   that they were doing drugs in your house?

14   A    Yes.

15   Q    And as a result they were kicked out?

16   A    Yes.

17   Q    Did you have another tenant by the name of Marius?

18   A    Yes.

19   Q    What was Marius' last name?

20   A    Dinu.

21   Q    Dinu?

22   A    I believe that's how you say it.

23   Q    Okay.  And --

24   A    Or something like that.

25   Q    And where did Marius live?

BRENDA VO - CROSS                    3-49

1    A    Upstairs.

2    Q    He rented a room upstairs?

3    A    Well, when he first came he stayed upstairs.

4    Q    And did he later move downstairs?

5    A    Yes.

6    Q    How long did Marius live with you?

7    A    I'm not sure.

8    Q    Was it during the same time that Eugene and Aiko were

9    your tenants?

10   A    No.

11   Q    Before or after Eugene and Aiko?

12   A    Before.

13   Q    Okay.  Did you have any other tenants besides the three

14   that I've named?

15   A    Yes.

16   Q    Who?

17   A    Patrick.

18   Q    And where did Patrick stay when he was renting from you?

19   A    Downstairs.

20   Q    In that same room that Eugene and Aiko stayed in?

21   A    Yes.

22   Q    And when was he there?

23   A    A little bit after we moved in.

24   Q    And how long was he there?

25   A    For about a year.

1    Q    So you had people living in that room downstairs pretty

2    constantly from the time that you bought the house until,

3    what, 2002?

4    A    Yes.

5    Q    As a matter of fact, Rick's brother, Khanh Vo, lived down

6    there for a while, didn't he?

7    A    Yes.

8    Q    And Rick's other brother, Mon Lee, lived down there for a

9    while, didn't he?

10   A    Yes.

11   Q    So you've had people living in and out of that -- in that

12   room pretty constantly from the time you bought the house;

13   isn't that so?

14   A    Yes.

15   Q    Is there a lock on the door to that room downstairs, a

16   separate lock with a key?

17   A    I -- I think there is, but I'm not sure.

18   Q    Was it pretty much available to the tenants exclusively,

19   that is that they had it as their own place?

20   A    Yes.

21   Q    This seal-a-meal that's sitting in front of you, this

22   device, you say you've used this yourself on at least one

23   occasion, or one like it?

24   A    Yes.

25   Q    But you don't know where it came from?

1    A    No.

2    Q    It could have been brought in by one of the tenants,

3    could it not?

4          MR. MUEHLECK:  I'm going to object.  Without

5    foundation at this point.  He's asking her to guess.

6          THE WITNESS:  I don't know.

7          THE COURT:  You better rephrase your question.

8          MR. WEIGHT:  Very well, Your Honor.  We'll just move

9    along.

10   BY MR. WEIGHT:

11   Q    Mrs. Vo, you've indicated to us --

12         MR. WEIGHT:  Your Honor, I need another sidebar if it

13   please the court.

14               (Bench conference on the record:)

15         MR. WEIGHT:  Your Honor, the next area I intend to

16   get into relates to the defendant's 1991 DEA drug selling

17   business that she was in when she was operating -- selling

18   drugs to undercover DEA agents.

19         I made a demand for Giglio material of the United

20   States and specifically told them that I wanted the DEA

21   records relative to this 1991 pair of transactions.  What I

22   was provided, Your Honor, is the government's view of what

23   those records might show in a two-page letter.  I have never

24   seen these Giglio records.  I think I am entitled to see them

25   in order to properly cross-examine this defendant because it

1    is clearly as a result of those two drug sales that she was

2    arrested and prosecuted.  The case was given by the U.S.

3    Attorney's Office -- or taken across the street to the

4    Prosecuting Attorney's Office who prosecuted her, and she was

5    facing a 20-year prison term over there.  And we're entitled,

6    I believe, to a review of those records rather than the

7    government's two-page summary of what they think it contains.

8    And we have not been provided that information.

9            THE COURT:  You're referring to the state's records?

10           MR. WEIGHT:  No, I'm referring to the -- the DEA

11   records which Mr. Muehleck has and won't give me.

12           MR. MUEHLECK:  My response is this.

13           THE COURT:  Yes.

14           MR. MUEHLECK:  There's no precedent for us to have to

15   give up records.  We have to provide information, and those

16   records have been gone through very carefully and that

17   information has been given to Mr. Weight.

18           He also doesn't tell the court that we provided him

19   with the taped calls, the cassette tapes of the calls that

20   have been referenced before.  He also doesn't reference that I

21   orally told him before we had the records the information that

22   I had received from the state as to her conviction, as to her

23   arrest.

24           So -- but there's no precedent and there's no

25   authority that he's given us, given you, given me that I have

1      to turn over the records.

2            If the court wants to see them, I'll turn them over

3      to the court, but the court -- and the court will review those

4      records, the DEA records, and they'll see that the two --

5      well, it's more than two pages that I provided him -- has that

6      Giglio material and in fact there's more than that in the --

7      in the letter that I've given Mr. Weight.

8            But we don't give up reports.  There's no authority

9      under Giglio for us to give up the reports, for the defense

10     demand reports.  We're required to provide information about

11     bad stuff, and we've done that.  We've given them a lot of

12     information.  We've given them her tax returns, we've given

13     them the fact that there are currency -- currency transaction

14     report that's been filed against her and names her husband.

