1    Q    You have an attorney by the name of David Klein; is that
2    right?
3    A    Yes.
4    Q    And Mr. Klein has been advocating diligently on your
5    behalf; is that true?
6    A    Yes.
7    Q    And as a result of that diligence, you entered into a
8    plea agreement with the United States, right?
9    A    Yes.
10   Q    You signed a piece of paper saying that you would plead
11   guilty to one count in this case, the conspiracy, and you
12   would cooperate, correct?
13   A    Yes.
14   Q    Mrs. Vo, in your mind do you believe that you have been
15   promised by the government that in return for your assistance,
16   you will receive a sentence of less than the 30 to life you're
17   looking at in federal court?
18   A    I wasn't promised anything.
19   Q    Okay.  Were you led to believe that based on your
20   cooperation you would get sentencing consideration that would
21   get you a sentence of less than 30 to life?
22   A    I was led to believe that I could get less time.
23   Q    How much less?
24   A    I'm not sure.
25   Q    Well, how much do you think you're going to get?

1    A    I don't know.

2    Q    Isn't it also true that based on discussions with your

3    lawyer, you believe that when you get sentenced across the

4    street in state court, that that sentence can get rolled into

5    your federal sentence so you don't have them stacked one on

6    top of the other; isn't that true?

7    A    Yes.

8    Q    You expect to get concurrent time for your state sentence

9    and your federal sentence; is that right?

10   A    I'm going to try to.

11   Q    And that's the reason you're on the witness stand here

12   today, isn't it?

13   A    Because I was called as a witness.

14   Q    And because you entered into an agreement with the

15   government to testify, right?

16   A    Yes.

17   Q    And you have had extensive debriefings with the

18   government where they have talked to you at great length about

19   what you are going to say or what they want you to say; isn't

20   that true?

21   A    Not about what they want me to say.

22   Q    Has it been suggested to you as to how you should say

23   things as you testify in the course of this trial?

24   A    Yes.

25          MR. WEIGHT:  No further questions.

1                       REDIRECT EXAMINATION

2    BY MR. MUEHLECK:

3    Q    What promises were made to you, Mrs. Vo, about any

4    sentence you would receive?

5    A    None.

6    Q    What's your understanding of who decides what sentence

7    you'll get?

8    A    The judge.

9    Q    What judge?

10   A    Judge Gillmor.

11   Q    Did Mr. Klein make suggestions about exactly how -- what

12   to testify to?

13   A    He -- can you repeat the question?

14   Q    What did Mr. Klein tell you about testifying, when you

15   get up on the stand to testify?

16   A    He helped guide me into how I should answer questions.

17   Q    And what did he tell you to say?

18   A    That -- I don't have to just say yes or no.

19   Q    Did he tell you to tell the truth?

20   A    And the truth.

21   Q    Aiko and, what is it, Eugene were your tenants?

22   A    Yes.

23   Q    When were they your tenants?

24   A    About a year before -- they left a few months before I

25   came to Hawaii, November of 2001.

1    Q    Would they have left your place in the year 2001, left

2    the residence?

3    A    Yes.

4    Q    And how much of their stuff did they leave in your

5    residence in storage?

6    A    In -- in the garage?  I'm not sure.  They had some boxes

7    in there.  I'm not sure.

8    Q    How much of the stuff did they leave in storage in the

9    bedroom slash office where the heat sealer was found or your

10   computers were, do you know?  Did they leave anything there?

11   A    I'm not sure what was in there.

12   Q    And how about Marius and -- and -- Dinu, what's his --

13   what is it?

14   A    Dinu.

15   Q    Dinu.  Did that person leave stuff in storage in the

16   bedroom?

17   A    Not in the bedroom, no.

18   Q    And how about Patrick, did Patrick leave stuff in storage

19   in the bedroom downstairs?

20   A    I'm not sure what Patrick left at the house, but I know

21   we have some things of his.

22   Q    And Khanh Vo, was he storing stuff in the bedroom

23   downstairs?

24   A    I don't know.

25   Q    Mr. Weight asked you about $52,000 that your father was

1    holding.   You remember that question?

2    A    Yes.

3    Q    Okay.   Can you tell us what money that was, what made up

4    the $52,000?

5    A    I remember about 16 something was from a savings account

6    that was --

7    Q    I'm sorry, I didn't mean to cut you off.   From a savings

8    account?   You have to answer verbally for the record.   You

9    can't just shake your head.

10   A    Yes.

11   Q    Okay.   Whose savings account?

12   A    My savings account.

13   Q    And where did the -- where did you get that money for the

14   savings account?   How long have you had that savings account?

15   A    Had it -- it was cashed in around '96 and I had it from

16   late '80s.

17   Q    And in '96 you said it was cashed in, what do you mean?

18   A    My father -- I gave him the power of attorney to cash it

19   in and use it for my attorney fees.

20   Q    In the -- in the state case in Hawaii, the attorney fees?

21   A    Yes.

22   Q    And he was holding that money?

23   A    Yes.

24   Q    What other money comprised or made up that $52,000 that

25   your father held?

```
 1   A    The $11,000 mutual fund.

 2   Q    Whose mutual fund was that?

 3   A    Mine.

 4   Q    That have anything to do with your husband?

 5   A    No.

 6   Q    How long had you had that?

 7   A    For about five years.

 8   Q    You said your savings was, what, 16?

 9   A    16 something, yes.

10   Q    16,000?

11   A    Yes.

12   Q    And mutual fund was 11,000?

13   A    Yes.

14   Q    What else made up the $52,000 that your father had?

15   A    The 10,000 that I gave back to my father.

16   Q    All right.  Explain what you mean 10,000 you gave back to

17   your father.

18   A    He wrote me a check for 20,000 to help us with the house.

19   Q    Okay.

20   A    And I gave him back 10,000.

21   Q    From the 20,000, you gave him ten back?

22   A    Actually that was money that I gave back.

23   Q    And he was holding that?

24   A    Yes.

25   Q    Was there other money, if there's anything else you can
```

1    tell us made up the 52,000?

2    A    There was a -- there was a trip to Brazil that I took

3    with an ex-boyfriend that I had paid for and my dad promised

4    that he was going to pay for that.  So instead of giving me

5    the money back, he just held it for me.

6    Q    How much money was that?

7    A    About $3,000.

8    Q    And any other amounts that you can tell us that make up

9    the 52,000?

10   A    There was -- I remember a funeral that I gave money for

11   and my father added that.  It was only $500.

12   Q    I'm sorry --

13   A    It was a funeral, a friend of my family's that I put

14   money in a card for, attended a funeral.  And there was hair

15   products that I purchased for my mom that I charged on the

16   credit card.

17   Q    And?  So how did that --

18   A    Instead of giving me the money, my mom gave the money to

19   my dad and he held it.

20   Q    Okay.  The hair products and the funeral money, what

21   would that have added up to, if you can give us an idea?

22   A    Close to 10,000 maybe.  I don't know.

23   Q    And the money, the income that you had with your husband

24   from this warehouse promotions, how much of that did you give

25   to your father?

1   A    About 15,000.  And actually that 10,000 that was given

2   back to my dad, that came from the parties, too.

3   Q    That came from the?

4   A    The parties.

5   Q    So 15 and ten should be added together?

6   A    Yes.

7   Q    That money was then, what?  You say, what, marital income

8   from the -- from the rental of the warehouse for these

9   promotions and parties?

10  A    Yes.

11           MR. MUEHLECK:  A moment please, Your Honor?

12                  (Pause in the proceedings.)

13           THE WITNESS:  The hair products might have been close

14  to 6,000 or 5,000, something like that.

15           MR. MUEHLECK:  Thank you.

16                  (Pause in the proceedings.)

17           MR. MUEHLECK:  Moment please, Your Honor

18                  (Pause in the proceedings.)

19  BY MR. MUEHLECK:

20  Q    Mr. Weight asked you about going to Waimea Falls in

21  October, last October when you came and visited your folks?

22  A    Yes.

23  Q    Did you -- did you go to Waimea Falls?

24  A    Yes.

25  Q    What was that, what was that all about?

1    A    It was a field trip that my husband and I and my baby

2    went on.  We were chaperones.

3    Q    Okay.  And he asked you if that could have been that same

4    day that you took -- where's 1 -- oh, 1 is on the side  --

5    when you went to Mail Boxes Etc. with the box, Government

6    Exhibit 1?

7    A    Yes.

8    Q    He asked you that question?

9    A    Yes.

10    Q    And you said -- what was your answer?

11    A    I -- I don't remember what day it was.

12    Q    That you went to Waimea Falls?

13    A    Yes.

14    Q    Do you remember where you were prior to going to Mail

15    Boxes Etc. with the box, what you were doing that morning or

16    that day before you went to the store Mail Boxes Etc., drove

17    there in the car with your husband?  Do you know where you

18    were that day?

19    A    Yes.

20    Q    Can you tell us when you got up what you did that day or

21    where you went?

22    A    I remember getting up and dropping my mom off to use the

23    car.

24    Q    Whose car --

25    A    My mom's car for the day.

1    Q    Okay.

2    A    I would drop her off at work and come back.  And I

3    remember --

4    Q    Was that -- what kind of car was that?

5    A    Toyota Avalon.

6    Q    Okay.

7    A    And I remember --

8    Q    Was that the car you were driving when you were arrested

9    at the airport?