15     We've given up -- them general information about deposits of

16     cash transactions that she and her husband made.  But we're

17     not required to give up law enforcement reports, particularly

18     when they're not done or not prosecuted by our office.

19            Now, this thing about carrying it across the street,

20     it's -- that's a red herring here.  My understanding is the

21     DEA took the case to the prosecutor.  And that's -- that's

22     come out, I think.  But as far as saying that we sent it

23     across the street, we didn't send it across the street.  It

24     was declined, by my understanding, by my office because of

25     threshold amounts of drugs.  It was so small.  But we didn't

1   prosecute --

2           THE COURT:  You think the defendants are complaining

3   about the other direction.

4           MR. MUEHLECK:  Oh, yeah.

5           THE COURT:  Coming from the state.

6           MR. MUEHLECK:  Coming this way.

7           MR. WEIGHT:  Not this time.

8           MR. MUEHLECK:  Well, this was -- this was -- but

9   that's where we are, Judge.  If the court wants to see those,

10  I'll provide those, but I assure the court we've provided that

11  Giglio material in writing by letter.  And I'd ask Mr. Weight

12  to show the court the letter.  And --

13          THE COURT:  -- read it now.

14          MR. WEIGHT:  Okay.  The difficulty is this, Your

15  Honor:  Giglio relates to bad acts on the part of -- on the

16  part of a government witness, and these bad acts are

17  compounded.  It's not merely that she was arrested on these

18  charges and investigated for sale of drugs, that's not the

19  gravamen of the matter.  That certainly is part of it.  The

20  gravamen of the matter is that as a result of these two

21  undercover sales she faced a 20-year prison sentence, an open

22  20, as they would say in state court, when she was sentenced.

23  Now by dint of good lawyering, apparently, she got ten years

24  of probation.

25          MR. MUEHLECK:  That's inaccurate.  That's inaccurate

1    also.  I've checked the law on that and I've talked to the

2    prosecutor.  There are two things on that.  First of all,

3    Mr. Weight has state records and has had the state records and

4    has had the names of the DEA agents long before I did.

5            MR. WEIGHT:  I gave them to you.

6            MR. MUEHLECK:  That's right.  He sent me a letter.

7    So his investigator was aware of who did these arrests before

8    I was, and there's nothing to prevent him from talking to

9    those investigators.

10           MR. WEIGHT:  I don't even know where these people

11   are.

12           MR. MUEHLECK:  Secondly, secondly, my understanding,

13   according to Wayne Tashima, who is now with the Prosecutor's

14   Office and her attorney at that time, Judge, and might look at

15   the law that he told me is that while she was facing a 20

16   under the statute, the law changed by the time she was

17   prosecuted or charged by the state and it allowed Judge

18   Perkins to give her a ten-year probation, that is probation

19   was available.  It was within his discretion.  There's no deal

20   here.  You get Wayne Tashima at a sidebar and he'll tell you

21   that what Mr. Weight said in his opening statement is

22   nonsense.  I asked Wayne:  Was there a deal, did she provide

23   anything, was she debriefed, did she have to give anything up?

24   He said:  Absolutely not.  She got -- Judge Perkins gave her a

25   break.  The law changed.  By the time she got charged and pled

1    guilty, she could get a ten-year probation on a Promoting

2    Dangerous Drugs in the First Degree.  And I looked at the law

3    this morning, he gave me the cite; he was right.  She didn't

4    give up anything.  There's no deal.  Your argument that she

5    made this deal with the state is a red herring.

6           THE COURT:  Let's get back to Giglio.

7           MR. WEIGHT:  Yes, let's get back to Giglio.

8           MR. MUEHLECK:  He knew about these people and he had

9    her state conviction records before I did.  I just got them

10   this morning, they were brought in here this morning when I

11   was doing my direct.  I didn't have them.  If he wants to get

12   the state records, he should go to the state.  But as far as

13   our turning over -- and he's apparently got state material.

14   As far as DEA being ordered to turn it over, I'll turn it over

15   to the court, but there's no precedent for us having to turn

16   over reports.  We're required to provide information.

17          MR. WEIGHT:  Well, Your Honor, here's the problem:

18   Obviously the government does not want to give this -- give

19   this stuff up.  The problem is that when Brenda was arrested,

20   and we're going to get into all of this, she was advised by

21   her attorney:  Lady, you're in a deep, deep hole because you

22   are on probation in the state court.  When you are convicted

23   in federal court, the state will revoke your ten years of

24   probation and give you 20 years on the -- on the state

25   sentence.  If you go to trial in the federal case and lose,

1    your federal sentence and state sentences will almost

2    certainly be consecutive.  And that's where we end up with her

3    with a stacked 20 on top of whatever she ends up in federal

4    court.  We're going to get into -- into her understanding of

5    what she was facing in terms of her state court jeopardy as

6    well as what she was facing in her federal court jeopardy as a

7    result of this case.  The Giglio material is the underpinning

8    for the state court jeopardy, which puts a 20-year hammer over

9    her head.

10         MR. MUEHLECK:  And they have the state court record

11   which puts the 20-year hammer over her head.

12         THE COURT:  Frankly, Mr. Weight, you should have

13   asked for this before.  You knew that she was on the stand

14   yesterday and you hadn't asked the court at that point.  Now

15   we're holding up the jury.

16         MR. WEIGHT:  Well, Your Honor, I kept hoping that the

17   government was going to give up the Giglio material as they're

18   required to do.  Unfortunately, Giglio -- Giglio says it has

19   to be given up when the witness is offered for

20   cross-examination.  They don't have to give it up before then.