10   A    Yes.

11   Q    Okay.  After you dropped your mom off where?

12   A    I dropped her off at work.

13   Q    Which is?

14   A    Pearl Kai Hairstyling.

15   Q    All right.  What time is that, roughly?

16   A    About 8 o'clock.

17   Q    Okay.  Then where did you go?

18   A    Then I came home and my husband said to get the baby

19   ready, let's go get something to eat.  And I remember we went

20   towards Waikiki.  And --

21   Q    Then what did you do?

22   A    And he stopped at a friend's house.

23   Q    Who was driving?

24   A    My husband.

25   Q    In your mom's car?

1    A    Yes.

2    Q    Please continue.  Where did you stop?

3    A    He stopped at a friend's house and talked to a friend for

4    a few minutes.  And then we went to an apartment near Ala

5    Moana.

6    Q    Okay.  What happened there?

7    A    And he carried in a box.

8    Q    Who carried in a box?

9    A    My husband.

10   Q    From where?

11   A    From the trunk of the car.

12   Q    Carried it in to where from the trunk of the car?

13   A    Into this apartment building.

14   Q    Had you been to that apartment building before, Ms. Vo?

15   A    No.

16   Q    What happened then?

17   A    I took my daughter in the back room and while she played

18   I heard some --

19   Q    You went into the apartment?

20   A    Yes.

21   Q    And your husband was where at that time?

22   A    In the kitchen.

23   Q    Of the same apartment?

24   A    Yes.

25   Q    Please continue.  What happened then?

```
 1    A     I heard some vacuum sounds, sounded like the seal-a-meal.

 2    Q     Okay.  And then what?

 3    A     And then we stayed there for about 20 to 30 minutes.  And

 4    then --

 5    Q     Did you see what he was doing, your husband?

 6    A     No.

 7    Q     When you heard the sounds, did you ever talk to him or

 8    see him?

 9    A     I came into the living room.

10    Q     And?

11    A     And he told me to watch Kianna, to stay in the back room

12    and watch Kianna.

13    Q     Did you go in the back room?

14    A     Yes.

15    Q     Then what happened?

16    A     And then we left the -- left the apartment and he carried

17    out a garbage bag and the box.

18    Q     What box?

19    A     A big box.

20    Q     And then what happened?

21    A     And then we went into the car and then drove down the

22    parking lot and he asked me to throw away the bag, the garbage

23    bag and the big box.

24    Q     And where did you do that, how did you do that?

25    A     There was a dumpster downstairs.
```

1    Q    And then what?

2    A    And then -- and then we went to go get something to eat.

3    Q    Where, if you recall?

4    A    We went to North Shore Grinds.  And then they didn't have

5    breakfast, I wanted to eat breakfast.  And then we went to the

6    Big City Diner, and it was too late for breakfast.

7    Q    So what did you do then?

8    A    We went to another place, a hole in the wall plate lunch

9    place.

10   Q    That's the name of it?

11   A    Yeah -- I don't know the name of the place.

12   Q    Okay.

13   A    To eat and we had mahimahi and eggs.

14   Q    Why is it you went to this second place or the -- the

15   hole in the wall place for eggs?

16   A    Because there was a -- a Puka Guide that had different

17   places to eat.

18   Q    Okay.  Who wanted the eggs, who had the eggs?

19   A    I wanted the eggs.  We both had eggs.

20   Q    And then what happened?

21   A    And then before that, before we went inside the

22   restaurant is when he asked me about the package, asked me if

23   I could send out the package.

24   Q    And you went from there to where?

25   A    To the Mail Box Etc.

1    Q    Did you see anybody else in the apartment?

2    A    No.

3    Q    Had you seen the box prior to that, Government Exhibit 1

4    prior to that?

5    A    No.

6    Q    You hadn't -- had you seen it in the trunk or anywhere

7    prior to that?

8    A    No.

9    Q    How did your husband get into this apartment?

10   A    He had a key.

11   Q    Had you ever been there before?

12   A    No.

13            MR. MUEHLECK:  I don't have any questions, but I

14   would offer Government Exhibit 18.  18 to Mr. Weight for the

15   record.

16            MR. WEIGHT:  Your Honor, I'm going to object to 18

17   unless it's redacted.

18            MR. MUEHLECK:  I agree.

19            MR. WEIGHT:  Perhaps we need a bench conference on

20   that.

21            THE COURT:  Well, you --

22            MR. MUEHLECK:  I agree.

23            THE COURT:  You get together over lunch and --

24            MR. MUEHLECK:  I agree to a redaction.

25            THE COURT:  See if you can agree on the redactions.

1          MR. WEIGHT:  Okay.

2                    (Counsel conferring.)

3          MR. MUEHLECK:  Yup.  We agree, Your Honor.

4          THE COURT:  Well, something new every day.

5          MR. MUEHLECK:  I must be wrong then, Judge.

6          MR. WEIGHT:  I'm a reasonable man, Your Honor.

7          I have no further questions for Mrs. Vo, Your Honor.

8          THE COURT:  I take it this is subject to recall?

9          MR. MUEHLECK:  Yes, same.

10         MR. WEIGHT:  Indeed, Your Honor, based on the bench

11    conference.

12         THE COURT:  Very well.  So you may step down.

13                              (Witness excused)

14         MR. MUEHLECK:  Can we approach, Judge?

15         THE COURT:  Yes.

16         MR. MUEHLECK:  Briefly.

17              (Bench conference on the record:)

18         THE COURT:  I am going to deny the Motion to Strike

19    that you made, Mr. Weight.  I find that that was relevant and

20    under 403, I find that substantially more probative than

21    giving rise to any unfair prejudice.  So I will allow that

22    testimony.

23         We still have to take up the Giglio and 404(b).  What

24    did you want --

25         MR. MUEHLECK:  Well, my witnesses are told to be here

1    at 1 o'clock, Your Honor, and the one -- next one I have is

2    Mr. Tashima.  Wayne Tashima.  We called him earlier this

3    morning and we told him it looked like this afternoon.

4            THE COURT:  Still have to call him after all this

5    testimony?

6            MR. MUEHLECK:  Well, I think he's going to have to

7    say, you know, that there was no deal, there is no deal.

8    There was no plea agreement.  She didn't plead.  She didn't

9    negotiate this plea, because I don't think that's very clear

10   and I think it should -- we should explain that to the jury

11   that the law --

12           THE COURT:  Apparently she didn't cooperate.

13           MR. MUEHLECK:  Well, I don't think it is.  I don't

14   think it's clear.

15           THE COURT:  -- she was the only person involved so

16   she --

17           MR. MUEHLECK:  Well, that's what we're doing.  I

18   would like to break early if we could, and I can get him here

19   at 12:30 and the rest of my people here, and we're going to --

20   is the court going to argue Giglio today, allow us to argue

21   that today?

22           THE COURT:  Well, what do your files look like?

23           MR. MUEHLECK:  Judge, I don't have -- I've got

24   like -- I don't have many other witnesses except on this

25   Giglio matter.  We're way ahead of schedule.  I think my case

1    will -- if we argue Giglio, my case will be done Tuesday

2    morning.  I've got, like, eight witnesses, six, seven

3    witnesses on this.  The rest of my witnesses deal with Mail

4    Boxes Etc. issue of the other -- the packages.  They deal --

5    there's a police officer and that's -- that's about it, Judge.

6    I've told them to stay back until we handled this issue.  I've

7    got a Hawaiian Airlines lady that I've got on standby, give

8    her a call.  I've got --

9                THE COURT:  Airlines?

10               MR. MUEHLECK:  Hawaiian Airlines on the who traveled

11   first, who was going home first.  It's interesting that Mr. Vo

12   was going back home before Mrs. Vo.  And had always planned

13   to.

14               THE COURT:  Okay.  Well, let's --

15               MR. MUEHLECK:  Just thinking that we could have a

16   little bit shorter day today because we're not going to -- I

17   don't see how we're going to do six days.  I thought we would

18   be in trial four days.  We're in trial two days.

19               THE COURT:  Couldn't you stretch it out?

20               MR. MUEHLECK:  You want us to try, Judge?  I mean --

21   we cleared the decks for next week, Your Honor.

22               THE COURT:  Okay.  I'll -- we'll go ahead and break

23   until 1:00.

24               MR. MUEHLECK:  Until 1 o'clock?  Thank you.

25                         (End of bench conference.)

1          THE COURT:  The court is going to deny the defense

2     Motion to Strike the testimony.

3          And we're going to break now, give you a little

4     longer lunch hour.  Please be back at 1 o'clock.

5          (The following proceedings were held in open court

6     out of the presence of the jury:)

7          THE COURT:  One thing I did want to take up with

8     counsel in conjunction with the 404(b) motion, and that is I

9     think I need an offer of proof as to what sort of a statement

10    the government would be attempting to elicit from Mrs. Vo.  As

11    I understand it, it's something to -- to the effect that many

12    of the things in the house were the result of drug money or

13    something like that.  What is that?

14         MR. MUEHLECK:  Conversation is Mrs. Vo asking the

15    defendant about where the money -- the two conversations,

16    where the money that she saw him with came from.

17         THE COURT:  Money or --

18         MR. MUEHLECK:  Monies.  Money, Judge.  And his

19    response --

20         THE COURT:  What -- she saw money lying around in the

21    house or what?

22         MR. MUEHLECK:  Money in protein boxes, Judge.

23         THE COURT:  Pardon me?

24         MR. MUEHLECK:  Protein boxes, like weight-lifters,

25    body-builders use protein packages, and they put it in boxes.

1    It's boxed.

2             THE COURT:  Like -- like how much?  Or a lot?

3             MR. MUEHLECK:  She saw him take hundred dollar bills,

4    a couple hundred dollar bills from it.  It was obviously money

5    in protein boxes, had seen him on a couple of occasions and

6    questioned him about it -- this.

7             THE COURT:  So she said:  Where did the money come

8    from?

9             MR. MUEHLECK:  Where is this coming from?  And one

10   occasion saying:  Never -- never mind where this comes from.

11   And then another occasion asking him about financing the house

12   and if it was -- if it was drug money.  And he said:  I'm

13   not -- not dealing drugs anymore.  My drug-dealing days are

14   over.

15             This is in '98, while they're buying the house,

16   Judge, before they're married, before the house is purchased

17   in his apartment, his previous apartment before they move into

18   this house.

19             THE COURT:  And she asked him:  Where did the

20   money -- or where's the money going to come from for financing

21   the house, are you -- is this drug money?

22             MR. MUEHLECK:  Yes.  She also asks him, while he's in

23   this apartment before they buy the house, about a guy that's

24   died from steroids, a friend of his, a common friend, and if

25   he was involved in steroids, too.  And his response was he's

1  not -- he's not doing -- he's not dealing drugs anymore -- not

2  dealing drugs anymore.  Those days are over.

3          THE COURT:  But we don't know what that relates to.

4          MR. MUEHLECK:  Well, we -- we do know that he's had a

5  criminal conviction for -- under the state for distribution of

6  cocaine.

7          THE COURT:  In '88.  That's a long time ago.

8          MR. MUEHLECK:  Well, again, I believe in my memo,

9  I've tried to set forth for the court that there's no hard,

10 fast rule about time.

11         THE COURT:  Yeah, you came up with a case that

12 involved 13 years, I think.  This is longer than that.

13         MR. MUEHLECK:  Well, again, the position is, Your

14 Honor, that if we subtract the time when he's in custody,

15 which is appropriate, and the Ninth Circuit has affirmed

16 that --

17         THE COURT:  Well, I think what the Ninth Circuit did

18 in that case that you cited was that involved ten years.  I

19 think the conviction was ten years old and the trial judge --

20 I haven't studied the case that thoroughly, but the trial

21 judge simply said:  Well, it's only ten years and moreover you

22 were in prison some of that time.