21   I've made a proper demand, Your Honor.

22         THE COURT:  -- in-camera review then.

23         MR. WEIGHT:  Very well.

24         MR. MUEHLECK:  The court doesn't have to have an

25   in-camera review.  They've had this material.  I provided this

1    material two days ago by letter in writing.

2         THE COURT:  As far as what you want to establish,

3    though, Mr. Weight, you haven't really convinced me that you

4    need to receive anything more than you've already gotten.

5    You've got the state records and you've got the --

6         MR. WEIGHT:  The state records consist -- the state

7    records, Your Honor, consist of an indictment, consist of a

8    plea and consisted of -- of her being placed on probation.

9         MR. MUEHLECK:  And that's the --

10        MR. WEIGHT:  That's what we have.

11        MR. MUEHLECK:  -- what 20-year sentence is and he has

12   the right --

13        THE COURT:  I'll review them in-camera, but move on

14   with the witness now.

15        MR. WEIGHT:  Very well.

16                   (End of bench conference.)

17        THE COURT:  Please proceed, Mr. Weight.

18        MR. WEIGHT:  Thank you, Your Honor.

19   BY MR. WEIGHT:

20   Q    Brenda, you've testified that in 1991, at the request of

21   Ron, who lived across the street, you started selling drugs to

22   the DEA, obviously you didn't know they were the DEA at that

23   time; is that right?

24   A    Yes.

25   Q    But you had negotiations with the DEA to sell him crack

1    cocaine?

2    A    Sorry?

3    Q    You had negotiations with this person who turned out to

4    be a DEA undercover agent, you had dealings with him to sell

5    crack cocaine?

6    A    Yes.

7    Q    And you sold an ounce of crack cocaine to him for about,

8    what, 15, $1600?

9    A    About there, I guess.

10   Q    And did you also tell this agent that you were going to

11   make a trip to San Francisco to purchase a kilogram of coke

12   and another kilogram of crack cocaine, did you tell him that?

13   A    I don't remember saying --

14   Q    Did you tell the agent that the regular cocaine had

15   already been promised to somebody else, but the kilo of crack

16   was still available for purchase; you remember telling him

17   that?

18   A    I don't remember telling him that.  I mean I could have

19   talked to him about it, but I don't remember.

20   Q    And was the agent -- did the agent then tell you that he

21   was interested in purchasing more crack from you?

22   A    Yes.

23   Q    And did you then tell the agent that you would figure out

24   a better price for larger quantities of crack, did you tell

25   him you could get him a better price if the amount was larger?

1    A    I don't remember.

2    Q    Did you tell him that you usually paid $25,000 for a kilo

3    of regular cocaine?  Did you tell him that?

4    A    I don't think I told him that.

5    Q    Well, if it showed up in the DEA's report as to that's

6    what you said at that time, would they be lying or not?

7              MR. MUEHLECK:  Objection.  That's argumentative, Your

8    Honor.

9              THE COURT:  Rephrase your question, Mr. Weight.

10   BY MR. WEIGHT:

11   Q    Would the DEA be incorrect if they wrote in a report in

12   1991 regarding a conversation with you that you said you

13   usually paid $25,000 for a kilo of regular cocaine, if they

14   wrote that in their report would that be incorrect or correct?

15   A    Incorrect.

16   Q    Would it be correct or incorrect if they wrote in their

17   report that you asked Agent Hughes --

18             MR. MUEHLECK:  I'm going to object to the form of

19   this question.  Now we're reading from something apparently

20   outside of evidence.  I don't object to the form -- or the

21   subject being gone into, but saying -- now reading from a

22   report, the report is not before the witness and the report is

23   not in evidence.

24             THE COURT:  Ask her the question first and then you

25   can cross-examine her on the report.

1         MR. WEIGHT:  Okay.

2    BY MR. WEIGHT:

3    Q    Did you tell the agent, Agent Hughes from the DEA, did

4    you ask him if he knew where you could purchase plastic

5    packets because you had some marijuana you wanted to package

6    up?

7    A    I could have asked him, but I don't remember.

8    Q    In November of 1991, did you ask another DEA agent by the

9    name of Follis if he could get you some of the chemical test

10   kits so you could test drugs because you didn't want to get

11   burned?

12   A    I don't -- I remember asking if I could get some of

13   those, but -- some of those things to check cocaine, but I

14   don't remember saying anything about being burned or anything.

15   Q    Did you tell Agent Follis that you had moved to Hawaii

16   from California to do business with your source of supply?

17   A    Can you repeat the question?

18   Q    Did you tell the agent, you didn't know he was an agent

19   at the time, but did you tell the guy you were dealing with

20   who turns out to be Agent Follis that you had moved to Hawaii

21   from California to do business with your source of supply of

22   drugs?

23   A    No.

24   Q    Did you tell Agent Follis that since your source had been

25   shot and killed, you were looking for a new source?

1    A    Because he asked me if I could get some drugs for -- some

2    more.

3    Q    And you did tell him that?

4    A    Yes.

5    Q    Who was your source who had been shot and killed?

6    A    Francis Beauchamp.

7    Q    Okay.  As a result of your dealing with the DEA, you

8    ended up getting arrested and prosecuted in state court; is

9    that correct?