23         MR. MUEHLECK:  That's correct.

24         THE COURT:  And the Ninth Circuit simply affirmed

25 him.

1          MR. MUEHLECK:  That's -- that's correct.

2          THE COURT:  But didn't lay out some rule that custody

3  is necessarily excluded from the time consideration.

4          MR. MUEHLECK:  No, but I -- I think what the Ninth

5  Circuit saying -- was saying that the judge's balancing and

6  taking that into consideration was appropriate.

7          THE COURT:  I don't know.  I mean you could read it

8  as the Ninth Circuit saying:  Well, ten years is not too long

9  and we just won't really consider whether he was incarcerated

10  or not.

11          MR. MUEHLECK:  Well, again, we're talking about a

12  conspiracy that starts in 2001.  I -- I agree.  We're talking

13  about cases -- a couple cases I've submitted -- excuse me --

14  submitted to the court talked about 13 years not being too

15  old.  The other cases that I submitted talked about having no

16  hard, fast bright line is the expression they use, bright line

17  rule, and that the court has to look at all of it, the nature

18  of the -- the prior conduct, what that's offered for, how

19  similar it is, what the -- the issues are, what the crime

20  charged is.

21          At this point our position is that we have to show

22  knowledge, we have to show intent for both offenses.

23  Mr. Weight, in his request for instructions and in his

24  cross-examination and in his arguments, had -- has painted the

25  picture of his client as a businessman and an aspiring actor

1    and a body-builder who just happened to be living with someone

2    who is a big drug dealer, and that his presence with her is

3    sort of innocent, he's sort of just a bystander.  He doesn't

4    have the intent and didn't join in a conspiracy, didn't have

5    knowledge of even what was going on apparently.  That she's

6    away on these trips for months at a time, doing her thing.

7          So I think, I submit to the court, that a conviction

8    precisely for a distribution of drugs, although they call it

9    Promoting Dangerous Drugs in the Second Degree, by the

10   defendant is highly relevant for the government that has the

11   burden, the affirmative burden to prove these things.

12         THE COURT:  And -- and it's your position that you

13   measure the time from the date of the -- of the crime which is

14   currently being charged rather than the date of the trial?

15         MR. MUEHLECK:  No, I think it's -- the cases talk

16   about the time of the -- the particular crime because they

17   say -- well, the conviction, I should say -- they say that the

18   fact that he was convicted is one of the reasons that you know

19   that it's certainly good evidence; that there's a judicial

20   determination that the act was committed.  The offense was

21   committed.

22         THE COURT:  Well, what I was trying to ask you was,

23   is it your position that you measure the time ten years, 13

24   years, whatever --

25         MR. MUEHLECK:  From the date of the conviction, Your

1    Honor?

2             THE COURT:  -- from the date of the -- well, from the

3    date of the conviction to the date of the currently charged

4    crime --

5             MR. MUEHLECK:  Yes.

6             THE COURT:  -- or the date of the trial of the

7    currently --

8             MR. MUEHLECK:  No, the date of the charged crime.

9    Not the date of the trial.

10            THE COURT:  So it's your position that '88 would be

11   13 years then.

12            MR. MUEHLECK:  To -- to 2001.  Which is the intent at

13   this point.

14            THE COURT:  Thank you.  Do you want to say something,

15   Mr. Weight?

16            MR. WEIGHT:  Well, Your Honor, I was handed the memo

17   this morning.  I haven't had a chance to study it, the

18   response.

19            THE COURT:  I haven't either.  So I'm in the same

20   boat with you.

21            MR. WEIGHT:  So I think we might both do well to read

22   it and study it a bit before --

23            THE COURT:  I didn't mean to rule on it now.  I just

24   wondered if you wanted to --

25            MR. WEIGHT:  No, I don't want to make any comment on

1    it yet.

2            THE COURT:  Okay.  Let's break for lunch.

3        (A recess was taken from 11:45 a.m. to 1:05 p.m.)

4            (The following proceedings were held in open court in

5    the presence of the jury:)

6            MR. MUEHLECK:  Like to offer Government Exhibit 18

7    into evidence at this time, Your Honor.

8            THE COURT:  Very well.  Any objections, Mr. Weight?

9            MR. WEIGHT:  No, Your Honor.  It's been appropriately

10   redacted.

11           THE COURT:  Very well.  18 is admitted.

12       (Government's Exhibit 18 was received in evidence.)

13           MR. MUEHLECK:  Call our next witness, Your Honor?

14           THE COURT:  You may.

15           MR. MUEHLECK:  Wayne Tashima.  May I step outside for

16   a moment, Judge?

17           THE COURT:  You may.

18           MR. MUEHLECK:  Thank you.

19               (Pause in the proceedings.)

20                   WAYNE TASHIMA,

21   called as a witness by the Government, having been first duly

22   sworn, was examined and testified as follows:

23           THE CLERK:  Please be seated.

24           THE WITNESS:  Thank you.

25           THE CLERK:  Please state your name and spell your

1    last name.

2              THE WITNESS:  My name is Wayne Tashima,

3    T-A-S-H-I-M-A.

4              MR. MUEHLECK:  Excuse me, Your Honor.

5                      DIRECT EXAMINATION

6    BY MR. MUEHLECK:

7    Q    Mr. Tashima, how are you employed?

8    A    I'm a Deputy Prosecutor with the City and County of

9    Honolulu.

10   Q    And you've been an attorney how long?

11   A    Approximately 23 years.

12   Q    And do you know a Brenda Marie Cooper?

13   A    Yes.

14   Q    How do you know Brenda Marie Cooper?

15   A    I represented her when I was doing defense -- criminal

16   defense work and I believe it was 1995, 1996.

17   Q    Do you remember the nature of the criminal charges

18   against her?

19   A    Yes, she was charged in state court with two counts of

20   Promoting a Dangerous Drug in the First Degree.

21   Q    And do you recall what the drug was?

22   A    I can't recall.

23   Q    All right.  You recall the resolution of that case or the

24   disposition of that case?

25   A    Yes.  She pled no contest to both counts and she was

TASHIMA - DIRECT

1   sentenced to ten-year terms of probation for each count to run

2   concurrent.

3   Q    Was there a plea agreement in that case?

4   A    No.

5   Q    Did you bargain with the Prosecutor's Office in that

6   case?

7   A    We tried to, but we didn't reach any agreements.

8   Q    How did you get a no contest -- how did you get a

9   probation sentence, ten-year probation then?

10  A    The state law authorized probation for Class A felonies,

11  which these were, and my understanding or my belief is the law

12  was changed in 1995 to allow probation for Class A felony drug

13  cases.  So, therefore, fortunately for her, she qualified

14  under that.  We argued before Judge Perkins in state court and

15  he granted her probation.

16  Q    Did Ms. Cooper have to give up information concerning her

17  drug activities in order to get this sentence?

18  A    Not with my knowledge.

19  Q    Did you have friends in the Prosecutor's Office that you

20  tried to pull strings with to get this probation sentence?

21  A    I had friends, but no string pulling.

22  Q    And no contest, why did you plead no contest versus

23  guilty?

24  A    In state court it's common for defendants to plead no

25  contest because rather than acknowledge guilt, they'd rather

1    just not contest the charge, although it's treated the same as

2    a guilty plea, and they feel better about it.

3    Q    The defendants feel better about it, you mean?

4    A    Defendants feel better about it.

5    Q    How often do you get no contest pleas when you were in

6    private practice doing defense work?

7    A    I'd say 90 percent of the cases.

8    Q    Did you have to negotiate in order to get a no contest

9    plea, did you have to negotiate with a prosecutor to get a no

10   contest plea for your client?

11   A    No, it was defendant's choice.  Although some judges did

12   require a guilty plea, others did not care and you could plead

13   guilty or no contest.

14   Q    And how long were you in private practice doing criminal

15   defense work, sir?

16   A    A little more than eight years.

17   Q    And prior to that your legal employment was?

18   A    I was with the city prosecutors from 1980 to 1988.

19   Q    And I take it, you've -- you rejoined them when?

20   A    In July of 1997.

21   Q    And your position there since July of '97?

22   A    I'm a team captain.

23   Q    Which is, what does that mean in the rank and file?

24   A    We have felony teams where we're divided up into five

25   teams and I captain one of the teams, which compose or is

1    comprised of approximately five attorneys.

2              MR. MUEHLECK:  Moment, please, Your Honor.

3                       (Pause in the proceedings.)

4              MR. MUEHLECK:  I don't have any questions.

5              THE COURT:  Mr. Weight?

6              MR. WEIGHT:  Thank you, Your Honor.

7                       CROSS-EXAMINATION

8    BY MR. WEIGHT:

9    Q    Mr. Tashima, who was the Deputy Prosecuting Attorney

10   handling this case for the government?

11   A    You're talking about the state case?

12   Q    Yes.

13   A    Brian Sano.

14   Q    And did you know Brian Sano before you undertook

15   representation of Mrs. -- Ms. Brenda Cooper?

16   A    I knew who he was.

17   Q    You knew who he was, that's all?

18   A    By name.

19   Q    Okay.  You didn't know him personally?

20   A    No.

21   Q    Okay.  Prior to your undertaking this case, you said it

22   was in '95 or '96?

23   A    The reason I say '95 is I believe the change of plea took

24   place in January '96.  So, I would assume I represented her

25   late '95.

1    Q    You're aware that the criminal number in this case is

2    93-0126; that's a 1993 criminal number, isn't it?

3    A    Correct.

4    Q    Meaning that the case was indicted at that time in 1993;

5    that's when it got its criminal number, didn't it?

6    A    Correct.

7    Q    And then you came into the case about when, do you know?

8    A    The year, I -- I believe it's 1995.  The date, I don't

9    recall.

10   Q    Were you hired immediately, were you the first attorney

11   on the case?  Or I should say the only attorney on the case?

12   A    I'd be guessing, but I believe she had a Mainland

13   attorney initially that contacted me here and I picked up

14   representation in Hawaii.

15   Q    And when she came to Hawaii, she had been living on the

16   Mainland and had to come back to Hawaii to face these charges?

17   A    I assume that, since she had a Mainland attorney.

18   Q    Okay.  And she had bail set at $20,000; is that right?

19   A    The amount I'm not sure.

20   Q    But she had bail set?

21   A    Correct.

22   Q    And she was released on bail after she came back to

23   Hawaii and -- and appeared in court?

24   A    As far as I recall, yes.

25   Q    Okay.  Now, in 1993, which is when this case was

1    indicted, the law under which she was charged carried with it

2    only one sentence; isn't that true?