10   A    Yes.

11   Q    You had an attorney at that time by the name of Wayne

12   Tashima; is that correct?

13   A    Yes.

14   Q    Did Mr. Tashima negotiate a plea for you with the

15   Prosecuting Attorney's Office for the City and County of

16   Honolulu?

17         MR. MUEHLECK:  Going to object to the form of the

18   question.

19         MR. WEIGHT:  Pretty straight forward, Your Honor.

20         MR. MUEHLECK:  Talking a plea agreement or did he

21   make her -- have her plead guilty?  I mean you can have

22   someone plead guilty without a formal agreement, Your Honor.

23   What's "negotiate a plea"?  It's a misleading question.  I

24   object.

25         MR. WEIGHT:  Mr. Muehleck can redirect.

 1          THE COURT:  I'll allow the question.

 2          MR. WEIGHT:  Thank you.

 3   BY MR. WEIGHT:

 4   Q    Did he?  Did Wayne get a deal for you?

 5   A    I'm not sure how -- what he did, but he said that I was

 6   going to get probation.

 7   Q    I see.  You're aware today that Wayne Tashima is now --

 8          MR. MUEHLECK:  I'm going to object to what

 9   Mr. Tashima's position is today.

10          MR. WEIGHT:  I'll withdraw that question.

11          THE COURT:  Sustained.

12          MR. WEIGHT:  Withdraw the question.

13   BY MR. WEIGHT:

14   Q    As a result of Mr. Tashima's discussions with the

15   Prosecuting Attorney, did you plead guilty in state court?

16   A    I pled no contest.

17   Q    You pled no contest?

18   A    Yes.

19   Q    Okay.  That means that you chose not to contest the

20   government's evidence against you that on two occasions in

21   1991 you sold cocaine and crack cocaine to DEA agents; is that

22   right?

23   A    Yes.

24   Q    And as a result of that, you were sentenced to ten years

25   of probation; is that right?

1   A    Yes.

2   Q    You knew prior to being sentenced that you were looking

3   at a possible 20 years in prison if the judge did not give you

4   probation; isn't that true?

5   A    Yes.

6   Q    Mr. Tashima and you had discussions about what kind of

7   sentence you might expect --

8           MR. MUEHLECK:  Well, I've --

9   BY MR. WEIGHT:

10  Q    -- if you went to trial and lost, didn't he?

11          MR. MUEHLECK:  I've got to object here because as an

12  attorney, of course, I don't have a problem with going into

13  what she understands the position was or what she understands

14  the sentence was, but as an attorney, some of this stuff may

15  be privileged and she should understand her rights in that

16  regard, Your Honor.  So I object to the form of the question,

17  unless the court wants to advise her, you know, some of this

18  is privileged.  And I don't think one should ask any client to

19  break that unless they've got some --

20          THE COURT:  Please rephrase your question,

21  Mr. Weight.

22          MR. MUEHLECK:  Thank you.

23          MR. WEIGHT:  Well, Your Honor, for the record, it's

24  our position that the privilege has been waived.

25          MR. MUEHLECK:  How about a sidebar, Your Honor?  Can

1    we talk about this then?

2             THE COURT:  We'll take -- I will allow the jury to

3    take a break.  Please be back at quarter of.

4             (At 10:21 a.m., the jury was excused, and the

5    following proceedings were held:)

6             MR. MUEHLECK:  My position is simply this, Your

7    Honor -- I don't know if the court wants the witness to hear

8    me on this, but we have no problem Mr. Weight --

9             THE COURT:  I think probably -- the witness will be

10   excused at this point.

11            MR. MUEHLECK:  Right.

12            THE COURT:  For a break.

13                    (Pause in the proceedings.)

14            MR. MUEHLECK:  Witness has left, Your Honor, for the

15   record.

16            THE COURT:  All right.

17            MR. MUEHLECK:  The defendant has to stay, please.

18            THE COURT:  Pardon me?

19            THE CLERK:  He has to stay.  He was going to go.

20            MR. MUEHLECK:  Yes.  Your Honor, our position -- I

21   don't care Mr. Weight asked her what her understanding is of

22   what her maximum penalty is and all that sort of thing.  I

23   object to him talking about communications with Wayne Tashima,

24   unless the court wants to advise her that this is potentially

25   privileged conversations.  She can waive that if she wants.  I

1    really don't care whether she waives it or not.  But I have a
2    problem with people -- attorneys asking witnesses to go into
3    privileged communications and them not understanding that they
4    have a right to keep it privileged.
5         I don't think there's been a waiver.  I haven't asked
6    her about any conversations with Mr. Tashima.  I asked
7    Mr. Tashima what the results of that was and how it happened
8    to get that sentence.  And for the record, as I said at the
9    sidebar, there was no deal, there was no negotiated plea.  The
10   question I objected to was, you know, this deal that she got,
11   she said she got what -- she doesn't know how she got it, but
12   she got probation.  And for the record, there was no deal.
13   Thank you.
14        MR. WEIGHT:  Well, Your Honor, I think we're here on
15   the question of waiver of the privilege or not.  Because the
16   question is her understanding and what that is based on as to
17   what she was facing in state court when she entered into this
18   plea of no contest.  I can tell the court as an officer of the
19   court, having practiced before the state court for many, many
20   years, a plea of no contest is a negotiated plea.  This is not
21   something that is commonly given.  A plea of no contest is
22   generally reserved for those cases in which the defendant has
23   potential exposure to civil liability for something else, as
24   in a robbery, a burglary, a traffic accident where someone is
25   hurt or killed.