3    A    Yes.

4    Q    20 years in prison, period; no probation, no nothing,

5    straight prison?

6    A    Correct.

7    Q    And you're saying that in 1995 that law was amended in

8    drug cases only for Class A felonies.  That's what we're

9    talking about, right?

10    A    Correct.

11    Q    Amended so that a judge could in his or her discretion

12    grant probation?

13    A    Correct.

14    Q    Now, in the course of your representation, you attempted

15    to get the charges against her dismissed, didn't you?

16    A    Yes.

17    Q    And you filed a motion to that effect which you didn't

18    win?

19    A    Yes.

20    Q    The judge did not throw them out?

21    A    No.

22    Q    At which point you then say you tried to negotiate

23    something with the prosecutors, negotiate something with the

24    state?

25    A    I can't recall if I specifically did something, but in

1    most cases you try as a defense attorney to get the charges

2    either reduced or some kind of sentencing consideration.

3    Q    And did you talk to Mr. Sano in this case about that?

4    A    I may have in terms of reducing the offenses to Class B

5    felonies.

6    Q    Wouldn't it be normal, Mr. Tashima, in a circumstance

7    like this where the prosecutor says:  Well, look, you know,

8    I'm not going to reduce this in grade from a Class A to a

9    Class B; if they were to tell you that, wouldn't you then at

10   least try to say:  Well, look, if we plead straight up, that

11   is plead as charged, would you at least not oppose a motion to

12   get her out on probation?  Wouldn't you do that?

13   A    If the offense was probationable.

14   Q    And this now was in 1995, '96, because by then the law

15   changed, you say?

16   A    Correct.

17   Q    So didn't you do that with Mr. Sano in this case?

18   A    I can't recall if I asked him to take a position on that.

19   We may have pretried the case before Judge Perkins to get his

20   indication, and that's why she may -- she pled because of

21   that --

22   Q    Sure.

23   A    -- indication.

24   Q    And a pretrial is kind of like a little preview for the

25   judge where you and Mr. Sano would go and sit down with Judge

1    Perkins, right?

2    A     Yes.

3    Q     And Judge Perkins would say:  What's this case all about?

4    And Sano would say:  Well, this lady is charged with selling

5    an ounce of crack and an ounce of coke to the DEA back in '91.

6    And he would say something like:  Okay.  Well, what are you

7    guys going to do with this, you going to trial or we got a

8    deal going here?  And you would probably say:  Well, we'd kind

9    of like to know what Your Honor might do if we enter a plea of

10   guilty straight up; isn't that about the way it would go?

11   A     Guilty or no contest, correct.

12   Q     Right.  And the judge would likely say to you:  Well,

13   tell me a little more about the case.  And you would talk to

14   him about the background of the case --

15         MR. MUEHLECK:  Well, I'm going to object if we're

16   asking for guessing how things --

17         THE COURT:  Sustained.

18         MR. MUEHLECK:  -- Would go.

19   BY MR. WEIGHT:

20   Q     Okay.  What went on in this case?

21   A     The case itself?

22   Q     No, what went on in the negotiations or the pretrial with

23   Judge Perkins?

24   A     To be honest with you, I can't recall because there are

25   no notes that I have that reflect any kind of conversation or

1    pretrial.

2    Q    Have you reviewed your file in the case?

3    A    I did.

4    Q    And based on your common practice at the time, can you

5    reconstruct with some degree of accuracy what almost certainly

6    went on at that pretrial conference?

7    A    No, because I did not take any notes of that conference,

8    if there was one.  I'm just saying that it's common practice

9    to have one in cases where you -- you want to get the judge's

10   indication.

11   Q    And it's common practice to get the judge not to give you

12   a firm commitment but to say:  Well, if these facts are as you

13   say they are, then I'll probably put her on probation?

14   A    Correct, after he looks at the presentence report.

15   Q    Right.  And in this case you ended up pleading her

16   straight up to the two charges against her?

17   A    That's correct.

18   Q    Did Mr. Sano oppose probation at sentencing?

19   A    I believe he did because it was the practice of the

20   prosecutors to oppose probation.

21   Q    And you called witnesses on her behalf at sentencing?

22   A    That I can't recall.

23   Q    Isn't it a fact you called her father, Richard Cooper, to

24   testify?

25   A    I know I called him, but it -- it may have been for the

1    motion.

2    Q    Okay.  And at any rate, you were able to get her ten

3    years of probation?

4    A    I'd like to believe I convinced the judge of that.

5    Q    Well, somebody did, Mr. Tashima; isn't that so?

6    A    Yes.

7    Q    And you are not now her attorney because obviously you're

8    working for the government?

9    A    That's correct.

10   Q    Prosecuting Attorney.

11          MR. WEIGHT:  I have no other questions for

12   Mr. Tashima, Your Honor.

13          THE COURT:  Any redirect?

14          MR. MUEHLECK:  Yes, briefly.

15                    REDIRECT EXAMINATION

16   BY MR. MUEHLECK:

17   Q    And would that result of probation also be affected

18   because she had no criminal record?

19   A    That would be a factor, but I can't recall what her

20   background was.

21   Q    Okay.  And she hadn't -- had to do -- she didn't have to

22   do anything for this, Mr. Tashima, to testify?

23   A    No.

24   Q    To incriminate people?

25   A    No.

```
 1   Q    To give information to the police about what she knew?
 2   A    No.  The only thing she did was to comply with conditions
 3   of probation.
 4             MR. MUEHLECK:  Thank you.
 5             MR. WEIGHT:  Recross, Your Honor?
 6             THE COURT:  You may.
 7                        RECROSS-EXAMINATION
 8   BY MR. WEIGHT:
 9   Q    Mr. Tashima, you picked up this case in either late '95
10   or early '96, according to the records; is that right?
11   A    That's correct.
12   Q    The events we're talking about occurred in 1991; isn't
13   that correct?
14   A    As far as I recall, that's correct.
15   Q    Are you aware of any deals that your client had
16   negotiated with or any cooperation she had given the DEA prior
17   to her being charged in state court?
18   A    I can't recall any kind of deals.
19   Q    Because you don't know?
20   A    I don't know.
21             MR. WEIGHT:  No further questions.
22             THE COURT:  Anything more, Mr. Muehleck?
23                        REDIRECT EXAMINATION
24   BY MR. MUEHLECK:
25   Q    When you came into the case, Mr. Tashima, would it have
```

1   been common practice for you to talk to the other attorney to

2   see if there were any deals on the table or being discussed?

3          MR. WEIGHT:  Objection, Your Honor.  Vague and

4   ambiguous.  What other attorneys?

5          MR. MUEHLECK:  Not -- well, we talked about a

6   Mainland attorney.

7          THE COURT:  I'll overrule the objection.

8          MR. MUEHLECK:  Thank you.

9   BY MR. MUEHLECK:

10  Q     Would -- go ahead.

11  A     It would be common practice to discuss the case with any

12  counsel she may have had prior.

13  Q     And the Mainland attorney brought you in?

14  A     Yes, as far as I remember, that's what the sequence of

15  events was.

16  Q     And do you remember any conversations about any deals

17  that were on the table in negotiations?

18  A     The only thing I remember is that Mainland attorney

19  wanted to have someone represent her here or to sponsor the

20  Mainland attorney where he would come down and represent her

21  with a local attorney sitting on his side.

22  Q     Sponsor the Mainland attorney before the local court?

23  A     Correct, because he wasn't licensed here, but it turned

24  out that she just hired me outright.

25         MR. MUEHLECK:  Thank you.

1          THE COURT:  That's it?

2          MR. WEIGHT:  That's it, Your Honor.

3          THE COURT:  Thank you.  You may step down.

4          THE WITNESS:  Thank you, Judge.

5                                        (Witness excused)

6          MR. MUEHLECK:  Call our next witness, Your Honor?

7          THE COURT:  Please.

8          MR. MUEHLECK:  Janette Freeman.

9                    JANETTE FREEMAN,

10  called as a witness by the Government, having been first duly

11  sworn, was examined and testified as follows:

12          THE CLERK:  Please be seated.

13          Please state your name and spell your last name.

14          THE WITNESS:  It's Janette, J-A-N-E-T-T-E, Freeman,

15  F-R-E-E-M-A-N.

16                  DIRECT EXAMINATION

17  BY MR. MUEHLECK:

18  Q    Ms. Freeman, how are you employed?

19  A    I work at Hawaiian Airlines.

20  Q    And what is your position at Hawaiian Airlines?

21  A    I'm manager of the legal department.

22  Q    As the manager of the legal department, have you any

23  familiarity with the records kept by Hawaiian Airlines?

24  A    Yes.

25  Q    You ever had occasion to review records kept by Hawaiian

1    Airlines?

2    A    Yes.

3    Q    And as the manager of the legal department, have you ever

4    had occasion to testify --

5    A    Yes.

6    Q    -- concerning the records kept by Hawaiian Airlines?

7    A    Yes.

8         MR. MUEHLECK:  Approach the witness with 23 and 24,

9    Your Honor, if I could, please?

10        THE COURT:  You may.

11        MR. MUEHLECK:  Copy for the court (handing document).

12   BY MR. MUEHLECK:

13   Q    Exhibit 23 marked for identification, would you take a

14   look at that, please, Ms. Freeman, and tell me if you can

15   identify that document?

16   A    Sure.  The first page is a copy of the electronic ticket

17   that's attached to the reservation record on pages -- the

18   following pages.

19   Q    Okay.  Are those records kept -- are they -- whose

20   records are they?

21   A    Hawaiian Airlines.

22   Q    Kept in the normal course of business?

23   A    Yes.

24   Q    By persons with a duty to make those records?

25   A    Yes.

1  Q    And keep the entries -- make the entries in the records?

2  A    Yes.

3  Q    All right.  Does Hawaiian Airlines normally rely on the

4  entries in those records in its normal course of business?

5  A    Yes.

6  Q    And have you provided these records prior to court to the

7  Drug Enforcement Administration?

8  A    Yes.

9         MR. MUEHLECK:  Offer --

10  BY MR. MUEHLECK:

11  Q    And 23 is what; a record for who, please, ma'am?

12  A    For Ricky Vo.

13         MR. MUEHLECK:  Offer 23 into evidence.

14         MR. WEIGHT:  No objection.

15         THE COURT:  23 is admitted.

16      (Government's Exhibit 23 was received in evidence.)