1          In drug cases, a no contest plea is negotiated when
2   the lawyer does not want the defendant to have to admit that
3   she was involved in a drug transaction and the government is
4   willing to allow the plea.  They don't have to allow it.  It
5   can only be with the concurrence of the Prosecuting Attorney.
6   And in this case that concurrence was obtained by some
7   lawyering, it wasn't done by this defendant.  And the
8   discussions that she had with her attorney leading up to that
9   plea and leading up to the assurances that she apparently was
10  given that she was going to get probation are highly relevant
11  because now that probation is on the line and is going to go
12  out the window as soon as --

13          THE COURT:  She's already testified that Tashima told
14  her she would get probation.

15          MR. WEIGHT:  And I think we're entitled to go into
16  that a little further.

17          THE COURT:  Like what?

18          MR. WEIGHT:  Like what did he do to get her
19  probation.  You can't tell me this was a straight up plea in
20  the dark.  This was negotiated.  Wayne Tashima is a canny
21  lawyer.  He has been around the block.  He was a Prosecuting
22  Attorney for many years before he went into private practice,
23  which was before he went back to the Prosecutor's Office.  He
24  had friends in high places up there.  This was negotiated,
25  there's no question in my mind, and I am entitled to get into

1    it.

2                THE COURT:  And how is the --

3                MR. WEIGHT:  There's no privilege.

4                THE COURT:  How has the privilege been waived?

5                MR. WEIGHT:  There is no privilege.  The case is

6    over, it's done.  She is on the witness stand, has testified

7    that she has -- she entered this plea and we're entitled to

8    get into it.  I'd like to see some authority from the

9    government as to what they're basing this bogus claim of

10   theirs that there's a privilege that still exists.

11               MR. MUEHLECK:  The position that we make is simply I

12   don't have a problem with Mr. Weight asking what her

13   understanding is.  I have a problem with him asking:  Now, you

14   communicated with your attorney and your attorney told you

15   this.  I object to the form of the question because it asks

16   her to waive her privilege.  She doesn't understand that's

17   privileged, Judge, and the court, an attorney, somebody should

18   tell her that.  I don't have a problem with the nature of the

19   question.  I have a problem with the form of the question,

20   asking her to waive her right to keep privileged

21   communications privileged.  That's all, Judge.  I think

22   everybody, as an attorney, an officer of the court, has an

23   obligation to tell her:  Look, you're going to have to go into

24   some of this, he has a right to ask you generally about this,

25   but you don't have to disclose communications with your

1    attorney that are privileged.

2           THE COURT:  Well, I think it's already gone into and

3    I'm going to allow Mr. Weight to pursue that.

4           MR. WEIGHT:  Thank you, Your Honor.

5           THE COURT:  Now, as far as this Motion to Strike, I

6    didn't want to take up more of the jury -- we've been taking

7    up quite a bit of the jury time here.  I think we've already

8    heard Mr. Weight's argument.  What's your counter-argument on

9    that, Mr. Muehleck?

10          MR. MUEHLECK:  It's relevant.  Somebody that gets

11   cash, Your Honor, in a method like this when he's not working.

12   The company wasn't going on then.  I have their tax returns to

13   show what the company was doing.

14          Another matter I have on this, Your Honor, is that

15   Mr. Weight has gone outside the conspiracy, the terms of the

16   conspiracy and the period of the conspiracy to ask this

17   witness about the defendant's drug involvement.  We've sort of

18   opened the door here, Judge, for the government to go into

19   some of these things, too.  I mean we stayed very, very 404(b)

20   away from stuff and we haven't mentioned any, they filed a

21   motion to stay away from the defendant's involvement with

22   drugs and we've, you know, stayed way away from that, Judge.

23   Now they come out and they start asking this witness about:

24   You saw this and you saw that and his -- what he was doing and

25   what the company was making, it was an ongoing enterprise --

1           THE COURT:  You went into that initially,

2     Mr. Muehleck.

3           MR. MUEHLECK:  I didn't go into it --

4           THE COURT:  I want to get back to this Motion to

5     Strike.

6           MR. MUEHLECK:  What's the question, Your Honor?

7           THE COURT:  Question is:  What's your argument

8     against the motion?

9           MR. MUEHLECK:  My position is this:  During the

10    period of the conspiracy, someone receiving cash to be picked

11    up in Hawaii where there was drugs sent out in the package, we

12    all know drugs are being sent and sold in Hawaii, someone

13    getting cash from somebody in Hawaii, that is the co-defendant

14    getting cash at her husband's direction, getting it for her

15    husband as a result of phone calls during the period of the

16    conspiracy, when a large amount of controlled substances is

17    being sent up, and at the same time we have other packages

18    going back from Hawaii -- excuse me, from California to

19    Hawaii.  Court is well aware what that can be.  That could be

20    shipments of drugs here.  Mr. Weight is aware that we have

21    intercepted cash being sent by a common denominator so to

22    speak.  That is a gentleman by the name of Baby Boomers.  Two

23    shipments were intercepted by Mail Boxes Etc. during the

24    period of the conspiracy, Your Honor.  That's in the response

25    that I filed this morning, probably about 20 minutes ago.  I

1    signed it before Mr. Weight got up and did the cross.  Cash

2    being received --

3              THE COURT:  This -- this other cash from the Mailbox

4    intercepted, that was sent from here or --

5              MR. MUEHLECK:  It was sent from here, Judge, yes.

6              THE COURT:  California?

7              MR. MUEHLECK:  Yes, it was sent to California to a

8    Martinez address.  And that same person that -- on two

9    occasions, in February and April of 2002.  February

10   transaction, this gentleman came in using a phony name, a

11   phony address, a phony phone number, sent it out calling Baby

12   Boomers Enterprises.  He sent it to a Martinez, California

13   address.  They opened up the box at Mail Boxes Etc. and saw an

14   amount of cash.  The FBI didn't seize it because they didn't

15   get there in time, they had other commitments that day.