17  BY MR. MUEHLECK:

18  Q    Let's do 24 then.  Take a look at 24, familiarize

19  yourself with it.  Have you seen that before, Ms. Freeman?

20  A    Yes.

21  Q    What is that, please?

22  A    It's the electronic ticket record for Brenda Vo attached

23  to the reservation record following this page.

24  Q    And same question, kept by Hawaiian Airlines?

25  A    Yes.

1    Q    In the normal course of business?

2    A    Yes.

3    Q    By persons with a duty to make those entries?

4    A    Yes.

5    Q    And are the records relied upon in the operation by

6    Hawaiian Airlines in their normal course of operations?

7    A    Yes.

8         MR. MUEHLECK:  Offer that exhibit into evidence, 24,

9    Your Honor.

10        MR. WEIGHT:  No objection, Your Honor.

11        THE COURT:  24 is admitted.

12   (Government's Exhibit 24 was received in evidence.)

13        MR. MUEHLECK:  Your Honor, I have copies for the

14   jury.  If I could pass them out?

15        MR. WEIGHT:  Your Honor, I'm going to object to that

16   as a waste of time.  The jury will get these in due course.

17        THE COURT:  Yeah, I don't think that's necessary.

18   Let's proceed without that.

19        MR. MUEHLECK:  Thank you.

20   BY MR. MUEHLECK:

21   Q    23 you said is an electronic ticket?

22   A    Yes.

23   Q    Okay.  For a passenger by the name of Ricky Vo?

24   A    Yes.

25   Q    Can you tell us what this electronic ticket is, ma'am?

1    A    It's --

2    Q    What it represents?

3    A    It represents a travel document.  Before it used to be a

4    piece of paper that you checked in with and this is the

5    electronic version of that.

6    Q    Can you tell us what trip -- does this represent a trip?

7    A    Yes.

8    Q    What is the trip it represents?

9    A    Well, actually what it represents is his itinerary, which

10   is on the bottom.  He was scheduled to go from Los Angeles to

11   Honolulu on October 1st and return Honolulu/Los Angeles on

12   October 5.  That was what the ticket was purchased for.  And

13   the document activity line is where we actually -- what we

14   call a lift of a ticket, where you pull the ticket for travel,

15   and he traveled on October 1 from Los Angeles to Honolulu.

16   Q    Okay.  Can you tell us looking at it if -- looking at the

17   document, not just the front page but the other pages, if

18   there were any changes to his travel itinerary?

19   A    Yes, there were several changes.

20   Q    Please explain.

21   A    He originally booked to leave on the 4th of October on

22   the same --

23   Q    To leave where?

24   A    I'm sorry, Los Angeles -- I mean Honolulu, his return --

25   on his return leg.  So he came to Honolulu on the 1st.  And

1    it's the return that he made changes on.

2    Q    What changes -- when were the changes made, can you tell

3    us?

4    A    On -- initially when he made the reservation on September

5    30, he changed the return from the 4th of October to the 5th

6    of October.  And then he subsequently changed it to the 6th of

7    October, and he was supposed to depart on the 6th of October,

8    and when he appeared at the airport, he was supposed to pay

9    $100 for the date change.

10   Q    When was the change in the travel made?

11        THE COURT:  Which change?

12   BY MR. MUEHLECK:

13   Q    The last change we're talking about, the 6th.  It was --

14   he was supposed to travel on the return on the 6th, or what is

15   the date --

16   A    Right -- well, okay.  On the 5th of October, he was

17   suppose -- I'm sorry.  On the 30th of September, he changed it

18   to travel on our Flight 4, which is the red eye, on the 5th of

19   October.

20   Q    So red eye back from Honolulu to California?

21   A    To Los -- yes.  And then --

22   Q    This is the day he made the original reservation, the

23   30th --

24   A    Right.

25   Q    -- of September of the year 2002?

```
 1   A    Right.  And then on the 4th of October, there was a
 2   schedule change and he was still supposed to go back on the
 3   5th, but they ticketed, because it was a date change from the
 4   4th to the 5th, so they ticketed for the 5th.  And then --
 5   Q    Did he make that flight on the 5th?
 6   A    No, he didn't.
 7   Q    Why?  Can you tell us?
 8   A    It looks like he wasn't going to make the flight.  So
 9   they -- Brenda Vo called in and changed it to the 6th.
10   Q    And what day was that change made?
11   A    On the 5th of October.
12   Q    So he was originally scheduled to return from Honolulu to
13   California on what day?
14   A    5th.
15   Q    Originally.  And that was the day the reservation was
16   made, on the 30th of September?
17   A    Right.
18   Q    And then it was changed the day it was made, the same day
19   it was changed?
20   A    Well, originally it was on the 4th.
21   Q    Okay.
22   A    So then it changed to the 5th, that same day.
23   Q    Right.
24   A    And then on the 5th of October, they changed it to the
25   6th of October.
```

 1   Q    Okay.  And on October 4th --

 2   A    Mm-hmm.

 3   Q    -- was there any activity on the record to show a change?

 4   A    On October 4th, the only thing that it shows is that they

 5   ticketed on the 4th for the 5th.

 6   Q    Okay.  An electronic ticket again?

 7   A    Correct.  Correct.

 8   Q    Let me ask you to look at the next document, which is the

 9   Exhibit 24.  You said this is for a Brenda Vo?

10   A    Yes.

11   Q    And looking at the electronic ticket and in comparison --

12   Brenda Vo's electronic ticket in Exhibit 24 to Rick Vo's

13   ticket in Exhibit 23, can you tell us anything about when the

14   tickets were issued or reservations were made or anything like

15   that?

16   A    Brenda Vo's Los Angeles/Honolulu travel was October 1

17   returning on October 9.  And --

18   Q    What day was she supposed to return from Honolulu to

19   California?

20   A    9th of October.

21   Q    All right.

22   A    And the activity shows that she did travel on the 1st,

23   the ticket was lifted and -- but there was a refund on the

24   return on the 18th of March.

25   Q    Of this year?

1    A    Yes.

2    Q    Okay.

3    A    So she didn't take that trip.

4    Q    All right.  Any changes in the records, do you see any

5    changes, can you find any records of changes in the October

6    9th date?

7    A    Yes.

8    Q    What are the changes?

9    A    When she initially made the reservation on the 30th of

10   September, she also -- she was originally on Flight 2 on the

11   9th of October, but then changed it to Flight 4, which is the

12   red eye.  Flight 2 leaves in the afternoon.  And -- and then

13   she called back and changed it back to the afternoon flight

14   and canceled the red eye flight on the same day.

15   Q    So we're just changing the times of the departures on

16   October 9th?

17   A    Correct.

18   Q    Any other changes that Brenda Vo made to her ticket or

19   are made to her reservation on that trip?

20   A    And then on -- let me see, on the 1st of October, I think

21   probably when she checked in at the airport, I'm not sure if

22   that's the right time, but on the 1st of October, they're

23   reverifying that she has the seat on Flight 2, which is the

24   afternoon flight, on the 9th of October.

25   Q    So her return is always on the 9th of October?

1    A     Correct.

2    Q     Just the -- which flight it is, red eye or afternoon,

3    changes?

4    A     Correct.

5              MR. MUEHLECK:   Moment please, Your Honor?

6                         (Pause in the proceedings.)

7    BY MR. MUEHLECK:

8    Q     And the times that are on here, you're reading what

9    times, ma'am?

10   A     The time stamp on each entry is Tulsa, Oklahoma time

11   because that's where the server for our reservation system

12   resides.

13   Q     Did they come over together on the same flight, Brenda

14   and Rick Vo?

15   A     Yes.

16   Q     When you change flights, is there a charge?

17   A     Yes, there's a -- what we call an add/collect fee, and if

18   it's a date change, it's a $100 fee, if it's the same class of

19   service is available.

20   Q     Did Rick Vo incur any changes of a hundred dollar fee in

21   the records, if you can tell us?

22   A     Yeah, he would have -- if he had traveled, he would have

23   had to have paid a hundred dollars for the date change.

24   Q     Are they told -- are customers told that when they change

25   their tickets?

1   A    Yes, they are.

2           MR. MUEHLECK:  Pass the witness.

3           MR. WEIGHT:  No questions.

4           THE COURT:  Thank you.  May be excused.

5                              (Witness excused)

6           MR. MUEHLECK:  Call our next witness, Your Honor?

7           THE COURT:  Please.

8           MR. MUEHLECK:  Elaine Burton.

9                   ELAINE BURTON,

10   called as a witness by the Government, having been first duly

11   sworn, was examined and testified as follows:

12           THE CLERK:  Please be seated.

13           Please state your name and spell your last name.

14           THE WITNESS:  My name is Elaine Burton.  My last name

15   is spelled B, as in boy, U-R-T, as in Tom, O-N, as in Nancy

16                   DIRECT EXAMINATION

17   BY MR. MUEHLECK:

18   Q    Ms. Burton, let me ask you, are you employed?

19   A    Yes.

20   Q    How are you employed?

21   A    I'm an evidence specialist for the Honolulu Police

22   Department.

23   Q    How long have you been an evidence specialist for HPD?

24   A    Since 1986.

25   Q    And what are your duties as an evidence specialist with

1    HPD?

2    A    I assist the police department in documenting and

3    processing the scene.

4    Q    You have any training or any -- do any work with

5    collection of fingerprints?

6    A    Yes.

7    Q    Latent fingerprints?

8    A    Yes, I do.

9    Q    What training do you have in that?

10   A    I have had a 40-hour course with the FBI and on -- on

11   duty training, and I'm a member of the International

12   Association of Identification, and I have qualified as a

13   senior crime scene analyst.

14   Q    As an evidence specialist and crime scene analyst, have

15   you ever been called to testify for purposes of an expert for

16   the collection of latent fingerprints?

17   A    Yes.

18   Q    How many times?

19   A    I -- I can't -- in 17 years, I guess quite a few times.

20   Q    In what -- what courts?

21   A    Circuit -- in district court and federal court.

22   Q    And crime scenes, do a number of crime scenes before?

23   A    Yes.

24   Q    How many, roughly?

25   A    500.

1           MR. MUEHLECK:   Approach the witness with Exhibit 9,

2    Your Honor?

3           THE COURT:  You may.

4    BY MR. MUEHLECK:

5    Q    Ms. Burton, have you seen Exhibit 9 before?

6    A    Yes.

7    Q    When have you seen that before?

8    A    May 7th, 2003.

9    Q    This year?

10   A    Wednesday, yes.

11   Q    Okay.  And what was the occasion that you happened to see

12   it on Wednesday?