16             Two months later, in April, the same guy comes in,

17   sends it to the same place, Martinez, California, a place

18   called -- excuse me, Martinez, California, a place called

19   Lipary Collectibles.  The FBI gets a search warrant, opens it

20   up; $40,790, Your Honor.  A dog alerts on that cash.

21             That same person, that same customer sent three

22   packages to Mr. Vo during the period of the conspiracy.  In

23   September, in January and in February.  Same person.  Same

24   phony address.  Same phony name.  Same period of time.  The

25   same period of time when packages, other packages, according

1    to Mrs. Vo, are coming from the house, Khanh Vo sends one, and

2    at her -- his instruction two other packages mailed out using

3    the phony name Linda Chang and don't get your fingerprints on

4    it.   There's a conspiracy that's going on here.   It's obvious

5    there's a conspiracy going on here with other people besides

6    Ms. Vo and the defendant.

7            THE COURT:   And nobody ever checked what were in

8    those other packages that were sent to Mr. Vo?

9            MR. MUEHLECK:   We just found out about them about two

10   weeks -- well, a week ago?   Whenever I found them, I gave to

11   Mr. Weight.   We got these other Vo packages, I guess you'd

12   call them, packages sent to Vo; one to the Vo family, one to

13   G. Vo and one to R. Vo.

14           MR. WEIGHT:   Well, Your Honor, here's the problem

15   with that:   We have no idea what were in these packages if

16   they were ever received at the house.   And the government

17   simply wants to throw this red herring to the jury to say:

18   Well, see, some stranger sent money on some other occasion to

19   some other address, not the Vos' address.   Martinez is in

20   Northern California, it's not down in L.A.   Who knows what

21   that person -- who that is or what they were getting it for.

22           There's no connection as to what the packages that

23   were mailed to Shaolin, one was mailed to Shaolin, according

24   to the records the government gives us, one is mailed to G. Vo

25   and another one to the Vo family.   They were never opened.   We

1    don't know what was in them and we can't speculate.  And

2    that's precisely what the government wants to do, to invite

3    the jury to speculate:  Well, if we opened two packages that

4    this guy sent, then -- and they had money in them, then these

5    other three that we didn't open must have had money in them.

6    And that's just not cricket.

7              THE COURT:  Well, I'm going to have to review

8    Mr. Muehleck's memorandum.  I assume the court's received it

9    by now.

10             MR. WEIGHT:  I haven't received it.

11             MR. MUEHLECK:  Well, I think it has been, Your Honor.

12   It's probably being brought to Mr. Weight.  I directed it to

13   be sent to your chambers.

14             THE COURT:  And are you still pursuing this Giglio

15   motion?

16             MR. WEIGHT:  Yes, Your Honor, I am.

17             THE COURT:  Seems like you've gone into it pretty

18   much already.

19             MR. WEIGHT:  I am because the witness is now denying

20   statements that are apparently in -- in the Giglio motion.  I

21   think we're entitled to --

22             THE COURT:  Well, she apparently is denying things

23   that are in what Mr. Weight -- Mr. Muehleck --

24             MR. WEIGHT:  Which Mr. Muehleck contends were in the

25   Giglio material.  I haven't seen the Giglio material, so I

1    don't know.

2            THE COURT:  Well, you have some of it right before

3    you.

4            MR. WEIGHT:  All I have, Your Honor --

5            THE COURT:  The DEA report.

6            MR. WEIGHT:  I don't have the DEA reports.  All I

7    have --

8            THE COURT:  Well, you have whatever he gave you,

9    those two pages, whatever you want to call that.

10            MR. WEIGHT:  It's Mr. Muehleck's letter, it's

11   Mr. Muehleck's version of whatever those reports are.

12            THE COURT:  Well, I'll have to review that, too.

13   And, you know, it looks like the trial is probably going to be

14   interrupted because of these matters having been brought up so

15   late.  So we'll take a break.

16            (A recess was taken from 10:35 a.m. to 10:57 a.m.)

17            (The following proceedings were held in open court in

18   the presence of the jury:)

19            THE COURT:  Please proceed, Mr. Weight.

20            MR. WEIGHT:  Thank you, Your Honor.

21   BY MR. WEIGHT:

22   Q    Mrs. Vo, we left off when Mr. Tashima was making

23   recommendations to you about whether to plead guilty or go to

24   trial in that case arising out of the 1991 sales to the DEA

25   undercover agents; you remember that?

1     A     Yes.

2     Q     Now, did Mr. Tashima lead you to believe that if you pled

3     guilty, you were going to get probation?

4     A     Yes.

5     Q     Did he tell you in strong terms:  Hey, Brenda, don't

6     worry about it.  I'll get you probation in this case?