13   A    Detective Jack Wright from HPD brought this material

14   to -- to the SIS office and I was assigned to --

15   Q    SIS -- I'm sorry, SIS is what?

16   A    Scientific Investigation Section.  Sorry.

17   Q    Thank you.  Please continue.

18   A    He came at about 11:55, and I was assigned to process

19   this evidence for latent fingerprints.

20   Q    And did you do so?

21   A    I did.

22   Q    How did you do it on Exhibit 9, please?

23   A    I used magnetic powder to process the plastic surfaces

24   that this material is made of.

25   Q    And you put -- okay, what, powder on it and then what?

1    A    I examined it with a magnifying glass and oblique

2    lighting, and recovered three latent prints from the -- an

3    item called a heat sealer.

4    Q    What did you did -- how did you recover them, ma'am?

5    A    I used tape to lift them, I put them on a card and filled

6    the card out according to protocol, and submitted them for

7    examination on the 5/8, the next day, at 7:55 in the morning.

8    Q    What was the quality of these prints in your opinion?

9    A    I thought they were possibly identifiable.

10    Q    Okay.  And who were they submitted to?

11    A    Just to the I.D. section.  There's a log that we fill out

12    and there are examiners, there's more than one, and the cards

13    are submitted with a chain of custody to a box, and I followed

14    the protocol.

15    Q    And the examiner, is that what you submit them to?  What

16    is the purpose of submitting them to an examiner, the latent

17    prints that you pull up?

18    A    My understanding is that they at first examine the prints

19    for quality, and then if they are deemed identifiable or

20    comparable, the prints are compared to inked prints, perhaps

21    those are submitted by or recommended by the detective who is

22    handling the case.

23    Q    Known prints of possible suspects; that is known

24    individuals that they've been identified with their prints?

25    A    That's one -- that's one approach, yes.

```
 1          MR. MUEHLECK:  Nothing further, Ms. Burton.
 2     Your Honor.
 3          MR. WEIGHT:  No questions.
 4          THE COURT:  Thank you.  You're excused.
 5                                   (Witness excused)
 6          MR. MUEHLECK:  Call our next witness, Your Honor?
 7          THE COURT:  Please.
 8          MR. MUEHLECK:  Stephanie Kamakane.
 9               STEPHANIE KAMAKANE,
10     called as a witness by the Government, having been first duly
11     sworn, was examined and testified as follows:
12          THE CLERK:  Please be seated.
13          Please state your name and spell your last name.
14          THE WITNESS:  Stephanie Kamakane, K-A-M-A-K-A-N-E.
15               DIRECT EXAMINATION
16     BY MR. MUEHLECK:
17     Q    Ma'am, let me ask you, how are you employed?
18     A    I am employed by the City and County of Honolulu,
19     Honolulu Police Department.
20     Q    In what capacity?
21     A    My title is a fingerprint identification technician.
22     Q    What does a fingerprint identification technician do?
23     A    Examine crime scene prints and try to effect
24     identifications with unknown prints to the known.  Also
25     unidentified decedents.
```

1    Q    How long have you done that?

2    A    Since 1988.

3    Q    Were you recently requested by Mr. Jack Wright to do an

4    examination of three lift cards prepared by Elaine Burton?

5    A    Yes.

6    Q    Of the Honolulu Police Department?

7    A    Yes.

8    Q    When did you -- and did you do an examination, ma'am?

9    A    I examined three lift cards, yes.

10   Q    Did you have any prints to compare them to?

11   A    Yes, I did.

12   Q    What prints or known prints did you have to compare the

13   three latent prints to?

14   A    I do not recall their names, their specific names.

15   Q    All right.  Did you prepare a report, ma'am?

16   A    Yes, I did.

17        MR. MUEHLECK:  Approach with 22 marked for

18   identification, Your Honor.

19        THE COURT:  You may.

20   BY MR. MUEHLECK:

21   Q    Ms. Kamakane, can you identify Government's Exhibit 22

22   marked for identification?

23   A    Yes.

24   Q    How can you identify that document?

25   A    My signature.

1    Q    What is that document, please?

2    A    This is a work request.

3    Q    Submitted by whom to whom?

4    A    Requested by Jack Wright to me.

5    Q    And Mr. Wright is what, an investigator with the Honolulu

6    Police Department?

7    A    Yes.

8    Q    What were you asked to do in this request, please, ma'am?

9    A    To compare three lift cards that were recovered from

10   evidence specialist Elaine Burton.

11   Q    When did she -- I'm sorry, go ahead.  When did she

12   recover them?

13   A    On the May 7th, 2003.

14   Q    And did you take some action when you -- you get this in

15   your possession, this work request?

16   A    Yes.

17   Q    And what action did you take after getting this work

18   request, Ms. Kamakane?

19   A    I retrieved the latent prints that is requested under

20   that specific report number and did an analysis on the lift

21   cards to be compared against two subjects.

22   Q    And what subjects were you comparing -- the latent --

23   latent print means what?  I suppose I should ask you this.

24   A    The word "latent" means hidden.  And latent print is

25   something that's hidden and produced only through means of

1    dusting powder.  When you put it on a little feather and you

2    dust the object, it becomes visible to the eyes.  There are

3    other means of recovering latent prints also.  But this is one

4    of the methods and this is a method that evidence specialist

5    Elaine Burton had used.

6    Q    The latent prints that you received, in what fashion were

7    they received?

8    A    They were three lift cards in an envelope.  How she

9    recovered it was by dusting it, by dusting the object, putting

10   tape over and sealing it over a white background of index

11   card.

12   Q    And you compared those latent prints to what, please,

13   Ms. Kamakane?

14   A    Well, I examined the latent prints and deemed them to be

15   of no value.

16   Q    What do you mean they were of no value, ma'am?

17   A    They were just smudges and not enough characteristics in

18   the print itself to be compared to anyone.

19   Q    How long have you been doing this, this type of work?

20   A    Since 1988.

21   Q    Did you have a set of prints to compare them against?

22   A    Yes.

23   Q    Whose prints did you have to compare them against?

24   A    A Ricky Vo and a Brenda Vo.

25   Q    And when you say they didn't have enough characteristics,

1    what do you mean, the latent prints didn't have --

2    A    What is called a points of identity, there were not

3    enough distinct characteristics in the prints that I examined

4    to be compared to anyone.

5    Q    You couldn't compare it against anyone?

6    A    Correct.

7            MR. MUEHLECK:  Nothing further, Your Honor.  Offer

8    the exhibit, though, which is 22 marked for identification.

9            MR. WEIGHT:  No objection to the exhibit.  No

10   cross-examination.

11           THE COURT:  22 is admitted.

12   (Government's Exhibit 22 was received in evidence.)

13           THE COURT:  Thank you.  You may leave.

14                              (Witness excused)

15           MR. MUEHLECK:  Call our next witness, Your Honor?

16           THE COURT:  Please.

17           MR. MUEHLECK:  James Yuen.

18                    JAMES YUEN,

19   called as a witness by the Government, having been first duly

20   sworn, was examined and testified as follows:

21           THE CLERK:  Please be seated.

22           THE WITNESS:  Thank you.

23           THE CLERK:  Please state your name and spell your

24   last name.

25           THE WITNESS:  My name is James Yuen.  Last name is

1    Y-U-E-N.

2                    <u>DIRECT EXAMINATION</u>

3    BY MR. MUEHLECK:

4    Q    How are you employed, Mr. Yuen?

5    A    I'm employed as a special agent with the Drug Enforcement

6    Administration out of Honolulu, Hawaii.

7    Q    How long have you been with HPD?

8             Excuse me.  How long have you been with DEA?

9    A    Since 1991.

10   Q    Were you with HPD prior to being with DEA?

11   A    Yes, sir, I was.

12   Q    How long were you with HPD?

13   A    I was there from 1981 to 1991.

14   Q    And your duties with DEA are what?

15   A    To investigate the Controlled Substance Act, Title 21, of

16   United States Code.

17   Q    On October 6 of 2002, do you know if you were working

18   that day?

19   A    Yes, I was.

20   Q    What were your duties on that day?

21   A    My duties was to assist Special Agent Rich Jones and

22   others in the -- looking for Mr. -- Mr. Vo, Ricky Vo.

23   Q    Mr. Vo in the courtroom --

24   A    Yes, he is.

25   Q    -- Agent Yuen?

1    A    Yes.

2    Q    Point to him and tell me what he's wearing.

3    A    He -- he's seated to my far right on -- on the table

4    wearing the bluish color shirt with collar.

5          MR. MUEHLECK:  May the record reflect the witness has

6    indicated the defendant, Your Honor?

7          THE COURT:  The record will so reflect.

8    BY MR. MUEHLECK:

9    Q    And where were you looking for the defendant on the 6th

10   of October of last year?

11   A    It was at the Honolulu International Airport.

12   Q    Was the defendant found at the airport on the 6th of

13   October by federal agents last year?

14   A    Yes, he was.

15   Q    Do you know if he was taken into custody?

16   A    Yes, he was.

17   Q    Subsequent to his being taken into custody, you know if

18   any property was taken from him or from a vehicle?

19   A    Yes.

20   Q    What was taken, do you recall?

21   A    Well, also in -- inside the vehicle were -- was Mr. Vo

22   and Mrs. Vo, and -- and they were both placed under arrest and

23   taken from them were their properties.

24   Q    Do you know if any particular objects were taken from

25   Mr. Vo and Ms. Vo?

1    A    Personal items, they were to include self -- cellular

2    telephones.

3    Q    Did you take any cellular telephones from Mrs. Vo?

4    A    I was in possession of her purse and inside her purse

5    there were two cell -- cellular phones from Ms. Brenda Vo.

6    Q    What was done with those cellular phones, Agent Yuen?

7    A    What I did is that I extracted the numbers, the telephone

8    numbers from one of the cellular telephones inside of her

9    purse.

10    Q    Can you tell us the make of that particular phone?

11    A    There were two phones, I believe one of them was a

12    Nextel.

13    Q    And how did you extract numbers, can you explain to the

14    jury, please?

15    A    Okay.  Basically turn the phone on, scroll through the

16    menu items, anything in the phone such as names, recent calls,

17    personal information.

18    Q    When was that done in relationship to Mrs. Vo and

19    Mr. Vo's arrest on the 6th of October?

20    A    Okay.  Well, my -- my extraction of the phone started

21    about a little -- after 11:00 p.m., and the arrest was

22    sometime around 9:00-ish p.m.