7     A     Yes.

8     Q     Did he tell you how he was going to do that?

9     A     I don't remember.

10    Q     Did he mention that he had friends in the Prosecutor's

11    Office and that they'd go light on you?

12    A     I don't remember him saying that.

13    Q     But in any event, you went before Judge Perkins and you

14    entered a plea of guilty and you were later sentenced to ten

15    years of probation by him; is that correct?

16    A     Yes.

17    Q     And when you were put on probation, you had certain terms

18    and conditions that you had to follow; is that right?

19    A     Yes.

20    Q     And if you didn't follow them, your probation could be

21    revoked and you would be sentenced to prison; you were told

22    that, right?

23    A     Yes.

24    Q     And were you told how much prison time you would get

25    sentenced to if you broke the terms of probation?

1    A    20 years.

2    Q    So you knew at the time that you were sentenced that you

3    were looking at a potential of 20 years in prison on the state

4    side if you broke the terms of probation, correct?

5    A    Yes.

6    Q    Isn't it a fact that the first term, the first condition

7    of probation, number one on the list that they give you is you

8    must not commit another federal or state crime during the term

9    of probation; isn't that true?

10   A    I'm sorry, can you repeat that?

11   Q    When -- when you -- let me back up.  When you are placed

12   on probation by the court, you meet with your probation

13   officer?

14   A    Yes.

15   Q    And when you met with your probation officer, he or she

16   went over the terms and conditions of your probation, those

17   things you could do, those things you could not do and the

18   rules you had to follow while on probation, correct?

19   A    Yes.

20   Q    And they made you or asked you to sign a paper saying

21   that you acknowledged having received these instructions,

22   correct?

23   A    Yes.

24   Q    And the first of those instructions is you must not

25   commit another federal or state crime during the term of

1    probation; isn't that so?

2    A    Yes.

3    Q    And you signed an agreement with the state that you

4    wouldn't break any laws, right?

5    A    Yes.

6    Q    After you were arrested in this case, were you led to

7    believe that as a result of this arrest and prosecution, that

8    your probation in the state court would be violated and you

9    would get a 20-year prison term over there?

10   A    Can you repeat the question?

11   Q    After you were arrested in this case and had a lawyer

12   representing you in federal court, were you told or did you

13   get the impression, the strong impression that as a result of

14   this federal arrest and prosecution, you would have your

15   probation in state court revoked and get a 20-year sentence

16   over there?

17   A    I was led to believe that I could get paroled out.

18   Q    You could -- we'll get to that in a moment.  But you were

19   told you were looking at 20 years across the street?

20   A    Yes.

21   Q    Weren't you told that?

22   A    Yes.

23   Q    So you knew just on the basis of this arrest and

24   prosecution in federal court, you had 20 years staring you in

25   the face across the street, right?

1    A    Yes.

2    Q    Now, let's back up for a moment.  After your being placed

3    on probation, you were permitted to move back to California,

4    and that was in, what, 1996?

5    A    Yes.

6    Q    And shortly after that you met Mr. Vo again in 1997?

7    A    Yes.

8    Q    After you and Rick got married in 19, what was it, 99?

9    A    Yes.

10   Q    Your marriage to Rick was a rocky one; is that a fair

11   statement?

12   A    Yes.

13   Q    You and he had periods where you didn't get along at all;

14   is that right?

15   A    Yes.

16   Q    And you would leave the marital home for extended periods

17   of time and come to Hawaii; isn't that true?

18   A    Not that long.

19   Q    Six months, you don't call that long?

20   A    Yeah, that one time.

21   Q    Okay.  And how many other trips to Hawaii were there

22   during that time period, from the time you got married in '99

23   until you made the big trip in 2001, how many other trips to

24   Hawaii did you make?

25   A    I don't remember.

1   Q    Was your brother living in San Diego in 2001 and 2002?

2   A    Yes.

3   Q    And would you go down and take Kianna, your daughter, and

4   go down and see him for extended periods of time?

5   A    Yes.

6   Q    How often?

7   A    Before I came, I was going very often.

8   Q    Like several times a month?

9   A    Yes.

10  Q    Now, during your marriage with Rick, having another child

11  was very important to him, wasn't it?

12  A    Yes.

13  Q    He wanted a son, didn't he?

14  A    Yes.

15  Q    Did you want any more kids?

16        MR. MUEHLECK:  Objection as to relevance.

17        MR. WEIGHT:  Withdraw the question.

18  BY MR. WEIGHT:

19  Q    During the time of the marriage, would it be a fair

20  statement that neither you nor Rick trusted each other as far

21  as ex-boyfriends, ex-girlfriends and ex-wives went?

22  A    Can you say that again, repeat it?

23  Q    Yeah, let me rephrase it this way:  Rick had been married

24  before, correct?

25  A    Yes.

1    Q    And his prior marriage had resulted in Gabriella, his now

2    12-year-old daughter, right?

3    A    Yes.

4    Q    And Gabby lived with you?

5    A    Yes.

6    Q    And Gabby's mother would call from time to time, wouldn't

7    she?

8    A    Yes.

9    Q    And sometimes she spoke to Rick, didn't she?

10   A    Yes.

11   Q    And weren't you concerned -- isn't it true that you were

12   concerned that maybe he was having a little fling with his

13   ex-wife?

14   A    I was just bothered that she was calling a lot.  I didn't

15   know why she was calling and talking to him all the time.

16   Q    And Rick was concerned that you were having affairs with

17   old boyfriends; isn't that true?