23    Q    Did you make a record of this -- of this information?

24    A    Yes, I did.  As one of -- when I was looking through the

25    phones, I would write down on a note pad the -- the

1    information from the cellular phones.

2    Q    And was there a particular -- what -- what is the entries

3    called, can you tell us if it's a memory, or what are they

4    called for like the recorded recent calls and for the

5    memory -- the memory of the names; do you recall the features

6    on the phone?

7    A    I would have to review the notes that I had taken that

8    night.

9         MR. MUEHLECK:  May I approach the witness?

10        THE COURT:  You may.

11   BY MR. MUEHLECK:

12   Q    Do you have a copy with you, Agent Yuen?

13   A    No, sir, I don't.

14        MR. MUEHLECK:  May I approach the witness, Your

15   Honor?

16        THE COURT:  You may.

17        MR. MUEHLECK:  I've given a copy to defense, Your

18   Honor.

19   BY MR. MUEHLECK:

20   Q    Yeah, turn it face down, if you would, please.  Do you

21   recall the features on the phone that you looked at?

22   A    Yes.  Some of the features would be like a phone book

23   menu, features would be recent calls menu.

24   Q    And did you make those recordings?

25   A    Yes, I did.

1    Q    And are they on that sheet of paper in front of you?

2    A    Yes.

3    Q    Let me ask you if you recall an entry or reviewing an

4    entry or a notation of the name Crash Om?

5    A    Yes, I reviewed the notes and there is a name by that --

6    by Crash Om.

7         MR. MUEHLECK:  May I, Your Honor?

8         THE COURT:  You may.

9    BY MR. MUEHLECK:

10   Q    Could you tell us if it was spelled like this, what you

11   saw on the phone of Brenda Vo that night?

12   A    Yes.

13   Q    And could you tell us if there was any more information

14   with that notation, the name Crash Om?

15   A    Yes, associated with that name, I pressed the view --

16   well, the view item for that name and with it came a telephone

17   number.

18   Q    Do you recall that telephone number off the top of your

19   head?

20   A    No, I don't.

21   Q    If you looked at your notes, would it refresh your

22   memory?

23   A    Yes, it would.

24   Q    Please refresh your memory or look at your notes.

25   A    My memory has been refreshed.

1              MR. MUEHLECK:  May I, Your Honor?

2    BY MR. MUEHLECK:

3    Q    What was that number?

4    A    The number in its entirety was (818) 530-2456.

5    Q    (818) 530-2456?

6    A    Yes.

7    Q    This one, sir (indicating)?

8    A    Yes.

9    Q    Were there a number of other entries or entries that you

10   viewed on the phones?

11   A    Yes.

12   Q    And recent list of recent calls?

13   A    Yes.

14   Q    Did you see, happen to notice if there was a recent call

15   to this number?

16   A    No, there weren't -- there wasn't any recent calls to

17   that number.

18             MR. MUEHLECK:  Nothing further of the witness, Your

19   Honor.

20             MR. WEIGHT:  No cross.

21             THE COURT:  Thank you.  You're excused.

22                                      (Witness excused)

23             MR. MUEHLECK:  Call Agent Russell Woodward, Your

24   Honor.

25                       RUSSELL WOODWARD,

1    called as a witness by the Government, having been first duly

2    sworn, was examined and testified as follows:

3              THE CLERK:  Please be seated.

4              Please state your name and spell your last name.

5              THE WITNESS:  Russell Woodward, W-O-O-D-W-A-R-D.

6                        DIRECT EXAMINATION

7    BY MR. MUEHLECK:

8    Q    How are you employed, sir?

9    A    I'm employed by the City and County of Honolulu as a

10   police officer.

11   Q    How long have you been a police officer with the Honolulu

12   Police Department?

13   A    Over 28 years.

14   Q    28 years?

15   A    Yes.

16   Q    What is your assignment now, where are you working?

17   A    I'm currently assigned to the Hawaii airport task force,

18   cross-designated with the Drug Enforcement Administration as a

19   task force officer.

20   Q    Explain that to the jury, what do you mean you are

21   cross-designated, please?

22   A    I'm cross-deputized as a federal agent to work with the

23   Drug Enforcement Administration.

24   Q    Working as a cross-designated federal agent, are you

25   allowed to work with DEA and make arrests outside the state of

1     Hawaii?

2     A     Yes, I am.

3     Q     How long have you been cross-designated?

4     A     February last year, I came over.

5     Q     Let me ask you if you were -- and prior to working with

6     the DEA, what was your area of assignment?

7     A     I've had several throughout my career.

8     Q     Such as?

9     A     I've worked in Internal Affairs.  I've worked in Narcotic

10    Vice Division, Traffic Division.

11    Q     Let me ask you, officer, if you were -- I guess they call

12    you task force agent, Agent Woodward.  Is that -- Agent

13    Woodward, on the 6th of October of last fall, were you working

14    that day?

15    A     Yes, I was.

16    Q     2002?

17    A     Yes, I was.

18    Q     Where were you working?

19    A     Honolulu International Airport.

20    Q     What was your detail that day, October 6 of 2002?

21    A     We were called to assist the FBI in an investigation at

22    the airport.

23    Q     What were you trying -- what were you doing to assist

24    them, the FBI?

25    A     They were going to try and apprehend a suspect, Ricky Vo.

1    Q    Is that person in the courtroom?

2    A    Yes, he is.

3    Q    Point to him and tell me what he's wearing, please.

4    A    He's the gentleman seated to the right with the greenish

5    colored aloha shirt on.

6         MR. MUEHLECK:  May the record reflect the witness has

7    indicated the defendant.

8         THE COURT:  The record will so reflect.

9    BY MR. MUEHLECK:

10   Q    What activities, what actions did you take that day,

11   October 6, in assisting the FBI at the airport?

12   A    Well, I was part of the task force that was there, and

13   this is with the apprehension of Mr. Vo and his wife at the

14   airport.

15   Q    Where were they arrested at the airport, sir?

16   A    Fronting the Hawaiian Airlines baggage claim area inside

17   a vehicle.

18   Q    And subsequent to their arrest, did you examine any items

19   for evidentiary value?

20   A    Yes, I did.

21   Q    What did you examine?

22   A    Mr. Vo's telephone, cell phone.

23   Q    And how did you examine it, sir?

24   A    What I did is I turned it on and went through the

25   different things in the phone book and different modes of the

 1    phone.

 2    Q    And do you recall if you -- what you found or if you

 3    found anything at all?

 4    A    I found recent calls, I think there were 20 recent calls

 5    it holds.  I annotated that down on the note pad, and then I

 6    went through the phone book.  There's quite a few phone

 7    numbers in his phone book.

 8    Q    A phone book is what on a cell phone?

 9    A    It's like your private phone book, it has names and

10    usually phone numbers of people that you can call directly

11    from it.

12    Q    Do you recall off the top of your head any of the entries

13    in the phone book?

14    A    Off the top of my head, he had, I think, his wife's

15    phone, he had somebody called "mom."  I really can't remember

16    that many.

17    Q    Did you keep notes?

18    A    Yes, I did.

19         MR. MUEHLECK:  Approach the witness, Your Honor?

20         THE COURT:  You may.

21    BY MR. MUEHLECK:

22    Q    Agent Woodward, take a look at the document I've given

23    you.

24    A    Yes.

25    Q    What is that that you have?

```
 1   A     This is a copy of the notes I took that night as I
 2   entered all the information from the book or telephone.
 3   Q     When was it you were examining the defendant's cellular
 4   phone in relationship to his arrest on the 6th of October?
 5   A     A couple hours after he was arrested.
 6   Q     And where were you when you were doing that?
 7   A     In our office at the airport.
 8   Q     Sitting at a desk doing this, I take it?
 9   A     Yes.
10   Q     Turn that back over.
11   A     (Complying).
12              MR. MUEHLECK:  May I, Your Honor?
13              THE COURT:  You may.
14   BY MR. MUEHLECK:
15   Q     Agent Woodward, can you see that, what I'm holding?
16   A     Yes, I can.
17   Q     This number (818) 530-2456, do you know if you saw that
18   number when you reviewed the defendant's phone book on October
19   6?
20   A     I can't recall without looking at my notes.
21   Q     Take a look at your notes, see if that would refresh your
22   memory.
23   A     There is that number in there without the prefix or the
24   area code, I mean.
25   Q     Which number is in there?
```

1    A    530-2456.

2    Q    Without the area code that I've covered up?

3    A    Yes.

4    Q    And --

5    A    Oh, oh, sorry, no.  It's even a different spelling of the

6    word.  The number is there but the name is different.

7    Q    How is the name spelled?

8    A    C-R-A-P-S-E-M.

9    Q    Slowly please for me.  C-R --

10   A    A-P-S-E-M.

11   Q    C-R-A-S?

12   A    C-R-A-P-S-E-M.

13   Q    I'm sorry.  Once more for the dummy.

14   A    C-R-A-P-S-E-M.

15   Q    C-R-A-P-S-E-M?

16   A    Yes.

17   Q    And that appears where in your notes in relationship to

18   the 530-2456?

19   A    Right in front of it.

20   Q    Were those two notations together?

21   A    Yes.

22        MR. MUEHLECK:  If I might, Your Honor, hold it up.

23        THE COURT:  You may.

24        MR. MUEHLECK:  (Complying.)

25   BY MR. MUEHLECK:

```
 1   Q    Agent Woodward, did you go back and look at the phone
 2   since the October 6 of 2002?
 3   A    Yes, I did.
 4   Q    When did you go back and look at Mr. Vo's phone?
 5   A    Yesterday.
 6   Q    And what were you looking for?
 7   A    To see if there was an area code attached to it.
 8   Q    Attached to what?
 9   A    To that phone number 530-25 -- 2456.
10   Q    And how -- the stuff -- were you able to find something
11   or look for something; is there still data on that phone?
12   A    Yes, we had to put a new battery in it, but all the
13   information is still there.
14   Q    And did you find an area code for the number 530-2456?
15   A    Yes, I did.
16   Q    What area code did you find?
17   A    818.
18             MR. MUEHLECK:  Moment please, Your Honor.
19             Pass the witness.
20             THE COURT:  Mr. Weight?
21             MR. WEIGHT:  No questions.
22             THE COURT:  Thank you.  You're excused.
23                                        (Witness excused)
24             MR. MUEHLECK:  Could we see the court, please?
25             THE COURT:  Pardon me?
```

1          MR. MUEHLECK:  Could we see the court, please?

2          THE COURT:  You mean a sidebar?

3          MR. MUEHLECK:  Yes, please.

4               (Bench conference on the record:)

5          MR. MUEHLECK:  Run out of witnesses, Your Honor.

6   I've got pretty much Giglio and that's about it.  I've got

7   a --

8          THE COURT:  You know, you haven't given me the report

9   that you gave to Mr. Weight.