18            MR. MUEHLECK:  Objection as to relevance.

19            MR. WEIGHT:  Bias and prejudice, Your Honor.

20            THE COURT:  I'll allow it.

21            MR. WEIGHT:  Thank you.

22   BY MR. WEIGHT:

23   Q    Rick was concerned and you had arguments over phone calls

24   that you were receiving from ex-boyfriends?

25   A    Yes.

1    Q    Specifically, a guy named Derek?

2    A    Yes.

3    Q    Because as it turned out, Derek happened to be best

4    friends with Eugene, who was the other half of Eugene and

5    Aiko, your tenants downstairs, right?

6    A    Yes.

7    Q    Were there threats of divorce made by you during the

8    course of the marriage?

9    A    Yes.

10    Q    Did you have an abortion with Rick's child during the

11    course of the marriage?

12            MR. MUEHLECK:  I'm going to object.

13            MR. WEIGHT:  Goes to bias and prejudice, Your Honor.

14            THE COURT:  I'll allow it.

15            MR. WEIGHT:  Thank you.

16    BY MR. WEIGHT:

17    Q    Did you?

18    A    Yes.

19    Q    During the course of the money (sic), did you take money,

20    cash money and send it to your father in Hawaii?

21    A    Yes.

22    Q    Did you bring money, cash money with you to Hawaii, money

23    that belonged to you and Rick and have your father hold on to

24    it for you?

25    A    Yes.

1    Q    Was that because you intended to leave Rick and you

2    wanted to have a few dollars set aside for that day?

3    A    For the future.

4    Q    Yes.

5    A    Yes.

6    Q    And as a matter of fact, you set aside somewhere around

7    $52,000, didn't you?

8    A    Yes.

9    Q    And that was without Rick's knowledge or consent, wasn't

10   it?

11   A    No.

12   Q    No?  He knew what was going on?

13   A    I mean yes, it was without his knowledge.

14   Q    He didn't know you were taking the money and squirreling

15   it away in Hawaii, did he?

16   A    No.

17   Q    In October, on October 2nd, 19 -- or 2002, you and Rick

18   came to Hawaii together; is that correct?

19   A    Yes.

20   Q    And when you were here, where did you stay?

21   A    With -- at my parents' house.

22   Q    During that time period, was Rick going to the gym here

23   in Hawaii?

24   A    Yes.

25   Q    Was he going every day?

1   A    Yes.

2   Q    Did he have a pretty much set schedule as to when he

3   went?

4   A    Yes.

5   Q    He normally went around noon, didn't he?

6   A    Yes.

7   Q    And he would normally be there at least two hours, didn't

8   he?

9   A    Yes.

10   Q    And you would take him, drop him off and come back and

11   pick him up; is that right?

12   A    Yes.

13   Q    When -- the day the package was mailed, what time did you

14   take the package to Mail Boxes Etc.?

15   A    I don't remember.  Around 1:00 or 2:00, or something like

16   that.

17   Q    And that was because that morning you and Rick had gone

18   with your niece on a field trip with her school to Waimea

19   Falls Park; isn't that true?

20   A    I don't remember it being that day, but --

21   Q    Well, did you go on such a field trip?

22   A    Yes.

23   Q    And you don't recall today whether it was the day that

24   you mailed the package or not?

25   A    I don't remember it being that day, but we did go on the

1    field trip.

2    Q    All right.  Isn't it also true that Rick went to the gym

3    that day?

4    A    I remember him going to the gym every day.

5    Q    And he'd go at noon and you'd drop him off and you'd come

6    back and pick him up around 2:00 or later; isn't that true?

7    A    Yes.

8    Q    After you were arrested at the airport on Sunday, October

9    6th, 2002, you were taken into federal custody; is that right?

10   A    Can you repeat the question?

11   Q    After you were arrested at the airport in October last

12   year, you were taking Rick to the airport, right?

13   A    Yes.

14   Q    The agents swooped down and arrested you, didn't they?

15   A    Yes.

16   Q    Then you and Rick were both taken off to jail, right?

17   A    Yes.

18   Q    And after that you had a lawyer appointed to represent

19   you at that time; isn't that so?

20   A    Yes.

21   Q    And your lawyer and you had discussions so you could find

22   out what kind of trouble you were in, didn't you?

23   A    Yes.

24   Q    Isn't it a fact that your lawyer and you went over

25   something called the sentencing guidelines?

1   A    Yes.

2   Q    The sentencing guidelines are the guidelines the court

3   uses in determining what sentence someone is to get for the

4   commission of a federal crime, correct?

5   A    Yes.

6   Q    Isn't it also true that based on the quantity of drugs in

7   this case, you were led to believe and you do believe that the

8   guidelines you were looking at puts you in a sentencing range

9   of around 30 years to life in prison; isn't that true?

10  A    Yes.

11  Q    And that's on top of the 20 years in prison you're

12  looking at across the street in the state court; isn't that

13  also true?

14  A    Yes.

15  Q    And you were told or you were led to believe by your

16  lawyers that the best thing you could do in this case was to

17  roll over on your husband, pin the tail on the donkey and get

18  the government's favor so that you would end up with a lesser

19  sentence; isn't that true?

20  A    Can you rephrase the question?

21  Q    You were advised by your lawyers that if you made a deal

22  with the government, pleaded guilty and acted as a witness on

23  their behalf, you could get a smaller sentence than 30 to life

24  in the federal court and maybe do better across the street?

25  A    Yes.