10         THE CLERK:  He gave it to you.

11         THE COURT:  Just gave me -- you gave two letters.

12         MR. MUEHLECK:  I had sent --

13         THE COURT:  It was a letter, two copies.

14         MR. WEIGHT:  Mm-hmm.

15         MR. MUEHLECK:  I didn't give Mr. Weight a report.  I

16  never gave Mr. Weight the DEA report.  I thought that was

17  clear.  I'm sorry, Your Honor.

18         THE COURT:  Mr. Weight seemed to have a lot of

19  information --

20         MR. MUEHLECK:  Yes, I took it off the DEA report.  I

21  went off -- I read --

22         THE COURT:  He questioned Mrs. Vo on a number of

23  matters that were not on what you gave him, such as $25,000

24  for a kilogram, San Francisco, a source -- source having been

25  killed.

1          MR. MUEHLECK:  That's in the tapes, some -- source

2     being killed is in the cassette tapes.  I offered them to Your

3     Honor's clerk to see if you wanted them.  I gave Mr. Weight

4     the cassette recordings, the telephone recordings that he had,

5     the second guy.  I have those available if the court wants to

6     hear them.

7          THE COURT:  I mean I don't -- spinning wheels.  I

8     don't know what he's gotten and what he hasn't gotten.

9          MR. MUEHLECK:  Well, I gave Mr. Weight --

10         THE COURT:  Just seems like practically everything --

11         MR. MUEHLECK:  That's in the report by letter.

12         THE COURT:  -- he's already asked.

13         MR. MUEHLECK:  Yes.

14         THE COURT:  Not in your letter but he's already asked

15    Mrs. Vo.

16         MR. WEIGHT:  Well, I don't know that, Your Honor,

17    because I haven't seen what the report says.  There may be a

18    veritable gold mine there --

19         THE COURT:  I don't think so.  Anyway, you -- you've

20    run out of witnesses?

21         MR. MUEHLECK:  Yes, sir.

22         THE COURT:  You have any -- your --

23         MR. MUEHLECK:  I've got -- this is what's coming,

24    Judge.  I have -- this is what's coming next week:  I have in

25    the mail, they've promised me, some business records through

```
 1    affidavit.  We're going to offer them that way.  I think
 2    that's Nextel.  And I have Fed Ex, I'm trying to get a local
 3    witness for that.  And I think that's it, Judge.  The rest of
 4    the issue is the Giglio -- the 404(b) issue, I think.  I think
 5    that's it, Judge.  I think -- I believe that's all we have
 6    left.
 7            THE COURT:  How long do you think your case is going
 8    to be, Mr. Weight?
 9            MR. WEIGHT:  Half a day at the most.
10            MR. MUEHLECK:  We're ahead of schedule.  We're way
11    ahead of schedule.
12            THE COURT:  I'll let the jury go.  You want to
13    discuss a few things?
14            MR. MUEHLECK:  Yes, sir.
15                 (End of bench conference.)
16            THE COURT:  We're going to have to let you go early
17    today.  So you may leave.  Please be back at 9 o'clock on
18    Tuesday.  Have a nice weekend.
19            (At 2:05 p.m., the jury was excused and the following
20    proceedings were held:)
21            THE COURT:  This is what you gave Mr. Weight, a
22    letter dated May 6, 2003 with -- well, and also a letter dated
23    May 7, 2003, and then two attachments, one referring to August
24    13th, '91, and the other referring to --
25            MR. MUEHLECK:  November, Your Honor?  I have to get
```

1    my copy, Your Honor.

2            MR. WEIGHT:  Excuse me, Your Honor.  What were those

3    dates, the letters that -- letters to me that you were given?

4            THE COURT:  May 6 and May 7.

5            MR. MUEHLECK:  And April 28th.

6            MR. WEIGHT:  There's one on May 13th, which was a

7    couple days ago.

8            THE COURT:  I don't think I have that.  I have a lot

9    of various reports.

10           MR. MUEHLECK:  (Handing document).  That's the bulk

11   of it, Your Honor.

12           THE COURT:  The bulk or all?

13           MR. MUEHLECK:  That's the bulk of the DEA reports

14   concerning Brenda Cooper's sale in August --

15           THE COURT:  Oh, this is -- this is -- this is what

16   Mr. Weight was reading from in cross-examining Mrs. Vo.

17           MR. MUEHLECK:  I thought so.

18           THE COURT:  This is what I was looking for.  I didn't

19   receive that.

20           MR. MUEHLECK:  I'm sorry, Your Honor.  You didn't --

21   I thought you got that.  I made a copy.  I'm sorry.  My

22   mistake.  I know we -- we also talked to -- your law clerk and

23   I about giving you the -- there are four cassette tapes of

24   like six, seven calls, taped telephone calls, between Agent

25   Follis and Ms. Vo, which I provided to Mr. Weight.  And the

1    law clerk advised he didn't think you wanted to listen to

2    calls over the noon hour.  But they're still available.

3              THE COURT:  Well, I think rather than listening to

4    the calls, if I find anything in the DEA files that you gave

5    me that are not included in these letters to Mr. Weight, then

6    I'll let you know on -- on Monday.

7              MR. MUEHLECK:  Yes, sir.

8              THE COURT:  And let Mr. Weight know on Monday.

9              MR. MUEHLECK:  I -- yeah, right.  I also gave him the

10   lab reports of the two compounds sold by Ms. Vo to the agents.

11   Two separate laboratory reports, Your Honor.

12             THE COURT:  Looks like we will -- we will finish

13   testimony evidence on Tuesday.  So we need to finalize the

14   jury -- I haven't seen the verdict yet.

15             MR. MUEHLECK:  I haven't started on it, Your Honor.

16   We'll do that.  We'll get that.

17             THE COURT:  Okay.  I think we better meet at, say,

18   2 o'clock on Monday.  You both available then?

19             MR. MUEHLECK:  I don't have my calendar.  I know I've

20   got something that afternoon, Judge, with the court -- with

21   the District Court.  I'm not -- I suppose I can get somebody

22   to handle that.

23             MR. WEIGHT:  I have a sentencing that afternoon, I

24   believe, at 2:00 or 2:30, Your Honor.

25             MR. MUEHLECK:  I have a change of plea, I know,

1    before Judge Mollway I'm saying -- I think 2:30.

2              MR. WEIGHT:  I think it's Judge Mollway.

3              THE CLERK:  Hold on.

4              MR. WEIGHT:  Case name is Hacker.

5              THE CLERK:  Wait just a second.

6              MR. MUEHLECK:  Mine is Yun.  May we approach?

7              THE COURT:  You may.

8              MR. MUEHLECK:  Thank you.  Y-U-N.

9              THE CLERK:  2:15, that's yours.

10             MR. MUEHLECK:  Okay.

11             MR. WEIGHT:  Judge Mollway.

12             THE CLERK:  1:30?  Hold on.  Nothing.  You don't have

13   anything with Mollway on Monday.

14             MR. MUEHLECK:  I have something else.

15             THE CLERK:  How about Judge Gillmor?

16             MR. WEIGHT:  Could be Gillmor.

17             MR. MUEHLECK:  I think I had something else.  I took

18   something off.  It may be just before the magistrate.  That's

19   not a problem.

20             MR. WEIGHT:  Doesn't appear on the calendar.  That's

21   good enough for me.

22             MR. MUEHLECK:  I can get somebody else to do that

23   change of plea, Judge.  2 o'clock is the only break you have,

24   that's fine.

25             MR. WEIGHT:  Can I use your phone?

1           THE CLERK:  Yeah, go ahead.

2           He's going to call his office, Your Honor.

3           THE COURT:  Okay.

4                 (Pause in the proceedings.)

5           MR. WEIGHT:  That's fine.  If it's not on the

6   court's calendar, good enough for me.  I'm good then for the

7   afternoon on Monday.  Court's convenience.

8           THE COURT:  Okay.  So you both are free in the

9   afternoon?

10          MR. MUEHLECK:  Yes, sir, we can be.

11          MR. WEIGHT:  We will be available.

12          THE COURT:  Okay.  2 o'clock on Monday.  And as I

13  understand it, the matters that I still have to rule on are,

14  as far as the 404(b), a prior conviction, and the cash in the

15  protein boxes, and the financing of the house, and also on

16  Giglio.  And we also have to finalize the jury instructions

17  and approve the verdict form.  Does that cover everything?

18          MR. WEIGHT:  I think so, Your Honor.

19          MR. MUEHLECK:  I believe so, Your Honor.

20          Did the court want the -- Ms. Vo here for that?

21          THE COURT:  On Monday?

22          MR. MUEHLECK:  (Nods head up and down).

23          THE COURT:  I don't --

24          MR. MUEHLECK:  I've made the proffer, as best I know

25  it, Judge.

```
 1                THE COURT:  You -- you made your proffer --

 2                MR. MUEHLECK:  Yes, sir.

 3                THE COURT:  -- for whatever it was worth.

 4                MR. MUEHLECK:  Judge, we take our witnesses as we

 5     find them.  That's what I understand.

 6                THE COURT:  If -- if you want her here, you can bring

 7     her, but --

 8                MR. MUEHLECK:  No.  No, I --

 9                MR. WEIGHT:  You want the defendant --

10                THE COURT:  That's your proffer.

11                MR. MUEHLECK:  No, I don't have anything more on

12     that, Judge.  I was asking maybe if the court wanted her.

13     That's fine.

14                MR. WEIGHT:  Would you like Rick here on Monday

15     afternoon then, Your Honor?

16                THE COURT:  I think he should be here, yes.

17                MR. WEIGHT:  Very well, Your Honor.

18                THE COURT:  Have a nice weekend.

19                MR. MUEHLECK:  Thank you, Your Honor.  You too.

20                (The proceedings recessed at 2:17 p.m., May 16,

21     2003.)

22

23

24

25
```

1                    COURT REPORTER'S CERTIFICATE

2          I, CYNTHIA TANDO FAZIO, Official Court Reporter,

3    United States District Court, District of Hawaii, Honolulu,

4    Hawaii, do hereby certify that the foregoing pages numbered 1

5    through 162 is a correct transcript of the proceedings had in

6    connection with the above-entitled matter.

7

8          DATED at Honolulu, Hawaii, February 3, 2004.

9

10

11              CYNTHIA TANDO FAZIO, RMR, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25